# Exhibit 3

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


IN RE:  COLUMBIA UNIVERSITY        )  CA 04-01592
                                   )  Boston, MA
PATENT LITIGATION                  )  September 9, 2004
                                   )


BEFORE THE HONORABLE MARK L. WOLF
UNITED STATES DISTRICT JUDGE
TELEPHONE CONFERENCE


APPEARANCES:


(As previously noted.)


JUDITH A. TWOMEY, RPR
Official Court Reporter
One Courthouse Way
Courtroom 10~Room 5200
Boston, MA 02210
(617)946-2577

1          THE COURT:  Good morning.  This is Judge Wolf.

2     I have the stenographer and members of my staff here.

3          Could we start with the plaintiffs and have you

4     each identify yourselves for the record.  In addition, it

5     will be necessary for you to identify yourself before you

6     speak.

7          MR. WARE:  This is Donald Ware on behalf of

8     Biogen, Idec, and Genzyme.

9          MS. LAPORTE:  Claire Laporte, also on behalf of

10    Biogen, Idec, and Genzyme.

11         MR. PALS:  Mark Pals on behalf of Abbott

12    Bioresearch Center.  And with me is Marcus Sernel, also

13    for Abbott Bioresearch Center.

14         MS. PRUETZ:  Adrien Pruetz on behalf of

15    Genentech.

16         MR. STONE:  And Robert Stone on behalf of

17    Genentech.

18         MR. HASSON:  Good morning, your Honor.  Kirke

19    Hasson on behalf of Amgen and Immunex.

20         MS. HERLIHY:  Eileen Herlihy on behalf of Amgen

21    and Immunex.

22         MS. BEN-AMI:  Leora Ben-Ami for Wyeth and

23    Genetics Institute.

24         MR. ZALESIN:  And this is Steven Zalesin and

25    also Melissa Mandrgoc on behalf of Johnson & Johnson.

3

```
 1              THE COURT:  Is that all the plaintiffs?  I think
 2    so.
 3              And for Columbia?
 4              MR. GINDLER:  This is David Gindler for Columbia
 5    University.
 6              MS. TESSAR:  And Amanda Tessar, also for
 7    Columbia.
 8              MR. MCCONCHIE:  And Scott McConchie, also for
 9    Columbia.
10              THE COURT:  Mr. Maffei is not available?
11              MR. MCCONCHIE:  He's not available.
12              THE COURT:  All right.  This conference call was
13    scheduled by my September 3 order following the filing on
14    Thursday, September 2, of Columbia's motion to dismiss
15    based on the covenant not to sue.
16              Mr. Gindler, the motion has what purports to be
17    a certificate of consultation, but it doesn't meet the
18    requirements of our Local Rule 7.1A2.  The rule requires
19    that no motion shall be filed unless counsel certify that
20    they've conferred and have attempted in good faith to
21    resolve or narrow the issue.
22              The certificate is clear, and the e-mail that
23    has been sent to me confirms it, that on September 1, I
24    guess it was, a week ago Wednesday, you sent an e-mail to
25    the plaintiffs and asked them to let you know by the next
```

4

1    day at one o'clock whether their clients would agree to

2    the dismissal based on the covenant not to sue of this

3    case involving hundreds of millions of dollars.  That's

4    not a good faith conference, and it's a particular

5    problem, although it would have been inadequate under any

6    circumstances, when we're talking about the Thursday

7    before Labor Day weekend when it's foreseeable that

8    lawyers and their clients are not going to be immediately

9    accessible or at least some of them.

10          I and many of my colleagues reject motions on

11   that basis alone, and I think the problem in this case is

12   particularly acute because, if you had had the kind of

13   serious conference and consultation contemplated by the

14   rule, perhaps much of this or all of this frenzied

15   activity could have been avoided.  You feel you have a

16   strong case for dismissal, and the plaintiffs haven't

17   really had a chance to or didn't have a chance before the

18   motion was filed to focus on it and see whether the

19   issues could be narrowed or resolved.

20          Mr. McConchie, you vouched for the fact that Mr.

21   Gindler and his colleagues were familiar with the Local

22   Rules.  They were familiar enough to put on a

23   certification, but not familiar enough to obey them.  And

24   I think it has substantive implications, potentially,

25   here.  Because now at a time that the parties were to be

5

1    and are, I'm sure, very busy preparing for the motions

2    for summary judgment on double patenting -- and I've got

3    other things to do too -- we may be having controversies

4    over things that would be resolved if there were proper

5    consultation.

6              And one of the things I'm contemplating, but

7    we'll get to it, is building in a period in this schedule

8    for that consultation, because it seems to me that it

9    really might not be futile.

10             At the moment, I'm not talking about sanctions,

11   and I'm not talking about revoking Mr. Gindler's right to

12   practice here although, if there's a recurrence of this

13   attributable to Columbia, I'm sure I'll seriously

14   consider both.  But I'm really concerned about the

15   substance of this.

16             Let me see -- I've read the papers and some of

17   the cases.  And the schedule, including whether I ought

18   to build in a time for consultation, which would give the

19   plaintiffs beyond the 16th to respond, is appropriate.

20             I want to see if you and I have a common sense

21   of the meaning of the covenant not to sue on the '275

22   patent as presently issued.

23             Mr. Gindler, does this mean that Columbia has

24   given up its right to seek damages or other remedies up

25   to the date of any reissuance, even if some of the

6

1    original claims of the '275 patent are reissued in the

2    original form?

3         MR. GINDLER:  I think so, but let me be as clear

4    as possible.  We are giving up our right to go after the

5    plaintiffs for infringement or for royalties based upon

6    any product that they make now or made in the past,

7    whether those products were sold today or tomorrow, on

8    the '275 patent.  It does not cover the reissue except

9    for any claims in the reissue which are the same as or

10   substantively identical to the claims that are in the

11   '275 patent today.

12        THE COURT:  Okay, and that's responsive to my

13   question, because I did look at your Spectronics case,

14   and I got the impression, possibly the misimpression,

15   that in the absence of that representation you might have

16   a right to sue on claims in any reissuance that -- well,

17   sue for conduct prior to the reissuance based on any

18   claims in the reissuance that were the same as the

19   original claims.

20        MR. GINDLER:  That right has been given up.

21        THE COURT:  And, in that sense, you say, this is

22   like Spectronics?

23        MR. GINDLER:  It's like Spectronics and it's

24   like Amana.

25        THE COURT:  Okay.  If we get to briefing and the

7

1   plaintiffs disagree, you can tell me, but -- and it may

2   be that some of this clarification should be memorialized

3   in writing in addition to being in the transcript, but we

4   can get to that.

5       Then there's a statement in the September 3

6   letter, which it will take me just a second to pull out,

7   that Mr. Gindler wrote to me in response to Mr. Ware's

8   September 2 letter, which I didn't have when I issued my

9   September 3 order.  It was electronically filed in the

10  evening, but I wasn't aware that it was here, Mr. Ware.

11  But the last paragraph on the first page says in part:

12  Columbia's covenant not to sue expressly states that

13  Columbia will not assert the '275 patent as it presently

14  reads against any plaintiff as a basis to recover

15  royalties with respect to covered products under

16  plaintiffs' license agreement with Columbia.  This means

17  that Columbia's notice of termination of plaintiffs'

18  license agreements are ineffective insofar as they were

19  based upon the failure to report and pay royalties on

20  products covered by the '275 patent.

21      Does this mean that Biogen and the other

22  plaintiffs now have their licenses back, in effect, from

23  Columbia's perspective and, among other things, as long

24  as they pay whatever they were required to pay to

25  maintain the license, they have a right to future patents

8

1    covered by the license?

2          MR. GINDLER:  It may not mean that for all the

3    licensees.  I don't have the termination letters before

4    me, but I do recall that for at least some of the

5    licensees there were additional grounds for the

6    termination, and one additional ground that I can think

7    of is the failure to permit Columbia to conduct an audit

8    under the provisions of the licensing agreement.  So it

9    may not be the case that everyone gets their license

10   back, but I can say what I think is very clear in the

11   letter, which is that any failure to pay royalties under

12   the '275 patent, as set forth in our covenant not to sue,

13   that's not a basis for termination anymore.  That is

14   withdrawn.

15         THE COURT:  And so does that mean -- was the

16   sole reason for terminating Biogen, which is the one I

17   have most clearly in mind, the failure to pay royalties

18   in connection with the '275?

19         MR. GINDLER:  I would say it was probably the

20   biggest reason.  I don't have the Biogen termination

21   letter in front of me.

22         THE COURT:  Mr. Ware, do you know?

23         MR. WARE:  I also don't have it in front of me,

24   but I believe that the notice referred to more than

25   merely nonpayment of royalties under the '275 patent.  We

9

1    raised this in our conference call with Mr. Gindler on

2    Tuesday and, similarly, were not told one way or the

3    other what Columbia's position was as to whether there

4    was a license in effect.

5         THE COURT:  Well, that anticipated my next

6    question.  These are the type of things when, you know,

7    you're conferring, to narrow or eliminate disputes, you

8    ought to be focusing on, because if Biogen has its

9    license back, if it's Columbia's position -- and it has

10   to be clarified that it's not terminated -- under that

11   Gen-Probe case that I discussed at 29 to 30 of

12   preliminary injunction decision on August 13, maybe that

13   contributes to eliminating a case in controversy too.

14   Or, conversely, and this is really a rhetorical -- this

15   is really not a rhetorical question -- if they have lost

16   their licenses, does that distinguish this from that

17   Supersack line of cases?

18        MR. GINDLER:  Your Honor, it might create a

19   controversy between the parties as to whether or not

20   their license is in effect, but it would not be in a

21   controversy at all about the '275 patent because it would

22   simply be a controversy, for example, with Biogen as to

23   whether or not we had the right to terminate or, later,

24   to permit an audit.  That's not a question about the '275

25   patent.

1            THE COURT:  Well, but I haven't gone back to the

2      pleadings today.  The question before me is not -- you

3      know, it's in part whether there's any case or

4      controversy at all.  If I'm going to dismiss -- well,

5      these are the type of issues.  But, I mean, as a

6      practical matter, if you're going to talk about

7      settlement, which Columbia tells me as recently as the

8      joint report yesterday it's willing to do, or if you're

9      going to talk about narrowing the issues, I think

10     Columbia has to be clear on whether Biogen has a license

11     today or not.

12            MR. GINDLER:  This is David Gindler.  I'm happy

13     to communicate that position to Biogen sometime later

14     today.  I will go back and look at their (sic) letter.

15            THE COURT:  But with regard to all of the

16     plaintiffs.

17            MR. GINDLER:  I'm happy to do that for all of

18     the plaintiffs.

19            THE COURT:  All right.  Because it's -- and if

20     it takes you longer than today, take your time.  I mean,

21     you're not going to take forever, I know.

22            MR. GINDLER:  I don't think it will take longer

23     than today or tomorrow.

24            THE COURT:  All right.  Because that -- I was

25     wondering about the language insofar as they were based

1     on the failure to report and pay royalties.  I didn't

2     know whether that meant they might be terminated for

3     another reason and, if they're terminated for another

4     reason, whether that has any implications for whether I

5     have Article III power to hear this case and, to the

6     extent they're only declaratory judgment cases, I should

7     exercise my equitable discretion, because -- I think this

8     may be in Columbia's memo.  I keep using Biogen as kind

9     of the paradigm because I had the preliminary injunction

10    motion.  But Biogen has a claim for declaratory relief,

11    right?

12            MR. WARE:  Yes, your Honor.  This is Donald

13    Ware.  But there is more than a claim for declaratory

14    judgment.

15            THE COURT:  That's what I was going to get to.

16    Are you seeking more than attorneys' fees in declaratory

17    relief?

18            MR. WARE:  Well, there is a contract claim and,

19    of course, when we pleaded the contract claim, we pleaded

20    it more than a year ago, so the events of the last six

21    months had not occurred, and a lot has occurred since

22    then, which will lead us to supplement our pleadings to

23    cite those events.  So, in our view, there is a breach of

24    contract claim that implicates the actions of Columbia

25    over the last six months, including the attempt to

1    enforce the '275 patent and the termination letter and

2    the attempt to extract royalties and, indeed, the

3    successful extraction of royalties from some of the

4    companies.  So it's a complex factual situation that is

5    quite different from the cases, I think, that have been

6    cited to the court by Columbia.

7            THE COURT:  And is that why you said in your

8    letter, Mr. Ware, that Biogen has wrongful termination

9    claims too, but they're not asserted yet?

10           MR. WARE:  Yes, because, of course, we haven't

11   had the opportunity to do so.  That's by way of

12   supplementing.  But I would say that we also, at least

13   thus far, as we have looked at the cases, we also think

14   that there will be issues we presented to the court that

15   do concern the -- or that will demonstrate to the court

16   that the court continues to have jurisdiction over even a

17   straight-forward declaratory judgment claim, because

18   there's some issues as to the scope of this covenant.

19           THE COURT:  You see, that's what I think you

20   really need to confer about.  I've asked you probably the

21   questions on the scope of the covenant.  But what are the

22   other questions you have on the scope of the covenant?

23           MR. WARE:  Well, we did have a conference with

24   Mr. Gindler on Tuesday, and so we only just began to

25   learn some of the issues about the scope of the covenant.

13

1    But the covenant, I think you can see, is limited in

2    terms of -- it's directed to certain products or products

3    that were or, arguably, infringe prior to a certain date.

4    And just to call the court's attention to the Ultratech

5    decision that you brought to our attention, there

6    certainly are many issues about other activities the

7    parties have undertaken.  Virtually, I think, all of

8    these other companies have other products under

9    development that were not clear as to whether they're

10   within this covenant or not, but they may not be.  And,

11   so, as the Altertec decision pointed out, there are

12   issues about whether concrete steps have been taken that

13   would be outside of the scope of the covenant.  And

14   that's the sort of thing that we need to be able to

15   present to the court in briefing and, indeed, it's one of

16   the reasons why the proposed briefing schedule of

17   Columbia is too short, because it requires considerable

18   consultation with our clients to pull together the facts

19   that are relevant to each of these different  --

20           THE COURT:  But even before you consult your

21   clients or even in connection with consulting your

22   clients, maybe after, don't you have to confer with Mr.

23   Gindler and clarify the scope of the covenant?  I gather

24   that they -- that Columbia tried to, you know, draft a

25   covenant not to sue that's, you know, broad enough to

14

 1    cover everything, you know, including -- well, I don't

 2    know, including what you're developing.  But whatever the

 3    cases have said -- and I'll have to go back and look at

 4    what I wrote, among other things -- you know, is

 5    sufficient to extinguish an Article III case or

 6    controversy.

 7          MR. WARE:  Your Honor, again, this is Donald

 8    Ware.  And, certainly, a consultation conference with

 9    Columbia on some of these points can be very helpful.  We

10    did have a conference pursuant to your Honor's order on

11    Tuesday afternoon.  So we did receive some clarification,

12    although some of even that is confusing to us.  We're not

13    sure if it's consistent with what was written, and we

14    don't have any written confirmation of any of it.  I

15    think as we all come to understand through conferring

16    with our own clients as to what their peculiar factual

17    circumstances are, that that is likely to lead to the

18    desirability of further conference with Columbia to seek

19    further clarification.

20          THE COURT:  Well, this is what I had in mind,

21    because you think there's some question, if not

22    ambiguity, about the scope, and I notice that in my SVG

23    decision I call it, the Ultratech decision, on page 8, I

24    noted that patents infringement can result not only from

25    selling a patent infringement can result not only from

15

1    selling a patented invention, but also from making,

2    using, or offering to sell that invention.  See 35 USC,

3    section 271.

4            I mean, it sounds to me like, Mr. Ware, you're

5    saying -- well, your client is making something in

6    development or whatever.  But I haven't, although I can

7    pull it out, looked at the covenant not to sue.

8            But, Mr. Gindler, if they're making something

9    but not selling it now, is that also protected by the

10   covenant not to sue?

11           MR. GINDLER:  I believe that's what the covenant

12   says.  We tracked the language of the patent statute.

13           THE COURT:  Right.

14           MR. GINDLER:  If I could be very, very clear on

15   that point and, in fact, in the conference that we had on

16   Tuesday, the plaintiffs did ask me many questions about

17   the scope of the covenant.  I tried to answer all of

18   those as clearly as I could, and I'm happy to put all my

19   answers in writing if there's something that was unclear

20   to them in the call.  There was no question that I

21   declined to answer about the scope of the covenant.  I

22   tried to be as clear as I possibly could.

23           THE COURT:  It would actually be helpful to me,

24   if not to them, if you would do that.  They should tell

25   you, maybe when I get off the call, what they think their

1    questions are, or we can do some of them in the call.

2    Because when we come up to a hearing on this motion, if I

3    if I have to decide the motion, I don't want any facts to

4    be in dispute.  I don't want to have competing

5    contentions as to what the covenant means because,

6    although I may change my mind before we get off the call,

7    I think this is going to take longer to get to the

8    hearing than Mr. Gindler would like.  It's going to be my

9    intention to either decide the matter orally or, if I

10   can, very shortly after the hearing in writing.  And to

11   do that, it means that there should be a clear and common

12   sense, at least to the maximum extent possible, of what

13   the facts are.  And you'll be arguing, I'll be deciding

14   the implications of those facts.

15        And, in fact, you know, the more you reassure

16   them that they're fully protected except with regard to

17   new claims or amended claims that might emerge from a

18   reissuance, I think the better chance you have, Mr.

19   Gindler, of persuading them not to contest this or

20   persuading me, based on what I know so far, which is

21   tentative, that there's not an Article III case or

22   controversy.

23        MR. GINDLER:  Your Honor, this is David Gindler.

24   Concerning the covenant, we did take a very hard look at

25   the case law.  There obviously is a good body of Federal

1    Circuit case law on this.  And we tried to model the

2    covenant exactly on what courts have found to be

3    appropriate in the past so that we could look at our

4    covenant and look at the case law and say, well, gee,

5    that's pretty much like the covenant in Supersack, pretty

6    much like the covenant in Amana.  And we tried to be even

7    clearer than the covenants in those cases by always

8    tracking the language of the Patent Act, even though some

9    of the covenants in those cases didn't quite exactly do

10   this.  We tried to make this as clear as we could.

11        When we spoke with the plaintiffs' counsel on

12   Tuesday, we did try to engage them in a dialogue about

13   what concerns they had about, okay, we've now answered

14   your questions, can you tell us your views about whether

15   you think any of the claims that you've currently pled

16   are going to survive and tell us some of the reasons for

17   that?  All we got back from them was, well, we think some

18   of our claims survive, but really no substantive dialogue

19   on that point.

20        Mr. Ware said that there are contract claims in

21   their current complaint, and I'm not a hundred percent

22   sure of what he meant by that because there are four

23   counts in Biogen's complaint, all of which are

24   declaratory judgment counts.  One is for a declaration

25   under the license agreement that no royalties are owed

1    under the '275 patent because the patent is invalid.  The

2    second is the declaration for invalidity of the '275

3    patent.  The third is declaration for unenforceability of

4    the '275 patent for prosecution laches.  And the fourth

5    is a request for declaration of exceptional case.  That's

6    what we're moving to dismiss.

7          THE COURT:  Mr. Ware can clarify, but what I

8    thought the implication of his earlier remarks were -- I

9    thought the implication of his earlier remark was that

10   they filed the complaint before you terminated the

11   license and, therefore, like -- is it Genentech? -- they

12   want to amend their complaint to assert a wrongful

13   termination claim.

14         MR. GINDLER:  I did understand Mr. Ware to be

15   suggesting that he would do that.  But if they do that,

16   again, the '275 patent is not going to be a basis for

17   that.  I think we've made that very clear.

18         MR. WARE:  Your Honor, I'll just say that we

19   don't agree with that.  We think that there would be a

20   variety of causes of action that arise out of the

21   activities of Columbia over the last six months which

22   will put directly -- which do put directly into play

23   whether Columbia has engaged in activities to assert an

24   invalid patent against these companies.

25         THE COURT:  And once they've abandoned those,

1    what would you be seeking, damages?

2         MR. WARE:  Yes.

3         THE COURT:  And what would be -- what makes it

4    -- I'm not a patent lawyer -- what makes it unlawful to

5    assert what you claim is an unvalid patent?

6         MR. WARE:  I think that we would assert both

7    under the contract that it would be a breach of the

8    contract to demand payment of royalties on threat of

9    termination of a license that covers other intellectual

10   property by asserting an invalid patent.

11        In addition to that, under the federal law,

12   there is a doctrine of patent misuse that comes into

13   play.  Because what we have seen over the last six months

14   is a pattern of activity by Columbia in which an invalid

15   patent was asserted against the entire industry.

16   Royalties were extracted from many companies, including

17   one or more of the companies that are involved in this

18   litigation which, as far as I know, Columbia hasn't

19   offered to pay back.  And threats of termination and then

20   actual termination occurred.  Settlements were extracted,

21   including from one of our clients.

22        THE COURT:  Well, but if somebody has settled,

23   then they don't have -- I've dismissed their case,

24   haven't I?

25        MR. WARE:  No, I don't say that in the sense of

20

```
 1        saying that I'm attempting to resurrect their case.  I'm
 2        talking about a pattern of misuse of a patent to obtain
 3        financial gain that is -- was improper.  And, only now,
 4        after causing everyone to spend boat loads of money to
 5        try to preserve these licenses, Columbia has decided to
 6        change its mind about terminating licenses, evidently,
 7        although we're not even sure about that.  But there is
 8        some pretty clear law that supports the proposition that
 9        those fees that were incurred can be recovered as
10        damages, not merely as fees under these circumstances.
11             So those are the kinds of claims that we would
12        be supplementing our complaint to assert.
13             THE COURT:  Well, you'd have to move for leave
14        to amend it, and then I'd have to decide if that's
15        contested and, if it's contested, whether the interests
16        of justice make it appropriate.
17             MR. WARE:  Yes, I was only going to say it would
18        be -- I think there's a somewhat different standard for
19        supplementation as opposed to amending to bring to light
20        facts that occurred after the filing of the original
21        complaint.  But, in any event, yes, that is certainly
22        true.  The existing complaint, however, does have a count
23        in the complaint asking the court to determine that no
24        royalties would be owed on the '275 patent because that
25        patent is invalid.
```

1    THE COURT:  Well, I know, but that essentially

2  is moot.  If the covenant not to sue gives up any right

3  to sue on the present claims or to recover on the present

4  claims of the '275 patent, even if they emerge in their

5  original form in the reissuance, you've won that.  I

6  mean, I just have a question, the idea of whether you

7  have the license anymore, because I don't know whether

8  this license for a bundle of intellectual properties in

9  any way distinguishes this case from the other cases in a

10  way that would make a difference.  But that's why I think

11  it's important to know whether you've got a license.

12    MR. WARE:  Well, right, your Honor, and we still

13  don't know the answer to that.  I would point out that

14  none of the cases that Columbia has cited were cases that

15  involved licenses.  They were all declaratory judgment

16  actions by parties who had been, perhaps, threatened with

17  an infringement suit, but they weren't licensees.  So

18  there are different circumstances here.  And even if the

19  issue of a declaration as to whether royalties are owed

20  the license agreement on the '275 patent, that would not

21  remove the basis for a claim to damages for breach of

22  that contract which, in our view, puts the issue of the

23  validity of the '275 patent in play, in any case.

24    These are all matters that we hope to be able to

25  have an opportunity to brief.

1          THE COURT:  Well, if necessary, you will,

2     but  --

3          MR. GINDLER:  Your Honor, this is David Gindler.

4     I think some of the points that Mr. Ware has made really

5     are distinctions without a difference, things you pointed

6     out.  We tried to be as clear as possible under the

7     covenant that no royalties are owed for the '275 patent

8     under the license agreement.  You wanted that to be

9     clear, and so we made that statement (sic) in addition to

10    making the point about not suing for infringement of the

11    '275 patent (sic) with respect to products which were

12    made an hour before the date of the covenant.

13         Mr. Ware's recitation of the history, I just

14    don't think is right.  He said that we asserted this

15    patent against the entire biotech industry.  We didn't do

16    any such thing.  The only thing that we did, when the

17    patent issued, we sent a copy of it to all of our

18    licensees that there's a new patent that's covered by the

19    provision of the agreement.

20         THE COURT:  Well, it wasn't right after it

21    issued, was it?

22         MR. GINDLER:  Sorry?

23         THE COURT:  You didn't send it right after it

24    issued.

25         MR. GINDLER:  Yes, shortly after the patent

1    issued, we sent letters.

2           THE COURT:  I thought -- maybe I misremember.  I

3    thought it issued in September, and you didn't send the

4    letter to Biogen until after it wrote in and said, this

5    is our last payment.

6           MR. GINDLER:  No, I think we sent letters after

7    the patent issued to everybody who was a licensee and

8    told them areas of the patent (sic).  And we didn't sue,

9    start this fight.  Actually, Genentech did first.  They

10   sued us.  And then Amgen sued us.  And then Biogen and

11   Genzyme and Abbott sued us.  And then Baxter sued us.

12   And once every licensee with any material royalty

13   obligations had sued us, there were only two that were

14   left out, and we thought, well, if we're going to fight

15   it out with most everybody, we might as well fight with

16   everybody, and we brought in J & J and Soronto (sic), who

17   shortly after that sued us back.  So this is not a fight

18   that we started.

19          THE COURT:  Okay.  If the -- let's say the '275

20   claims are not -- I'm satisfied, as Mr. Gindler says I

21   should be, that there's no case or controversy regarding

22   the '275 claims.  Then, right now, there are claims

23   against Genentech and J & J that Mr. Gindler would like

24   me to try to have remanded.  What are those claims?  Mr.

25   Gindler?

1          MR. GINDLER:  I think the claim by Genentech is

2     a claim that the license agreement was improperly

3     terminated.  I believe that the basis for termination --

4     one of the bases for termination of the Genentech license

5     agreement was the failure to permit an audit.

6          The J & J claim deals with, I believe, a

7     provision which is unique for the J & J agreement, and I

8     think J & J are just concerned that we would be seeking

9     royalties for products made and sold after the expiration

10    date of the original (sic) patent based upon possibly

11    patents in foreign jurisdictions which are still in

12    existence.  And I can tell you as to the J & J provision,

13    we're not going to seek any such royalties.

14         THE COURT:  Exactly.  This is why I want you all

15    to talk because -- I'll get to it shortly.  I'm almost

16    done with my questions.  Yeah, if that were the only

17    issue that were left, you could settle that.  You just

18    said, in effect, you wouldn't seek anything.  And then

19    Columbia has counterclaims against Amgen and Immunex.

20    What are those counterclaims?

21         MS. TESSAR:  Those counterclaims relate to

22    breach of contract and declaratory judgment -- this is

23    Amanda Tessar -- partially for -- excuse me.  The claims

24    are permanent on Amgen and Immunex's breach of contract

25    and failing to pay royalties relating to, initially, both

25

1    the '275 patent and also some of the original patents.

2    So, to the extent that they relate to the '275 patent,

3    they're mooted by the covenant not to sue.

4         THE COURT:  All right.  I mean, you probably

5    wouldn't be -- I have this vague sense -- maybe it's not

6    so vague -- that, you know, if it were any non-'275

7    issues, you all wouldn't be litigating with each other.

8    And maybe this is impossible if you have time, but maybe

9    it's not.  In view of this covenant not to sue, I really

10   think there should be some very serious settlement

11   discussions.  My -- here's my impression of things, and

12   not just the legal merits.  I have been educated to

13   understand -- I hope not misunderstand -- you know, since

14   I started seeing you in May that the plaintiffs want as

15   much clarity as possible.  Uncertainty is undesirable.

16   And, in fact, I think I wrote about that in denying the

17   motion for a stay.  I understand.  But I'm an Article III

18   judge.  If there's no genuine case or controversy, I'm

19   not going to reach out to, you know, to perpetuate

20   litigation.

21        If the heart of this matter is the '275 and, at

22   the moment, the plaintiffs have no exposure under the

23   '275, including not losing their rights to whatever they

24   would get rights to under the license agreement, you

25   know, maybe there's no case.  If what the plaintiffs at

26

1    this point are really worried about is that the Patent

2    Office will, in their view, make a mistake and reissue

3    the '275 with similar double patenting problems maybe --

4    so the plaintiffs think they have a strong case.  You

5    think you're going to win and persuade me that there's

6    nonstatutory double patenting, and then you can take that

7    to the Patent Office, and it will help.  But, you know,

8    now the Patent Office knows about this litigation.

9    You've got your experts.  Why don't you just give all

10   that to the Patent Office and if, in your view, they do

11   the foolish thing and reissue the patent with some

12   amended or new claims and you think there's another

13   double patenting problem or that the reissued patent is

14   invalid for some purpose, you'll file new cases.  For

15   better or worse, if it happens within two years, at

16   least, they'll come back to me in Massachusetts under our

17   related case rule.  And if they're all over the country,

18   the multi-district panel will probably send them back to

19   me too.  But if the plaintiffs are right and the '275

20   shouldn't be reissued in any form, then there's no reason

21   for any more litigation.  And it seems to me that you

22   really ought to be having some serious discussions about

23   settlement.  To a certain extent, the plaintiffs have

24   brought this case because there was no reissue

25   application filed, as I recall, when the cases started.

1    What the plaintiffs wanted to do is not have to pay on

2    the '275 and not lose their licenses.  If Mr. Gindler

3    tells you you're not going to lose your licenses or you

4    haven't lost your licenses and you don't have to pay on

5    the '275, why shouldn't you, in essence, take yes for the

6    answer?  You haven't had much time to think about this

7    because it all just came up before Labor Day weekend.  If

8    you pause and look around, essentially, you may have

9    accomplished everything you could have reasonably hoped

10   to accomplish at the outset of litigation.  And then you

11   should settle the case.  And if something gets reissued,

12   cross that bridge when you come to it.  But I'm sure that

13   the PTO is going to pay careful attention to this,

14   knowing how much litigation the dispute has already

15   generated.

16          I mean, is there some reason why you can't -- is

17   there something flawed about that kind of common sense?

18   You won't hurt my feelings by saying yes.  I'm trying to

19   understand as a practical matter what's going on here.

20   Am I missing something really material there?

21          MR. WARE:  Your Honor, this is Donald Ware.

22   Your Honor certainly put your finger on one thing that is

23   important to everybody, and that is greater certainty.

24   There are continuing -- there continue to be many issues

25   that cause uncertainty to all of the plaintiffs.  They

28

1    include, for example, Mr. Gindler did make clear to us in

2    the conference on Tuesday that this covenant doesn't

3    cover any new products that come out, and these companies

4    are all constantly developing new products.  And so every

5    time we have to make decisions, business decisions about

6    potential new products and what direction to go with new

7    products, we are faced with uncertainty as to whether we

8    should make technical scientific decisions about how we

9    develop those products in ways that will avoid the '275

10   claims or not, because those products are not covered by

11   this covenant.  So that's an area of uncertainty.

12          Another thing we discussed with Mr. Gindler on

13   Tuesday was the pending '159 application, and we asked

14   could Columbia take an identical claim that is in the

15   '275 patent and put that in the '159 application and

16   assert that against the parties, or would that be covered

17   by the covenant?  And he said, no, that would not be

18   covered by the covenant; they are absolutely free to take

19   an absolutely identical claim out of the '275 patent and

20   put it in the '159 application.

21          We are in the meantime faced with -- well, we

22   don't know whether the contracts are in force or not.

23   But if they were in force, we're asked to pay non-trivial

24   maintenance fees in order to maintain rights pending

25   another pending patent application.  So there are a great

1    many uncertainties that continue to vex us in terms of

2    making both business and scientific decisions.

3         However, your Honor's point that perhaps these

4    matters too are matters that should be -- the parties

5    should be talking about -- is certainly a good one, and

6    perhaps Columbia is more prepared to give us greater

7    certainty than they have so far.  But we certainly do not

8    feel that we have any certainty at this point.

9         MR. GINDLER:  Your Honor, this is David Gindler.

10        THE COURT:  I just want to say one thing.  You

11   know, there may be some measure of uncertainty that you

12   would have to live with, you know, even if -- let's say

13   you win on the double patenting issue.  Does that

14   eliminate all of these questions?

15        MR. WARE:  We think it would eliminate all or

16   most of them.  We also have, of course, the prosecution

17   laches defense and, if we prevail on that, that decision

18   would apply to any other application as well.

19        MR. GINDLER:  Your Honor, this is David Gindler.

20        THE COURT:  Yes.  Mr. Gindler, try to speak a

21   little louder.  The telephone is breaking up a bit.

22        MR. GINDLER:  The issues that Mr. Ware has

23   raised have been addressed in the very cases cited in our

24   papers.  The issue of new products is governed by

25   Supersack, and it's governed by Amana.  That issue was

1    raised in those cases, and the court said, that does not

2    raise an actual existing controversy today.  There's also

3    Federal Circuit authority that there can be no case or

4    controversy if someone says they're concerned about a

5    patent application that's still in the Patent Office.

6    That's been addressed as well.  And the third issue that

7    Mr. Ware raised I was surprised he raised, which is the

8    payment of maintenance fees.  We had this motion that was

9    brought by Biogen and Genzyme to keep their license

10    agreement in place.  They said that they wanted to pay

11    the maintenance fees to keep it in place because they

12    wanted to maintain the rights to the '636 patent, the

13    other patent that is not part of the actual family that's

14    part of the license agreement.  Now I'm hearing him say

15    something different.

16          THE COURT:  But that's why -- I mean, if this

17    were just about the maintenance fees, my sense is you

18    would work it out, and --

19          MR. GINDLER:  They can pay them or not.  It's up

20    to them if they want the '636 or not.

21          THE COURT:  Well, or also to preserve their

22    options with regard to any reissued '275, I suppose.

23          MR. GINDLER:  That's exactly right.  That's

24    their call.

25          THE COURT:  Because, I mean, you saw what I did

1    in SVG and, on one hand, I understand, you know, why the

2    plaintiffs would like maximum certainty, no uncertainty,

3    ideally, but I follow the law, in any event.  I tend to

4    be a stickler on jurisdiction.  I always pay attention to

5    it, try to pay attention to it, even if the parties don't

6    raise it.  And it just seems to me that this case has

7    changed so much now that my inclination is the following.

8    I think that the representations that Mr. Gindler has

9    made about the scope of the covenant, what it covers and

10   what it doesn't, and the answers he'll give you soon on

11   whether you have licenses or you don't have licenses --

12   and I suppose if they don't have licenses, they're going

13   to argue more strenuously that they were wrongfully

14   terminated -- maybe they'll argue that anyway -- but my

15   inclination is to give you at least a week to really try

16   to narrow and settle some or all of these cases.  And

17   then -- I mean, you'd have more time if we weren't on

18   this fast track on the double patenting issue, which I'm

19   not inclined to alter, and then I'd get the plaintiffs'

20   response and the Columbia reply and, if necessary, I

21   would probably give you a hearing toward the beginning of

22   August -- October, excuse me -- with a view to deciding

23   the matter pretty quickly.  So, if there's no case, you

24   don't have to finish the summary judgment submissions,

25   but you will have to complete all the discovery, unless

1    you settle the case in the next week or so.  And I know

2    that's -- it just seems to me that that will, at a

3    minimum, lead to greater factual clarity so -- I know I'm

4    not trying to decide on a fluid record, actual record --

5    we'll know the scope of the covenants and whether people

6    have licenses or don't have licenses.  And then I'll

7    decide it.  It's all subject to an appeal.  If I dismiss

8    the case, the plaintiffs can appeal.  But I'm willing to

9    hear from you, but I don't know if it has any impact.

10   But you've got some Jewish holidays starting next week,

11   and I'm going to be in Seattle, Washington for a good

12   part of the week after that and have some other things

13   when I get back that can't be moved.  So the schedule I'm

14   talking about, in some respects, is not going to delay a

15   decision, because I'd have trouble getting you in for a

16   serious hearing before about October 5, in any event.

17   And I suppose if Columbia had -- and I'm willing to

18   listen to you on this, Mr. Gindler -- but if Columbia

19   filed this covenant back in June or earlier, we wouldn't

20   be under the time pressures we're under now.  But I do

21   know that counsel, the experts, and me have carved out

22   big pieces of time for the remainder of this year to deal

23   with this double patenting issue and I'll either dismiss

24   the case and get some time, or I'll adhere to that

25   schedule.  But my ability to devote that kind of time

1    further down the road is uncertain.  I've got other

2    demands in criminal cases, among other things.

3            MR. GINDLER:  Your Honor, this is David Gindler.

4    We understand the demands on the court's time.  Our hope

5    is to try to have this done as quickly as possible with

6    the court's own schedule and hoping to avoid any further

7    costs in the current double patenting schedule that the

8    court has laid out.  We gave the covenant as soon as

9    Columbia made the decision to go this route.  It was an

10   extremely difficult decision for the university to make.

11   It was largely driven by the university's desire not to

12   litigate '275 patent while the Patent Office is

13   determining what if any patent rights Columbia is

14   entitled to have in the first place.  A very hard

15   decision to make.  Many people were involved.  And

16   Columbia is giving up quite a lot to make this decision.

17           THE COURT:  And, in fact, you got -- I assume

18   that you and your client had material new information

19   after you had my decisions in the middle of August.  If I

20   had stayed this litigation --

21           MR. GINDLER:  We had a lot of new information

22   based upon the hearings we had, based upon your Honor's

23   rulings on the motion to stay, based upon expert reports.

24   All of these informed our decision.  But the primary

25   factor making our decision ultimately, looking back on

34

1    things, was the desire to not be litigating the validity

2    or stability of the '275 patent while the Patent Office

3    has decided to take a fresh look at the patent and decide

4    what patent protection Columbia is entitled to have.

5    That issue is informed, of course, by all of the things

6    that have transpired in this case.

7         THE COURT:  Mr. Ware, why don't you just take

8    your expert reports to the PTO.

9         MR. WARE:  Well, we are not a participant.  It's

10   Columbia.  It's an ex parte.

11        THE COURT:  I know.  I wrote about this in the

12   stay.  But it doesn't mean that -- you don't have the

13   same rights that you have in court, but it doesn't mean

14   you can't be heard at all.  And the concern is you want

15   more certainty.  But -- I mean, this may be as far as we

16   can go now.  But, Mr. Ware, you and your colleagues have

17   been reading the cases that you think are going to

18   distinguish this from the Supersack line.  We'll see.

19   But it just seems to me that this would be a very -- this

20   is a wonderful window of opportunity for everybody to

21   talk about settling the cases, because they are going to

22   be expensive.  If the plaintiffs don't win on double

23   patenting, this goes for a long time.  If the plaintiffs

24   do win on double patenting, there will be an appeal and a

25   period of uncertainty.  It's hard when you get a motion

1    and somebody asks for an immediate response to step back

2    and say, you know, can we settle all of this?  But I

3    think you ought to take at least a week to do that.  And

4    if you come back at the end of the week and ask for more

5    time, both of you, I'd give you that.

6            MR. WARE:  Your Honor, this is Donald Ware.

7    We'll certainly take that advice to heart.  In terms of

8    the schedule for the briefing, is it your Honor's

9    suggestion that we not set a date today?

10           THE COURT:  I'll give you some alternative

11   dates.  I think I should.  I'll give you some dates.  But

12   if you're in serious settlement discussions, which I

13   really think you should be, I'll relax some of the

14   briefing dates, if you ask me to, because you're going on

15   several tracks.  At the moment, I'm not relaxing the

16   dates for my June order to prepare -- to finish discovery

17   on the double patenting issues.  We can take that up when

18   I see you.  But I guess I'm going to order that you

19   report by 12 noon a week from today, the 17th, that you

20   confer with regard to both clarifying issues concerning

21   the scope of the covenant, and that should be in writing.

22   You should clarify whether the plaintiffs have licenses

23   or not.  And you should try to settle the cases and

24   report to me on where all that is by 12 noon on the 17th,

25   unless you went to the beginning of the next week.  And

1   then I thought I would have the plaintiffs respond to the

2   motion.  Somebody should keep working on it, since you

3   have so many lawyers on different tracks, if necessary,

4   by the 21st.  And I thought I would have Columbia respond

5   by maybe the 24th or, if they asked, maybe the 27th.

6   Then looking at my schedule, I'll give you a hearing on

7   the 5th at two o'clock.

8            MR. GINDLER:  Your Honor, this is David Gindler.

9   That's fine with us.  If we could have our reply until

10  the 27th.

11           THE COURT:  That's fine.

12           MR. GINDLER:  Thank you.

13           MS. BEN-AMI:  Your Honor, it's Leora Ben-Ami for

14  Wyeth who, once again, has a conflict with your schedule.

15  I have a Markman hearing on the 5th in Delaware.

16           THE COURT:  How about ten o'clock on the 6th?

17           MS. BEN-AMI:  That works for me.  Thank you,

18  your Honor.

19           THE COURT:  Is that all right for everybody

20  else?

21           MR. GINDLER:  Yes.

22           MR. WARE:  Yes, your Honor.

23           MR. ZALESIN:  Steven Zalesin for Johnson &

24  Johnson.  With respect to the date for reporting to the

25  court, in light of the Jewish holidays, I think it would

1    be preferable from our standpoint if it could be on

2    Monday, the 20th.

3              THE COURT:  Let's do that.  Let's make that the

4    20th, and my office will have to get this to me out in

5    Seattle where I'm going to be at a judges' meeting.

6              So Mr. Gindler will get it on the 20th, and then

7    you've got until the 27th.  Is that still enough time, or

8    do you want until the 28th, Mr. Gindler?  Because I've

9    got to work on this too.

10             MR. GINDLER:  If I understood the schedule, we

11   have to report to the court on the 20th.  Plaintiffs'

12   response, though, is due the next day, the 21st.

13             THE COURT:  Well, I was just going to move that

14   back.  I think I should move that back a little bit.

15             MR. GINDLER:  Okay.

16             THE COURT:  Let's see.  Just a second.  Why

17   don't I give them until the 22nd.

18             Is the 27th still okay for you?

19             MR. GINDLER:  If I could get until the 28th,

20   that would be great.  Is that possible?

21             THE COURT:  I'm just trying to make sure that I

22   leave my clerk and me enough time to get on this, in view

23   of everything else -- okay, the 28th.

24             MR. GINDLER:  Thank you very much, your Honor.

25             THE COURT:  And the other thing is I don't know

1    if you found this discussion helpful, but I certainly

2    did.  If you're talking settlement and think seeing me or

3    speaking to me this way might contribute in any way to

4    breaking some log jamb, let Mr. O'Leary, the deputy

5    clerk, know, because, you know, just having the slight

6    bit of distance from this that the lawyers working at

7    frantic pace may not have, you know, a lot of what this

8    case has been about seems to be over.  And maybe you can

9    get something mutually tolerable in settlement.  You

10   know, sometime settlements involve payment of money,

11   sometimes it doesn't.  But, you know, I keep using

12   Biogen, but Biogen is not being enjoined from making its

13   products or using its processes.  You think that the --

14   Biogen thinks that the '275 should not be reissued.  The

15   Patent Office certainly should know about the double

16   patenting problem.  And there are ways for Biogen to

17   communicate, if not fully participate.  And if you have a

18   license, you see what emerges.  You can do one of two

19   things.  You know, you can look at it and say, well, look

20   at that.  They sufficiently revised it that now it's

21   valid.  And you've got a right to it under terms that

22   Biogen negotiated many years ago.

23        Conversely, you know, if the Patent Office does

24   what Biogen thinks is the wrong thing and issues an

25   invalid patent, it's concrete.  You can attack it the way

39

```
 1    you attacked this one.  But, otherwise, you run the risk

 2    that -- you know what risks you run.  But one of the

 3    risks you run is that I dismiss the case if it's not

 4    distinguishable from the line of cases that Mr. Gindler

 5    is relying on.

 6         But if I could contribute through moderating

 7    discussions or anything else to settling the case, I'd be

 8    happy to try to do that, to devote time to doing that,

 9    because I really do think, particularly in the present

10    posture of the case, it would really be in everybody's

11    interest to settle.  And the world always has some

12    uncertainty.  Can't get rid of all of it, I don't think.

13    All right?

14         MR. WARE:  All right.  Thank you, your Honor.

15         THE COURT:  Thank you very much.  So long.

16

17

18

19

20

21

22

23

24

25
```

40

CERTIFICATE


        I, JUDITH A. TWOMEY, RPR, Official Court

Reporter for the United States District Court, District

of Massachusetts, do hereby certify that the foregoing

transcript, pages 1 through 39 inclusive, was taken by me

stenographically and thereafter by me reduced to

transcription and is a true record of the proceedings in

the above-entitled matter to the best of my ability.


                    JUDITH A. TWOMEY, RPR
                    Official Court Reporter