We let the science lead us.

Genentech 2003 Annual Report



## our mission

Our mission is to be the leading biotechnology company, using human genetic information to discover, develop, manufacture, and commercialize biotherapeutics that address significant unmet medical needs. We commit ourselves to high standards of integrity in contributing to the best interests of patients, the medical profession, our employees and our communities, and to seeking significant returns to our stockholders, based on the continual pursuit of scientific and operational excellence.

Cover photos (left to right): Jane, Rituxan® patient; South San Francisco packaging plant; scientist at work in a Genentech lab

# dear stockholders

2003 was an exciting year for Genentech, with significant accomplishments and important developments in all areas of our business.

In looking at the performance of the company over the last decade, it's clear that the successes of 2003 were the result of many years of effort and our long-standing commitment to several important research and development initiatives. Project timelines in biotechnology can span up to 15 years, so what we've seen in 2003 is a convergence of success for a few well-calculated long-term investments, as well as a continuation of our 28-year track record of transforming innovative science into breakthrough therapies for patients. And, while we continue to appreciate these recent milestones, we are also staying focused on the future to ensure we have a strong plan in place to take us through 2004 and beyond.

Important developments in our pipeline in 2003 included the approval and launch of two new products for immunological diseases, Xolair® (Omalizumab) for persistent asthma and RAPTIVA™ (efalizumab) for

chronic plaque psoriasis. In addition, after receiving positive results from the pivotal trial of Avastin™ (bevacizumab) in first-line metastatic colorectal cancer, we filed the Biologics License Application (BLA) and received priority review status from the U.S. Food and Drug Administration (FDA). In February 2004, we received FDA approval for Avastin for use in combination with intravenous 5-Fluorourcil-based chemotherapy as a treatment for patients with first-line — or previously untreated — metastatic cancer of the colon or rectum. Avastin is the first FDA-approved therapy designed to inhibit angiogenesis, the process by which new blood vessels develop, which is necessary to support tumor growth and metastasis. Finally, we filed a supplemental New Drug Application (sNDA) for the additional indication of Nutropin® [somatropin (rDNA origin) for injection]/Nutropin AQ® [somatropin (rDNA origin) injection] for the long-term treatment of idiopathic short stature.

With the approvals of Xolair, RAPTIVA and Avastin, we have exceeded the 5X5 goal of five new products or indications approved by 2005. Our development pipeline, with over 20 projects in various stages, is also well-positioned to exceed our 5X5 goal of leaving 2005 with five significant products in late-stage clinical development. In 2003, we and our collaborators began enrollment in multiple clinical



Arthur D. Levinson
Chairman and Chief Executive Officer

# letter to stockholders (cont'd)

trials, including Rituxan® (Rituximab) for rheumatoid arthritis, Lucentis™ (ranibizumab) for age-related macular degeneration, Avastin and Omnitarg™ (pertuzumab) in multiple tumor types, and RAPTIVA for psoriatic arthritis. We also entered more than 10 new projects into our development portfolio, including two new molecular entities: the fully humanized anti-CD20 antibody, which we will jointly develop with Biogen Idec Inc. and Roche, and PRO1762 (formerly Apo2L/TRAIL), which we will jointly develop with Immunex, a subsidiary of Amgen, Inc.

In 2003, we also delivered strong top-line and bottom-line growth, with revenue growth of 28 percent to more than $3 billion, non-GAAP[1] earnings per share (EPS) growth of 30 percent to $1.20, and non-GAAP[1] net income growth of 31 percent to $634.9 million compared to 2002. GAAP EPS for 2003 increased to $1.06 per share compared to 12 cents per share for 2002, and GAAP net income for 2003 increased to $562.5 million compared to $63.8 million for 2002. The average non-GAAP[1] EPS growth from 1999 through 2003 was 28 percent. The average GAAP EPS growth from 1999 through 2003 was 75 percent. Our financial position remains strong, with approximately $2.9 billion in unrestricted cash and marketable securities.

We remain confident that we will meet or exceed our 5X5 goal of an average annual non-GAAP[1] EPS growth of 25 percent (1999 through 2005). However, given the importance of Rituxan to the overall numbers and the associated profit split, as well as our need to continue to develop new innovative products for the pipeline, our financial productivity goal of 25 percent non-GAAP[1] net income as a percentage of operating revenues remains a significant challenge that will be difficult to meet. For 2004, we are currently expecting year-over-year non-GAAP[1] EPS growth consistent with our previously stated objective of no less than 20 percent annual non-GAAP[1] EPS growth.

Key commercial successes in 2003 include total product sales of $2.6 billion, a 21 percent increase over 2002. Our marketed products continue to drive performance, with every product reporting growth in 2003. Total oncology sales increased 24 percent over 2002 and now constitute 73 percent of total product sales. We rapidly launched Xolair in July 2003 and RAPTIVA in November 2003, and we ramped up to ship Avastin on the same day that we received FDA approval. We have developed the infrastructure necessary to support a major period of commercialization for the company.



Lajonna
Xolair® Patient

---

[1] Non-GAAP amounts exclude the recurring charges related to the Redemption, litigation-related special items, cumulative effects of accounting changes, and all related tax effects. See pages 10-11 for the reconciliation to our GAAP numbers.

# letter to stockholders (cont'd)

We also finalized several important business development agreements in 2003, including agreements with: Novartis Ophthalmics for ex-North American marketing of Lucentis for age-related macular degeneration; Biogen Idec for the development of one or more new humanized anti-CD20 antibodies for a broad range of diseases; Biogen (now Biogen Idec) for research and development of a BR3 modulator; Curis for a molecule in the hedgehog signaling pathway; and Lonza Group Ltd. for third-party manufacturing of Rituxan. Our 5X5 goal of $500 million in incremental revenue due to new alliances may be difficult to meet, but importantly, we have entered into more than 40 significant agreements and in-licensing deals since 1999 to add to our future growth prospects.

On the operations front, both our South San Francisco and Vacaville facilities have ramped up manufacturing efforts in order to meet the increased product demand given our successful year. As mentioned above, we entered into a long-term manufacturing agreement with Lonza Biologics, under which Lonza will manufacture commercial quantities of Rituxan at Lonza's production facility in Portsmouth, New Hampshire. Finally, we made progress on our facility in Porriño, Spain (Genentech España) and now expect to bring it online in 2004 to produce Avastin for clinical trials. Both projects are key to our short- and long-term strategy to maximize our manufacturing capacities and meet demand for our products.

In terms of our ongoing research projects, we continue our extensive work in oncology, including our Tumor Antigen Program and mechanism of action studies. Angiogenesis also remains an important and broad arena of study for us, not only in oncology but also in vascular biology. Immunology is a growing area of expertise and emphasis for Genentech, and we are exploring several promising areas of research, including TNF (tumor necrosis factor) super family members, autoimmunity, transplant issues and allergy/asthma. Finally, we are developing a strong focus on diagnostics for our novel, targeted treatments in order to increase development success rates in our clinical trials and deliver the right drugs to the right patients.

In 2003, we were involved in challenges over contracts and intellectual property. We were pleased that we were able to resolve or make substantial progress in resolving several major contract differences through confidential negotiations. We settled our patent litigation with Amgen, resulting in a one-time payment to Genentech, increasing GAAP earnings per diluted share for 2003 by approximately



Steven
RAPTIVA™ Patient

# letter to stockholders (cont'd)

$0.19. We also settled our litigation with Bayer for a one-time payment from that company. Finally, should we face future challenges over contracts and intellectual property, we believe that our strong intellectual property position will serve us well, as we have over 2,400 applications on full-length DNA sequences (or the protein encoded thereby or the antibody that binds to the protein or uses of the protein or antibody), and we currently hold more than 4,600 patents worldwide and have close to 5,000 patent applications pending.

I would like to highlight a few areas in the political/economic arena of interest to Genentech, including the recent Medicare legislation and generic biologics. The Medicare Prescription Drug, Improvement and Modernization Act was enacted into law in December 2003. While we support the intent of the law, we are concerned about the impact on patient treatment and care of provisions relating to the reform of Average Wholesale Price (AWP) as the basis of oncology reimbursement. We will follow the implementation of AWP reform to make certain that cancer patients continue to receive the best treatments possible for their disease. We currently anticipate limited impact on our business from the multiple changes associated with the Medicare legislation, although we are monitoring the situation closely.

Regarding the issue of generic biologics once patents expire, Genentech does not believe that the technology currently exists to prove a generic biotech product safe and effective outside the New Drug Application (NDA) and Biologics License Application (BLA) process. Potential patient risks could result from providing patients with proteins approved without the requirement that the manufacturer conduct safety and efficacy studies on the protein it makes but rather on the basis of an innovator's proof of safety and efficacy on the innovator's protein. Years of experience have taught us and others in the industry that differing cell lines and manufacturing processes mean different manufacturers will make different protein products. The process defines the product in biotechnology, and Genentech has spent decades optimizing the process to consistently deliver the most reliable product possible. We understand that the concept of generic biologics is of increasing interest, but the issues of safety and efficacy are real and need further exploration and understanding and to be appropriately addressed before moving forward. We are open to working with the FDA and the Congress on the many issues involved.

This past year, the company experienced its largest annual growth in employees in the company's history, recruiting and hiring more than 1,500 new employees.




Grace
Avastin™ Clinical Trial Patient

# letter to stockholders (cont'd)

The continued growth of the company depends on our ability to bring highly qualified and talented people into all areas of the company. It also depends on our ability to retain our world-class employees, and Genentech continues to receive external recognition as an employer of choice. *FORTUNE* ranked Genentech #15 on its list of the 100 Best Companies to Work for in America in early 2004. In 2003, *Science* magazine named Genentech "the top employer and most admired company in the biotechnology and pharmaceutical industries" for the second year in a row; *Essence* magazine recognized Genentech as one of 17 "Great Places to Work" for women of color; and *Health* magazine listed Genentech as one of the top 10 healthiest companies for women in the United States.

The transforming events of 2003 have positioned us for significant growth ahead, with the potential to launch multiple novel products or indications over the next several years. Translating science into successful product development takes significant effort and planning throughout all areas of the company and requires leveraging our people, science, commercial strengths, intellectual property and manufacturing capacity and expertise while balancing the risks that are inherent to our business. Fortunately, with our financial resources, we are able to invest both for near-term growth in our product launches and at the same time in our research and development programs to provide longer term growth prospects.

The energies of the management team at Genentech are directed towards the critical activities of the business at hand, as well as long-range planning for growth in the 2006 through 2010 time frame and beyond. We are focusing on the priorities that will allow us to meet our goals while delivering products that have the potential to change the practice of medicine and improve and extend patients' lives. We remain committed to our 5X5 goals, and we are also well-positioned to fulfill our non-GAAP[1] EPS growth trajectory of annual double-digit growth for 2006 through 2010. In closing, we continue to manage our business with the intent of delivering breakthrough therapies to patients while building sound and consistent growth and continuing to increase shareholder value.

Arthur D. Levinson, Ph.D.
Chairman and Chief Executive Officer
March 2004



Lucy
Herceptin® Patient

---

[1] Non-GAAP amounts exclude the recurring charges related to the Redemption, litigation-related special items, cumulative effects of accounting changes, and all related tax effects. See page 10 for the reconciliation to our GAAP numbers.

# 5X5 report card

Our 5X5 goals began in 1999 and continue in place through 2005. Our performance against these ambitious goals remains strong.

**1.** 25 percent average annual non-GAAP[1] EPS growth

The first goal is the most important of the 5X5 goals. We remain comfortable that we will meet or exceed this goal, given that our average annual non-GAAP[1] EPS growth for 1999 through 2003 has been 28 percent.

**2.** 25 percent non-GAAP[1] net income as a percentage of operating revenues

For 2003, our non-GAAP[1] net income as a percentage of operating revenues was 19.2 percent. Given the importance of Rituxan® (Rituximab) to the overall numbers and the associated profit split and our need to continue to develop new products for the pipeline, this financial productivity goal remains a significant challenge that will be difficult to meet.

**3.** 5 new products/indications approved

With the approvals of Xolair® (Omalizumab), RAPTIVA™ (efalizumab), and Avastin™ (bevacizumab), we have exceeded our 5X5 goal of five new products or indications approved by 2005.

**4.** 5 significant products in late-stage clinical trials

We are well-positioned to meet or exceed this goal; our development pipeline has over 20 projects, with several projects in early stage and a steady flow of projects advancing in the pipeline.

**5.** $500 million in new revenues from strategic alliances or acquisitions

This goal may be difficult to meet revenue-wise, but importantly, we have entered into more than 40 significant agreements and in-licensing arrangements since 1999 which augur well for future growth prospects.

The statements made on pages 1 to 6 of this annual report relating to the number of expected products in late-stage clinical development, time frame for multiple product launches, impact of Medicare legislation on our business, time frame for manufacturing Avastin at Porriño, and Genentech's expected growth, including non-GAAP earnings per share growth, are forward-looking and actual results could differ materially. Among other things, the number of products in late-stage clinical trials and the time frame for multiple product launches may be affected by safety or efficacy issues, the need for additional clinical studies and FDA actions, including the failure to receive FDA approval; the impact of the Medicare legislation on our business may result in decreased sales based on changes in physician prescribing conduct; the Porriño manufacturing time frame may be affected by technical, legal or regulatory challenges or compliance with local and national laws and regulations; and Genentech's growth, including growth in non-GAAP earnings per share, could be affected by all of the foregoing or by competition, pricing, the ability to supply product, product withdrawals, new product approvals and launches, achieving sales revenue consistent with internal forecasts, unanticipated expenses such as litigation or legal settlement expenses or equity securities write-downs, costs of sales, R&D expenses, fluctuations in contract revenues and royalties, or fluctuations in tax and interest rates. Genentech has no intention, and disclaims any obligation, to update or revise any forward-looking statements appearing on pages 1 to 6.

[1] Non-GAAP amounts exclude the recurring charges related to the Redemption, litigation-related special items, cumulative effects of accounting changes, and all related tax effects. See pages 10-11 for the reconciliation to our GAAP numbers.

# development pipeline

For more than 28 years, Genentech has excelled at transforming scientific discoveries into breakthrough therapies for patients. Since the start, we have directed our drug discovery efforts towards therapies that would fill unmet medical needs. Today, Genentech's development pipeline focuses on oncology, immunology, vascular medicine and specialty therapeutics. The pipeline has both breadth and depth, with more than 20 projects targeting a range of disease areas across all phases of clinical development. The pipeline below is current as of March 12, 2004, and reflects several updates to our 2003 Form 10-K.



**Pre-IND / Phase 1**

| | | |
|---|---|---|
| Oncology | G-024856 | Basal Cell Carcinoma* |
| | PRO1762 (Apo2L/TRAIL) | Cancer Therapy* |
| Immunology | PRO70769 (Anti-CD20) | Rheumatoid Arthritis |
| Vascular | PRO128115 (VEGF) | Wound Healing |

**Phase 2**

| | | |
|---|---|---|
| Oncology | Omnitarg™ | Breast Cancer |
| | | Lung Cancer |
| | | Ovarian Cancer |
| | | Prostate Cancer |
| | Tarceva™ | Glioblastoma Multiforme |
| Immunology | RAPTIVA™ | Psoriatic Arthritis |
| | Rituxan® | Mod.-to-Sev. Rheumatoid Arthritis |
| | | Multiple Sclerosis* |
| | Xolair® | Peanut Allergy* |

**Phase 3**

| | | |
|---|---|---|
| Oncology | Avastin™ | Adjuvant Colorectal Cancer* |
| | | Metastatic Breast Cancer |
| | | Non-Small Cell Lung Cancer |
| | | Pancreatic Cancer* |
| | | Renal Cell Carcinoma |
| | Herceptin® | Adjuvant Breast Cancer |
| | Rituxan® | Aggressive Frontline Non-Hodgkin's Lymphoma |
| | | Indolent Frontline Non-Hodgkin's Lymphoma** |
| | | Indolent Maintenance Non-Hodgkin's Lymphoma |
| | | Relapsed Chronic Lymphocytic Leukemia |
| | Tarceva™ | Refractory Lung Cancer |
| | | Pancreatic Cancer |
| Immunology | Rituxan® | ANCA-Associated Vasculitis* |
| | | Lupus Nephritis* |
| | | Refractory Rheumatoid Arthritis |
| | | Systemic Lupus Erythematosus* |
| | Xolair® | Pediatric Asthma* |
| Vascular | Lucentis™ | Age-Related Macular Degeneration |
| | Veletri™ | Acute Heart Failure |
| Specialty | Nutropin Depot® | Adult Growth Hormone Deficiency** |

**Filed sNDA**

| | | |
|---|---|---|
| Specialty | Nutropin® & Nutropin AQ® | Idiopathic Short Stature |

*Preparing for Phase
**Preparing for Filing

# financial highlights (UNAUDITED)

(IN MILLIONS, EXCEPT PER SHARE AND EMPLOYEE DATA)

| YEARS ENDED DECEMBER 31, | 2003 | 2002 | 2001 | % CHANGE FROM PRECEDING YEAR 2003/2002 | 2002/2001 |
|---|---|---|---|---|---|
| Total operating revenues | $3,300.2 | $2,583.7 | $2,044.1 | 28% | 26% |
| Product sales | 2,621.4 | 2,163.6 | 1,742.9 | 21 | 24 |
| Cost of sales (COS) | 480.1 | 441.6 | 354.5 | 9 | 25 |
| Research and development (R&D) expenses | 722.0 | 623.5 | 526.2 | 16 | 18 |
| R&D expenses as a % of operating revenues | 22% | 24% | 26% | — | — |
| Marketing, general and administrative expenses | 794.8 | 546.2 | 446.9 | 46 | 22 |
| Collaboration profit sharing | 457.5 | 350.7 | 246.7 | 30 | 42 |
| Recurring charges related to redemption[1] | 154.3 | 155.7 | 321.8 | (1) | (52) |
| Special items: litigation-related[2] | (113.1) | 543.9 | — | (121) | — |
| Cumulative effect of accounting change, net of tax[3] | 47.6 | — | 5.6 | — | (100) |
| Net income[4] | 562.5 | 63.8 | 150.3 | 782 | (58) |
| Diluted earnings per share | 1.06 | 0.12 | 0.28 | 783 | (57) |
| Non-GAAP net income[5] | $ 634.9 | $ 483.6 | $ 404.5 | 31% | 20% |
| Non-GAAP diluted EPS[5] | 1.20 | 0.92 | 0.76 | 30 | 21 |
| Non-GAAP net income as a % of operating revenues[5] | 19% | 19% | 20% | — | — |
| Shares used to compute diluted earnings per share | 528.8 | 524.4 | 535.3 | 1 | (2) |
| Actual shares at year-end | 524.7 | 512.8 | 528.3 | 2 | (3) |
| Stock price at year-end | $ 93.57 | $ 33.16 | $ 54.25 | 182 | (39) |
| *No cash dividends were paid* | | | | | |
| Cash, cash equivalents, short-term investments, and long-term marketable debt and equity securities | $2,934.7 | $1,601.9 | $2,864.9 | 83 | (44) |
| Property, plant and equipment, net | 1,617.9 | 1,068.7 | 865.7 | 51 | 23 |
| Total assets | 8,736.2 | 6,758.1 | 7,146.9 | 29 | (5) |
| Total stockholders' equity | 6,520.3 | 5,338.9 | 5,919.8 | 22 | (10) |
| Capital expenditures | 322.0 | 322.8 | 213.4 | — | 51 |
| Number of employees at year-end | 6,226 | 5,252 | 4,950 | 19 | 6 |

[1] Amounts primarily relate to the amortization of other intangible assets in 2003, 2002 and 2001, and the amortization of goodwill in 2001, due to the June 30, 1999 redemption of our special common stock (or Redemption) and the effects of push-down accounting.

[2] Amount in 2003 includes litigation-related special items comprised of Amgen and Bayer litigation settlements (net of City of Hope litigation-related charges) in 2003. Amount in 2002 includes litigation-related special charges for the City of Hope judgment in the second quarter of 2002, including accrued interest and costs related to obtaining a surety bond, and certain other litigation-related matters. For further information on these items, see the "Results of Operations" section of Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations," of Part II of our 2003 Form 10-K on file with the Securities and Exchange Commission (or SEC).

[3] We adopted Financial Accounting Standards Board Interpretation No. 46 (or FIN 46), "Consolidation of Variable Interest Entities," on July 1, 2003, which resulted in a $47.6 million charge, net of tax, (or $0.09 per share) as a cumulative effect of a change in accounting principle. We adopted Statement of Financial Accounting Standards No. 133 (or FAS 133) on January 1, 2001, and recorded $5.6 million, net of tax, as a cumulative effect of a change in accounting principle and recorded $10.0 million for the changes in fair value of certain derivatives as "other income, net."

[4] We adopted FAS 141 on Business Combinations and FAS 142 on Goodwill and Other Intangible Assets on January 1, 2002. As a result of our adoption, reported net income in 2002 increased by $157.6 million, net of tax, (or $0.30 per share), due to the cessation of goodwill amortization and the amortization of our trained and assembled work-force intangible asset related to the Redemption and push-down accounting.

[5] Non-GAAP amounts exclude the recurring charges related to the Redemption, litigation-related special items, cumulative effects of accounting changes, and all related tax effects. GAAP net income as a percentage of operating revenues was 17 percent in 2003, two percent in 2002, and seven percent in 2001. See below and page 10 for the reconciliation to our GAAP numbers. For further information on these items, see the "Results of Operations" section of Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations," of Part II of our 2003 Form 10-K on file with the SEC.



total operating revenues



net income



diluted earnings per share

# marketed products (UNAUDITED)
(IN MILLIONS)

## 2003 product sales



| | |
|---|---|
| Rituxan | $1,489 |
| Herceptin | 425 |
| Growth Hormone | 322 |
| Thrombolytic | 185 |
| Pulmozyme | 167 |
| Xolair | 25 |
| RAPTIVA | 1 |
| Other | 7 |
| Total | $2,621 |

### Total Product Sales



Total net product sales were $2,621 million in 2003, an increase of 21 percent from 2002. The increase in 2003 is primarily a result of higher product sales, in particular Rituxan® (Rituximab). Combined sales of our BioOncology products, Rituxan and Herceptin® (Trastuzumab), represented 73 percent of total product sales in 2003 and 72 percent in 2002.

### Rituxan Sales



Net sales of Rituxan were $1,489 million in 2003, a 28 percent increase from 2002. This increase in 2003 was driven primarily by increased use of the product for the treatment of B-cell non-Hodgkin's lymphoma, as well as chronic lymphocytic leukemia. Hoffmann-La Roche holds marketing rights for Rituximab outside of the United States, excluding Japan.

### Herceptin Sales



Net sales of Herceptin were $425 million in 2003, a 10 percent increase from 2002. The 2003 increase was driven by multiple factors, including treating more patients and extending the average treatment duration. Hoffmann-La Roche has exclusive marketing rights for Herceptin outside of the United States.

### Growth Hormone Product Sales



Combined net sales of our four growth hormone products, Nutropin Depot® [somatropin (rDNA origin) for injectable suspension], Nutropin AQ® [somatropin (rDNA origin) injection], Nutropin® [somatropin (rDNA origin) for injection], and Protropin® (somatrem for injection), were $322 million in 2003, an eight percent increase from 2002. The increase in 2003 was attributable to various factors, including continued strong demand for our Nutropin products.

### Thrombolytic Product Sales



Combined net sales of our three thrombolytic products, Activase® (Alteplase, recombinant), TNKase™ (Tenecteplase) and Cathflo® Activase® (Alteplase), were $185 million in 2003, a three percent increase from 2002. The increase in 2003 was positively impacted by the implementation of a new business model, which took advantage of our comprehensive thrombolytic portfolio and allowed us to focus our marketing efforts on accounts with the highest potential. The higher sales in 2003 were primarily due to Cathflo Activase for catheter clearance.

### Pulmozyme Sales



Net sales of Pulmozyme® (dornase alfa, recombinant) were $167 million in 2003, a 21 percent increase from 2002. The increase in 2003 primarily reflects an increased focus on aggressive treatment of cystic fibrosis early in the course of the disease.

### Xolair Sales    RAPTIVA Sales



Xolair
We received FDA approval to market Xolair® (Omalizumab) in June 2003 and began shipping Xolair in July 2003. Xolair achieved total net sales of $25 million in 2003, reflecting distribution of product into the supply channel and positive physician adoption rates.

RAPTIVA
We received FDA approval to market RAPTIVA™ (efalizumab) in October 2003 and began shipping RAPTIVA in November 2003. RAPTIVA achieved total net sales of $1 million in 2003, reflecting initial distribution of product into the supply channel. The RAPTIVA reimbursement model has been received positively.

# 11-year financial summary (UNAUDITED)

(IN MILLIONS, EXCEPT PER SHARE AND EMPLOYEE DATA)

| | 2003 | | | 2002 | | | 2001 | | |
|---|---|---|---|---|---|---|---|---|---|
| | GAAP | DIFFERENCES | NON-GAAP[1] | GAAP | DIFFERENCES | NON-GAAP[1] | GAAP | DIFFERENCES | NON-GAAP[1] |
| TOTAL OPERATING REVENUES | $3,300.2 | | $3,300.2 | $2,583.7 | | $2,583.7 | $2,044.1 | | $2,044.1 |
| Product sales | 2,621.4 | | 2,621.4 | 2,163.6 | | 2,163.6 | 1,742.9 | | 1,742.9 |
| Royalties | 500.9 | | 500.9 | 365.6 | | 365.6 | 264.5 | | 264.5 |
| Contract revenue | 177.9 | | 177.9 | 54.5 | | 54.5 | 36.7 | | 36.7 |
| TOTAL COSTS AND EXPENSES | $2,495.6 | $ (41.2) | $2,454.4 | $2,661.6 | $ (699.6) | $1,962.0 | $1,896.1 | $ (321.8) | $1,574.3 |
| Cost of sales | 480.1 | | 480.1 | 441.6 | | 441.6 | 354.5 | | 354.5 |
| Research and development | 722.0 | | 722.0 | 623.5 | | 623.5 | 526.2 | | 526.2 |
| Marketing, general and administrative | 794.8 | | 794.8 | 546.2 | | 546.2 | 446.9 | | 446.9 |
| Collaboration profit sharing | 457.5 | | 457.5 | 350.7 | | 350.7 | 246.7 | | 246.7 |
| Recurring charges related to redemption[4] | 154.3 | (154.3) | — | 155.7 | (155.7) | — | 321.8 | (321.8) | — |
| Special items | (113.1) | 113.1 | — | 543.9[11] | (543.9) | — | | | — |
| Other income, net | $ 92.8 | — | $ 92.8 | $ 107.7 | — | $ 107.7 | $ 135.0[9] | $ (10.0) | $ 125.0 |
| INCOME (LOSS) DATA | | | | | | | | | |
| Income (loss) before taxes and cumulative effect of accounting change | $ 897.4 | $ 41.2 | $ 938.6 | $ 29.8 | $ 699.6 | $ 729.4 | $ 283.0 | $ 311.8 | $ 594.8 |
| Income tax (benefit) provision | 287.3 | 16.4 | 303.7 | (34.0) | 279.8 | 245.8 | 127.1 | 63.2 | 190.3 |
| Income (loss) before cumulative effect of accounting change | 610.1 | 24.8 | 634.9 | 63.8 | 419.8 | 483.6 | 155.9 | 248.6 | 404.5 |
| Cumulative effect of accounting change, net of tax | (47.6)[2] | 47.6 | — | — | — | — | (5.6)[9] | 5.6 | — |
| Net income (loss) | 562.5 | 72.4 | 634.9 | 63.8[12] | 419.8 | 483.6 | 150.3 | 254.2 | 404.5 |
| EARNINGS (LOSS) PER SHARE: | | | | | | | | | |
| Basic:   Earnings (loss) before cumulative effect of accounting change | $ 1.18 | $ 0.05 | $ 1.23 | $ 0.12 | $ 0.81 | $ 0.93 | $ 0.30 | $ 0.47 | $ 0.77 |
| Cumulative effect of accounting change, net of tax | (0.09) | 0.09 | — | — | — | — | (0.01) | 0.01 | — |
| Net earnings (loss) per share | $ 1.09 | $ 0.14 | $ 1.23 | $ 0.12 | $ 0.81 | $ 0.93 | $ 0.29 | $ 0.48 | $ 0.77 |
| Diluted: Earnings (loss) before cumulative effect of accounting change | $ 1.15 | $ 0.05 | $ 1.20 | $ 0.12 | $ 0.80 | $ 0.92 | $ 0.29 | $ 0.47 | $ 0.76 |
| Cumulative effect of accounting change, net of tax | (0.09) | 0.09 | — | — | — | — | (0.01) | 0.01 | — |
| Net earnings (loss) per share | $ 1.06 | $ 0.14 | $ 1.20 | $ 0.12 | $ 0.80 | $ 0.92 | $ 0.28 | $ 0.48 | $ 0.76 |
| SELECTED BALANCE SHEET DATA | | | | | | | | | |
| Cash, cash equivalents, short-term investments, and long-term marketable debt and equity securities | $2,934.7 | | — | $1,601.9 | | — | $2,864.9 | | — |
| Accounts receivable | 574.1 | | — | 418.4 | | — | 315.3 | | — |
| Inventories | 469.6 | | — | 393.5 | | — | 356.9 | | — |
| Property, plant and equipment, net | 1,617.9[2] | | — | 1,068.7 | | — | 865.7 | | — |
| Goodwill | 1,315.0 | | — | 1,315.0 | | — | 1,302.5 | | — |
| Other intangible assets | 810.8 | | — | 927.5 | | — | 1,113.3 | | — |
| Other long-term assets[13] | 812.7[14] | | — | 796.8[14] | | — | 127.2 | | — |
| Total assets | 8,736.2 | | — | 6,758.1 | | — | 7,146.8 | | — |
| Total current liabilities | 873.0 | | — | 646.7 | | — | 663.8 | | — |
| Long-term debt | 412.3[2] | | — | | | —[10] | | | —[10] |
| Total liabilities | 2,215.9 | | — | 1,419.2 | | — | 1,227.0 | | — |
| Total stockholders' equity | 6,520.3 | | — | 5,338.9 | | — | 5,919.8 | | — |
| OTHER DATA | | | | | | | | | |
| Depreciation and amortization expense | $ 295.4 | | — | $ 275.0[12] | | — | $ 428.1 | | — |
| Capital expenditures | 322.0 | | — | 322.8 | | — | 213.4 | | — |
| SHARE INFORMATION | | | | | | | | | |
| Shares used to compute Basic EPS: | 517.2 | | 517.2 | 519.2 | | 519.2 | 527.0 | | 527.0 |
| Shares used to compute Diluted EPS: | 528.8 | | 528.8 | 524.4 | | 524.4 | 535.3 | | 535.3 |
| Actual year-end | 524.7 | | | 512.8 | | | 528.3 | | |
| PER SHARE DATA | | | | | | | | | |
| Market price:   High | $ 95.35 | | — | $ 55.15 | | — | $ 84.00 | | — |
| Low | $ 31.53 | | — | $ 25.10 | | — | $ 37.99 | | — |
| Book value | $ 12.43 | | — | $ 10.41 | | — | $ 11.21 | | — |
| NUMBER OF EMPLOYEES AT YEAR-END | 6,226 | | | 5,252 | | | 4,950 | | |

| | 2000 | | | 1999 | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| GAAP | DIFFERENCES | NON-GAAP[1] | GAAP | DIFFERENCES | NON-GAAP[1] | 1998 | 1997 | 1996 | 1995 | 1994 | 1993 |
| $1,514.2 | | $1,514.2 | $1,292.2 | | $1,292.2 | $1,053.1 | $935.9 | $904.4 | $851.7 | $752.6 | $608.2 |
| 1,278.3 | | 1,278.3 | 1,039.1 | | 1,039.1 | 717.8 | 584.9 | 582.8 | 635.3 | 601.0 | 457.4 |
| 207.3 | | 207.3 | 189.3 | | 189.3 | 229.6 | 241.1 | 214.7 | 190.8 | 126.0 | 112.9 |
| 28.6[6] | | 28.6[6] | 63.8 | | 63.8 | 105.7 | 109.9 | 106.9 | 25.6 | 25.6 | 37.9 |
| 1,726.3 | $(468.2) | 1,258.1 | 2,729.7 | $(1,728.8) | 1,000.9 | 873.5 | 839.3 | 815.7 | 731.0 | 646.1 | 584.3 |
| 364.9[8] | (92.9) | 272.0 | 285.6[8] | (93.4) | 192.2 | 138.6 | 102.5 | 104.5 | 97.9 | 95.8 | 70.5 |
| 489.9 | | 489.9 | 367.3 | | 367.3 | 396.2 | 470.9 | 471.1 | 363.0 | 314.3 | 299.4 |
| 367.4 | | 367.4 | 367.1 | | 367.1 | 298.9 | 265.9 | 240.1 | 245.1 | 236.0 | 214.4 |
| 128.8 | | 128.8 | 74.3 | | 74.3 | 39.8 | — | — | — | — | — |
| 375.3 | (375.3) | — | 197.7 | (197.7) | — | — | — | — | 25.0[15] | — | — |
| — | | — | 1,437.7[3] | (1,437.7) | — | — | — | — | — | — | — |
| $216.1 | — | $216.1 | $76.9 | — | $76.9 | $73.0 | $73.2 | $59.2 | $51.5 | $23.1 | $35.0 |
| $4.0 | $468.2 | $472.2 | $(1,360.6) | $1,728.8 | $368.2 | $252.6 | $169.8 | $147.9 | $172.2 | $129.6 | $58.9 |
| 20.4 | 126.7 | 147.1 | (203.1) | 324.6 | 121.5 | 70.7 | 40.8 | 29.6 | 25.8 | 5.2 | — |
| (16.4) | 341.5 | 325.1 | (1,157.5) | 1,404.2 | 246.7 | 181.9 | 129.0 | 118.3 | 146.4 | 124.4 | 58.9 |
| (57.8)[6] | 57.8 | — | | | | | | | | | |
| (74.2) | 399.3 | 325.1 | (1,157.5) | 1,404.2 | 246.7 | 181.9 | 129.0 | 118.3 | 146.4 | 124.4 | 58.9 |
| $(0.03) | $0.65 | $0.62 | $(2.26) | $2.74 | $0.48 | $0.36 | $0.26 | $0.25 | $0.31 | $0.27 | $0.13 |
| (0.11) | 0.11 | | | | | | | | | | |
| $(0.14) | $0.76 | $0.62 | $(2.26) | $2.74 | $0.48 | $0.36 | $0.26 | $0.25 | $0.31 | $0.27 | $0.13 |
| $(0.03) | $0.64 | $0.61 | $(2.26) | $2.73 | $0.47 | $0.35 | $0.26 | $0.24 | $0.30 | $0.26 | $0.12 |
| (0.11) | 0.11 | | | | | | | | | | |
| $(0.14) | $0.75 | $0.61 | $(2.26) | $2.73 | $0.47 | $0.35 | $0.26 | $0.24 | $0.30 | $0.26 | $0.12 |
| $2,459.4 | | — | $1,957.4 | | — | $1,604.6 | $1,286.5 | $1,159.1 | $1,096.8 | $920.9 | $719.8 |
| 273.7 | | — | 226.8 | | — | 149.7 | 189.2 | 197.6 | 172.2 | 146.3 | 130.5 |
| 265.8 | | — | 275.2 | | — | 148.6 | 116.0 | 91.9 | 93.6 | 103.2 | 84.7 |
| 752.9 | | — | 730.1 | | — | 700.2 | 683.3 | 586.2 | 503.7 | 485.3 | 456.7 |
| 1,455.8 | | — | 1,609.1 | | — | — | — | — | — | — | — |
| 1,280.4 | | — | 1,453.3 | | — | 65.0 | 54.7 | 40.1 | 42.2 | 16.0 | 13.8 |
| 168.5 | | — | 201.1 | | — | 131.3 | 122.5 | 109.1 | 63.3 | 45.0 | 50.3 |
| 6,728.4 | | — | 6,549.8 | | — | 2,855.4 | 2,507.6 | 2,226.4 | 2,011.0 | 1,745.1 | 1,468.8 |
| 465.3[10] | | — | 492.5 | | — | 291.3 | 289.6 | 250.0 | 233.4 | 220.5 | 190.7 |
| 149.7 | | — | 149.7 | | — | 150.0 | 150.0 | 150.0 | 150.0 | 150.4 | 151.2 |
| 1,054.2 | | — | 1,280.0 | | — | 511.6 | 476.4 | 425.3 | 408.9 | 396.3 | 352.0 |
| 5,674.2 | | — | 5,269.8[5] | | — | 2,343.8 | 2,031.2 | 1,801.1 | 1,602.0 | 1,348.8 | 1,116.8 |
| $463.0 | | | $280.7 | | | $78.1 | $65.5 | $62.1 | $58.4 | $53.5 | $44.0 |
| 112.7 | | | 95.0 | | | 88.1 | 154.9 | 141.8 | 70.2 | 82.8 | 87.5 |
| 522.2 | | 522.2 | 512.9 | | 519.2 | 503.3 | 492.2 | 482.5 | 473.1 | 464.0 | 455.6 |
| 522.2 | 13.9 | 536.1 | 512.9 | 16.6 | 529.5 | 519.5 | 505.6 | 495.9 | 487.0 | 480.8 | 475.0 |
| 525.5 | | — | 516.2 | | | 508.5 | 497.0 | 485.7 | 477.1 | 469.0 | 459.3 |
| $117.25 | | — | $22.50 | | — | $19.94 | $15.16 | $13.85 | $13.25** | $13.38 | $12.63 |
| | | | $71.50** | | | | | | | | |
| $46.13 | | — | $18.63 | | — | $14.82 | $13.32 | $12.85 | $11.13** | $10.44 | $7.82 |
| | | | $24.25** | | | | | | | | |
| $10.80 | | — | $10.21 | | — | $4.61 | $4.09 | $3.71 | $3.36 | $2.88 | $2.43 |
| 4,459 | | | 3,883 | | | 3,389 | 3,242 | 3,071 | 2,842 | 2,738 | 2,510 |

# 11-year financial summary footnotes (UNAUDITED)

Effective January 1, 2003, we made certain classification changes to our consolidated statements of income. Comparable amounts in the prior years have been reclassified to conform to the 2003 presentation. These classification changes included:

- a new caption titled "other income, net," which includes realized gains and losses from the sale of certain of our biotechnology equity securities as well as changes in the recoverability of our debt securities, write-downs for other-than-temporary declines in the fair value of certain of these biotechnology debt and equity securities, interest income and interest expense, net of amounts capitalized in 2002;

- a change from the "contract and other" caption to the new "contract revenues" caption (the gains on sales of biotechnology equity securities, which were previously included in "contract and other," are now reflected in the new "other income, net" caption); and

- a change from including write-downs of biotechnology equity securities and changes in the recoverability of our debt securities in "marketing, general and administrative" expenses to including them in the new "other income, net" caption.

The 11-year Financial Summary above reflects the Financial Accounting Standards Board Interpretation No. 46 (or FIN 46), "Consolidation of Variable Interest Entities," in 2003, Statement of Financial Accounting Standards (or FAS) No. 141, 142, 144 and 148 in 2002, FAS 133 in 2001, The Securities and Exchange Commission's Staff Accounting Bulletin No. 101 (or SAB 101) in 2000, FAS 130 and 131 in 1998, FAS 128 and 129 in 1997, FAS 121 in 1996 and FAS 115 in 1994.

We have paid no dividends. We currently intend to retain all future income for use in the operation of our business and for future stock repurchases and, therefore, do not anticipate paying any cash dividends in the foreseeable future.

All share and per share amounts reflect two-for-one stock splits of our Common Stock that were effected in 2000 and 1999.

\*   Special Common Stock began trading October 26, 1995. On October 25, 1995, pursuant to the 1995 Agreement with Roche Holdings, Inc. (or Roche), each share of our Common Stock not held by Roche or its affiliates automatically converted to one share of Special Common Stock.

\*\*  Common Stock began trading July 20, 1999; prior to that date, shares were Special Common Stock. On June 30, 1999, we redeemed all of our outstanding Special Common Stock held by stockholders other than Roche (also known as the Redemption). Roche's percentage ownership of our outstanding equity increased from 65% to 100%. On July 23, 1999, October 26, 1999, and March 29, 2000, Roche completed public offerings of our Common Stock. On January 19, 2000, Roche completed an offering of zero-coupon notes that are exchangeable for an aggregate of approximately 13 million shares of our Common Stock held by Roche. Roche's percentage ownership was 58.4% at December 31, 2003.

(1) Non-GAAP amounts exclude (i) recurring charges related to the Redemption; (ii) litigation-related special items in 2003 comprised of Amgen and Bayer litigation settlements (net of City of Hope litigation-related charges), and in 2002 special charges for the City of Hope judgment in the second quarter of 2002, including accrued interest and costs related to obtaining a surety bond, and certain other litigation-related matters; (iii) special charges in 1999 related to the June 30, 1999 redemption of our Special Common Stock (or Redemption) and the effects of "push-down"

accounting as required by U.S. generally accepted accounting principles; (iv) costs in 2000 and 1999 related to the sale of inventory that was written up at the Redemption; (v) the cumulative effect of accounting changes; (vi) the changes in fair value of certain derivatives recorded in "other income, net" in 2001; and (vii) all related tax effects. For further information on these items, see the "Results of Operations" section of Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations," of Part II of our Form 10-K for the respective years on file with the Securities and Exchange Commission (or SEC).

(2) Reflects the impact of the adoption of FIN 46 on Consolidation of Variable Interest Entities.

(3) Charges related to Redemption and push-down accounting ($1,207.7 million) and legal settlements ($230.0 million).

(4) Primarily reflects amortization of other intangible assets in 2003, 2002, 2001, 2000 and 1999, and goodwill amortization in 2001, 2000 and 1999, related to the Redemption and push-down accounting.

(5) Reflects the impact of the Redemption and related push-down accounting of $5,201.9 million of excess purchase price over net book value, net of charges and accumulated amortization of goodwill and other intangible assets.

(6) Reflects the impact of the adoption of SAB 101 on revenue recognition effective January 1, 2000.

(7) GAAP 1999 results reflect the June 30, 1999 Redemption and push-down accounting and include the combined New Basis and Old Basis periods presented in the 1999 Consolidated Statements of Operations and Consolidated Statements of Cash Flows. Refer to our 2001 Form 10-K (Part II, Item 8) on file with the SEC.

(8) Includes costs related to the sale of inventory that was written up at the Redemption due to push-down accounting.

(9) Reflects the impact of the adoption of FAS 133 on Accounting for Derivative Instruments and Hedging Activities.

(10) The $149.7 million long-term debt was reclassified to current liabilities to reflect the March 27, 2002 maturity.

(11) Amount includes litigation-related special charges comprised of the City of Hope Medical Center litigation judgment in the second quarter of 2002, including accrued interest and costs related to obtaining a surety bond, and certain other litigation-related matters. For further information on these charges, see the "Results of Operations" section of Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations," of Part II of our 2002 Form 10-K on file with the SEC.

(12) We adopted FAS 141 on Business Combinations and FAS 142 on Goodwill and other Intangible Assets on January 1, 2002. In accordance with FAS 141 and 142, we discontinued the amortization of goodwill and our trained and assembled workforce intangible asset, which resulted in an increase in reported net income by approximately $157.6 million, net of tax, (or $0.30 per share) in 2002, as compared to the accounting prior to the adoption of FAS 141 and 142.

(13) Includes restricted cash.

(14) Includes $630.0 million of restricted cash pledged to secure a bond for the City of Hope Medical Center judgment. For further information on the City of Hope Medical Center judgment, see the "Legal Proceedings" section of Part I, Item 3 of our 2003 Form 10-K on file with the SEC.

(15) Primarily includes charges related to 1995 merger and the 1995 Agreement with Roche ($21.0 million).

# stockholder information

**HEADQUARTERS**
Genentech
One DNA Way
South San Francisco, California 94080–4990
(650) 225-1000
www.gene.com

**STOCK LISTING**

 Genentech is listed on the New York Stock
Exchange under the symbol DNA.

**TRANSFER AGENT**
Communications concerning transfer requirements,
lost certificates and change of address should be
directed to Genentech's transfer agent:

EquiServe Trust Company, N.A.
Post Office Box 43010
Providence, Rhode Island 02940-3010

Telephone: (800) 733-5001
www.equiserve.com

**ANNUAL MEETING**
The annual meeting of stockholders will be held at
10:00 a.m. Pacific Time on April 16, 2004, at The
Marriott Hotel, 1770 South Amphlett Boulevard, San
Mateo, California. Detailed information about the meet-
ing is contained in the Notice of Annual Meeting and
Proxy Statement sent to each stockholder of record as
of February 17, 2004.

**INVESTOR RELATIONS**
Genentech invites stockholders, security analysts,
representatives of portfolio management firms and
other interested parties to contact:

Katherine Littrell, Ph.D., R.N.
Director, Investor Relations
Telephone: (650) 225-1034
Fax: (650) 225-8326
Mailing address above.
e-mail: investor.relations@gene.com

**AVAILABLE INFORMATION**
You may obtain a free copy of our annual reports on
Form 10-K, quarterly reports on Form 10-Q and cur-
rent reports on Form 8-K and amendments to those
reports on the day of filing with the SEC on our web-
site on the World Wide Web at http://www.gene.com,
by contacting the Investor Relations Department at our
corporate offices by calling (650) 225-1599, or by send-
ing an e-mail message to investor.relations@gene.com.
You can also direct requests for literature to our litera-
ture request line at (800) 488-6519 or submit requests
on our website.

**INDEPENDENT AUDITORS**
Ernst & Young LLP
Palo Alto, California

**WANT TO LEARN MORE ABOUT GENENTECH?**
Visit us on the World Wide Web: www.gene.com.

# genentech executive committee



**Genentech Executive Committee** (from left to right: Louis J. Lavigne, Jr.; Stephen G. Juelsgaard; Susan D. Desmond-Hellmann; Arthur D. Levinson; Myrtle S. Potter; Richard H. Scheller)

### ARTHUR D. LEVINSON, PH.D.
Chairman and Chief Executive Officer

Dr. Levinson became president and chief executive officer of Genentech and joined the board of directors in 1995. He was named chairman of the board of directors in 1999. Levinson joined the company in 1980 as a senior scientist and was named head of Research and Development in 1993. He has been a member of Genentech's executive management team since 1990. Prior to Levinson's employment with Genentech, he was a postdoctoral fellow in the department of microbiology at the University of California, San Francisco.

### STEPHEN G. JUELSGAARD, D.V.M., J.D.
Executive Vice President, General Counsel and Secretary

Mr. Juelsgaard joined Genentech in 1985 as corporate counsel. In 1994, he was named vice president and general counsel. He was named secretary in 1997 and executive vice president in 2002. Prior to his employment with Genentech, Juelsgaard was an associate with the law firm of Wilson Sonsini Goodrich & Rosati.

### MYRTLE S. POTTER
Executive Vice President, Commercial Operations, and Chief Operating Officer

Ms. Potter joined Genentech in 2000 as executive vice president, Commercial Operations, and chief operating officer. Before joining Genentech, Potter was president of Bristol-Myers Squibb's U.S. Cardiovascular/Metabolics business. Prior to joining Bristol-Myers, Potter spent 14 years at Merck & Co., Inc. in a variety of sales, marketing and business planning roles.

### SUSAN D. DESMOND-HELLMANN, M.D., M.P.H.
Executive Vice President, Development and Product Operations, and Chief Medical Officer

Dr. Hellmann joined Genentech in 1995 as a clinical scientist. Following several promotions, Hellmann was named executive vice president, Development and Product Operations in 1999. Prior to joining Genentech, Hellmann was associate director of clinical cancer research at the Bristol-Myers Squibb Pharmaceutical Research Institute. Trained as an oncologist, Hellmann spent several years in the clinical setting.

### LOUIS J. LAVIGNE, JR.
Executive Vice President and Chief Financial Officer

Mr. Lavigne joined Genentech in 1982 and became controller in 1983. After several promotions, Lavigne assumed the chief financial officer position in 1988. He was named executive vice president in 1997. Prior to joining Genentech, Lavigne held various financial management positions with Pennwalt Corporation, a chemical and pharmaceutical company.

### RICHARD H. SCHELLER, PH.D.
Executive Vice President, Research

Dr. Scheller joined Genentech in 2001 as senior vice president, Research. He was named executive vice president of Research in 2003. Prior to joining Genentech, Scheller served as professor of Molecular and Cellular Physiology and of Biological Sciences at Stanford University Medical Center for 19 years. In 1994, he became an investigator at the Howard Hughes Medical Institute. Scheller has published more than 200 papers in peer-reviewed scientific journals.

# directors and officers

## BOARD OF DIRECTORS

ARTHUR D. LEVINSON, PH.D.
Chairman and Chief Executive Officer
Genentech, Inc.

HERBERT W. BOYER, PH.D.
Co-founder of Genentech, Inc. and
Professor Emeritus of
Biochemistry and Biophysics
University of California, San Francisco

FRANZ B. HUMER, DOCTOR OF LAW
Chairman and Chief Executive Officer
The Roche Group, a research-based
healthcare company

JONATHAN K. C. KNOWLES, PH.D.
President of Global Research
The Roche Group, a research-based
healthcare company

SIR MARK RICHMOND, PH.D.
Former Senior Research Fellow
School of Public Policy
University College, London

CHARLES A. SANDERS, M.D.
Former Chairman and
Chief Executive Officer
Glaxo, Inc., a research-based
healthcare company

## EXECUTIVE OFFICERS

ARTHUR D. LEVINSON, PH.D.*
Chairman and Chief Executive Officer

SUSAN D. DESMOND-HELLMANN, M.D., M.P.H.*
Executive Vice President
Development and Product Operations
and Chief Medical Officer

STEPHEN G. JUELSGAARD, D.V.M., J.D.*
Executive Vice President
General Counsel and Secretary

LOUIS J. LAVIGNE, JR.*
Executive Vice President
and Chief Financial Officer

MYRTLE S. POTTER*
Executive Vice President
Commercial Operations
and Chief Operating Officer

RICHARD H. SCHELLER, PH.D.*
Executive Vice President
Research

DAVID A. EBERSMAN
Senior Vice President
Product Operations

ROBERT L. GARNICK, PH.D.
Senior Vice President
Regulatory, Quality and Compliance

JOHN M. WHITING
Vice President,
Controller and
Chief Accounting Officer

## OFFICERS

W. ROBERT ARATHOON, PH.D.
Vice President
Manufacturing Operations

HAL BARRON, M.D.
Senior Vice President
Development

J. JOSEPH BARTA
Vice President
Compliance

RONALD C. BRANNING
Vice President
Global Quality

ANDREW C. CHAN, M.D., PH.D.
Vice President
Research—Immunology & Antibody Engineering

IAN T. CLARK
Senior Vice President and General Manager
BioOncology

VISHVA DIXIT
Vice President
Research—Molecular Oncology

CLAUDIA M. ESTRIN
Vice President
Decision Support and
Commercial Operations

GWENDOLYN FYFE, M.D.
Vice President
Clinical Hematology/Oncology

ROY C. HARDIMAN, J.D.
Vice President
Corporate Law
and Assistant Secretary

KENNETH HILLAN, M.B. CH.B.
Vice President
Development Sciences

FRANCIS A. JACKSON
Vice President
Vacaville Product Operations

SEAN A. JOHNSTON, J.D., PH.D.
Vice President
Intellectual Property
and Assistant Secretary

JOSEPH S. MCCRACKEN, D.V.M.
Vice President
Business and Commercial Development

WALTER K. MOORE
Vice President
Government Affairs

GENESIO MURANO, PH.D.
Vice President
Regulatory Affairs

VARUN NANDA
Vice President
Sales and Marketing

PHILIPPA NORMAN
Vice President
Global Supply Chain

DIANE L. PARKS
Senior Vice President and General Manager
Specialty Biotherapeutics and Managed Care

TODD PIERCE
Vice President
Corporate Information Technology

CORSEE D. SANDERS, PH.D.
Vice President
Biometrics and Business Operations
Medical Affairs

DENISE SMITH-HAMS
Vice President
Human Resources

MARC TESSIER-LAVIGNE
Senior Vice President
Research Drug Discovery

THOMAS T. THOMAS, II
Treasurer

PATRICK YANG
Vice President
South San Francisco Manufacturing
and Engineering

## STAFF SCIENTISTS

AVI J. ASHKENAZI, PH.D.
Research

THOMAS A. BEWLEY, PH.D.
Process Development

STUART BUNTING, PH.D.
Research

FREDERIC DE SAUVAGE, PH.D.
Research

ABRAHAM DE VOS, PH.D.
Research

VISHVA DIXIT, M.D.
Research

DAVID GILTINAN, PH.D.
Development

PAUL GODOWSKI, PH.D.
Research

TIM GREGORY, PH.D.
Process Development

ANDREW J.S. JONES, D. PHIL.
Process Development

PAUL POLAKIS, PH.D.
Research

STEVE SHIRE, PH.D.
Process Development

MARK SLIWKOWSKI, PH.D.
Research

RICHARD VANDLEN, PH.D.
Research

WILLIAM I. WOOD, PH.D.
Research

## GENENTECH FELLOW

NAPOLEONE FERRARA, M.D.
Research

## DISTINGUISHED ENGINEERS

CHUNG HSU, PH.D., P.E.
Process Development

ROBERT VAN REIS
Process Development

BRADLEY WOLK
Process Development

## DISTINGUISHED PROGRAMMER ANALYST

COLIN WATANABE
Corporate Information Technology

* Member of Executive Committee

Activase, Cathflo Activase, Herceptin, Nutropin, Nutropin Depot, Nutropin AQ, Nutropin AQ Pen, Protropin and Pulmozyme are registered trademarks, and Avastin, Lucentis, Omnitarg, RAPTIVA, and TNKase are trademarks of Genentech, Inc. Rituxan is a registered trademark of Biogen Idem Inc. Tarceva is a trademark of OSI Pharmaceuticals, Inc. Xolair is a trademark of Novartis AG.
Copyright © 2004, Genentech

Form 10-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# FORM 10-K

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

### For the fiscal year ended December 31, 2003

### OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

### For the transition period from            to          .

### Commission file number: 1-9813

# GENENTECH, INC.
#### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **A Delaware Corporation** | **94-2347624** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |
| **1 DNA Way, South San Francisco, California 94080-4990** | **(650) 225-1000** |
| (Address of principal executive offices and zip code) | (Telephone Number) |

### Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common Stock, $0.02 par value | New York Stock Exchange |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of Act). Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☐

The approximate aggregate market value of voting stock held by non-affiliates of the registrant is $15,232,305,454 as of June 30, 2003.[A]

Number of shares of Common Stock outstanding as of February 17, 2004: 527,028,756

### Documents incorporated by reference:

Definitive Proxy Statement with respect to the 2004 Annual Meeting of Stockholders to be filed by Genentech, Inc. with the Securities and Exchange Commission (hereinafter referred to as "Proxy Statement")  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Part III

---

(A)  Excludes 306,641,166 shares of Common Stock held by directors and executive officers of Genentech and Roche Holdings, Inc.

## GENENTECH, INC.

### 2003 Form 10-K Annual Report

### Table of Contents

Page

PART I

Item 1      Business ........................................................................    1
Item 2      Properties ......................................................................    13
Item 3      Legal Proceedings ...........................................................    13
Item 4      Submission of Matters to a Vote of Security Holders ................................    16
Executive Officers of the Company .........................................................    16

PART II

Item 5      Market for the Registrant's Common Equity and Related Stockholder Matters ............    18
Item 6      Selected Financial Data .....................................................    19
Item 7      Management's Discussion and Analysis of Financial Condition and Results of Operations ...    21
Item 7A     Quantitative and Qualitative Disclosures About Market Risk ..........................    59
Item 8      Financial Statements and Supplementary Data ....................................    60
Item 9      Changes in and Disagreements with Accountants on Accounting and Financial Disclosure ...    93
Item 9A     Controls and Procedures ......................................................    93

PART III

Item 10     Directors and Executive Officers of the Company ..................................    94
Item 11     Executive Compensation ......................................................    94
Item 12     Security Ownership of Certain Beneficial Owners and Management ....................    94
Item 13     Certain Relationships and Related Transactions ...................................    94
Item 14     Principal Accounting Fees and Services .........................................    94

PART IV

Item 15     Exhibits, Financial Statement Schedules and Reports on Form 8-K ....................    95
SIGNATURES ..............................................................................    98

In this report, "Genentech," "we," "us" and "our" refer to Genentech, Inc. "Common Stock" refers to Genentech's common stock, par value $0.02 per share, "Special Common Stock" refers to Genentech's callable putable common stock, par value $0.02 per share, all of which was redeemed by Roche Holdings, Inc. on June 30, 1999.

We own or have rights to various copyrights, trademarks and trade names used in our business including the following: Activase® (alteplase, recombinant) tissue-plasminogen activator; Avastin™ (bevacizumab) anti-VEGF antibody; Cathflo® Activase® (alteplase for catheter clearance); Herceptin® (trastuzumab) anti-HER2 antibody; Lucentis™ (ranibizumab, rhuFab V2) anti-VEGF antibody fragment; Nutropin® (somatropin (rDNA origin) for injection) growth hormone; Nutropin AQ® and Nutropin AQ Pen® (somatropin (rDNA origin) for injection) liquid formulation growth hormone; Nutropin Depot® (somatropin (rDNA origin) for injectable suspension) encapsulated sustained-release growth hormone; Omnitarg™ (pertuzumab) HER dimerization inhibitor; Protropin® (somatrem for injection) growth hormone; Pulmozyme® (dornase alfa, recombinant) inhalation solution; Raptiva™ (efalizumab, formerly Xanelim™) anti-CD11a antibody; and TNKase™ (tenecteplase) single-bolus thrombolytic agent. Rituxan® (rituximab) anti-CD20 antibody is a registered trademark of Biogen Idec Inc.; Tarceva™ (erlotinib) is a trademark of OSI Pharmaceuticals, Inc.; and Xolair® (omalizumab) anti-IgE antibody is a trademark of Novartis AG. This report also includes other trademarks, service marks and trade names of other companies.

PART I

ITEM 1.  BUSINESS

**Overview**

Genentech is a leading biotechnology company that discovers, develops, manufactures, and commercializes biotherapeutics for significant unmet medical needs. Seventeen of the currently approved biotechnology products originated from or are based on Genentech science. We manufacture and commercialize in the United States 13 biotechnology products and license several additional products to other companies. See "Marketed Products" and "Licensed Products" below. Genentech was organized in 1976 as a California corporation and was reincorporated in Delaware in 1987.

**Redemption of Our Special Common Stock and Public Offerings**

On June 30, 1999, we redeemed all of our outstanding Special Common Stock held by stockholders other than Roche Holdings, Inc. (or Roche) at a price of $20.63 per share in cash with funds deposited by Roche for that purpose. We refer to this event as the "Redemption." As a result, on that date, Roche's percentage ownership of our outstanding Common Stock increased from 65% to 100%. Consequently, under accounting principles generally accepted in the United States (or GAAP), we were required to use push-down accounting to reflect in our financial statements the amounts paid for our stock in excess of our net book value. Push-down accounting required us to record $1,685.7 million of goodwill and $1,499.0 million of other intangible assets onto our balance sheet on June 30, 1999. For more information about push-down accounting, you should read "Redemption of Our Special Common Stock" note in the Notes to Consolidated Financial Statements of Part II, Item 8 of this Form 10-K.

Roche subsequently completed public offerings of our Common Stock in 1999 and 2000. At December 31, 2003, Roche's percentage ownership of our outstanding common stock was 58.4%. As a result of the Redemption and subsequent public offerings, we amended our certificate of incorporation and bylaws, amended our licensing and marketing agreements with F. Hoffmann-La Roche Ltd (or Hoffmann-La Roche), an affiliate of Roche, and entered into or amended certain agreements with Roche, which are discussed in "Relationship With Roche" of Part II, Item 7 of this Form 10-K.

**Marketed Products**

We manufacture and commercialize in the United States 13 biotechnology products listed below.

*Rituxan* (rituximab) anti-CD20 antibody is for the treatment of patients with relapsed or refractory, low-grade or follicular, CD20-positive, B-cell non-Hodgkin's lymphoma, a cancer of the immune system, including retreatment, times 8 dosing and bulky disease. We co-developed Rituxan with Biogen Idec Inc. (or Biogen Idec), formerly known as IDEC Pharmaceuticals Corporation, from whom we license Rituxan.

*Herceptin* (trastuzumab) anti-HER2 antibody is the first humanized antibody for the treatment of certain patients with metastatic breast cancer whose tumors overexpress the Human Epidermal growth factor Receptor type 2 (or HER2) protein. Herceptin is approved for use as a first-line therapy in combination with Taxol® (paclitaxel), a product made by Bristol-Myers Squibb Company (or Bristol-Myers), and other drugs, and as a single agent in second- and third-line therapy in patients with metastatic breast cancer who have tumors that overexpress the HER2 protein.

*Nutropin Depot* [somatropin (rDNA origin) for injectable suspension] is a long-acting growth hormone for the treatment of growth failure associated with pediatric growth hormone deficiency. It uses ProLease®, an injectable extended-release drug delivery system, which was developed by our collaborator Alkermes, Inc.

*Nutropin* [somatropin (rDNA origin) for injection] is a growth hormone for the treatment of growth hormone deficiency in children and adults, growth failure associated with chronic renal insufficiency prior to kidney

1

transplantation and short stature associated with Turner syndrome. Nutropin is similar to Protropin (see below); however, it does not have the additional N-terminal amino acid, methionine, found in the Protropin chemical structure.

*Protropin* (somatrem for injection) is a growth hormone approved for the treatment of growth hormone inadequacy in children. Manufacture of Protropin was discontinued at the end of 2002 because physicians are typically initiating therapy with one of the Nutropin family products and the demand for Protropin has declined, but sales are expected to continue through the first half of 2004 or until inventory is depleted.

*Nutropin AQ* [somatropin (rDNA origin) for injection] is a liquid formulation growth hormone for the same indications as Nutropin and is aimed at providing improved convenience in administration.

*TNKase* (tenecteplase) is a single-bolus thrombolytic agent for the treatment of acute myocardial infarction (heart attack).

*Activase* (alteplase, recombinant) is a tissue plasminogen activator (or t-PA) approved for the treatment of acute myocardial infarction (heart attack), acute ischemic stroke (blood clots in the brain) within three hours of the onset of symptoms and acute massive pulmonary embolism (blood clots in the lungs).

*Cathflo Activase* (alteplase, recombinant) is a thrombolytic agent for the restoration of function to central venous access devices that have become occluded due to a blood clot.

*Pulmozyme* (dornase alfa, recombinant) is an inhalation solution for the treatment of cystic fibrosis.

*Xolair* (omalizumab) is an anti-IgE antibody, which we commercialize with Novartis, for the treatment of moderate-to-severe persistent asthma in adults and adolescents. In June 2003, we received U.S. Food and Drug Administration (or FDA) approval to market Xolair. We began shipping Xolair in July 2003.

*Raptiva* (efalizumab) is an anti-CD11a antibody co-developed with XOMA Ltd. It was approved by the FDA in October 2003 for the treatment of chronic moderate-to-severe plaque psoriasis in adults age 18 or older who are candidates for systemic therapy or phototherapy. We began shipping Raptiva in November 2003.

*Avastin* (bevacizumab) is an antibody approved by the FDA on February 26, 2004 for use in combination with intravenous 5-fluorouracil-based chemotherapy as a treatment for patients with first-line (or previously untreated) metastatic cancer of the colon or rectum. We began shipping Avastin on February 26, 2004.

Sales of Rituxan and Herceptin accounted for more than 10 percent of our total consolidated revenues in the last three fiscal years. Sales of our growth hormone products accounted for more than 10 percent of our total consolidated revenues in 2002 and 2001. See "Product Sales" under Results of Operations in Part II, Item 7 of this Form 10-K for a discussion of the revenues contributed by each of our products in the last three years.

2

**Licensed Products**

We receive royalty revenue under license agreements with companies that sell and/or manufacture products based on technology developed by us or on intellectual property to which we have rights. These licensed products are sometimes sold under different trademarks or trade names. Significant licensed products, representing approximately 94% of our royalty revenues in 2003, are as follows:

| Product | Trade Name | Licensee | Licensed Territory |
|---|---|---|---|
| D2E7/adalimumab | Humira | Abbott | Worldwide |
| Factor VIII | Kogenate/Helixate | Bayer Corporation | Worldwide |
| Recombinant tissue plasminogen activator | Actilyse | Boehringer Ingelheim | Marketing rights in a number of countries outside of U.S., Canada and Japan; manufacturing rights |
| Tenecteplase | Metalyse | Boehringer Ingelheim | Europe, Switzerland and Australia |
| Infliximab | Remicade | Celltech Pharmaceuticals plc (which transferred rights to Centocor/ Johnson & Johnson | Worldwide |
| Interferon gamma-1b | Actimmune | Connetics Corporation (which transferred rights to InterMune Pharmaceuticals, Inc.) | U.S., Canada and Japan |
| Human growth hormone[1] | Humatrope | Eli Lilly and Company | Worldwide |
| Hepatitis B vaccine | Engerix-B | GlaxoSmithKline plc | Worldwide |
| Rituximab | Rituxan/MabThera | Hoffmann-La Roche | Worldwide excluding U.S. and Japan |
| Trastuzumab | Herceptin | Hoffmann-La Roche | Worldwide excluding U.S. |
| Dornase alfa, recombinant | Pulmozyme | Hoffmann-La Roche | Worldwide excluding U.S. |
| Alteplase and Tenecteplase | Activase and TNKase | Hoffmann-La Roche | Canada |
| Somatropin and Somatrem | Nutropin and Protropin | Hoffmann-La Roche | Canada |
| Etanercept | ENBREL | Immunex Corporation | Worldwide |
| Palivizumab | Synagis | MedImmune, Inc. | Worldwide |
| Bovine growth hormone | Posilac | Monsanto Company | Worldwide |
| Somatropin[1] | Genotropin and Genotropin MiniQuick | Pharmacia Corporation | Worldwide |

_____
(1) Licensing arrangement expired in 2003.

3

**Products in Development**

Our product development efforts, including those of our collaborative partners, cover a wide range of medical conditions, including cancer, respiratory disorders, cardiovascular diseases, endocrine disorders, and inflammatory and immune problems. Below is a summary of products, the related stages of development, and the estimate of completion of the phase.

| Product | Description | Estimate of Completion of Phase* |
|---|---|---|
| **Awaiting Regulatory Approval** | | |
| Nutropin and Nutropin AQ . . . . . . . | Nutropin is an approved product indicated for the long-term treatment of growth failure in pediatric patients due to inadequate endogenous growth hormone (GH) secretion, for growth failure in pediatric patients associated with chronic renal insufficiency (CRI) up to the time of renal transplantation, for the long-term treatment of short stature associated with Turner's syndrome in pediatric patients, and for the replacement of endogenous GH in eligible patients diagnosed with adult growth hormone deficiency (AGHD). We filed a New Drug Application (or NDA) for the additional indication of long-term treatment of idiopathic short stature in December 2003. | 2004 |
| **Preparing for Filing** | | |
| Nutropin Depot . . . . . . . . . . . . . . . | Nutropin Depot is a long-acting formulation of growth hormone that is approved for the treatment of growth failure associated with pediatric growth hormone deficiency. We are preparing to submit a Supplemental NDA (or sNDA) for the treatment of adults with growth hormone deficiency. This product is being developed in collaboration with Alkermes. | 2004 |
| Rituxan . . . . . . . . . . . . . . . . . . . . . | An antibody approved for the treatment of relapsed or refractory low-grade or follicular, CD20-positive B-cell non-Hodgkin's lymphoma, a cancer of the immune system, including retreatment, times 8 dosing and bulky disease. We are preparing to submit a Supplemental BLA (or sBLA) for the treatment of indolent front-line non-Hodgkin's lymphoma. This product is being developed in collaboration with Hoffmann-La Roche and Biogen Idec. | 2004 |
| **Phase III** | | |
| Rituxan . . . . . . . . . . . . . . . . . . . . . | We are in Phase III clinical trials for the treatment of indolent and aggressive non-Hodgkin's lymphoma, indolent maintenance in non-Hodgkin's lymphoma and relapsed chronic lymphocytic leukemia. We are also in Phase III clinical trials for anti-TNF refractory rheumatoid arthritis. This product is being developed in collaboration with Hoffmann-La Roche and Biogen Idec. | 2005-2008 |
| Herceptin . . . . . . . . . . . . . . . . . . . | An antibody approved for the treatment of HER2-positive overexpressing metastatic breast cancer. We are conducting Phase III trials for adjuvant treatment of early-stage breast cancer in patients who overexpress the HER2 protein. This product is being developed in collaboration with Hoffmann-La Roche. | 2007 |

4

| Product | Description | Estimate of Completion of Phase* |
|---|---|---|
| Tarceva . . . . . . . . . . . . . . . . . . . . . . | A small molecule tyrosine kinase inhibitor directed against epidermal growth factor receptor (or EGFR) for the potential treatment of solid tumors. We have initiated four Phase III clinical trials and numerous additional trials as part of the clinical development program. Two first-line Phase III studies of Tarceva plus standard chemotherapy in metastatic non-small cell lung cancer did not meet their primary endpoints of improving overall survival. Phase III trials are evaluating Tarceva for refractory non-small cell lung cancer and pancreatic cancer. This product is being developed in collaboration with OSI Pharmaceuticals and Hoffmann-La Roche. | 2004-2005 |
| Avastin . . . . . . . . . . . . . . . . . . . . . . | An antibody approved for use in combination with intravenous 5-fluorouracil-based chemotherapy as a treatment for patients with first-line (or previously untreated) metastatic cancer of the colon or rectum. Phase III programs in renal cell carcinoma, non-small cell lung cancer, and breast cancer are being conducted. This product is being developed in collaboration with Hoffmann-La Roche. | 2005-2007 |
| Lucentis AMD (formerly rhuFab V2 AMD) . . . . . . . . . . . . | A customized fragment of an anti-VEGF antibody for the potential treatment of age-related macular degeneration (or AMD). We are in Phase III clinical trials for AMD. This product is being developed in collaboration with Novartis. | 2005 |

**Preparing for Phase III**

| | | |
|---|---|---|
| Rituxan . . . . . . . . . . . . . . . . . . . . . . | We are currently planning for Phase III clinical trials in systemic lupus eruthematosus, lupus nephritis and ANCA-associated vasculitis. This product is being developed in collaboration with Biogen Idec. | 2004 |
| Xolair . . . . . . . . . . . . . . . . . . . . . . | An antibody approved by the FDA for the treatment of moderate-to-severe persistent asthma in adults and adolescents. We are currently planning for Phase III clinical trials in pediatric asthma. This product is being developed in collaboration with Novartis and Tanox. | 2004-2005 |
| Avastin . . . . . . . . . . . . . . . . . . . . . . | We are currently planning for Phase III clinical trials in adjuvant colorectal cancer and pancreatic cancer. This product is being developed in collaboration with Hoffmann-La Roche. | 2004 |

**Phase II**

| | | |
|---|---|---|
| Omnitarg (formerly 2C4 antibody) . . . . . . . . . . . . . . . . . . | An antibody directed against the human epidermal growth factor receptor, type 2 (or HER2) as a potential treatment for cancer. We are in Phase II clinical trials for ovarian cancer, prostate cancer, HER2 negative breast cancer, and non-small cell lung cancer. This product is being developed in collaboration with Hoffmann-La Roche. | 2004-2006 |

5

| Product | Description | Estimate of Completion of Phase* |
|---|---|---|
| Raptiva .......................... | An anti-CD11a antibody approved for the treatment of chronic moderate-to-severe plaque psoriasis in adults age 18 or older who are candidates for systemic therapy or phototherapy. XOMA is conducting a Phase II study in psoriatic arthritis. This product is being developed in collaboration with XOMA. | 2004 |
| Tarceva .......................... | We are in Phase II clinical trials for glioblastoma multiforme (brain cancer). This product is being developed in collaboration with OSI Pharmaceuticals and Hoffmann-La Roche. | 2004-2005 |
| Rituxan .......................... | We are in a Phase IIb clinical trial for the treatment of moderate-to-severe rheumatoid arthritis. This product is being developed in collaboration with Biogen Idec and Hoffmann-La Roche. | 2004-2005 |

**Preparing for Phase II**

| Product | Description | Estimate of Completion of Phase* |
|---|---|---|
| Xolair .......................... | We are currently planning for Phase II clinical trials in peanut allergy. This product is being developed in collaboration with Novartis and Tanox. | 2004 |
| Rituxan .......................... | We are currently planning for a Phase II clinical trial in multiple sclerosis. This product is being developed in collaboration with Biogen Idec. | 2004 |

**Preparing for Phase I**

| Product | Description | Estimate of Completion of Phase* |
|---|---|---|
| PRO70769 .................... | A humanized anti-CD20 antibody that binds CD20 antigen that is predominantly expressed on B-lymphocytes. We filed an Investigational New Drug Application (or IND) in 2003 and expect to begin enrolling patients to a clinical trial for rheumatoid arthritis. This product is being developed in collaboration with Hoffmann-La Roche and Biogen Idec. | 2004 |
| PRO1762 (formerly Apo2L/TRAIL) .............. | A recombinant soluble human protein involved in the regulation of apoptosis. We are preparing to file an IND in 2004. This product is being developed in collaboration with Immunex, a wholly-owned subsidiary of Amgen Inc., with whom we have an agreement for both development and commercialization of this potential product. | 2004 |
| VEGF ......................... | Vascular endothelial growth factor is being evaluated in diabetic wound healing. | 2004-2005 |

_____

\* Note: For those projects preparing for a Phase, the estimated date of completion refers to the date the project enters that Phase for which it was preparing.

**Collaboration Arrangements**

In December 2003, we entered into a non-exclusive long-term manufacturing agreement with Lonza Biologics, a subsidiary of Lonza Group Ltd, under which Lonza will manufacture commercial quantities of Rituxan for us at Lonza's production facility in Portsmouth, New Hampshire. We may be obligated to make milestone payments to

Lonza subject to Lonza's achievement of a series of factory preparation and process validation milestones, as well as receipt of FDA approval for the manufacturing of Rituxan bulk drug at the Lonza facility; the amounts of such payments cannot be estimated at this time. Following FDA approval at the Lonza facility, it is expected that commercial production would begin in 2005.

In June 2003, Hoffmann-La Roche exercised its option to license from us the rights to market Avastin for all countries outside of the U.S. under Hoffmann-La Roche's licensing agreement with us, which is discussed further in Part II, Item 7, "Relationship With Roche." As part of its opt-in, Hoffmann-La Roche paid us approximately $188.0 million and will pay 75% of subsequent global development costs related to the metastatic colorectal cancer indication of Avastin and all others unless Hoffmann-La Roche specifically opts out of the development of certain other indications. In September 2003, Hoffmann-La Roche exercised its option to license from us the rights to market PRO70769, a humanized antibody that binds to CD20, for all countries outside of the U.S. (other than territory previously licensed to others) under the existing licensing agreement. As part of its opt-in, Hoffmann-La Roche paid us $8.4 million and will pay 50% of subsequent global development costs related to PRO70769 unless Roche opts out of the development of certain indications. We will receive royalties on net sales of Avastin and PRO70769 in countries outside of the U.S.

In June 2003, we entered into an agreement with Novartis Opthalmics, an affiliate of Novartis AG, under which Novartis Opthalmics licensed the exclusive right to develop and market Lucentis outside of North America for indications related to diseases of the eye. As part of this agreement, Novartis Opthalmics agreed to an upfront milestone and R&D reimbursement fee of $46.6 million and will pay 50% of Genentech's ongoing Phase III and related development expenses. Genentech is not responsible for any portion of the development and commercialization costs incurred by Novartis outside of North America, but we may receive additional payments for Novartis' achievement of certain clinical development and product approval milestones outside of North America. In addition, we will receive royalties on net sales of Lucentis products, which we will manufacture and supply to Novartis, outside of North America.

In August 2002, we entered into an agreement with Serono S.A. which, in addition to granting Serono marketing rights in specific areas of the world, included an arrangement to co-develop additional indications of Raptiva and share certain global development costs. We also have a supply agreement with Serono, under which we may have a loss exposure up to a maximum of $10.0 million.

In the second quarter of 2002, we entered into a manufacturing agreement with Immunex Corporation, a wholly-owned subsidiary of Amgen, to provide Immunex with additional manufacturing capacity for ENBREL® (etanercept) at Genentech's manufacturing facility in South San Francisco, California. As part of the agreement, we are responsible for facility modifications needed to manufacture ENBREL, including the internal labor costs and costs of certain raw materials for development runs. The facility modification and services costs, which include engineering and equipment costs, are reimbursable by Immunex. However, if certain milestones are not met, we are required to reimburse Immunex for up to 45% of the facility modification and services costs. Costs associated with development runs are reflected in R&D expense as incurred. Shipment of the product, including pre-approval product, to Immunex would be recorded as product sales based on an agreed upon price with the associated costs reflected in cost of sales. In the fourth quarter of 2003, we determined that certain milestones, including obtaining FDA approval for the manufacturing process, would likely not be met in the pre-agreed upon time frame. As a result, certain equipment paid for by us related to ENBREL manufacturing will not qualify for reimbursement by Immunex. Certain ENBREL-related equipment in our consolidated balance sheet will be depreciated over the estimated useful life of the equipment and certain of it will be depreciated over the term of the supply arrangement.

In April 1996, we entered into a research collaboration agreement with XOMA to develop and commercialize Raptiva. The agreement was subsequently modified in the first quarter of 2003 to provide a convertible equity loan to XOMA of up to $80.0 million (outstanding at any one time) for its share of development costs for Raptiva through FDA approval, and a cash loan of up to $15.0 million for its share of U.S. marketing and sales costs prior

to the date of regulatory approval of Raptiva. On October 27, 2003, the FDA approved Raptiva for the treatment of chronic moderate-to-severe plaque psoriasis. Under the provisions of the agreement, XOMA elected to defer payment of $40.0 million of the development loan, of which we had previously recognized $11.9 million as an other-than-temporary impairment charge, as an offset against the proceeds from its share of U.S. operating profits on Raptiva. XOMA repaid the remaining development loan balance of approximately $29.6 million, of which we had previously recognized $8.8 million as an other-than-temporary impairment charge, with Series B preference shares. The Series B preference shares are convertible at our option into XOMA common shares at $7.75 per share. As of December 31, 2003, the commercial loan balance was $13.5 million, which will be repaid in cash through April 2004.

**Distribution**

We have a U.S.-based pharmaceutical marketing, sales and distribution organization. Our sales efforts are focused on specialist physicians in private practice or at hospitals and major medical centers in the United States. In general, our products are sold largely to wholesalers, specialty distributors or directly to hospital pharmacies. We utilize common pharmaceutical company marketing techniques, including sales representatives calling on individual physicians and distributors, advertisements, professional symposia, direct mail, public relations and other methods.

Our products are also available at no charge to qualified patients under our uninsured patient programs in the United States. We have established the Genentech Endowment for Cystic Fibrosis to assist cystic fibrosis patients in the United States with obtaining Pulmozyme and the Genentech Access To Care Foundation for all other Genentech products.

We provide certain customer service programs relating to our products. We maintain a comprehensive patient-related product wastage replacement program for Rituxan, Activase and TNKase that, subject to specific conditions, provides customers the right to return these products to us for replacement. We also maintain expired product programs for all our products that, subject to certain specific conditions, provides customers the right to return products to us for replacement or credit for the price paid related to product expiration. We maintain the right to renew, modify or discontinue the above programs.

As discussed in the "Segment, Significant Customer And Geographic Information" note in the Notes to Consolidated Financial Statements of Part II, Item 8 of this Form 10-K, we had three major customers who individually provided over 10% of our total operating revenues in each of the last three years. Also discussed in the note are material net foreign revenues by country in 2003, 2002 and 2001.

**Raw Materials**

Raw materials and supplies required for the production of our principal products are available, in some instances from one supplier and in other instances, from multiple suppliers. In those cases where raw materials are only available through one supplier, such supplier may be either a sole source (the only recognized supply source available to us) or a single source (the only approved supply source for us among other sources). We have adopted policies to minimize raw material supply risks to the Company, including maintenance of greater levels of raw materials inventory and coordination with our collaborators to implement raw materials sourcing strategies.

**Proprietary Technology — Patents and Trade Secrets**

We seek patents on inventions originating from our ongoing research and development (or R&D) activities. Patents, issued or applied for, cover inventions ranging from basic recombinant DNA techniques to processes relating to specific products and to the products themselves. Our issued patents extend for varying periods according to the date of patent application filing or grant and the legal term of patents in the various countries

8

where patent protection is obtained. The actual protection afforded by a patent, which can vary from country to country, depends upon the type of patent, the scope of its coverage and the availability of legal remedies in the country. We have either been issued patents or have patent applications pending that relate to a number of current and potential products including products licensed to others. We consider that in the aggregate our patent applications, patents and licenses under patents owned by third-parties are of material importance to our operations. Important legal issues remain to be resolved as to the extent and scope of available patent protection for biotechnology products and processes in the United States and other important markets outside of the United States. We expect that litigation will likely be necessary to determine the validity and scope of certain of our proprietary rights. We are currently involved in a number of patent lawsuits, as either a plaintiff or defendant, and administrative proceedings relating to the scope of protection and validity of our patents and those of others. These lawsuits and proceedings may result in a significant commitment of our resources in the future and, depending on their outcome, may adversely affect the validity and scope of certain of our patent or other proprietary rights. We cannot assure you that the patents we obtain or the unpatented proprietary technology we hold will afford us significant commercial protection.

In general, we have obtained licenses from various parties that we deem to be necessary or desirable for the manufacture, use or sale of our products. These licenses (both exclusive and non-exclusive) generally require us to pay royalties to the parties on product sales.

Our trademarks, Activase, Avastin, Cathflo, Herceptin, Lucentis, Nutropin, Nutropin Depot, Nutropin AQ, Nutropin AQ Pen, Omnitarg, Protropin, Pulmozyme, Raptiva, Rituxan (licensed from Biogen Idec), TNKase, Xolair (licensed from Novartis) and Tarceva (licensed from OSI), in the aggregate are considered to be of material importance. All are covered by registrations or pending applications for registration in the U.S. Patent and Trademark Office and in other countries. Trademark protection continues in some countries for as long as the mark is used and, in other countries, for as long as it is registered. Registrations generally are for fixed, but renewable, terms.

Our royalty income for patent licenses, know-how and other related rights amounted to $500.9 million in 2003, $365.6 million in 2002, and $264.5 million in 2001. Royalty expenses were $244.6 million in 2003, $204.4 million in 2002 and $150.4 million in 2001.

**Competition**

We face competition from pharmaceutical companies, pharmaceutical divisions of chemical companies, and biotechnology companies of various sizes. Some competitors have greater clinical, regulatory and marketing resources and experience than we do. Many of these companies have commercial arrangements with other companies in the biotechnology industry to supplement their own research capabilities.

The introduction of new products or biogeneric versions of products or the development of new processes by competitors or new information about existing products may result in price reductions or product replacements, even for products protected by patents. However, we believe our competitive position is enhanced by our commitment to research leading to the discovery and development of new products and manufacturing methods. Other factors that should help us meet competition include ancillary services provided to support our products, customer service, and dissemination of technical information to prescribers of our products and to the health care community, including payers.

Over the longer term, our and our collaborators' abilities to successfully market current products, expand their usage and bring new products to the marketplace will depend on many factors, including but not limited to the effectiveness and safety of the products, FDA and foreign regulatory agencies' approvals of new products and indications, the degree of patent protection afforded to particular products, and the effect of managed care as an important purchaser of pharmaceutical products.

We face competition in five of our therapeutic markets. First, in the thrombolytic market, Activase and TNKase have lost market share and could lose additional market share to Centocor's Retavase® (approved in 1996 for the treatment of acute myocardial infarction) and to the use of mechanical reperfusion therapies to treat acute myocardial infarction; the resulting adverse effect on sales has been and could continue to be material. We expect that the use of mechanical reperfusion in lieu of thrombolytic therapy for the treatment of acute myocardial infarction will continue to grow. In addition, we face potential competition in the catheter clearance market from the reintroduction of Abbott Laboratories' Abbokinase® (urokinase) in October 2002.

Second, in the growth hormone market, we face competition from other companies currently selling growth hormone products and delivery devices. As a result of that competition, we have experienced a loss in market share in the past. Competitors have also received approval to market their existing growth hormone products for additional indications. As a result of this competition, market share of our growth hormone products may decline. In addition, we have certain patents related to the production of growth hormone that have expired and as a consequence those patents no longer exclude others from making growth hormone using the processes claimed by those patents. Any competitive entry as a result of expiration of our patents may cause further decline in our market share.

Third, in the non-Hodgkin's lymphoma market, Corixa Corporation received FDA approval in June 2003, for Bexxar™ (tositumomab and iodine I 131 tositumomab), which may potentially compete with our product Rituxan. Biogen Idec received marketing approval from the FDA and began commercial shipments in late March 2002 for Zevalin™ (ibritumomab tiuxetan), a product that could also potentially compete with Rituxan. Both Bexxar and Zevalin are radiolabeled molecules while Rituxan is not. We are also aware of other potentially competitive biologic therapies for non-Hodgkin's lymphoma in development.

Fourth, Raptiva competes with established therapies for moderate-to-severe psoriasis including oral systemics such as methotrexate and cyclosporin, as well as ultraviolet light therapies. In addition, Raptiva competes with Biogen Idec's biologic therapy Amevive® (alefacept), approved by the FDA in January 2003 for the treatment of moderate-to-severe psoriasis. Raptiva also competes with drugs approved for other indications that are used in psoriasis. Additional biologic therapies are expected to enter the psoriasis market in the next several years. ENBREL® (etanercept), marketed by Amgen and Wyeth in the U.S., is already approved for psoriatic arthritis, a condition associated with psoriasis. In the first quarter of 2003, Amgen announced positive Phase III trial results using ENBREL for moderate-to-severe plaque psoriasis, and in July 2003 announced that ENBREL was filed for FDA approval to treat the condition. Other products are known to be in development for the psoriasis market.

Finally, Avastin may compete with Oxaliplatin. Avastin has been approved for use as first-line therapy for metastatic colorectal cancer patients in combination with intravenous 5-fluorouracil ("5-FU")-based chemotherapy. In the Avastin pivotal trial, first-line patients were treated with an irinotecan-based regimen, 5-FU/Leucovorin and CPT-11 (or "the Saltz Regimen"). In another Phase II trial, Avastin was found to provide benefit for first line patients when used in combination with 5-FU/Leucovorin alone. These regimens represent approximately 40% of all treatments used in the first-line setting. However, the use of these regimens is likely to decline as more physicians adopt Oxaliplatin-based regimens in the first-line setting. Avastin is currently being studied in combination with 5-FU/Leucovorin and Oxaliplatin (the "FOLFOX Regimen") in patients with relapsed, metastatic colorectal cancer in a large randomized study through the Eastern Cooperative Oncology Group (the "E3200 Trial"). If the results from the E3200 Trial are positive for the combination of Avastin and 5-FU/Leucovorin and Oxaliplatin or show a similar magnitude of benefit as previous colorectal cancer studies with Avastin, use of Avastin may increase as physicians increase their use of Avastin in combination with Oxaliplatin-based regimens in the relapsed, and also the first-line setting. However, if the results of the E3200 Trial are negative for the combination of Avastin and 5-FU/Leucovorin and Oxaliplatin, potential sales of Avastin may be materially adversely affected as physicians may limit their use of Avastin to irinotecan-based regimens. Physicians may also restrict their use of Avastin to first-line patients only.

10

## Government Regulation

Regulation by governmental authorities in the United States and other countries is a significant factor in the manufacture and marketing of our products and in ongoing research and product development activities. All of our products require regulatory approval by governmental agencies prior to commercialization. In particular, our products are subject to rigorous preclinical and clinical testing and other premarket approval requirements by the FDA and regulatory authorities in other countries. Various statutes and regulations also govern or influence the manufacturing, safety, labeling, storage, record keeping and marketing of such products. The lengthy process of seeking these approvals, and the subsequent compliance with applicable statutes and regulations, require the expenditure of substantial resources. Any failure by us to obtain or maintain, or any delay in obtaining or maintaining, regulatory approvals could materially adversely affect our business.

The activities required before a pharmaceutical product may be marketed in the United States begin with preclinical testing. Preclinical tests include laboratory evaluation of product chemistry and animal studies to assess the potential safety and efficacy of the product and its formulations. The results of these studies must be submitted to the FDA as part of an Investigational New Drug Application (or IND), which must be reviewed by the FDA before proposed clinical testing can begin. Typically, clinical testing involves a three-phase process. In Phase I, clinical trials are conducted with a small number of subjects to determine the early safety profile and the pattern of drug distribution and metabolism. In Phase II, clinical trials are conducted with groups of patients afflicted with a specified disease in order to provide enough data to statistically evaluate the preliminary efficacy, optimal dosages and expanded evidence of safety. In Phase III, large scale, multicenter, comparative clinical trials are conducted with patients afflicted with a target disease in order to provide enough data to statistically evaluate the efficacy and safety of the product, as required by the FDA. The results of the preclinical and clinical testing of a chemical pharmaceutical product are then submitted to the FDA in the form of a New Drug Application (or NDA), or for a biological pharmaceutical product in the form of a Biologic License Application (or BLA), for approval to commence commercial sales. In responding to a NDA or a BLA, the FDA may grant marketing approval, request additional information or deny the application if it determines that the application does not provide an adequate basis for approval. We cannot assure you that any approval required by the FDA will be obtained on a timely basis, if at all.

Among the conditions for a NDA or a BLA approval, is the requirement that the prospective manufacturer's quality control and manufacturing procedures conform on an ongoing basis with current Good Manufacturing Practices (or GMP). Before approval of a BLA, the FDA will perform a prelicensing inspection of the facility to determine its compliance with GMP and other rules and regulations. In complying with GMP, manufacturers must continue to expend time, money and effort in the area of production and quality control to ensure full compliance. After the establishment is licensed for the manufacture of any product, manufacturers are subject to periodic inspections by the FDA. Any determination by the FDA of manufacturing related deficiencies could materially adversely affect our business.

The requirements that we must satisfy to obtain regulatory approval by governmental agencies in other countries prior to commercialization of our products in such countries can be as rigorous, costly and uncertain.

We are also subject to various laws and regulations relating to safe working conditions, clinical, laboratory and manufacturing practices, the experimental use of animals and the use and disposal of hazardous or potentially hazardous substances, including radioactive compounds and infectious disease agents, used in connection with our research. The extent of governmental regulation that might result from any legislative or administrative action cannot be accurately predicted.

The levels of revenues and profitability of biopharmaceutical companies may be affected by the continuing efforts of government and third-party payers to contain or reduce the costs of health care through various means. For example, in certain foreign markets, pricing or profitability of therapeutic and other pharmaceutical products is subject to governmental control. In the United States there have been, and we expect that there will continue to

be, a number of federal and state proposals to implement similar governmental control. While we cannot predict whether any such legislative or regulatory proposals will be adopted, the adoption of such proposals could have a material adverse effect on our business, financial condition and profitability.

In addition, in the United States and elsewhere, sales of therapeutic and other pharmaceutical products are dependent in part on the availability of reimbursement to the physician or consumer from third-party payers, such as the government or private insurance plans. Government and private third-party payers are increasingly challenging the prices charged for medical products and services, through class action litigation and otherwise. For example, the Medicare Prescription Drug Improvement and Modernization Act, enacted in December 2003 (the "Medicare Act"), decreased the Medicare reimbursement rate for many drugs, including our oncology products, possibly offset to some extent by increased physician payment rates for drug administration services related to certain of our oncology products. It is unclear how these changes in reimbursement rates for products administered by oncologists in the office setting will affect physician prescribing practices and ultimately the sales of our products. Depending on changes in physician prescribing conduct or usage of the product as a result of this legislation or any future legislation limiting or decreasing drug reimbursement rates to physicians, sales of our products may be materially adversely affected. See "Decreases in Third Party Reimbursement Rates May Affect our Product Sales" under "Forward-Looking Information and Cautionary Factors that May Affect Future Results."

## Research and Development

A major portion of our operating expenses to date is related to R&D. R&D expenses consist of independent R&D costs and costs associated with collaborative R&D and in-licensing arrangements. R&D expenses were $722.0 million in 2003, $623.5 million in 2002, and $526.2 million in 2001. Our R&D efforts have been the primary source of our products. We intend to maintain our strong commitment to R&D as an essential component of our product development effort. Licensed technology developed by outside parties is an additional source of potential products.

## Human Resources

As of December 31, 2003, we had 6,226 employees.

## Environment

We seek to comply with all applicable statutory and administrative requirements concerning environmental quality. We have made, and will continue to make, expenditures for environmental compliance and protection. Expenditures for compliance with environmental laws have not had, and are not expected to have, a material effect on our capital expenditures, results of operation, or competitive position.

## Available Information

The following information can be found on our website at http://www.gene.com or can be obtained free of charge by contacting our Investor Relations Department at (650) 225-1599 or by sending an e-mail message to investor.relations@gene.com:

- our annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and all amendments to those reports as soon as reasonably practicable after such material is electronically filed with the Securities and Exchange Commission;

- our policies related to corporate governance, including Genentech's Good Operating Principles (Genentech's code of ethics applying to Genentech's directors, officers and employees) as well as Genentech's Code of Ethics applying to our chief executive officer and senior financial officials; and

- the charter of the Audit Committee of our Board of Directors.

## ITEM 2.   PROPERTIES

Our primary facilities are located in a research and industrial park in South San Francisco, California in both leased and owned properties. In South San Francisco, we currently occupy 33 buildings for our research and development, manufacturing, marketing and administrative activities. Of the buildings, 19 are owned and 14 are leased. Of the 14 leased buildings, 4 were leased as of December 31, 2003, pursuant to synthetic lease arrangements. On January 2, 2004, upon the expiration of one of the synthetic leases, we purchased the related land and office building from our lessor at a cost of $25.0 million. In late 2003, we purchased a building in Redwood City, California, to accommodate our data center. We have made and continue to make improvements to these properties to accommodate our growth.

We also lease a manufacturing facility in Vacaville, California. This property is leased pursuant to a synthetic lease arrangement and is consolidated in accordance with accounting rules adopted in 2003 and included in our property, plant and equipment in the accompanying consolidated balance sheet at December 31, 2003. See "Leases, Commitments and Contingencies" in the Notes to Consolidated Financial Statements of Part II, Item 8 of this Form 10-K for a discussion of our synthetic lease arrangements.

Outside of North America we are finishing construction on a cell culture manufacturing facility and a warehouse in Porrino, Spain for the manufacture of Avastin for clinical trials.

We also lease additional office facilities in several locations throughout the United States. We believe our facilities are in good operating condition and that the real property owned or leased are adequate for all present and near term uses. We have over 275,000 liters of installed fermentation capacity worldwide to support our current clinical and commercial production needs. Additionally, in December 2003, we entered into a non-exclusive long-term manufacturing agreement with Lonza to help us meet a portion of our Rituxan production requirements for the next several years. Additional manufacturing capacity may be added to Vacaville or other sites depending on the success of potential products in clinical trials. We believe our capital resources are sufficient to purchase or construct any additional facilities required to meet our long-term growth needs.

## ITEM 3.   LEGAL PROCEEDINGS

We are a party to various legal proceedings, including patent infringement litigation, and licensing and contract disputes, and other matters.

We and the City of Hope National Medical Center (or COH) are parties to a 1976 agreement relating to work conducted by two COH employees, Arthur Riggs and Keiichi Itakura, and patents that resulted from that work, which are referred to as the "Riggs/Itakura Patents." Since that time, Genentech has entered into license agreements with various companies to make, use and sell the products covered by the Riggs/Itakura Patents. On August 13, 1999, the COH filed a complaint against us in the Superior Court in Los Angeles County, California, alleging that we owe royalties to the COH in connection with these license agreements, as well as product license agreements that involve the grant of licenses under the Riggs/Itakura Patents. The first trial of this suit began on August 28, 2001. On October 24, 2001, the jury hearing the lawsuit announced that it was unable to reach a verdict and on that basis the Court declared a mistrial. COH requested a retrial, and the retrial began on March 20, 2002. On June 10, 2002, the jury voted to award the COH approximately $300 million in compensatory damages. On June 24, 2002, the jury voted to award the COH an additional $200 million in punitive damages. Such amounts were accrued as an expense in the second quarter of 2002 and were included in litigation-related liabilities in the consolidated balance sheets at December 31, 2003 and 2002. Genentech filed a notice of appeal of the verdict and damages awards with the California Court of Appeal. The appeal process is ongoing. The amount of cash paid, if any, in connection with the COH matter will depend on the outcome of the appeal.

On June 7, 2000, Chiron Corporation filed a patent infringement suit against us in the U.S. District Court in the Eastern District of California (Sacramento), alleging that the manufacture, use, sale and offer for sale of our

Herceptin antibody product infringes Chiron's U.S. Patent No. 6,054,561. This patent was granted on April 25, 2000, and will expire on June 28, 2005, and it relates to certain antibodies that bind to breast cancer cells and/or other cells. Chiron is seeking compensatory damages for the alleged infringement, additional damages (e.g., for willful infringement), and attorneys' fees and costs. On April 22, 2002, the Court issued its decision ("Markman Order") construing certain aspects of the patent claims that are in dispute. On June 25, 2002, the Court issued several decisions regarding summary judgment motions that previously had been filed by Chiron and us. In those decisions, the Court ruled as a matter of law that Herceptin infringes claims 1 to 25 of Chiron's patent, and also ruled as a matter of law in favor of Chiron on some but not all of Genentech's defenses and counterclaims regarding the alleged invalidity and/or unenforceability of the patent. The trial of this suit began on August 6, 2002. Following the first phase of the trial, which related to Genentech's remaining defenses and counterclaims regarding the alleged invalidity of the patent, the jury unanimously found that claims 1 to 25 of Chiron's patent were invalid, and on that basis the Court entered judgment in favor of Genentech. Chiron filed a notice of appeal with the U.S. Court of Appeals for the Federal Circuit, and Genentech filed a notice of cross-appeal. The appeal process is ongoing and therefore the outcome of this matter cannot be determined at this time.

On August 12, 2002, the U.S. Patent and Trademark Office (or Patent Office) declared an interference between the Chiron patent involved in the above-mentioned lawsuit (U.S. Patent No. 6,054,561) and a patent application exclusively licensed by Genentech from a university relating to anti-HER2 antibodies. An interference proceeding is declared to decide who first made a particular invention where two or more parties claim the same invention, whether the parties' claims are patentable, and consequently who is or is not entitled to a patent on the invention. In declaring this interference, the Patent Office has determined that there is a substantial question as to whether the inventors of the Chiron patent were first to invent and are entitled to this patent. If the Patent Office were to decide that the inventors of the university's patent application were first to invent and that their claims are patentable, a new patent would be issued to the university and the Chiron patent would be revoked. On October 24, 2002, the Patent Office redeclared the interference to include, in addition to the above-referenced Chiron patent and university patent application, a number of patents and patent applications owned by either Chiron or Genentech, including Chiron's U.S. Patent No. 4,753,894 that is also at issue in the separate patent infringement lawsuit described below. The interference proceeding is ongoing and therefore the outcome of this matter cannot be determined at this time.

On March 13, 2001, Chiron filed another patent infringement lawsuit against us in the U.S. District Court in the Eastern District of California, alleging that the manufacture, use, sale and/or offer for sale of our Herceptin antibody product infringes Chiron's U.S. Patent No. 4,753,894. Chiron is seeking compensatory damages for the alleged infringement, additional damages, and attorneys' fees and costs. Genentech filed a motion to dismiss this second lawsuit, which was denied. On November 1, 2002, the parties filed a proposed stipulation to stay all proceedings in this lawsuit until (1) the interference involving U.S. Patent No. 4,753,894 is resolved or (2) two years from entry of the proposed stipulation, whichever is sooner. On or about November 13, 2002, the Court entered the stipulation, staying the proceedings as requested by the parties. This lawsuit is separate from and in addition to the Chiron suit mentioned above.

We and Tanox Biosystems, Inc. (or Tanox) are parties to a July 1996 Settlement and Cross-Licensing Agreement relating to the development and manufacture of certain antibody products directed towards immunoglobin E, including Xolair and Hu-901. On February 20, 2002, Tanox filed an amended demand in an ongoing arbitration proceeding between Genentech and Tanox that is being conducted by the American Arbitration Association in San Francisco. In its amended demand, Tanox has claimed breach of the July 1996 Agreement, conversion, tortious interference, unjust enrichment, and unfair competition by Genentech, and requests injunctive relief as well as monetary damages "many times in excess of $100,000,000." On March 14, 2002, Genentech denied all of Tanox's claims, and counterclaimed for breach of contract, theft of trade secrets, misappropriation, breach of confidence, interference with contract, and interference with economic expectancies by Tanox. Genentech requested injunctive relief and monetary damages. On October 16, 2002, Tanox announced that in a dispute between it and Novartis, an arbitration panel ruled that Tanox is not entitled to develop independently the Hu-901 antibody product. The Novartis/Tanox panel also ruled that Tanox is entitled to receive certain know-how from

Novartis. Tanox contends in its dispute against Genentech that it is entitled to similar information from Genentech. The effect of the October 16 ruling from the Novartis/Tanox arbitration, if any, on Tanox's claims against Genentech cannot be determined since the arbitrators in the Tanox/Genentech proceedings have not yet resolved it. As a general matter, the claims are divided into two categories: (1) compensation for lost rights under agreements with Genentech and Novartis, and (2) additional royalties on future sales. On February 25, 2004, the parties settled and agreed to dismiss with prejudice all claims from the arbitration that began on January 13, 2003.

On April 11, 2003, MedImmune, Inc. filed a lawsuit against Genentech, City of Hope National Medical Center (or COH), and Celltech R & D Ltd. in the U.S. District Court for the Central District of California (Los Angeles). The lawsuit relates to U.S. Patent No. 6,331,415 ("the '415 patent") that is co-owned by Genentech and COH and under which MedImmune and other companies have been licensed and are paying royalties to Genentech. The lawsuit includes claims for violation of antitrust, patent, and unfair competition laws. MedImmune is seeking to have the '415 patent declared invalid and/or unenforceable, a determination that MedImmune does not owe royalties under the '415 patent on sales of its Synagis® antibody product, an injunction to prevent Genentech from enforcing the '415 patent, an award of actual and exemplary damages, and other relief. Genentech intends to vigorously defend itself against all of the allegations and claims in this lawsuit. On January 14, 2004 (amending a December 23, 2003 Order), the U.S. District Court granted summary judgment in Genentech's favor on all of MedImmune's antitrust and unfair competition claims. MedImmune is seeking to amend its complaint to reallege certain claims for antitrust and unfair competition and the Court has not yet ruled on this issue. Discovery in the case on the remaining claims is ongoing and trial is currently set to begin on August 30, 2004. An estimate of any potential loss or range of loss cannot be made at this time.

We recorded $53.9 million in 2003 for accrued interest and bond costs related to the COH trial judgment. In 2002, we recognized $543.9 million of litigation-related special charges, which included the COH trial judgment, including accrued interest and bond costs, and certain other litigation-related matters. In conjunction with the COH trial judgment, in the second quarter of 2002 we posted a $600.0 million surety bond and as part of this arrangement, we were required to pledge $630.0 million in cash and investments to secure the bond. The $630.0 million cash and investments were classified as restricted cash and investments on our consolidated balance sheets at December 31, 2003 and 2002. In addition, we accrued $4.7 million in 2003 and $9.1 million in 2002 of royalty expenses related to the COH trial judgment, which were reflected in marketing, general and administrative expenses. We expect that we will continue to incur interest charges on the judgment and service fees on the surety bond each quarter through the process of appealing the COH trial results. These special charges represent our best estimate of the costs for the current resolution of these matters and are included in litigation and other long-term liabilities in the consolidated balance sheets at December 31, 2003 and 2002. We developed this estimate in consultation with outside counsel handling our defense in these matters using the facts and circumstances of these matters known to us at that time. The amount of our liability for certain of these matters could exceed or be less than the amount of our current estimate, depending on the outcome of these matters. The amount of cash paid, if any, in connection with the COH matter will depend on the outcome of the appeal.

See the "Leases, Commitments and Contingencies" note in the Notes to Consolidated Financial Statements of Part II, Item 8 of this Form 10-K for further information regarding our litigations.

**Litigation Settlement**

In August 2003, we settled our patent litigation with Amgen, Inc. in the U.S. District Court for the Northern District of California. The settlement of our complaint, originally filed in 1996, resulted in a one-time payment from Amgen to us. The settlement resulted in an increase of approximately $0.19 in earnings per diluted share for 2003 and was reported as a litigation-related special item in our consolidated statements of income. In November 2003, we received a settlement payment from Bayer, one of our licensees, in connection with the settlement of a breach of contract action, which resulted in an increase of approximately $0.03 in earnings per diluted share for 2003 and was reported as a litigation-related special item.

**Item 4.  SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS**

Not applicable.

**Executive Officers of the Company**

The executive officers of the Company and their respective ages (ages as of December 31, 2003) and positions with the Company are as follows:

| Name | Age | Position |
| --- | --- | --- |
| Arthur D. Levinson, Ph.D.* | 53 | Chairman, President and Chief Executive Officer |
| Susan D. Desmond-Hellmann, M.D., M.P.H.* | 46 | Executive Vice President, Development and Product Operations and Chief Medical Officer |
| Stephen G. Juelsgaard, J.D.* | 55 | Executive Vice President, General Counsel and Secretary |
| Louis J. Lavigne, Jr.* | 55 | Executive Vice President and Chief Financial Officer |
| Myrtle S. Potter* | 45 | Executive Vice President, Commercial Operations and Chief Operating Officer |
| Richard H. Scheller, Ph.D.* | 50 | Executive Vice President, Research |
| David A. Ebersman | 34 | Senior Vice President, Product Operations |
| Robert L. Garnick, Ph.D. | 54 | Senior Vice President, Regulatory, Quality and Compliance |
| John M. Whiting | 48 | Vice President, Controller and Chief Accounting Officer |

_____

\*    Members of the Executive Committee of the Company.

The Board of Directors elects all officers annually. There is no family relationship between or among any of the officers or directors.

**Business Experience**

*Arthur D. Levinson, Ph.D.* was appointed Chairman of the Board of Directors in September 1999 and was elected President and Chief Executive Officer and a director of the Company in July 1995. Since joining the Company in 1980, Dr. Levinson has been a Senior Scientist, Staff Scientist and Director of the Company's Cell Genetics Department. Dr. Levinson was appointed Vice President of Research Technology in April 1989, Vice President of Research in May 1990 and Senior Vice President in January 1993. Dr. Levinson was formerly on the editorial boards of "Molecular Biology and Medicine" and "Molecular and Cellular Biology," and is active in the American Society of Microbiology, the New York Academy of Sciences, the American Association for the Advancement of Science, and the American Society for Biochemistry and Molecular Biology. From 1977 to 1980, Dr. Levinson was a Postdoctoral Fellow in the Department of Microbiology at the University of California, San Francisco. In 1977, Dr. Levinson received his Ph.D. in Biochemistry from Princeton University. Dr. Levinson also serves as a member of the Board of Directors of Apple Computer, Inc.

*Susan D. Desmond-Hellmann, M.D., M.P.H.* was appointed Executive Vice President, Development and Product Operations in September 1999. She has served as Chief Medical Officer since December 1996. She previously served as Senior Vice President, Development from December 1997 until September 1999, among other positions, since joining Genentech in March 1995 as a Clinical Scientist. Prior to joining Genentech, she held the position of Associate Director at Bristol-Myers Squibb.

*Stephen G. Juelsgaard, J.D.* was appointed Executive Vice President in September 2002, Vice President and General Counsel in July 1994 and Secretary in April 1997. He joined Genentech in July 1985 as Corporate Counsel and subsequently served as Senior Corporate Counsel from 1988 to 1990, Chief Corporate Counsel from 1990 to 1993, Vice President, Corporate Law from 1993 to 1994, Assistant Secretary from 1994 to 1997 and Senior Vice President from April 1998 to September 2002.

16