Statements in Part II, Item 8 of this Form 10-K, at various times other companies have filed patent infringement lawsuits against us alleging that the manufacture, use and sale of certain of our products infringe their patents.

- The increasing use and development of alternate therapies. For example, the overall size of the market for thrombolytic therapies, such as our Activase product, continues to decline as a result of the increasing use of mechanical reperfusion.

- The rate of market penetration by competing products. For example, we have lost market share to new competitors in the thrombolytic and, in the past, growth hormone markets.

## Our Royalty and Contract Revenues Could Decline

Royalty and contract revenues in future periods could vary significantly. Major factors affecting these revenues include, but are not limited to:

- Hoffmann-La Roche's decisions whether to exercise its options and option extensions to develop and sell our future products in non-U.S. markets and the timing and amount of any related development cost reimbursements.

- Variations in Hoffmann-La Roche's sales and other licensees' sales of licensed products.

- The expiration or termination of existing arrangements with other companies and Hoffmann-La Roche, which may include development and marketing arrangements for our products in the U.S., Europe and other countries outside the United States.

- The timing of non-U.S. approvals, if any, for products licensed to Hoffmann-La Roche and to other licensees.

- Fluctuations in foreign currency exchange rates.

- The initiation of new contractual arrangements with other companies.

- Whether and when contract benchmarks are achieved.

- The failure of or refusal of a licensee to pay royalties.

- The expiration or invalidation of our patents or licensed intellectual property.

- Decreases in licensees' sales of product due to competition, manufacturing difficulties or other factors that affect the sales of product.

## We May Incur Material Product Liability Costs

The testing and marketing of medical products entail an inherent risk of product liability. Liability exposures for biotherapeutics could be extremely large and pose a material risk. Our business may be materially and adversely affected by a successful product liability claim or claims in excess of any insurance coverage that we may have.

## Insurance Coverage Is Increasingly More Difficult to Obtain or Maintain

While we currently have insurance for our business, property and our products, first- and third-party insurance is increasingly more costly and narrower in scope, and we may be required to assume more risk in the future. If we are subject to third-party claims or suffer a loss or damage in excess of our insurance coverage, we may be required to share that risk in excess of our insurance limits. Furthermore, any first- or third-party claims made on our insurance policy may impact our ability to obtain or maintain insurance coverage at reasonable costs or at all in the future.

**We are Subject to Environmental and Other Risks**

We use certain hazardous materials in connection with our research and manufacturing activities. In the event such hazardous materials are stored, handled or released into the environment in violation of law or any permit, we could be subject to loss of our permits, government fines or penalties and/or other adverse governmental action. The levy of a substantial fine or penalty, the payment of significant environmental remediation costs or the loss of a permit or other authorization to operate or engage in our ordinary course of business could materially adversely affect our business.

**Fluctuations in Our Operating Results Could Affect the Price of Our Common Stock**

Our operating results may vary from period to period for several reasons including:

- The overall competitive environment for our products as described in "We Face Competition" above.

- The amount and timing of sales to customers in the United States. For example, sales of a product may increase or decrease due to pricing changes, fluctuations in distributor buying patterns or sales initiatives that we may undertake from time to time.

- The amount and timing of our sales to Hoffmann-La Roche and our other collaborators of products for sale outside of the United States and the amount and timing of sales to their respective customers, which directly impacts both our product sales and royalty revenues.

- The timing and volume of bulk shipments to licensees.

- The availability and extent of government and private third-party reimbursements for the cost of therapy.

- The extent of product discounts extended to customers.

- The effectiveness and safety of our various products as determined both in clinical testing and by the accumulation of additional information on each product after the FDA approves it for sale.

- The rate of adoption and use of our products for approved indications and additional indications. Among other things, the rate of adoption and use of our products may be affected by results of clinical studies reporting on the benefits or risks of a product.

- The potential introduction of new products and additional indications for existing products.

- The ability to successfully manufacture sufficient quantities of any particular marketed product.

- The number and size of any product price increases we may issue.

**Our Stock Price, Like That of Many Biotechnology Companies, Is Highly Volatile**

The market prices for securities of biotechnology companies in general have been highly volatile and may continue to be highly volatile in the future. In addition, the market price of our common stock has been and may continue to be volatile.

In addition, the following factors may have a significant impact on the market price of our common stock:

- Announcements of technological innovations or new commercial products by us or our competitors.

- Publicity regarding actual or potential medical results relating to products under development or being commercialized by us or our competitors.

- Developments or outcome of litigation, including litigation regarding proprietary and patent rights.

- Regulatory developments or delays concerning our products in the United States and foreign countries.

- Issues concerning the safety of our products or of biotechnology products generally.

- Economic and other external factors or a disaster or crisis.
- Period-to-period fluctuations in our financial results.

**Future Stock Repurchases Could Adversely Affect Our Cash Position**

Our Board of Directors has authorized stock repurchase programs. Generally, under these programs, Genentech can purchase its stock in the open market or in privately negotiated transactions from time to time at management's discretion. Genentech can also engage in transactions in other Genentech securities in conjunction with the repurchase program, including derivative securities.

Under a stock repurchase program approved by our Board of Directors on December 5, 2003, Genentech is authorized to repurchase up to $1 billion of its common stock through December 31, 2004. A total of 70,900 shares at a cost of approximately $6.1 million has been purchased under the plan through December 31, 2003.

While the dollar amounts associated with future stock repurchase programs cannot currently be estimated, future stock repurchases could have a material adverse impact on our liquidity, credit rating and ability to access additional capital in the financial markets, and may have the effect of limiting our ability to use our capital stock as consideration for acquisitions.

**Our Affiliation Agreement with Roche Could Adversely Affect Our Cash Position**

Our affiliation agreement with Roche provides that we establish a stock repurchase program designed to maintain Roche's percentage ownership interest in our common stock based on an established Minimum Percentage. For more information on our stock repurchase program, see the "Capital Stock" note in the Notes to Consolidated Financial Statements in Part II, Item 8 of this Form 10-K. See the "Relationship With Roche — Roche's Ability to Maintain Its Percentage Ownership Interest in Our Stock" note in the Notes to Consolidated Financial Statements in Part II, Item 8 of this Form 10-K for information regarding the Minimum Percentage.

While the dollar amounts associated with future stock repurchase programs cannot currently be estimated, future stock repurchases could have a material adverse impact on our liquidity, credit rating and ability to access additional capital in the financial markets, and may have the effect of limiting our ability to use our capital stock as consideration for acquisitions.

**Future Sales of Our Common Stock by Roche Could Cause the Price of Our Common Stock to Decline**

As of December 31, 2003, Roche owned 306,594,352 shares of our common stock or 58.4% of our outstanding shares. All of our shares owned by Roche are eligible for sale in the public market subject to compliance with the applicable securities laws. We have agreed that, upon Roche's request, we will file one or more registration statements under the Securities Act in order to permit Roche to offer and sell shares of our common stock. Sales of a substantial number of shares of our common stock by Roche in the public market could adversely affect the market price of our common stock.

**Roche Holdings, Inc., Our Controlling Stockholder, May Have Interests That Are Adverse to Other Stockholders**

Roche as our majority stockholder, controls the outcome of most actions requiring the approval of our stockholders. Our bylaws provide, among other things, that the composition of our board of directors shall consist of two Roche directors, three independent directors nominated by a nominating committee and one Genentech employee nominated by the nominating committee. As long as Roche owns in excess of 50% of our common stock, Roche directors will comprise two of the three members of the nominating committee. However, at any time until Roche owns less than 5% of our stock, Roche will have the right to obtain proportional representation on our board. Roche intends to continue to allow our current management to conduct our business

and operations as we have done in the past. However, we cannot assure stockholders that Roche will not institute a new business plan in the future. Roche's interests may conflict with minority shareholder interests.

### Our Affiliation Agreement with Roche Could Limit Our Ability to Make Acquisitions and Could Have a Material Negative Impact on Our Liquidity

The affiliation agreement between us and Roche contains provisions that:

- Require the approval of the directors designated by Roche to make any acquisition or any sale or disposal of all or a portion of our business representing 10% or more of our assets, net income or revenues.

- Enable Roche to maintain its percentage ownership interest in our common stock.

- Require us to establish a stock repurchase program designed to maintain Roche's percentage ownership interest in our common stock based on an established Minimum Percentage. For information regarding Minimum Percentage, see the "Relationship With Roche — Roche's Ability to Maintain Its Percentage Ownership Interest in Our Stock" note in the Notes to Consolidated Financial Statements in Part II, Item 8 of this Form 10-K. For more information on our stock repurchase program, see the "Capital Stock" note in the Notes to Consolidated Financial Statements in Part II, Item 8 of this Form 10-K.

These provisions may have the effect of limiting our ability to make acquisitions and while the dollar amounts associated with a stock repurchase program cannot currently be estimated, stock repurchases could have a material adverse impact on our liquidity, credit rating and ability to access additional capital in the financial markets.

### Our Stockholders May Be Unable to Prevent Transactions That Are Favorable to Roche but Adverse to Us

Our certificate of incorporation includes provisions relating to:

- Competition by Roche with us.

- Offering of corporate opportunities.

- Transactions with interested parties.

- Intercompany agreements.

- Provisions limiting the liability of specified employees.

Our certificate of incorporation provides that any person purchasing or acquiring an interest in shares of our capital stock shall be deemed to have consented to the provisions in the certificate of incorporation relating to competition with Roche, conflicts of interest with Roche, the offer of corporate opportunities to Roche and intercompany agreements with Roche. This deemed consent might restrict the ability to challenge transactions carried out in compliance with these provisions.

### Potential Conflicts of Interest Could Limit Our Ability to Act on Opportunities That Are Adverse to Roche

Persons who are directors and/or officers of Genentech and who are also directors and/or officers of Roche may decline to take action in a manner that might be favorable to us but adverse to Roche. Two of our directors, Dr. Franz B. Humer and Dr. Jonathan K.C. Knowles, currently serve as officers and employees of Roche Holding Ltd and its affiliates, and Dr. Humer is a director and the Chairman of Roche Holding Ltd.

**We Are Exposed to Market Risk**

We are exposed to market risk, including changes to interest rates, foreign currency exchange rates and equity investment prices. To reduce the volatility relating to these exposures, we enter into various derivative hedging transactions pursuant to our investment and risk management policies and procedures. We do not use derivatives for speculative purposes.

We maintain risk management control systems to monitor the risks associated with interest rates, foreign currency exchange rates and equity investment price changes, and our derivative and financial instrument positions. The risk management control systems use analytical techniques, including sensitivity analysis and market values. Though we intend for our risk management control systems to be comprehensive, there are inherent risks that may only be partially offset by our hedging programs should there be unfavorable movements in interest rates, foreign currency exchange rates or equity investment prices.

The estimated exposures discussed below are intended to measure the maximum amount we could lose from adverse market movements in interest rates, foreign currency exchange rates and equity investment prices, given a specified confidence level, over a given period of time. Loss is defined in the value at risk estimation as fair market value loss. The exposures to interest rate, foreign currency exchange rate and equity investment price changes are calculated based on proprietary modeling techniques from a Monte Carlo simulation value at risk model using a 21-trading days holding period and a 95% confidence level. The value at risk model assumes non-linear financial returns and generates potential paths various market prices could take and tracks the hypothetical performance of a portfolio under each scenario to approximate its financial return. The value at risk model takes into account correlations and diversification across market factors, including interest rates, foreign currencies and equity prices. Hedge instruments are modeled as positions on the actual underlying securities. No proxies were used. Market volatilities and correlations are based on a one-year historical times-series as of December 31, 2003.

### *Our Interest Income Is Subject to Fluctuations in Interest Rates*

Our material interest-bearing assets, or interest-bearing portfolio, consisted of cash, cash equivalents, restricted cash and investments, short-term investments, marketable debt securities, long-term investments and interest-bearing forward contracts. The balance of our interest-bearing portfolio, including restricted and unrestricted cash and investments, was $3,240.5 million or 37% of total assets at December 31, 2003. Interest income related to this portfolio was $78.4 million in 2003. Our interest income is sensitive to changes in the general level of interest rates, primarily U.S. interest rates. In this regard, changes in U.S. interest rates affect the interest-bearing portfolio. To mitigate the impact of fluctuations in U.S. interest rates, for a portion of our portfolio, we may enter into swap transactions that involve the receipt of fixed rate interest and the payment of floating rate interest without the exchange of the underlying principal.

Based on our overall interest rate exposure at December 31, 2003, including derivative and other interest rate sensitive instruments, a near-term change in interest rates, within a 95% confidence level based on historical interest rate movements could result in a potential loss in fair value of our interest rate sensitive instruments of $19.5 million.

### *We Are Exposed to Risks Relating to Foreign Currency Exchange Rates and Foreign Economic Conditions*

We receive royalty revenues from licensees selling products in countries throughout the world. As a result, our financial results could be significantly affected by factors such as changes in foreign currency exchange rates or weak economic conditions in the foreign markets in which our licensed products are sold. We are exposed to changes in exchange rates in Europe, Asia (primarily Japan) and Canada. Our exposure to foreign exchange rates primarily exists with the Swiss franc. When the dollar strengthens against the currencies in these countries, the dollar value of foreign-currency denominated revenue decreases; when the dollar weakens, the dollar value of the foreign-currency denominated revenues increases. Accordingly, changes in exchange rates, and in particular a

strengthening of the dollar, may adversely affect our royalty revenues as expressed in dollars. Expenses arising from our foreign manufacturing facility as well as non-dollar expenses incurred in our collaborations are offsetting exchange rate exposures on these royalties. Currently, our foreign royalty revenues exceed our foreign expenses. In addition, as part of our overall investment strategy, a portion of our portfolio is primarily in non-dollar denominated investments. As a result, we are exposed to changes in the exchange rates of the countries in which these non-dollar denominated investments are made.

To mitigate our net foreign exchange exposure, our policy allows us to hedge certain of our anticipated royalty revenues by purchasing option contracts with expiration dates and amounts of currency that are based on up to 90% of probable future revenues so that the potential adverse impact of movements in currency exchange rates on the non-dollar denominated revenues will be at least partly offset by an associated increase in the value of the option. Generally, the term of these options is one to five years. To hedge the non-dollar expenses arising from our foreign manufacturing facility, we may enter into forward contracts to lock in the dollar value of a portion of these anticipated expenses.

Based on our overall currency rate exposure at December 31, 2003, including derivative and other foreign currency sensitive instruments, a near-term change in currency rates within a 95% confidence level based on historical currency rate movements would not materially affect the fair value of our foreign currency sensitive instruments.

### Our Investments in Equity Securities Are Subject to Market Risks

As part of our strategic alliance efforts, we invest in equity instruments of biotechnology companies. Our biotechnology equity investment portfolio totaled $380.7 million or 4% of total assets at December 31, 2003. These investments are subject to fluctuations from market value changes in stock prices. For example, in 2002, we recorded charges related to the write-down of certain equity security investments that had other-than-temporary impairments.

To mitigate the risk of market value fluctuation, certain equity securities are hedged with zero-cost collars and forward contracts. A zero-cost collar is a purchased put option and a written call option in which the cost of the purchased put and the proceeds of the written call offset each other; therefore, there is no initial cost or cash outflow for these instruments at the time of purchase. The purchased put protects us from a decline in the market value of the security below a certain minimum level (the put "strike" level), while the call effectively limits our potential to benefit from an increase in the market value of the security above a certain maximum level (the call "strike" level). A forward contract is a derivative instrument where we lock-in the termination price we receive from the sale of stock based on a pre-determined spot price. The forward contract protects us from a decline in the market value of the security below the spot price and limits our potential benefit from an increase in the market value of the security above the spot price. Throughout the life of the contract, we receive interest income based on the notional amount and a floating-rate index. In addition, as part of our strategic alliance efforts, we hold convertible preferred stock, including dividend-bearing convertible preferred stock, and have made interest-bearing loans that are convertible into the equity securities of the debtor or repaid in cash. Depending on market conditions, we may determine that in 2004 certain of our other unhedged equity security investments are impaired, which would result in additional write-downs of those equity security investments.

Based on our overall exposure to fluctuations from market value changes in marketable equity prices at December 31, 2003, a near-term change in equity prices within a 95% confidence level based on historic volatilities could result in a potential loss in fair value of our equity securities portfolio of $22.4 million.

### *We Are Exposed to Credit Risk of Counterparties*

We could be exposed to losses related to the financial instruments described above should one of our counterparties default. We attempt to mitigate this risk through credit monitoring procedures.

### The Company's Effective Tax Rate May Vary Significantly

Various internal and external factors may have favorable or unfavorable effects on our future effective tax rate. These factors include but are not limited to changes in tax laws, regulations and/or rates, changing interpretations of existing tax laws or regulations, future levels of R&D spending, future levels of capital expenditures, and changes in overall levels of pretax earnings.

### New and Potential New Accounting Pronouncements May Impact Our Future Financial Position and Results of Operations

There may be potential new accounting pronouncements or regulatory rulings, which may have an impact on our future financial position and results of operations. In particular, there are a number of rule changes and proposed legislative initiatives following the recent corporate bankruptcies and failures which could result in changes in accounting rules, including the accounting for employee stock options as an expense. These and other potential changes could materially impact our assets and liabilities, and the expenses we report under generally accepted accounting principles, and could adversely affect our operating results or financial condition.

### Item 7A.  QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

Refer to the section labeled "Forward-Looking Information and Cautionary Factors That May Affect Future Results — We Are Exposed to Market Risk" of Part II, Item 7 of this Form 10-K.

**Item 8.   FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

### REPORT OF ERNST & YOUNG LLP, INDEPENDENT AUDITORS

*The Board of Directors and Stockholders of Genentech, Inc.*

We have audited the accompanying consolidated balance sheets of Genentech, Inc. as of December 31, 2003 and 2002, and the related consolidated statements of income, stockholders' equity and cash flows for each of the three years in the period ended December 31, 2003. Our audits also included the financial statement schedule listed in the Index at Item 15(a). These financial statements and schedule are the responsibility of Genentech, Inc.'s management. Our responsibility is to express an opinion on these financial statements and schedule based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Genentech, Inc. at December 31, 2003 and 2002, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2003, in conformity with accounting principles generally accepted in the United States. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

As discussed in the notes to the consolidated financial statements in 2003, the company changed its method of accounting for variable interest entities, in 2002 changed its method of accounting for goodwill and other intangible assets and in 2001 changed its method of accounting for derivative instruments and hedging activities.

*Ernst + Young LLP*

Palo Alto, California
January 13, 2004, except for the
second paragraph of the note titled
Subsequent Events and the
twenty-first paragraph of the note
titled Leases, Commitments and
Contingencies, as to which the
date is February 25, 2004

## CONSOLIDATED STATEMENTS OF INCOME
*(in thousands, except per share amounts)*

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2003** | **2002** | **2001** |
| **Revenues** | | | |
| Product sales (including amounts from related parties: | | | |
| 2003-$108,078; 2002-$117,257; 2001-$76,290) . . . . . . . . . . . . | $2,621,490 | $2,163,665 | $1,742,897 |
| Royalties (including amounts from related party: | | | |
| 2003-$245,623; 2002-$152,642; 2001-$87,854) . . . . . . . . . . . . | 500,903 | 365,550 | 264,475 |
| Contract revenue (including amounts from related parties: | | | |
| 2003-$90,692; 2002-$13,348; 2001-$5,754) . . . . . . . . . . . . . . | 177,934 | 54,443 | 36,660 |
| **Total operating revenues** . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,300,327 | 2,583,658 | 2,044,032 |
| **Costs and expenses** | | | |
| Cost of sales (including amounts for related parties: | | | |
| 2003-$90,657; 2002-$99,150; 2001-$63,761) . . . . . . . . . . . . . . | 480,123 | 441,630 | 354,442 |
| Research and development (including related parties amounts of: | | | |
| 2003-$37,556; 2002-$7,092; 2001-$2,937) | | | |
| (including contract related: | | | |
| 2003-$95,473; 2002-$24,060; 2001-$9,434) . . . . . . . . . . . . . . | 721,970 | 623,482 | 526,230 |
| Marketing, general and administrative . . . . . . . . . . . . . . . . . . . . . . | 794,845 | 546,276 | 446,906 |
| Collaboration profit sharing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 457,457 | 350,725 | 246,657 |
| Recurring charges related to redemption . . . . . . . . . . . . . . . . . . . . | 154,344 | 155,713 | 321,816 |
| Special items: litigation-related . . . . . . . . . . . . . . . . . . . . . . . . . . . | (113,127) | 543,905 | — |
| **Total costs and expenses** . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,495,612 | 2,661,731 | 1,896,051 |
| Operating margin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 804,715 | (78,073) | 147,981 |
| Other income, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 92,791 | 107,822 | 135,005 |
| Income before taxes and cumulative effect of accounting changes . . . . | 897,506 | 29,749 | 282,986 |
| Income tax provision (benefit) . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 287,324 | (34,038) | 127,112 |
| Income before cumulative effect of accounting changes . . . . . . . . . . . | 610,182 | 63,787 | 155,874 |
| Cumulative effect of accounting changes (net of taxes: | | | |
| 2003-$31,770; 2001-$3,759) . . . . . . . . . . . . . . . . . . . . . . . . . . . | (47,655) | — | (5,638) |
| **Net income** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 562,527 | $ 63,787 | $ 150,236 |
| **Earnings per share** | | | |
| **Basic** | | | |
| Earnings before cumulative effect of accounting changes . . . . | $ 1.18 | $ 0.12 | $ 0.30 |
| Cumulative effect of accounting changes (net of taxes: | | | |
| 2003-$0.06; 2001-$0.01) . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (0.09) | — | (0.01) |
| Net earnings per share . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 1.09 | $ 0.12 | $ 0.29 |
| **Diluted** | | | |
| Earnings before cumulative effect of accounting change . . . . . | $ 1.15 | $ 0.12 | $ 0.29 |
| Cumulative effect of accounting changes (net of taxes: | | | |
| 2003-$0.06; 2001-$0.01) . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (0.09) | — | (0.01) |
| Net earnings per share . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 1.06 | $ 0.12 | $ 0.28 |
| Weighted-average shares used to compute basic earnings per share . . . | 517,240 | 519,192 | 527,022 |
| Weighted-average shares used to compute diluted earnings per share . . . | 528,810 | 524,408 | 535,291 |

See Notes to Consolidated Financial Statements.

## CONSOLIDATED STATEMENTS OF CASH FLOWS
*(in thousands)*

| | Year Ended December 31, | | |
| --- | ---: | ---: | ---: |
| | **2003** | **2002** | **2001** |
| **Cash flows from operating activities** | | | |
| Net income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $  562,527 | $  63,787 | $  150,236 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Cumulative effect of accounting changes, net of tax . . . . . . . | 47,655 | — | 5,638 |
| Depreciation and amortization . . . . . . . . . . . . . . . . . . . . . . . . | 295,449 | 274,955 | 428,091 |
| Deferred income taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (149,001) | (196,644) | 29,357 |
| Deferred revenue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 239,145 | 2,001 | (15,457) |
| Litigation-related and other long-term liabilities . . . . . . . . . . | 56,113 | 552,185 | — |
| Gain on sales of securities available-for-sale and other . . . . . | (23,069) | (53,710) | (39,398) |
| Loss on sales of securities available-for-sale . . . . . . . . . . . . . | 3,137 | 5,868 | 2,011 |
| Write-down of securities available-for-sale . . . . . . . . . . . . . . | 3,795 | 40,759 | 27,504 |
| Loss on fixed asset dispositions . . . . . . . . . . . . . . . . . . . . . . . | 10,760 | 15,883 | 4,211 |
| Changes in assets and liabilities: . . . . . . . . . . . . . . . . . . . . . . . . . | | | |
| Receivables and other current assets . . . . . . . . . . . . . . . . . . . | (146,107) | (107,483) | (59,512) |
| Inventories . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (93,264) | (36,596) | (91,116) |
| Investments in trading securities . . . . . . . . . . . . . . . . . . . . . . | (33,825) | (121,986) | (85,712) |
| Accounts payable and other current liabilities . . . . . . . . . . . . | 463,622 | 148,681 | 124,774 |
| **Net cash provided by operating activities** . . . . . . . . . . . . . . . . . | 1,236,937 | 587,700 | 480,627 |
| **Cash flows from investing activities** | | | |
| Purchases of securities available-for-sale . . . . . . . . . . . . . . . . . . . . | (1,755,934) | (806,444) | (1,559,230) |
| Proceeds from sales and maturities of securities available-for-sale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 739,867 | 1,746,198 | 1,084,546 |
| Purchases of nonmarketable equity securities . . . . . . . . . . . . . . . . | (4,286) | (6,290) | (5,830) |
| Capital expenditures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (321,955) | (322,832) | (213,351) |
| Change in other assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (56,122) | 12,875 | (10,105) |
| Transfer to restricted cash . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | (630,000) | — |
| **Net cash used in investing activities** . . . . . . . . . . . . . . . . . . . . . | (1,398,430) | (6,493) | (703,970) |
| **Cash flows from financing activities** | | | |
| Stock issuances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 526,860 | 74,164 | 106,866 |
| Stock repurchases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (201,345) | (692,752) | (39,704) |
| Repayment of short-term debt . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | (149,692) | — |
| **Net cash provided by (used in) financing activities** . . . . . . . . . | 325,515 | (768,280) | 67,162 |
| Net increase (decrease) in cash and cash equivalents . . . . . . . . . . . . . | 164,022 | (187,073) | (156,181) |
| Cash and cash equivalents at beginning of year . . . . . . . . . . . . . . . . . | 208,130 | 395,203 | 551,384 |
| **Cash and cash equivalents at end of year** . . . . . . . . . . . . . . . . . . . . . | $  372,152 | $  208,130 | $  395,203 |
| **Supplemental cash flow data** | | | |
| Cash paid during the year for: | | | |
| Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $  2,223 | $  7,482 | $  7,493 |
| Income taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 167,761 | 128,108 | 36,450 |
| Stock received as consideration for outstanding loans . . . . . . . . . . | 29,600 | — | 6,490 |

See Notes to Consolidated Financial Statements.

62

## CONSOLIDATED BALANCE SHEETS

*(in thousands, except par value)*

|  | December 31, | |
|---|---|---|
|  | **2003** | **2002** |
| **Assets** | | |
| Current assets | | |
| Cash and cash equivalents | $ 372,152 | $ 208,130 |
| Short-term investments | 1,139,620 | 826,442 |
| Accounts receivable — product sales (net of allowances: 2003-$22,903; 2002-$16,827; including amounts from related parties: 2003-$16,018; 2002-$18,564) | 315,097 | 242,907 |
| Accounts receivable — royalties (including amounts from related party: 2003-$113,739; 2002-$60,615) | 184,163 | 116,423 |
| Accounts receivable — other (net of allowances: 2003-$2,191; 2002-$3,171; including amounts from related parties: 2003-$71,863; 2002-$27,716) | 74,831 | 59,151 |
| Inventories | 469,640 | 393,542 |
| Deferred tax assets | 121,885 | 82,299 |
| Hedge receivable | 38,485 | 103,148 |
| Prepaid expenses and other current assets | 40,957 | 50,742 |
| Total current assets | 2,756,830 | 2,082,784 |
| Long-term marketable debt and equity securities | 1,422,886 | 567,286 |
| Property, plant and equipment, net | 1,617,912 | 1,068,734 |
| Goodwill | 1,315,019 | 1,315,019 |
| Other intangible assets | 810,810 | 927,538 |
| Restricted cash and investments | 686,600 | 686,600 |
| Other long-term assets | 126,114 | 110,158 |
| **Total assets** | $ 8,736,171 | $ 6,758,119 |
| **Liabilities and stockholders' equity** | | |
| Current liabilities | | |
| Accounts payable | $ 59,700 | $ 51,380 |
| Deferred revenue | 47,478 | 20,044 |
| Other accrued liabilities (including amounts to related parties: 2003-$58,138; 2002-$51,116) | 765,853 | 575,236 |
| Total current liabilities | 873,031 | 646,660 |
| Long-term debt | 412,250 | — |
| Deferred tax liabilities | 26,056 | 148,314 |
| Deferred revenue | 281,243 | 69,533 |
| Litigation and other long-term liabilities | 623,293 | 554,728 |
| Total liabilities | 2,215,873 | 1,419,235 |
| Commitments and contingencies | | |
| Stockholders' equity | | |
| Preferred stock, $0.02 par value; authorized: 100,000,000 shares; none issued | — | — |
| Common stock, $0.02 par value; authorized: 1,200,000,000 shares; outstanding: 2003-524,742,041; 2002-512,810,225 | 10,495 | 10,256 |
| Additional paid-in capital | 7,370,261 | 6,650,352 |
| Accumulated deficit, since June 30, 1999 | (1,157,491) | (1,590,366) |
| Accumulated other comprehensive income | 297,033 | 268,642 |
| Total stockholders' equity | 6,520,298 | 5,338,884 |
| **Total liabilities and stockholders' equity** | $ 8,736,171 | $ 6,758,119 |

See Notes to Consolidated Financial Statements.

## CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY
*(in thousands)*

| | Common Stock | | Additional Paid-in Capital | Retained Earnings (Accumulated Deficit) | Accumulated Other Comprehensive Income | Total |
|---|---|---|---|---|---|---|
| | Shares | Amounts | | | | |
| **Balance December 31, 2000** ............ | 525,477 | $10,510 | $6,651,428 | $(1,319,353) | $331,618 | $5,674,203 |
| Comprehensive income | | | | | | |
| Net income ........................ | — | — | — | 150,236 | — | 150,236 |
| Changes in unrealized (loss) on securities available-for-sale, net of tax ........ | — | — | — | — | (27,741) | (27,741) |
| Cumulative effect of adopting FAS 133, net of tax ....................... | — | — | — | — | 5,020 | |
| Changes in fair value of cash flow hedges, net of tax ................. | — | — | — | — | 5,757 | |
| Derivative gains reclassified from other comprehensive income, net of tax .... | — | — | — | — | (2,932) | 7,845 |
| Comprehensive income ................. | | | | | | 130,340 |
| Issuance of stock upon exercise of options .... | 2,898 | 57 | 71,538 | — | — | 71,595 |
| Issuance of stock under employee stock plan .. | 838 | 17 | 35,254 | — | — | 35,271 |
| Repurchase of common stock ............. | (900) | (18) | (11,503) | (28,183) | — | (39,704) |
| Income tax benefits realized from employee stock option exercises ................. | — | — | 48,114 | — | — | 48,114 |
| **Balance December 31, 2001** ............ | 528,313 | 10,566 | 6,794,831 | (1,197,300) | 311,722 | 5,919,819 |
| Comprehensive income | | | | | | |
| Net income ........................ | — | — | — | 63,787 | — | 63,787 |
| Changes in unrealized (loss) on securities available-for-sale, net of tax ........ | — | — | — | — | (38,778) | (38,778) |
| Changes in fair value of cash flow hedges, net of tax ................. | — | — | — | — | (4,302) | (4,302) |
| Comprehensive income ................. | | | | | | 20,707 |
| Issuance of stock upon exercise of options .... | 1,672 | 34 | 39,018 | — | — | 39,052 |
| Issuance of stock under employee stock plan .. | 1,066 | 21 | 35,091 | — | — | 35,112 |
| Repurchase of common stock ............. | (18,241) | (365) | (235,534) | (456,853) | — | (692,752) |
| Income tax benefits realized from employee stock option exercises ................. | — | — | 16,946 | — | — | 16,946 |
| **Balance December 31, 2002** ............ | 512,810 | 10,256 | 6,650,352 | (1,590,366) | 268,642 | 5,338,884 |
| Comprehensive income | | | | | | |
| Net income ........................ | — | — | — | 562,527 | — | 562,527 |
| Changes in unrealized gain on securities available-for-sale, net of tax ........ | — | — | — | — | 29,249 | 29,249 |
| Changes in fair value of cash flow hedges, net of tax ................. | — | — | — | — | (858) | (858) |
| Comprehensive income ................. | | | | | | 590,918 |
| Issuance of stock upon exercise of options .... | 16,039 | 320 | 487,908 | — | — | 488,228 |
| Issuance of stock under employee stock plan .. | 1,398 | 28 | 38,605 | — | — | 38,633 |
| Repurchase of common stock ............. | (5,505) | (109) | (71,584) | (129,652) | — | (201,345) |
| Income tax benefits realized from employee stock option exercises ................. | — | — | 264,980 | — | — | 264,980 |
| **Balance December 31, 2003** ............ | 524,742 | $10,495 | $7,370,261 | $(1,157,491) | $297,033 | $6,520,298 |

See Notes to Consolidated Financial Statements.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

In this Annual Report, "Genentech," "we," "us" and "our" refer to Genentech, Inc. "Common Stock" refers to Genentech's common stock, par value $0.02 per share, "Special Common Stock" refers to Genentech's callable putable common stock, par value $0.02 per share, all of which was redeemed by Roche Holdings, Inc. on June 30, 1999.

## DESCRIPTION OF BUSINESS AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Genentech is a leading biotechnology company using human genetic information to discover, develop, manufacture and commercialize biotherapeutics for significant unmet medical needs. We manufacture and commercialize 13 biotechnology products directly in the United States and license several additional products to other companies.

### Principles of Consolidation

The consolidated financial statements include the accounts of Genentech and all subsidiaries. Genentech also consolidated a variable interest entity in which Genentech is the primary beneficiary pursuant to Financial Accounting Standards Board (or FASB) Interpretation No. 46 (or FIN 46) "Consolidation of Variable Interest Entities," as amended, and recorded the noncontrolling interest in the consolidated balance sheet. Material intercompany accounts and transactions have been eliminated.

### Use of Estimates

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make judgments, assumptions and estimates that affect the amounts reported in our financial statements and accompanying notes. Actual results could differ materially from those estimates.

### Changes in Accounting Principles

In January 2003, the FASB issued FIN 46, as amended, which requires a variable interest entity (or VIE) to be consolidated by a company if that company absorbs a majority of the VIE's expected losses, receives a majority of the entity's expected residual returns, or both, as a result of ownership, contractual or other financial interest in the VIE. Prior to the adoption of FIN 46, VIEs were generally consolidated by companies owning a majority voting interest in the VIE. The consolidation requirements of FIN 46 applied immediately to VIEs created after January 31, 2003. However, the FASB deferred the effective date for VIEs created before February 1, 2003 to the period ended March 31, 2004 for calendar year companies. Adoption of the provisions of FIN 46 prior to the deferred effective date was permitted.

We adopted FIN 46 on July 1, 2003, and consolidated the entity from which we lease our manufacturing facility located in Vacaville, California as of that date, as we determined that this entity is a VIE, as defined by FIN 46, and that we are the primary beneficiary of this entity as we absorb a majority of its expected losses. Accordingly, we consolidated assets, which consist of the Vacaville manufacturing building and related equipment, net of accumulated depreciation on July 1, 2003. Such property and equipment had a carrying value of $348.4 million at December 31, 2003 and was included in property, plant and equipment in the accompanying consolidated balance sheet. On July 1, 2003, we also consolidated the entity's debt of $412.3 million and the noncontrolling interests of $12.7 million, which amounts are included in long-term debt and litigation and other long-term liabilities, respectively, in the accompanying consolidated balance sheet at December 31, 2003. We recorded a $47.6 million charge, net of $31.8 million in taxes, (or $0.09 per share) as a cumulative effect of the accounting change on July 1, 2003. Due to our residual value guarantee on the property, the nonrecourse feature of the underlying debt, and certain other provisions of the lease arrangement, we do not allocate any of the entity's depreciation or interest expenses to the noncontrolling interest. We had previously accounted for our

65

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

involvement with this entity as an operating lease. See also the "Leases" note below for a discussion of all of our leases.

In April 2003, the FASB issued FAS 149, "Amendment of Statement 133 on Derivative Instruments and Hedging Activities." FAS 149 amends and clarifies financial accounting and reporting for derivative instruments, including certain derivative instruments embedded in other contracts (collectively referred to as derivatives) and for hedging activities under FASB Statement No. 133, "Accounting for Derivative Instruments and Hedging Activities." The adoption of FAS 149 did not have a material effect on our financial statements.

We adopted Statement of Financial Accounting Standards No. 133 (or FAS 133), "Accounting for Derivative Instruments and Hedging Activities," on January 1, 2001. Upon adoption, we recorded a $5.6 million charge, net of $3.8 million in taxes, ($0.01 per share) as a cumulative effect of a change in accounting principle, recognized $6.0 million in gains, net of $4.0 million in taxes, ($0.01 per share) in "other income, net" related to certain hedging instruments and increased other comprehensive income by $5.0 million, net of $3.3 million in taxes, as a result of recording derivative instruments at fair value.

### *Reclassifications*

Effective January 1, 2003, we made certain classification changes to our consolidated statements of income. Comparable amounts in the prior years have been reclassified to conform to the 2003 presentation. These classification changes included:

- a new caption titled "other income, net" (see below for the composition of this new caption),

- a change from the "contract and other" caption to the new "contract revenues" caption (the gains on sales of biotechnology equity securities, which were previously included in "contract and other," are now reflected in the new "other income, net" caption), and

- a change from including write-downs of biotechnology equity securities and changes in the recoverability of our debt securities in "marketing, general and administrative" expenses to including them in the new "other income, net" caption.

The following table summarizes the components of "other income, net" *(in millions)*:

| Other Income, Net | 2003 | 2002 | 2001 |
|---|---|---|---|
| Gains on sales of biotechnology equity securities and other . . . . . . . . . . . | $21.1 | $ 47.9 | $ 37.7 |
| Write-downs of biotechnology debt and equity securities . . . . . . . . . . . . . | (3.8) | (40.8) | (27.5) |
| Interest income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 78.4 | 101.4 | 130.5 |
| Interest expense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (2.9) | (0.8) | (5.7) |
| Total other income, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $92.8 | $107.7 | $135.0 |

As part of our strategic alliance efforts, we invest in debt and equity securities of certain biotechnology companies with which we have or have had collaborative agreements. The "other income, net" caption now includes realized gains and losses from the sale of certain of these biotechnology equity securities as well as changes in the recoverability of our debt securities. In addition, "other income, net" includes write-downs for other-than-temporary declines in the fair value of certain of these biotechnology debt and equity securities, interest income and interest expense, net of amounts capitalized in 2002.

Certain other reclassifications of prior years' amounts have been made to our consolidated statements of income and our consolidated balance sheets to conform to the current year presentation.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Cash and Cash Equivalents*

We consider all highly liquid debt instruments purchased with an original maturity of three months or less to be cash equivalents.

*Revenue Recognition*

We recognize revenue from the sale of our products, royalties earned and contract arrangements. Our revenue arrangements with multiple elements are divided into separate units of accounting if certain criteria are met, including whether the delivered element has stand-alone value to the customer and whether there is objective and reliable evidence of the fair value of the undelivered items. The consideration we receive is allocated among the separate units based on their respective fair values, and the applicable revenue recognition criteria are applied to each of the separate units. Advance payments received in excess of amounts earned are classified as deferred revenue until earned.

- We recognize revenue from product sales when there is persuasive evidence that an arrangement exists, delivery has occurred, the price is fixed and determinable, and collectibility is reasonably assured. Allowances are established for estimated uncollectible amounts, product returns and discounts.

- We recognize revenue from royalties based on licensees' sales of our products or technologies. Royalties are recognized as earned in accordance with the contract terms when royalties from licensees can be reliably measured and collectibility is reasonably assured. Royalty estimates are made in advance of amounts collected using historical and forecasted trends.

- Contract revenue generally includes upfront and continuing licensing fees, manufacturing fees, milestone payments and reimbursements of development costs and post-marketing costs.

  - Nonrefundable upfront fees, including product opt-ins, for which no further performance obligations exist are recognized as revenue on the earlier of when payments are received or collection is assured.

  - Nonrefundable upfront licensing fees, including product opt-ins, and certain guaranteed, time-based payments that require continuing involvement in the form of development, manufacturing or other commercialization efforts by us are recognized as revenue:

    - ratably over the development period if development risk is significant, or

    - ratably over the manufacturing period or estimated product useful life if development risk has been substantially eliminated.

  - Manufacturing fees are recognized as revenue as the related manufacturing services are rendered, generally on a straight-line basis over the longer of the manufacturing obligation period or the expected product life.

  - Milestone payments are recognized as revenue when milestones, as defined in the contract, are achieved.

  - Reimbursements of development and post-marketing costs are recognized as revenue as the related costs are incurred.

*Accounts Receivable Allowances*

Our accounts receivable allowances are based on estimates for our trade and other receivables. We make significant estimates primarily related to our trade receivables. To determine the collectibility of our trade receivables, we prepare estimates for discounts, rebates and sales returns and allowances based primarily on analysis of existing contractual obligations, historical trends and experience and changes in customer financial

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

conditions. If actual future results vary, we may need to adjust our estimates, which could have an impact on earnings in the period of the adjustment.

### *Investments in Marketable and Nonmarketable Securities*

We invest in short-term and long-term marketable securities, primarily corporate notes, government agencies, preferred stock, asset-backed securities and municipal bonds. As part of our strategic alliance efforts, we may also invest in equity securities, dividend bearing convertible preferred stock and interest-bearing debt of other biotechnology companies. All of our common equity investments represent less than a 20% ownership position in the investee company. Marketable equity and debt securities are accounted for as available-for-sale investments as described below. Nonmarketable equity securities are carried at cost. We periodically monitor the liquidity and financing activities of the respective issuers to determine if impairment write downs are necessary.

Marketable equity and debt securities are classified into one of three categories: held-to-maturity, available-for-sale or trading. Securities are considered held-to-maturity when we have the positive intent and ability to hold the securities to maturity. Held-to-maturity debt securities are stated at amortized cost, including adjustments for amortization of premiums and accretion of discounts. Securities are considered trading when purchased principally for the purpose of selling in the near term. These securities are recorded as short-term investments and are carried at market value. Unrealized holding gains and losses on trading securities are included in interest income. Securities not classified as held-to-maturity or as trading are considered available-for-sale. These securities are recorded as either short-term or long-term investments and are carried at fair value with unrealized gains and losses included in accumulated other comprehensive income in stockholders' equity. Nonmarketable equity securities are carried at cost, less write-downs for impairments. If the fair value of a security is below its carrying value for each trading day for six consecutive months or if its decline is due to a significant adverse event, the impairment is considered to be other-than-temporary and the security is written down to its estimated fair value. Other-than-temporary declines in fair value of all marketable securities are charged to "other income, net." Some of the factors we consider in determining whether a significant adverse event has occurred with an issuer include, among other things, unfavorable clinical trial results and the diminished prospect for new products, failure to receive product approval from a regulatory body, the termination of a major collaborative relationship and the liquidity position and financing activities of the issuer. The cost of all securities sold is based on the specific identification method. We recognized charges of $3.8 million in 2003, $40.8 million in 2002 and $27.5 million in 2001 as a result of charges related to other-than-temporary declines in the fair values of certain of our marketable equity and debt securities.

### *Derivative Instruments*

We use derivatives to manage our market exposure to fluctuations in foreign currencies, U.S. interest rates and marketable equity investments. We record all derivatives on the balance sheet at fair value. For derivative instruments that are designated and qualify as a fair value hedge (i.e., hedging the exposure to changes in the fair value of an asset or a liability or an identified portion thereof that is attributable to a particular risk), the gain or loss on the derivative instrument, as well as the offsetting loss or gain on the hedged item attributable to the hedged risk, is recognized in current earnings during the period of the change in fair values. For derivative instruments that are designated and qualify as a cash flow hedge (i.e., hedging the exposure to variability in expected future cash flows that is attributable to a particular risk), the effective portion of the gain or loss on the derivative instrument is reported as a component of other comprehensive income and reclassified into earnings in the same period or periods during which the hedged transaction affects earnings. The gain or loss on the derivative instruments in excess of the cumulative change in the present value of future cash flows of the hedged transaction, if any, is recognized in current earnings during the period of change. We do not use derivative instruments for speculative purposes. See the "Derivative Financial Instruments" note below for further information on our accounting for derivatives.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Inventories*

Inventories are stated at the lower of cost or market. Cost is determined using a weighted-average approach, which approximates the first-in first-out method. If inventory costs exceed expected market value due to obsolescence or lack of demand, reserves are recorded for the difference between the cost and the market value. These reserves are determined based on significant estimates. Inventories consist of currently marketed products, products manufactured under contract and product candidates awaiting regulatory approval (i.e. pre-launch inventories), which were capitalized based on management's judgment of probable near term commercialization.

In anticipation of the launch of Avastin in 2004, we produced approximately $86.7 million of inventory, net of reserves. The Avastin inventory was included in work in process at December 31, 2003. Avastin was approved by the U.S. Food and Drug Administration (or FDA) on February 26, 2004 and we began shipping Avastin on that date. Inventories at December 31 are summarized below *(in thousands)*:

|  | 2003 | 2002 |
|---|---|---|
| Raw materials and supplies | $ 37,069 | $ 30,181 |
| Work in process | 383,850 | 329,819 |
| Finished goods | 48,721 | 33,542 |
| Total | $469,640 | $393,542 |

*Property, Plant and Equipment*

The costs of buildings and equipment are depreciated using the straight-line method over the following estimated useful lives of the assets:

|  | Useful Lives |
|---|---|
| Buildings | 25 years |
| Certain manufacturing equipment | 15 years |
| Other equipment | 4 or 8 years |
| Leasehold improvements | length of applicable lease |

The costs of repairs and maintenance are expensed as incurred and were $65.6 million in 2003, $51.2 million in 2002 and $52.8 million in 2001.

Property, plant and equipment balances at December 31, 2003 and 2002 are summarized below *(in thousands)*:

|  | 2003 | 2002 |
|---|---|---|
| At cost: |  |  |
| Land | $ 153,265 | $ 149,533 |
| Buildings | 442,157 | 422,790 |
| Equipment | 924,303 | 880,624 |
| Leasehold improvements | 58,512 | 53,589 |
| Construction-in-progress | 498,231 | 289,810 |
| Vacaville capitalized lease assets | 425,000 | — |
|  | 2,501,468 | 1,796,346 |
| Less: accumulated depreciation and amortization | 883,556 | 727,612 |
| Net property, plant and equipment | $1,617,912 | $1,068,734 |

Depreciation expense was $124.7 million in 2003, $104.6 million in 2002 and $96.3 million in 2001.

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

*FDA Validation Costs*

FDA validation costs are capitalized as part of the effort required to acquire and construct long-lived assets, including readying them for their intended use, and are amortized over the estimated useful life of the asset or the term of the lease, whichever is shorter.

*Restricted Cash and Investments*

On October 3, 2002, we entered into an arrangement with third-party insurance companies to post a $600 million bond in connection with the City of Hope trial judgment that was issued in the second quarter of 2002. As part of this arrangement, we were required to pledge $630 million in cash and investments to secure this bond. Further, under certain lease agreements, we may be required from time to time to set aside cash as collateral. At December 31, 2003 and 2002, we had $56.6 million of restricted cash and investments related to such lease agreements. These amounts are classified as restricted cash and investments on our consolidated balance sheet at December 31, 2003 and 2002.

*Impairment of Long-Lived Assets*

Long-lived assets and certain identifiable intangible assets to be held and used are reviewed for impairment when events or changes in circumstances indicate that the carrying amount of such assets may not be recoverable. Determination of recoverability is based on an estimate of undiscounted future cash flows resulting from the use of the asset and its eventual disposition. In the event that such cash flows are not expected to be sufficient to recover the carrying amount of the assets, the assets are written down to their estimated fair values. Long-lived assets and certain identifiable intangible assets to be disposed of are reported at the lower of carrying amount or fair value less cost to sell.

*Goodwill and Other Intangible Assets*

Goodwill represents the difference between the purchase price and the fair value of the net assets acquired when accounted for by the purchase method of accounting arising from Roche's purchases of our Special Common Stock and push-down accounting (refer to the "Redemption of Our Special Common Stock" note below). On January 1, 2002, we adopted FAS 141, "Business Combinations" and FAS 142, "Goodwill and Other Intangible Assets." FAS 141 requires that the purchase method of accounting be used for all business combinations initiated after June 30, 2001, and also specifies the criteria for the recognition of intangible assets separately from goodwill. Under the new rules, goodwill is no longer amortized but is subject to an impairment test at least annually. Prior to 2002, goodwill was amortized using the straight-line method over 15 years. We performed an impairment test of goodwill upon transition to FAS 142 on January 1, 2002, and perform an annual impairment test every September, and have found no impairment. We will continue to evaluate our goodwill for impairment annually and whenever events and changes in circumstances suggest that the carrying amount may not be recoverable. FAS 141 specifically identified assembled workforce as an intangible asset that is not to be recognized apart from goodwill and it was subsumed into goodwill on January 1, 2002. Other intangible assets that meet the new criteria continue to be amortized over their useful lives.

In accordance with FAS 141 and 142, we discontinued the amortization of goodwill and our trained and assembled workforce intangible asset, which resulted in an increase in reported net income by approximately $157.6 million (or $0.30 per share) in 2002, as compared to the accounting prior to the adoption of FAS 141 and 142.

We amortize intangible assets with definite lives on a straight-line basis over their estimated useful lives, ranging from five to 15 years, and review for impairment when events or changes in circumstances indicate that the

70

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

carrying amount of such assets may not be recoverable. We capitalize costs of patents and patent applications related to products and processes of significant importance to us and amortize these on a straight-line basis over their estimated useful lives of approximately 12 years.

### Research and Development Expenses

Research and development (or R&D) expenses include salaries, benefits and other headcount related costs, clinical trial and related clinical manufacturing costs, contract and other outside service fees, and facilities and overhead costs. R&D expenses consist of independent R&D costs and costs associated with collaborative R&D and in-licensing arrangements. In addition, we fund R&D at other companies and research institutions under agreements, which we can generally terminate at will. R&D expenses also include post-marketing activities such as Phase IV and investigator-sponsored trials and product registries. R&D costs, including upfront fees and milestones paid to collaborative partners, are generally expensed as incurred.

### Collaboration Profit Sharing

Collaboration profit sharing primarily includes the net operating profit sharing with Biogen Idec Inc. (or Biogen Idec), formerly known as IDEC Pharmaceuticals Corporation, on Rituxan sales and with Novartis on Xolair sales, and the sharing of costs with these collaborators related to the commercialization of future products. See "Related Party Transactions" discussion below regarding Novartis related collaboration profit sharing expenses.

### Royalty Expenses

Royalty expenses directly related to product sales are classified in cost of sales. Other royalty expenses, relating to royalty revenue, are classified in marketing, general and administrative expenses and totaled $114.3 million in 2003, $92.0 million in 2002 and $59.5 million in 2001.

### Advertising Expenses

We expense the costs of advertising, which also includes promotional expenses, as incurred. Advertising expenses were $197.8 million in 2003, $111.7 million in 2002 and $91.9 million in 2001.

### Stock Award Plans

We have elected to continue to follow Accounting Principles Board Opinion No. 25 (or APB 25), "Accounting for Stock Issued to Employees," to account for employee stock options because the alternative fair value method of accounting prescribed by Statement of Financial Accounting Standards (or FAS) No. 123, "Accounting for Stock-Based Compensation," requires the use of option valuation models that were not developed for use in valuing employee stock options. Under APB 25, the intrinsic value method of accounting, no compensation expense is recognized because the exercise price of our employee stock options equals the market price of the underlying stock on the date of grant. We apply FAS 123 for disclosure purposes only. The FAS 123 disclosures include pro forma net income and earnings per share as if the fair value method of accounting had been used. We are currently evaluating our option valuation methodologies and assumptions in light of evolving accounting standards related to employee stock options.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The following information regarding net income and earnings per share has been determined as if we had accounted for our employee stock options and employee stock plan under the fair value method prescribed by FAS 123. The resulting effect on net income and earnings per share pursuant to FAS 123 is not likely to be representative of the effects in future periods, due to subsequent additional option grants and periods of vesting.

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Net income as reported | $562,527 | $ 63,787 | $150,236 |
| Deduct: Total stock-based employee compensation expense determined under the fair value based method for all awards, net of related tax effects | 172,045 | 166,624 | 152,799 |
| Pro forma net income (loss) | $390,482 | $(102,837) | $ (2,563) |
| Earnings (loss) per share: |  |  |  |
| Basic-as reported | $ 1.09 | $ 0.12 | $ 0.29 |
| Basic-pro forma | $ 0.76 | $ (0.20) | $ 0.00 |
| Diluted-as reported | $ 1.06 | $ 0.12 | $ 0.28 |
| Diluted-pro forma | $ 0.76 | $ (0.20) | $ 0.00 |

The fair value of options was estimated at the date of grant using a Black-Scholes option valuation model with the following weighted-average assumptions:

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Risk-free interest rate | 2.8% | 2.6% | 3.9% |
| Dividend yield | 0% | 0% | 0% |
| Volatility factors of the expected market price of our Common Stock | 44.7% | 43.0% | 63.0% |
| Weighted-average expected life of option (years) | 5 | 5 | 5 |

The Black-Scholes option valuation model was developed for use in estimating the fair value of traded options, which have no vesting restrictions and are fully transferable. Option valuation models require the input of highly subjective assumptions including the expected stock price volatility. Because our employee stock options have characteristics significantly different from those of traded options and changes in the subjective input assumptions can materially affect the fair value estimate, in management's opinion, the existing models do not provide a reliable single measure of the fair value of our employee stock options.

### 401(k) Plan

Our 401(k) Plan (or the Plan) covers substantially all of our employees. For 2003 and earlier, we matched a portion of employee contributions, up to a maximum of 4% of each employee's eligible compensation. This match increases to 5% beginning in 2004. The match is effective December 31 of each year and is fully vested when made. Also beginning in 2004, we will annually contribute to every employee's account 1% of his or her eligible compensation, regardless of whether or not the employee participates actively in the Plan. We provided $15.9 million in 2003, $13.6 million in 2002 and $11.9 million in 2001 for our match under the Plan.

### Income Taxes

Income tax provision (benefit) is based on pretax financial accounting income under the liability method. Deferred tax assets and liabilities are determined based on the difference between the financial statement and tax

72

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

basis of assets and liabilities using enacted tax rates in effect for the year in which the differences are expected to reverse. Significant estimates are required in determining our provisions (benefit) for income taxes. Some of these estimates are based on interpretations of existing tax laws or regulations. We believe that our estimates are reasonable and that our reserves for income tax related uncertainties are adequate. Various internal and external factors may have favorable or unfavorable effects on our future effective tax rate. These factors include, but are not limited to, changes in tax laws, regulations and/or rates, changing interpretations of existing tax laws or regulations, future levels of R&D spending, future levels of capital expenditures, and changes in overall levels of pretax earnings.

Effective with the consummation of the second public offering by Roche on October 26, 1999, we ceased to be a member of the consolidated federal income tax group (and certain consolidated or combined state and local income tax groups) of which Roche is the common parent. Accordingly, our tax sharing agreement with Roche now pertains only to the state and local tax returns in which we are consolidated or combined with Roche. We will continue to calculate our tax liability or refund with Roche for these state and local jurisdictions as if we were a stand-alone entity.

### Earnings Per Share

Basic earnings per share is computed based on the weighted-average number of shares of our common stock outstanding. Diluted earnings per share is computed based on the weighted-average number of shares of our common stock and other dilutive securities. See also "Earnings Per Share" note below.

### Comprehensive Income

Comprehensive income is comprised of net income and other comprehensive income (or OCI). OCI includes certain changes in stockholders' equity that are excluded from net income. Specifically, we include in OCI changes in the fair value of derivatives designated as effective cash flow hedges and unrealized gains and losses on our available-for-sale securities. Comprehensive income for the years ended December 31, 2003, 2002 and 2001 has been reflected in the consolidated statements of stockholders' equity.

The components of accumulated other comprehensive income, net of taxes, were as follows *(in millions)*:

|  | 2003 | 2002 |
|---|---|---|
| Net unrealized gains on securities available-for-sale ................ | $294.3 | $265.1 |
| Net gains on cash flow hedges ................................... | 2.7 | 3.5 |
| Accumulated other comprehensive income .................... | $297.0 | $268.6 |

The activity in OCI related to our available-for-sale securities was as follows *(in millions)*:

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Unrealized gains (losses) on securities available-for-sale (net of tax effect of $25.9 in 2003, ($23.1) in 2002, ($14.5) in 2001) ................ | $38.9 | $(34.6) | $(21.8) |
| Reclassification adjustment for net gains included in net income (net of tax effect of ($6.5) in 2003, ($2.8) in 2002, ($4.0) in 2001) ............. | (9.7) | (4.2) | (5.9) |
| Change in net unrealized gains (losses) on securities available-for-sale ... | $29.2 | $(38.8) | $(27.7) |

The activity in OCI related to our cash flow hedges held during the years ended December 31, 2003, 2002 and 2001 was not material.

73

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

## REDEMPTION OF OUR SPECIAL COMMON STOCK

On June 30, 1999, Roche exercised its option to cause us to redeem all of our Special Common Stock held by stockholders other than Roche (the Redemption). The Redemption was reflected as a purchase of a business, which under U.S. generally accepted accounting principles required push-down accounting to reflect in our financial statements the amounts paid for our stock in excess of our net book value. As a result, we were required to push down the effect of the Redemption and Roche's 1990 through 1997 purchases of our Common and Special Common Stock into our consolidated financial statements at the date of the Redemption. In 1990 and 1991 through 1997 Roche purchased 60% and 5%, respectively, of the outstanding stock of Genentech. In June 1999, we redeemed all of our Special Common Stock held by stockholders other than Roche resulting in Roche owning 100% of our Common Stock. The push-down effect of Roche's aggregate purchase price and the Redemption price in our consolidated balance sheet as of June 30, 1999 was allocated based on Roche's ownership percentages as if the purchases occurred at the original purchase dates for the 1990 and 1991 through 1997 purchases, and at June 30, 1999 for the Redemption. Management of Genentech determined the values of tangible and intangible assets, including in-process research and development (or IPR&D) used in allocating the purchase prices. The aggregate purchase price for the acquisition of all of Genentech's outstanding shares, including Roche's estimated transaction costs of $10.0 million, was $6,604.9 million, consisting of approximately $2,843.5 million for the 1990 and 1991 through 1997 purchases and approximately $3,761.4 million for the Redemption.

## GOODWILL AND OTHER INTANGIBLE ASSETS

The components of our acquisition-related intangible assets arising from the Redemption and push-down accounting at December 31, 2003 and 2002, are as follows *(in millions)*:

|  | 2003 | | | 2002 | | |
| --- | --- | --- | --- | --- | --- | --- |
|  | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| Developed product technology .......... | $1,194.1 | $  769.5 | $424.6 | $1,194.1 | $  690.4 | $503.7 |
| Core technology ..................... | 443.5 | 329.8 | 113.7 | 443.5 | 308.0 | 135.5 |
| Developed license technology .......... | 467.5 | 423.8 | 43.7 | 467.5 | 394.6 | 72.9 |
| Tradenames ......................... | 144.0 | 65.1 | 78.9 | 144.0 | 55.5 | 88.5 |
| Key distributor relationships ........... | 80.0 | 72.6 | 7.4 | 80.0 | 58.0 | 22.0 |
| Patents ............................. | 116.6 | 44.5 | 72.1 | 100.0 | 36.2 | 63.8 |
| Other intangible assets ................ | 114.3 | 43.9 | 70.4 | 77.3 | 36.2 | 41.1 |
| Total ......................... | $2,560.0 | $1,749.2 | $810.8 | $2,506.4 | $1,578.9 | $927.5 |

The $29.3 million increase in net other intangible assets was primarily due to purchased licenses related to our Xolair and Rituxan products.

Amortization expense of our goodwill and other intangible assets are as follows *(in millions)*:

|  | 2003 | 2002 | 2001 |
| --- | --- | --- | --- |
| Acquisition-related intangible assets amortization ................. | $154.3 | $155.7 | $164.3 |
| Goodwill amortization ......................................... | — | — | 153.3 |
| Patents amortization .......................................... | 8.3 | 6.5 | 5.5 |
| Other intangible assets amortization ............................. | 8.1 | 8.2 | 8.7 |
| Total amortization expense ................................ | $170.7 | $170.4 | $331.8 |

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The expected future annual amortization expense of our other intangible assets is as follows *(in millions)*:

| For the Year Ending December 31, | Amortization Expense |
|---|---|
| 2004 | $165.9 |
| 2005 | 142.9 |
| 2006 | 121.7 |
| 2007 | 120.5 |
| 2008 | 118.5 |
| Thereafter | 141.3 |
| Total expected future annual amortization | $810.8 |

## SEGMENT, SIGNIFICANT CUSTOMER AND GEOGRAPHIC INFORMATION

Our operations are treated as one operating segment as we only report profit and loss information on an aggregate basis to our executive committee. Information about our product sales, major customers and material foreign sources of revenues is as follows *(in millions)*:

| Product Sales | 2003 | 2002 | 2001 |
|---|---|---|---|
| Rituxan | $1,489.1 | $1,162.9 | $ 818.6 |
| Herceptin | 424.8 | 385.2 | 346.7 |
| Growth Hormone | 321.9 | 297.2 | 250.2 |
| Thrombolytic | 185.2 | 180.2 | 197.1 |
| Pulmozyme | 167.2 | 138.1 | 123.0 |
| Xolair | 25.3 | — | — |
| Raptiva | 1.4 | — | — |
| Product manufactured under contract | 6.5 | — | — |
| Actimmune | — | — | 7.3 |
| Total product sales | $2,621.4 | $2,163.6 | $1,742.9 |

Three major customers, Amerisource/Bergen, Corp., Cardinal Health, Inc. and McKesson, Inc. each contributed 10% or more of our total operating revenues in each of the last three years. Amerisource/Bergen, a national wholesale distributor of all of our products, contributed 23% in 2003 and 2002, and 22% in 2001 of our total operating revenues. Cardinal Health, a national wholesale distributor of all our products, contributed 18% in 2003, and 19% in 2002 and 2001 of our total operating revenues. McKesson, a national wholesale distributor of all of our products, contributed 18% in 2003 and 2002, and 16% in 2001 of our total operating revenues.

Net foreign revenues by country were as follows *(in millions)*:

| | 2003 | 2002 | 2001 |
|---|---|---|---|
| Europe: | | | |
| Switzerland | $210.3 | $118.4 | $ 74.9 |
| Germany | 33.0 | 31.7 | 39.2 |
| France | 21.0 | 13.5 | 8.9 |
| Italy | 15.4 | 23.0 | 18.0 |
| Great Britain | 13.7 | 20.9 | 24.5 |
| Others | 35.9 | 27.9 | 16.6 |
| Asia Pacific | 95.0 | 46.3 | 23.9 |
| Canada | 22.5 | 24.3 | 24.0 |
| Other | 30.6 | 10.0 | 3.7 |
| Total net foreign revenues | $477.4 | $316.0 | $233.7 |

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

We currently sell primarily to distributors and health care companies throughout the U.S., perform ongoing credit evaluations of our customers' financial condition and extend credit, generally without collateral, and give discounts for prompt payment. In 2003, 2002 and 2001, we did not record any material additions to, or losses against, our allowance for bad debts.

### RESEARCH AND DEVELOPMENT ARRANGEMENTS

To gain access to potential new products and technologies and to utilize other companies to help develop our potential new products, we establish strategic alliances with various companies. These strategic alliances often include the acquisition of marketable and nonmarketable equity investments or debt of companies developing technologies that complement or fall outside our research focus and include companies having the potential to generate new products through technology exchanges and investments. Potential future payments may be due to certain collaborative partners achieving certain benchmarks as defined in the collaborative agreements. We also entered into product-specific collaborations to acquire development and marketing rights for products. See the "Leases, Commitments and Contingencies" and the "Related Party Transactions" notes below for a discussion of our more significant collaborations.

R&D in-licensing expense includes $13.6 million in 2003, $4.0 million in 2002 and $19.0 million in 2001 of upfront payments to collaborators under in-licensing arrangements for the purchase of in-process research and development (or IPR&D). We have determined that the acquired IPR&D was not yet technologically feasible and that the acquired technology had no future alternative uses. The IPR&D purchases in 2001 included a $15.0 million upfront payment to OSI Pharmaceuticals, Inc. (or OSI) under an agreement with us, OSI and Hoffmann-La Roche for the global co-development and commercialization of Tarceva for the potential treatment of solid tumor cancers. One of the members of the Board of Directors of OSI is also a member of the Board of Directors of Genentech.

### INCOME TAXES

The income tax provision (benefit) consists of the following amounts *(in thousands)*:

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Current: |  |  |  |
| Federal | $ 389,354 | $ 148,419 | $ 72,731 |
| State | 46,971 | 14,187 | 25,024 |
| Total current | 436,325 | 162,606 | 97,755 |
| Deferred: |  |  |  |
| Federal | (133,085) | (166,008) | 47,043 |
| State | (15,916) | (30,636) | (17,686) |
| Total deferred | (149,001) | (196,644) | 29,357 |
| Total income tax provision (benefit) | $ 287,324 | $ (34,038) | $127,112 |

Tax benefits of $265.0 million in 2003, $16.9 million in 2002 and $48.1 million in 2001 related to employee stock options and stock purchase plans. These amounts reduced current income taxes payable and were credited to stockholders' equity.

76

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

A reconciliation between our income tax provision (benefit) and the U.S. statutory tax rate follows *(in thousands)*:

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Tax at U.S. statutory rate of 35% | $314,127 | $ 10,412 | $ 99,045 |
| Research and other credits | (23,531) | (31,192) | (24,114) |
| Prior years' items | (34,819) | (9,545) | (14,000) |
| Export sales benefit | (10,325) | (1,393) | (305) |
| State taxes | 44,842 | 837 | 16,219 |
| Goodwill amortization | — | — | 53,649 |
| Tax-exempt investment income | (3,680) | (4,057) | (3,630) |
| Other | 710 | 900 | 248 |
| Income tax provision (benefit) | $287,324 | $(34,038) | $127,112 |

Prior years' items in 2003 include additional research credits resulting from the settlement of IRS examinations in 2003. Other prior years' items relate principally to changes in estimates resulting from events in 2003, 2002 and 2001 that provided greater certainty as to the expected outcome of prior years' matters.

The components of deferred taxes consist of the following at December 31 *(in thousands)*:

|  | 2003 | 2002 |
|---|---|---|
| Deferred tax liabilities: | | |
| Depreciation | $(208,114) | $(209,144) |
| Unrealized gain on securities available-for-sale | (204,661) | (188,636) |
| Intangibles — Roche transaction | (267,361) | (329,099) |
| Other | (20,852) | (22,500) |
| Total deferred tax liabilities | (700,988) | (749,379) |
| Deferred tax assets: | | |
| Capitalized R&D costs | 38,227 | 58,983 |
| Federal credit carryforwards | 43,429 | 43,429 |
| Expenses not currently deductible | 294,148 | 258,213 |
| Deferred revenue | 131,193 | 35,231 |
| Investment basis difference | 213,222 | 202,876 |
| State credit carryforwards | 76,598 | 78,052 |
| Other | — | 6,580 |
| Total deferred tax assets | 796,817 | 683,364 |
| Total net deferred taxes | $ 95,829 | $ (66,015) |

Total tax credit carryforwards of $120.0 million have no expiration date.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

## EARNINGS PER SHARE

The following is a reconciliation of the numerators and denominators of the basic and diluted earnings per share computations for the years ended December 31, 2003, 2002, and 2001 *(in thousands)*:

| | 2003 | 2002 | 2001 |
|---|---|---|---|
| **Numerator:** | | | |
| Net income .............................................. | $562,527 | $ 63,787 | $150,236 |
| **Denominator:** | | | |
| Weighted-average shares outstanding used for basic earnings per share ... | 517,240 | 519,192 | 527,022 |
| Effect of dilutive securities: | | | |
| Stock options ............................................. | 11,570 | 5,216 | 8,269 |
| Weighted-average shares outstanding and dilutive securities used for diluted earnings per share ...................................... | 528,810 | 524,408 | 535,291 |

Options to purchase 17.4 million shares of our Common Stock with exercise prices ranging from $63.63 to $95.66 per share were outstanding during 2003, but were excluded from the computation of diluted earnings per share as their effect would be antidilutive. See the "Capital Stock" note below for information on option expiration dates.

## FAIR VALUES OF INVESTMENT SECURITIES AND FINANCIAL INSTRUMENTS

### Investment Securities

Securities classified as trading and available-for-sale at December 31, 2003 and 2002 are summarized below *(in thousands)*. Estimated fair value is based on quoted market prices for these or similar investments.

| December 31, 2003 | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Estimated Fair Value |
|---|---|---|---|---|
| TOTAL TRADING SECURITIES ...................... | $  481,336 | $  38,862 | $  (848) | $  519,350 |
| SECURITIES AVAILABLE-FOR-SALE | | | | |
| Equity securities ..................................... | $   45,192 | $335,595 | $    (65) | $  380,722 |
| Preferred stock ...................................... | 157,108 | 14,510 | (24) | 171,594 |
| Debt securities maturing: | | | | |
| within 1 year ...................................... | 697,067 | 1,213 | (881) | 697,399 |
| between 1-5 years ................................. | 1,180,764 | 14,262 | (2,783) | 1,192,243 |
| between 5-10 years ................................ | 342,119 | 20,016 | (2,534) | 359,601 |
| TOTAL SECURITIES AVAILABLE-FOR-SALE ......... | $2,422,250 | $385,596 | $(6,287) | $2,801,559 |

| December 31, 2002 | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Estimated Fair Value |
|---|---|---|---|---|
| TOTAL TRADING SECURITIES ...................... | $  466,417 | $  19,952 | $  (844) | $  485,525 |
| SECURITIES AVAILABLE-FOR-SALE | | | | |
| Equity securities ..................................... | $   37,788 | $242,172 | $(3,315) | $  276,645 |
| Preferred stock ...................................... | 150,271 | 7,114 | (573) | 156,812 |
| Debt securities maturing: | | | | |
| within 1 year ...................................... | 420,105 | 1,295 | (425) | 420,975 |
| between 1-5 years ................................. | 432,422 | 16,567 | (64) | 448,925 |
| between 5-10 years ................................ | 285,064 | 21,937 | — | 307,001 |
| TOTAL SECURITIES AVAILABLE-FOR-SALE ......... | $1,325,650 | $289,085 | $(4,377) | $1,610,358 |

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The carrying value of all cash and investment securities held at December 31, 2003 and 2002 is summarized below *(in thousands)*:

| Security | 2003 | 2002 |
|---|---|---|
| Cash | $ 243,145 | $135,271 |
| Cash equivalents | 129,007 | 72,859 |
| Total cash and cash equivalents | $ 372,152 | $208,130 |
| Trading securities | $ 519,350 | $485,525 |
| Securities available-for-sale maturing within one year | 448,676 | 184,105 |
| Preferred stock | 171,594 | 156,812 |
| Total short-term investments | $1,139,620 | $826,442 |
| Securities available-for-sale maturing after one year | $1,042,164 | $290,641 |
| Equity securities | 380,722 | 276,645 |
| Total long-term marketable debt and equity securities | $1,422,886 | $567,286 |
| Cash | $ 57,204 | $ 57,304 |
| Securities available-for-sale maturing within one year | 119,716 | 164,011 |
| Securities available-for-sale maturing between 1-10 years | 509,680 | 465,285 |
| Total restricted cash and investments | $ 686,600 | $686,600 |

In 2003, proceeds from the sales of available-for-sale securities totaled $739.9 million; gross realized gains totaled $23.1 million and gross realized losses totaled $3.1 million. In 2002, proceeds from the sales of available-for-sale securities totaled $1,746.2 million; gross realized gains totaled $53.7 million and gross realized losses totaled $5.9 million. In 2001, proceeds from the sales of available-for-sale securities totaled $1,084.5 million; gross realized gains totaled $30.0 million and gross realized losses totaled $2.0 million. We recorded charges of $3.8 million in 2003, $40.8 million in 2002 and $27.5 million in 2001 to write down certain available-for-sale biotechnology equity securities for which the decline in fair value below carrying value was deemed other-than-temporary.

Net change in unrealized holding gains (losses) on trading securities included in net income totaled $18.9 million in 2003, $21.2 million in 2002 and $0.2 million in 2001.

The marketable debt securities we hold are issued by a diversified selection of corporate and financial institutions with strong credit ratings. Our investment policy limits the amount of credit exposure with any one institution. Other than asset-backed and mortgage-backed securities, these debt securities are generally not collateralized. In 2003, 2002 and 2001, we did not have charges for credit impairment on marketable debt securities.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Financial Instruments*

The fair value of the foreign exchange put options was based on the forward exchange rates as of December 31, 2003 and 2002. The fair value of the equity forwards and collars was determined based on the closing market prices of the underlying securities at each year-end. The fair value of our long-term debt is estimated based on the current rates offered to us for debt of the same remaining maturities. The table below summarizes the fair value, which is also the carrying value, of our financial instruments at December 31, 2003 and 2002 *(in thousands)*:

| | 2003 | 2002 |
|---|---|---|
| Assets: | | |
| Purchased foreign exchange put options . . . . . . . . . . . . . . . . . . | $ 3,347 | $ 6,404 |
| Equity forwards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 107,407 | 154,101 |
| Equity collars . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14,526 | 13,160 |
| Liabilities: | | |
| Purchased foreign exchange forward contracts . . . . . . . . . . . . . | — | 5,402 |
| Long-term debt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 412,250 | — |

The financial instruments we hold are entered into with a diversified selection of institutions with strong credit ratings, which minimizes the risk of loss due to nonpayment from the counterparty. Credit exposure is limited to the unrealized gains on our contracts. We have not experienced any material losses due to credit impairment of our financial instruments.

**DERIVATIVE FINANCIAL INSTRUMENTS**

*Foreign Currency Instruments*

To protect against currency exchange risks on forecasted foreign currency cash flows from royalties to be received from licensees' foreign product sales over the next one to five years and expenses related to our foreign facility and our collaboration development expenses denominated in foreign currencies, we have instituted a foreign currency cash flow hedging program. We hedge portions of our forecasted foreign currency revenues with option contracts and we hedge our foreign currency expenses from our foreign facility with forward contracts. When the dollar strengthens significantly against the foreign currencies, the decline in value of future foreign currency revenues or expenses is offset by gains or losses, respectively, in the value of the option or forward contracts designated as hedges. Conversely, when the dollar weakens, the increase in the value of future foreign currency expenses is offset by gains in the value of the forward contracts. In accordance with FAS 133, hedges related to anticipated transactions are designated and documented at the hedge's inception as cash flow hedges and evaluated for hedge effectiveness at least quarterly.

During the years ended December 31, 2003 and 2002, the ineffective portions of our foreign currency hedging instruments were not material. Gains and losses related to option and forward contracts that hedge future cash flows are recorded against the hedged revenues or expenses in the statements of income.

At December 31, 2003, net losses on derivative instruments expected to be reclassified from accumulated other comprehensive income to earnings during the next twelve months due to the receipt of the related net revenues denominated in foreign currencies were $4.3 million.

*Interest Rate Swaps*

We enter into interest-rate swap agreements to limit our exposure to fluctuations in U.S. interest rates. Our material interest-bearing assets, or interest-bearing portfolio, consisted of cash, cash equivalents, restricted cash and investments, short-term investments, marketable debt securities and long-term investments as of December 31, 2003 and 2002. Our interest-rate swap agreements effectively convert a portion of our short-term investments

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

in our interest-bearing portfolio to a fixed-rate basis, thus reducing the impact of interest rate changes on future interest income. In 2002, we recognized gains of $10.7 million in earnings related to the early termination of certain of our swap agreements when we determined that the forecasted transaction was not likely to occur. We had no such gains in 2003 and we have no interest rate swaps outstanding as of December 31, 2003.

*Equity Instruments*

Our marketable equity securities portfolio consists primarily of investments in biotechnology companies whose risk of market fluctuations is greater than the stock market in general. To manage a portion of this risk, we enter into derivative instruments such as zero-cost collar instruments and equity forward contracts to hedge equity securities against changes in market value. We have zero-cost collars that expire in 2005 through 2007 and will require settlement in equity securities. A zero-cost collar is a purchased put option and a written call option on a specific equity security such that the cost of the purchased put and the proceeds of the written call offset each other; therefore, there is no initial cost or cash outflow for these instruments. At December 31, 2003, our zero-cost collars were designated and qualified as cash flow hedges.

As part of our fair value hedging strategy, we have also entered into equity forwards that mature in 2004 through 2008. An equity forward is a derivative instrument where we pay the counterparty the total return of the security above the current spot price and receive interest income on the notional amount for the term of the equity forward. A forward contract is a derivative instrument where we lock-in the termination price we receive from the sale of stock based on a pre-determined spot price. The forward contract protects us from a decline in the market value of the security below the spot price and limits our potential benefit from an increase in the market value of the security above the spot price. Throughout the life of the contract, we receive interest income based on the notional amount and a floating-rate index.

As part of our hedging transactions, we have entered and may in the future enter into security lending agreements with our counterparties. For an equity forward contract, in exchange for lending the hedged shares to the counterparty, we receive additional interest income throughout the life of the agreement based on the notional amount and a floating-rate index. For an equity collar, the benefit is embedded in the call strike price. The total fair value of the securities lent under these agreements was $89.8 million at December 31, 2003 and $76.5 million at December 31, 2002.

In 2003 and 2002, our recognized gains and losses related to certain derivative instruments as a result of FAS 133 were not material. We record gains and losses in "other income, net."

## OTHER ACCRUED LIABILITIES

Other accrued liabilities at December 31 are as follows *(in thousands)*:

|  | 2003 | 2002 |
|---|---|---|
| Accrued compensation | $139,392 | $ 77,238 |
| Accrued royalties | 105,366 | 87,082 |
| Accrued clinical and other studies (including to related parties: 2003-$21,934; 2002-$13,364) | 88,064 | 59,330 |
| Accrued marketing and promotion costs | 82,204 | 39,101 |
| Taxes payable | 88,988 | 85,405 |
| Accrued collaborations (including to related parties: 2003-$9,499; 2002-$0) | 141,551 | 103,432 |
| Other (including to related parties: 2003-$26,705; 2002-$37,752) | 120,288 | 123,648 |
| Total other accrued liabilities | $765,853 | $575,236 |

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

### DEBT OBLIGATIONS

Our short-term debt at December 31, 2001 consisted of $149.7 million of convertible subordinated debentures, with interest payable at 5%, due in March 2002. We redeemed the debentures in cash at maturity.

Our long-term debt at December 31, 2003 consisted of $412.3 million of debt related to a variable interest entity (or VIE), which we consolidated on July 1, 2003, with minimum interest payable at 1.2%, due in November 2006. See discussion on this VIE below in "Leases."

### LEASES, COMMITMENTS AND CONTINGENCIES

#### *Leases*

We lease various real properties under operating leases that generally require us to pay taxes, insurance, maintenance and minimum lease payments. Some of our leases have options to renew. Four of our operating leases are commonly referred to as "synthetic leases." Prior to the issuance of FIN 46, synthetic leases represented a form of off-balance sheet financing under which they were treated as operating leases for accounting purposes and as financing leases for tax purposes. Under FIN 46, each synthetic lease is evaluated to determine if it qualifies as a VIE and whether Genentech is the primary beneficiary under which it would be required to consolidate the VIE.

Under our synthetic lease structures, an unrelated third-party funds 100% of the costs of the acquisition and/or construction of the property and leases the asset to us, as the lessee, and at least 3% of the third-party funds represent at-risk equity. In addition, under our synthetic lease structures, upon termination or expiration, at our option, we must either purchase the property from the lessor at a predetermined amount that does not constitute a purchase at less than fair market value, sell the real property to a third-party, or renew the lease arrangement. If the property is sold to a third-party at an amount less than the amount financed by the lessor, we have agreed under residual value guarantees to pay the lessor up to an agreed upon percentage of the amount financed by the lessor.

The most significant of our synthetic leases relates to our manufacturing facility located in Vacaville, California. In November 2001, we completed a synthetic lease transaction for this facility, which had previously been leased to us under a predecessor synthetic lease. This new synthetic lease is structured differently from our other synthetic leases. As the lessee, we lease the property from an unrelated special purpose trust (owner/lessor) under an operating lease agreement for five years ending November 2006. Third-party financing is provided in the form of a 3% at-risk equity participation from investors and 97% debt commitment. Investors' equity contributions were equal to or greater than 3% of the fair value of the property at the lease's inception and are required to remain so for the term of the lease. A bankruptcy-remote, special purpose corporation (or SPC) was formed to fund the debt portion through the issuance of commercial paper notes. The SPC lends the proceeds from the commercial paper to the owner/lessor, who issues promissory notes to the SPC. The SPC loans mature in November 2006. The SPC promissory notes are supported by a credit facility provided by financing institutions and draws are generally available under that credit facility to repay the SPC's commercial paper. The collateral for the SPC loans includes the leased property, and an interest in the residual value guarantee provided by us. The creditors of the SPC do not have recourse to the general credit of Genentech. As the lessee, at any time during the lease term, we have the option to purchase the property at an amount that does not constitute a purchase at less than fair market value.

Under FIN 46, we determined that the entity from which we lease the Vacaville facility qualified as a VIE and that we are the primary beneficiary of this VIE as we absorb the majority of the entity's expected losses. Upon adoption of the provisions of FIN 46 on July 1, 2003, we consolidated the entity. See above in the "Changes in Accounting Principles" note for further information on our adoption of FIN 46.

82

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

Our three remaining leases were entered into with BNP Paribas Leasing Corporation (or BNP), who leases directly to us various buildings that we occupy in South San Francisco, California. Under certain of these leases, we are required to maintain cash collateral of $56.6 million, which we have included in our consolidated balance sheets as restricted cash and investments. We have evaluated our accounting for these leases under the provisions of FIN 46, and we determined that, as of July 1, 2003, we are not required to consolidate either the leasing entity or the specific assets that we lease under the BNP leases.

Under all the synthetic leases, Genentech, as the lessee, is also required to maintain certain pre-defined financial ratios and is limited to the amount of debt it can assume. In addition, no Genentech officer or employee has any financial interest with regard to these synthetic lease arrangements or with any of the special purpose entities used in these arrangements. In the event of a default, the maximum amount payable under the residual value guarantee would equal 100% of the amount financed by the lessor, and our obligation to purchase the leased properties or pay the related residual value guarantees could be accelerated. We believed at the inception of the leases and continue to believe that the occurrence of any event of default that could trigger our purchase obligation is remote.

Future minimum lease payments under all leases, exclusive of the residual value guarantees, executory costs and sublease income, at December 31, 2003, are as follows *(in millions)*. These minimum lease payments were computed based on interest rates current at that time, which are subject to fluctuations in certain market-based interest rates:

|  | 2004 | 2005 | 2006 | 2007 | 2008 | Thereafter | Total |
|---|---|---|---|---|---|---|---|
| Vacaville synthetic lease[1] | $ 6.2 | $ 6.2 | $ 5.6 | $ — | $ — | $ — | $18.0 |
| South San Francisco synthetic leases | 2.7 | 2.6 | 1.1 | — | — | — | 6.4 |
| Other operating leases | 6.5 | 6.9 | 5.8 | 5.8 | 5.8 | 24.1 | 54.9 |
| Total | $15.4 | $15.7 | $12.5 | $ 5.8 | $ 5.8 | $24.1 | $79.3 |

(1)   Represents a VIE, which we consolidated effective July 1, 2003, as we are the primary beneficiary of this VIE.

Rental expenses for our operating leases were $9.1 million in 2003 and 2002, and $12.7 million in 2001.

The following summarizes the approximate initial fair values of the facilities at the inception of the related leases, lease terms and residual value guarantee amounts for each of our synthetic leases *(in millions)*:

|  | Approximate Initial Fair Value of Leased Property | Lease Expiration | Maximum Residual Value Guarantee |
|---|---|---|---|
| Vacaville lease | $425.0 | 11/2006 | $371.8 |
| South San Francisco lease 1 | 56.6 | 07/2004 | 48.1 |
| South San Francisco lease 2 | 160.0 | 06/2007 | 136.0 |
| South San Francisco lease 3 | 25.0 | 01/2004 | 21.3 |
| Total | $666.6 |  | $577.2 |

We believe that there have been no impairments in the fair value or use of the properties that we lease under synthetic leases wherein we would be required to pay amounts under any of the residual value guarantees. We will continue to assess the fair values of the underlying properties and the use of the properties for impairment at least annually.

The maximum exposure to loss on our synthetic leases includes (i) residual value guarantee payments as shown above, (ii) certain tax indemnifications in the event the third-parties are obligated for certain federal, state or

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

local taxes as a result of their participation in the transaction, and (iii) indemnification for various losses, costs and expenses incurred by the third-party participants as a result of their ownership of the leased property or participation in the transaction, and as a result of the environmental condition of the property. The additional taxes, losses and expenses as described in (ii) and (iii) are contingent upon the existence of certain conditions and, therefore, would not be quantifiable at this time. However, we do not expect these additional taxes, losses and expenses to be material. In the case of South San Francisco Lease 1, we have pledged cash collateral of $56.6 million as a source of payment for Genentech's obligation for the residual value guarantee payments and other amounts we owe under the lease.

### *Commitments*

In December 2003, we entered into a non-exclusive long-term manufacturing agreement with Lonza Biologics, a subsidiary of Lonza Group Ltd, under which Lonza will manufacture commercial quantities of Rituxan for us at Lonza's production facility in Portsmouth, New Hampshire. We may be obligated to make milestone payments to Lonza subject to Lonza's achievement of a series of factory preparation and process validation milestones, as well as receipt of FDA approval for the manufacturing of Rituxan bulk drug at the Lonza facility; the amounts of such payments cannot be estimated at this time. Following FDA approval at the Lonza facility, it is expected that commercial production would begin in 2005.

In August 2002, we entered into an agreement with Serono S.A., which, in addition to granting Serono marketing rights in specific areas of the world, includes an arrangement to collaborate on co-developing additional indications of Raptiva and to share certain global development costs. We also have a supply agreement with Serono, under which we may have a loss exposure up to a maximum of $10.0 million.

In the second quarter of 2002, we entered into a manufacturing agreement with Immunex Corporation, a wholly-owned subsidiary of Amgen, to provide Immunex with additional manufacturing capacity for ENBREL® (etanercept) at Genentech's manufacturing facility in South San Francisco, California. As part of the agreement, we are responsible for facility modifications needed to manufacture ENBREL, including the internal labor costs and costs of certain raw materials for development runs. The facility modification and services costs, which include engineering and equipment costs, are reimbursable by Immunex. However, if certain milestones are not met, we are required to reimburse Immunex for up to 45% of the facility modification and services costs. Costs associated with development runs are reflected in R&D expense as incurred. Shipment of the product, including pre-approval product, to Immunex would be recorded as product sales based on an agreed upon price with the associated costs reflected in cost of sales. In the fourth quarter of 2003, we determined that certain milestones, including obtaining FDA approval for the manufacturing process, would likely not be met in the pre-agreed upon timeframe. As a result, certain equipment paid for by us related to ENBREL manufacturing will not qualify for reimbursement by Immunex. Certain ENBREL-related equipment in our consolidated balance sheet will be depreciated over the estimated useful life of the equipment and certain of it will be depreciated over the term of the supply arrangement.

In April 1996, we entered into a research collaboration agreement with XOMA to develop and commercialize Raptiva. The agreement was subsequently modified in the first quarter of 2003 to provide a convertible equity loan to XOMA of up to $80.0 million (outstanding at any one time) to fund XOMA's share of development costs for Raptiva through FDA approval, and a cash loan of up to $15.0 million to fund XOMA's share of U.S. marketing and sales costs prior to the date of regulatory approval of Raptiva. On October 27, 2003, the FDA approved Raptiva for the treatment of chronic moderate-to-severe plaque psoriasis. Under the provisions of the agreement, XOMA elected to defer payment of $40.0 million of the development loan, of which we had previously recognized $11.9 million as an other-than-temporary impairment charge, as an offset against the proceeds from its share of U.S. operating profits on Raptiva. XOMA repaid the remaining development loan balance of approximately $29.6 million, of which we had previously recognized $8.8 million as an other-than-

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

temporary impairment charge, with Series B preference shares. The Series B preference shares are convertible at our option into XOMA common shares at $7.75 per share. As of December 31, 2003, the commercial loan balance was $13.5 million, which will be repaid in cash through April 2004.

*Contingencies*

We are a party to various legal proceedings, including patent infringement litigation relating to our antibody products, and licensing and contract disputes, and other matters.

We and the City of Hope National Medical Center (or COH) are parties to a 1976 agreement relating to work conducted by two COH employees, Arthur Riggs and Keiichi Itakura, and patents that resulted from that work, which are referred to as the "Riggs/Itakura Patents." Since that time, Genentech has entered into license agreements with various companies to make, use and sell the products covered by the Riggs/Itakura Patents. On August 13, 1999, the COH filed a complaint against us in the Superior Court in Los Angeles County, California, alleging that we owe royalties to the COH in connection with these license agreements, as well as product license agreements that involve the grant of licenses under the Riggs/Itakura Patents. The first trial of this suit began on August 28, 2001. On October 24, 2001, the jury hearing the lawsuit announced that it was unable to reach a verdict and on that basis the Court declared a mistrial. COH requested a retrial, and the retrial began on March 20, 2002. On June 10, 2002, the jury voted to award the COH approximately $300 million in compensatory damages. On June 24, 2002, the jury voted to award the COH an additional $200 million in punitive damages. Such amounts were accrued as an expense in the second quarter of 2002 and were included in litigation and other long-term liabilities in the consolidated balance sheets at December 31, 2003 and 2002. Genentech filed a notice of appeal of the verdict and damages awards with the California Court of Appeal. The appeal process is ongoing. The amount of cash paid, if any, in connection with the COH matter will depend on the outcome of the appeal.

On June 7, 2000, Chiron Corporation filed a patent infringement suit against us in the U.S. District Court in the Eastern District of California (Sacramento), alleging that the manufacture, use, sale and offer for sale of our Herceptin antibody product infringes Chiron's U.S. Patent No. 6,054,561. This patent was granted on April 25, 2000, and will expire on June 28, 2005, and it relates to certain antibodies that bind to breast cancer cells and/or other cells. Chiron is seeking compensatory damages for the alleged infringement, additional damages (e.g., for willful infringement), and attorneys' fees and costs. On April 22, 2002, the Court issued its decision ("Markman Order") construing certain aspects of the patent claims that are in dispute. On June 25, 2002, the Court issued several decisions regarding summary judgment motions that previously had been filed by Chiron and us. In those decisions, the Court ruled as a matter of law that Herceptin infringes claims 1 to 25 of Chiron's patent, and also ruled as a matter of law in favor of Chiron on some but not all of Genentech's defenses and counterclaims regarding the alleged invalidity and/or unenforceability of the patent. The trial of this suit began on August 6, 2002. Following the first phase of the trial, which related to Genentech's remaining defenses and counterclaims regarding the alleged invalidity of the patent, the jury unanimously found that claims 1 to 25 of Chiron's patent were invalid, and on that basis the Court entered judgment in favor of Genentech. Chiron filed a notice of appeal with the U.S. Court of Appeals for the Federal Circuit, and Genentech filed a notice of cross-appeal. The appeal process is ongoing and therefore the outcome of this matter cannot be determined at this time.

On August 12, 2002, the U.S. Patent and Trademark Office (or Patent Office) declared an interference between the Chiron patent involved in the above-mentioned lawsuit (U.S. Patent No. 6,054,561) and a patent application exclusively licensed by Genentech from a university relating to anti-HER2 antibodies. An interference proceeding is declared to decide who first made a particular invention where two or more parties claim the same invention, whether the parties' claims are patentable, and consequently who is or is not entitled to a patent on the invention. In declaring this interference, the Patent Office has determined that there is a substantial question as to whether the inventors of the Chiron patent were first to invent and are entitled to this patent. If the Patent Office were to decide that the inventors of the university's patent application were first to invent and that their claims are patentable, a new patent would be issued to the university and the Chiron patent would be revoked. On

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

October 24, 2002, the Patent Office redeclared the interference to include, in addition to the above-referenced Chiron patent and university patent application, a number of patents and patent applications owned by either Chiron or Genentech, including Chiron's U.S. Patent No. 4,753,894 that is also at issue in the separate patent infringement lawsuit described below. The interference proceeding is ongoing and therefore the outcome of this matter cannot be determined at this time.

On March 13, 2001, Chiron filed another patent infringement lawsuit against us in the U.S. District Court in the Eastern District of California, alleging that the manufacture, use, sale and/or offer for sale of our Herceptin antibody product infringes Chiron's U.S. Patent No. 4,753,894. Chiron is seeking compensatory damages for the alleged infringement, additional damages, and attorneys' fees and costs. Genentech filed a motion to dismiss this second lawsuit, which was denied. On November 1, 2002, the parties filed a proposed stipulation to stay all proceedings in this lawsuit until (1) the interference involving U.S. Patent No. 4,753,894 is resolved or (2) two years from entry of the proposed stipulation, whichever is sooner. On or about November 13, 2002, the Court entered the stipulation, staying the proceedings as requested by the parties. This lawsuit is separate from and in addition to the Chiron suit mentioned above.

We and Tanox Biosystems, Inc. (or Tanox) are parties to a July 1996 Settlement and Cross-Licensing Agreement relating to the development and manufacture of certain antibody products directed towards immunoglobin E, including Xolair and Hu-901. On February 20, 2002, Tanox filed an amended demand in an ongoing arbitration proceeding between Genentech and Tanox that is being conducted by the American Arbitration Association in San Francisco. In its amended demand, Tanox has claimed breach of the July 1996 Agreement, conversion, tortious interference, unjust enrichment, and unfair competition by Genentech, and requests injunctive relief as well as monetary damages "many times in excess of $100,000,000." On March 14, 2002, Genentech denied all of Tanox's claims, and counterclaimed for breach of contract, theft of trade secrets, misappropriation, breach of confidence, interference with contract, and interference with economic expectancies by Tanox. Genentech requested injunctive relief and monetary damages. On October 16, 2002, Tanox announced that in a dispute between it and Novartis, an arbitration panel ruled that Tanox is not entitled to develop independently the Hu-901 antibody product. The Novartis/Tanox panel also ruled that Tanox is entitled to receive certain know-how from Novartis. Tanox contends in its dispute against Genentech that it is entitled to similar information from Genentech. The effect of the October 16 ruling from the Novartis/Tanox arbitration, if any, on Tanox's claims against Genentech cannot be determined since the arbitrators in the Tanox/Genentech proceedings have not yet resolved it. As a general matter, the claims are divided into two categories: (1) compensation for lost rights under agreements with Genentech and Novartis, and (2) additional royalties on future sales. On February 25, 2004, the parties settled and agreed to dismiss with prejudice all claims from the arbitration that began on January 13, 2003.

On April 11, 2003, MedImmune, Inc. filed a lawsuit against Genentech, City of Hope National Medical Center (or COH), and Celltech R & D Ltd. in the U.S. District Court for the Central District of California (Los Angeles). The lawsuit relates to U.S. Patent No. 6,331,415 ("the '415 patent") that is co-owned by Genentech and COH and under which MedImmune and other companies have been licensed and are paying royalties to Genentech. The lawsuit includes claims for violation of antitrust, patent, and unfair competition laws. MedImmune is seeking to have the '415 patent declared invalid and/or unenforceable, a determination that MedImmune does not owe royalties under the '415 patent on sales of its Synagis® antibody product, an injunction to prevent Genentech from enforcing the '415 patent, an award of actual and exemplary damages, and other relief. Genentech intends to vigorously defend itself against all of the allegations and claims in this lawsuit. On January 14, 2004 (amending a December 23, 2003 Order), the U.S. District Court granted summary judgment in Genentech's favor on all of MedImmune's antitrust and unfair competition claims. MedImmune is seeking to amend its complaint to reallege certain claims for antitrust and unfair competition and the Court has not yet ruled on this issue. Discovery in the case on the remaining claims is ongoing and trial is currently set to begin on August 30, 2004. An estimate of any potential loss or range of loss cannot be made at this time.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

We recorded $53.9 million in 2003 for accrued interest and bond costs related to the COH trial judgment. In 2002, we recognized $543.9 million of litigation-related special charges, which included the COH trial judgment, including accrued interest and bond costs, and certain other litigation-related matters. In conjunction with the City of Hope judgment, we arranged to post a $600.0 million surety bond and as part of this arrangement, we were required to pledge $630.0 million in cash and investments to secure the bond. In addition, we accrued $4.7 million in 2003 and $9.1 million in 2002 of royalty expenses related to the City of Hope judgment, which was reflected in marketing, general and administrative expenses. We expect that we will continue to incur interest charges on the judgment and service fees on the surety bond each quarter through the process of appealing the City of Hope trial results. These special charges represent our estimate of the costs for the current resolution of these matters and are included in litigation and other long-term liabilities in the consolidated balance sheet at December 31, 2002 and 2003. We developed this estimate in consultation with outside counsel handling our defense in these matters and it is based upon the facts and circumstances of these matters known to us at that time. The amount of our liability for certain of these matters could exceed or be less than the amount of our current estimate, depending on the outcome of these matters. The amount of cash, if any, paid in connection with the City of Hope matter will depend on the outcome of the appeal.

### Litigation Settlement

In August 2003, we settled our patent litigation with Amgen, Inc. in the U.S. District Court for the Northern District of California. The settlement of our complaint, originally filed in 1996, resulted in a one-time payment from Amgen to us. The settlement resulted in an increase of approximately $0.19 in earnings per diluted share for 2003 and was reported as a litigation-related special item in our consolidated statements of income. In November 2003, we received a settlement payment from Bayer, one of our licensees, in connection with the settlement of a breach of contract action which resulted in an increase of approximately $0.03 in earnings per diluted share for 2003 and was reported as a litigation-related special item.

## RELATIONSHIP WITH ROCHE

As a result of the Redemption of our Special Common Stock, the then-existing governance agreement between us and Roche terminated, except for provisions relating to indemnification and stock options, warrants and convertible securities. In July 1999, we entered into certain affiliation arrangements with Roche, amended our licensing and marketing agreement with Hoffmann-La Roche, and entered into a tax sharing agreement with Roche as follows:

### Affiliation Arrangements

Our board of directors consists of two Roche directors, three independent directors nominated by a nominating committee currently controlled by Roche, and one Genentech employee. However, under our bylaws, Roche has the right to obtain proportional representation on our board at any time. Roche intends to continue to allow our current management to conduct our business and operations as we have done in the past. However, we cannot ensure that Roche will not implement a new business plan in the future.

### Tax Sharing Agreement

Since the redemption of our Special Common Stock in June 1999, and until Roche completed its second public offering of our Common Stock in October 1999, we were included in Roche's U.S. federal consolidated group and state and local consolidated or combined income tax groups. Accordingly, we entered into a tax sharing agreement with Roche. Pursuant to the tax sharing agreement, we and Roche were to make payments such that the net amount paid by us on account of federal consolidated and state and local consolidated or combined income taxes was determined as if we had filed separate, stand-alone federal, state and local income tax returns.

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

Effective with the consummation of Roche's second public offering of Genentech Common Stock on October 26, 1999, we ceased to be a member of the consolidated federal income tax group (and certain state and local consolidated or combined income tax groups) of which Roche is the common parent. Accordingly, our tax sharing agreement with Roche now pertains only to the state and local tax returns in which we are consolidated or combined with Roche. We will continue to calculate our tax liability or refund with Roche for these state and local jurisdictions as if we were a stand-alone entity.

#### *Roche's Ability to Maintain Its Percentage Ownership Interest in Our Stock*

We expect from time to time to issue additional shares of common stock in connection with our stock option and stock purchase plans, and we may issue additional shares for other purposes. Our affiliation agreement with Roche provides, among other things, that we establish a stock repurchase program designed to maintain Roche's percentage ownership interest in our common stock. The affiliation agreement provides that we will repurchase a sufficient number of shares pursuant to this program such that, with respect to any issuance of common stock by Genentech in the future, the percentage of Genentech common stock owned by Roche immediately after such issuance will be no lower than Roche's lowest percentage ownership of Genentech common stock at any time after the offering of common stock occurring in July 1999 and prior to the time of such issuance, except that Genentech may issue shares up to an amount that would cause Roche's lowest percentage ownership to be no more than 2% below the "Minimum Percentage." The Minimum Percentage equals the lowest number of shares of Genentech common stock owned by Roche since the July 1999 offering (to be adjusted in the future for dispositions of shares of Genentech common stock by Roche as well as for stock splits or stock combinations) divided by 509,194,352 (to be adjusted in the future for stock splits or stock combinations), which is the number of shares of Genentech common stock outstanding at the time of the July 1999 offering, as adjusted for the two-for-one splits of Genentech common stock in November 1999 and October 2000. We have repurchased shares of our common stock in 2003 (see discussion below in Stock Repurchase Program). As long as Roche's percentage ownership is greater than 50%, prior to issuing any shares, the affiliation agreement provides that we will repurchase a sufficient number of shares of our common stock such that, immediately after our issuance of shares, Roche's percentage ownership will be greater than 50%. The affiliation agreement also provides that, upon Roche's request, we will repurchase shares of our common stock to increase Roche's ownership to the Minimum Percentage. In addition, Roche will have a continuing option to buy stock from us at prevailing market prices to maintain its percentage ownership interest. On December 31, 2003, Roche's percentage ownership of our common stock was 58.4%, which was 1.8% below the Minimum Percentage.

### RELATED PARTY TRANSACTIONS

#### *Roche*

We enter into transactions with Roche, Hoffmann-La Roche and its affiliates in the ordinary course of business. The accounting policies we apply to our transactions with Roche and its affiliates are consistent with those used in transactions with independent third-parties.

In June 2003, Hoffmann-La Roche exercised its option to license from us the rights to market Avastin for all countries outside of the U.S. under its existing licensing agreement with us. As part of its opt-in, Hoffmann-La Roche paid us approximately $188.0 million and will pay 75% of subsequent global development costs related to the metastatic colorectal cancer indication of Avastin and all others unless Hoffmann-La Roche specifically opts out of the development of certain other indications.

In September 2003, Hoffmann-La Roche exercised its option to license from us the rights to market PRO70769, a humanized antibody that binds to CD20, for all countries outside of the U.S. (other than territory previously licensed to others) under the existing licensing agreement. As part of its opt-in, Hoffmann-La Roche paid us $8.4 million and will pay 50% of subsequent global development costs related to PRO70769 unless Roche opts out of