**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

the development of certain other indications. We will receive royalties on net sales of Avastin and PRO70769 in countries outside of the U.S.

As part of our licensing and marketing agreement, we recognized milestone-related royalty revenue of $20.0 million in 2003 and $10.0 million in 2002 as a result of Hoffmann-La Roche reaching $400.0 million and $200.0 million, respectively, in net sales of Herceptin outside of the U.S. Contract revenue from Hoffmann-La Roche, including amounts earned related to ongoing development activities after the option exercise date, totaled $66.5 million in 2003, $7.6 million in 2002 and $5.8 million in 2001. All other revenues from Roche, Hoffmann-La Roche and their affiliates, principally royalties and product sales, totaled $353.5 million in 2003, $269.9 million in 2002 and $164.1 million in 2001. In 2003, Hoffmann-La Roche's Penzberg, Germany facility became the primary site for the manufacturing of Herceptin to supply ex-U.S. territories. Our ex-U.S. sales of Herceptin to Hoffmann-La Roche were $18.8 million in 2003, $40.3 million in 2002 and $31.3 million in 2001. R&D expenses include amounts related to Roche of $37.6 million in 2003, $7.1 million in 2002, and $2.9 million in 2001.

*Novartis*

We understand that Novartis AG (or Novartis) holds approximately 33.3% of the outstanding voting shares of Roche Holding Ltd. As a result of this ownership, Novartis is deemed to have an indirect beneficial ownership interest under FAS 57 "Related Party Disclosures" of more than 10% of Genentech's voting stock.

In June 2003, we entered into an agreement with Novartis Opthalmics, an affiliate of Novartis AG, under which Novartis Opthalmics licensed the exclusive right to develop and market Lucentis outside of North America for the indication of age-related macular degeneration (or AMD). As part of this agreement, Novartis Opthalmics paid an upfront milestone and R&D reimbursement fee of $46.6 million and will pay 50% of Genentech's ongoing Phase III and related development expenses. Genentech is not responsible for any portion of the development and commercialization costs incurred by Novartis outside of North America, but we may receive additional payments for Novartis' achievement of certain clinical development and product approval milestones outside of North America. In addition, we will receive royalties on net sales of Lucentis products, which we will manufacture and supply to Novartis, outside of North America.

During 2000, we entered into an arrangement with Novartis, whereby Novartis was required to fund a portion of the cost of our Xolair inventory until the FDA approved the product for marketing. In June 2003, we received FDA approval to market Xolair. This amount was to be returned to Novartis upon the earlier of regulatory approval of Xolair in the U.S. or the European Union, and was recorded in other accrued liabilities in our financial statements beginning in 2000. The amount payable to Novartis was $37.8 million at December 31, 2002. In June 2003, we received FDA approval to market Xolair; in July 2003, $37.8 million of funding that had been received from Novartis was repaid. Our arrangement with Novartis allows us to record all sales and cost of sales in the U.S. Genentech and Novartis will co-develop and co-promote in the U.S. and both will separately make payments to Tanox; Genentech's will be in the form of royalties. We will pay Novartis a share of the U.S. operating profits and record it as collaboration profit sharing expense. Novartis will market the product in and record all sales and cost of sales in Europe. Genentech will receive a portion of the European operating profits or losses, which will be recorded as contract revenue. Genentech is currently manufacturing the product and receives cost plus a mark-up similar to other arrangements where we manufacture. Novartis plans to assume primary manufacturing responsibilities in the future. Collaboration profit sharing expenses were $9.9 million in 2003, $1.8 million in 2002 and not material in 2001. R&D expenses include amounts related to Novartis of $11.1 million in 2003 and $5.8 million in 2002. Such expense from Novartis in 2001 was not material.

Revenue from Novartis related to product sales and the associated cost of sales was not material in 2003 or in prior years. Contract revenue from Novartis, including amounts recognized under new licensing arrangements

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

entered into in 2003 and amounts earned related to commercial and ongoing development activities, was $24.2 million in 2003 and $5.7 million in 2002. We had no such revenues from Novartis in 2001.

## CAPITAL STOCK

### Common Stock and Special Common Stock

On June 30, 1999, we redeemed all of our outstanding Special Common Stock held by stockholders other than Roche. Subsequently, in July and October 1999, and March 2000, Roche consummated public offerings of our Common Stock. On January 19, 2000, Roche completed an offering of zero-coupon notes that are exchangeable for an aggregate of approximately 13.0 million shares of our Common Stock held by Roche. See "Redemption of Our Special Common Stock" and "Relationship With Roche" notes above for a discussion of our Redemption and the related transactions.

### Stock Repurchase Program

Under a stock repurchase program approved by our Board of Directors on December 5, 2003, Genentech is authorized to repurchase up to $1 billion of its common stock through December 31, 2004. In this plan, as in previous stock repurchase plans, purchases may be made in the open market or in privately negotiated transactions from time to time at management's discretion. Genentech also may engage in transactions in other Genentech securities in conjunction with the repurchase program, including certain derivative securities. Genentech intends to use the repurchased stock to offset dilution caused by the issuance of shares in connection with Genentech's employee stock plans. Although there are currently no specific plans for the shares that may be purchased under the program, our goals for the program are (i) to make prudent investments of our cash resources; (ii) to allow for an effective mechanism to provide stock for our employee stock plans; and (iii) to address provisions of our affiliation agreement with Roche relating to maintaining Roche's minimum ownership percentage. Under a previous stock repurchase program approved by our Board of Directors, Genentech was authorized to repurchase up to $1 billion of our common stock through the period ended June 30, 2003.

Our stock repurchases under the above plans are summarized below *(in thousands)*.

|  | TOTAL | | 2003 | | 2002 | | 2001 | |
|---|---|---|---|---|---|---|---|---|
|  | Shares | Amounts | Shares | Amounts | Shares | Amounts | Shares | Amounts |
| Approved by Board pre-program ... | 800 | $ 34,034 | — | $ — | — | $ — | 800 | $34,034 |
| Repurchase program expired June 30, 2003 ............... | 23,775 | 893,696 | 5,434 | 195,274 | 18,241 | 692,752 | 100 | 5,670 |
| Repurchase program expiring December 31, 2004 ............ | 71 | 6,071 | 71 | 6,071 | — | — | — | — |
| Total repurchases ........... | 24,646 | $933,801 | 5,505 | $201,345 | 18,241 | $692,752 | 900 | $39,704 |

The par value method of accounting is used for our common stock repurchases. The excess of the cost of shares acquired over the par value is allocated to additional paid-in capital with the amounts in excess of the estimated original sales price charged to accumulated deficit.

### Stock Plans

We currently have an employee stock plan, adopted in 1991 and amended thereafter (or the 1991 Plan). The 1991 Plan allows eligible employees to purchase Common Stock at 85% of the lower of the fair market value of the Common Stock on the grant date or the fair market value on the purchase date. Purchases are limited to 15% of each employee's eligible compensation and subject to certain Internal Revenue Service restrictions. All full-time

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

employees of Genentech are eligible to participate in the 1991 Plan. Of the 23.2 million shares of Common Stock reserved for issuance under the 1991 Plan, 20.8 million shares have been issued as of December 31, 2003. During 2003, 4,990 of the eligible employees participated in the 1991 Plan.

We currently grant options under a stock option plan adopted in 1999 and amended thereafter (or the 1999 Plan), that allows for the granting of non-qualified stock options, incentive stock options and stock purchase rights to employees, directors and consultants of Genentech. Incentive stock options may only be granted to employees under this plan. Generally, non-qualified options and incentive options have a maximum term of 10 years. In general, options vest in increments over four years from the date of grant, although we may grant options with different vesting terms from time to time. No stock purchase rights or incentive stock options have been granted under the 1999 Plan to date.

A summary of our stock option activity and related information is as follows:

|  | Shares | Weighted-Average Exercise Price |
|---|---|---|
| Options outstanding at December 31, 2000 | 40,944,862 | $39.84 |
| Grants | 10,740,689 | 42.58 |
| Exercises | (2,899,135) | 24.69 |
| Cancellations | (2,146,446) | 45.84 |
| Options outstanding at December 31, 2001 | 46,639,970 | 41.06 |
| Grants | 12,655,875 | 28.98 |
| Exercises | (1,672,772) | 23.43 |
| Cancellations | (2,203,658) | 53.16 |
| Options outstanding at December 31, 2002 | 55,419,415 | 38.37 |
| Grants | 10,890,520 | 81.09 |
| Exercises | (16,039,322) | 68.27 |
| Cancellations | (2,207,504) | 47.59 |
| Options outstanding at December 31, 2003 | 48,063,109 | $50.36 |

The following table summarizes information concerning currently outstanding and exercisable options:

| | As of December 31, 2003 | | | | |
|---|---|---|---|---|---|
| | Options Outstanding | | | Options Exercisable | |
| Range of Exercise Prices | Number Outstanding | Weighted-Average Years Remaining Contractual Life | Weighted-Average Exercise Price | Number Exercisable | Weighted-Average Exercise Price |
| $12.53 – $17.78 | 893,205 | 6.19 | $14.91 | 893,205 | $14.91 |
| $20.00 – $28.70 | 17,646,638 | 7.44 | $26.77 | 10,017,070 | $25.42 |
| $30.07 – $44.77 | 11,561,689 | 7.27 | $41.67 | 7,123,060 | $42.22 |
| $45.75 – $66.00 | 777,874 | 7.19 | $56.00 | 413,299 | $57.97 |
| $71.25 – $95.66 | 17,183,703 | 8.54 | $82.01 | 5,356,716 | $79.75 |
| | 48,063,109 | | | 23,803,350 | |

Using the Black-Scholes option valuation model, the weighted-average fair value of options granted was $34.95 in 2003, $12.54 in 2002 and $24.00 in 2001. Shares of Common Stock available for future grants under all stock option plans were 20,365,697 at December 31, 2003. We have reserved a sufficient number of shares of our Common Stock in connection with these stock option programs.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**SUBSEQUENT EVENTS**

On January 2, 2004, one of our synthetic leases related to an office building we occupy in South San Francisco expired (refer to "South San Francisco Lease 3" in "Leases, Commitments and Contingencies" note above). Under the terms and conditions of the lease agreement, we must either purchase the property from the lessor at a predetermined amount that does not constitute a purchase at less than fair market value, sell the real property to a third-party, or renew the lease arrangement. At the expiration of the lease, we purchased the related land and office building from our lessor at a cost of $25.0 million.

To accommodate our growth, we purchased on February 4, 2004, an additional building in the research and industrial park in South San Francisco at a cost of $18.0 million.

## QUARTERLY FINANCIAL DATA (UNAUDITED)

*(in thousands, except per share amounts)*

| | 2003 Quarter Ended | | | |
| --- | --- | --- | --- | --- |
| | December 31 | September 30 | June 30 | March 31 |
| Total operating revenues .............................. | $933,899 | $817,044 | $ 799,712 | $749,672 |
| Product sales ........................................ | 723,736 | 654,948 | 644,324 | 598,482 |
| Gross margin from product sales ...................... | 597,534 | 539,275 | 520,917 | 483,640 |
| Income before cumulative effect of accounting changes .... | 126,730 | 199,636 | 132,345 | 151,471 |
| Cumulative effect of accounting changes, net of tax ....... | — | 47,655 | — | — |
| Net income[1] ....................................... | 126,730 | 151,981 | 132,345 | 151,471 |
| Earnings per share: | | | | |
|     Basic ......................................... | 0.24 | 0.29 | 0.26 | 0.30 |
|     Diluted ....................................... | 0.24 | 0.29 | 0.25 | 0.29 |

| | 2002 Quarter Ended | | | |
| --- | --- | --- | --- | --- |
| | December 31 | September 30 | June 30 | March 31 |
| Total operating revenues .............................. | $743,195 | $650,138 | $ 622,243 | $568,082 |
| Product sales ........................................ | 611,766 | 551,823 | 523,527 | 476,549 |
| Gross margin from product sales ...................... | 491,928 | 439,342 | 416,660 | 374,105 |
| Net income (loss)[2] ................................. | 92,828 | 89,304 | (213,648) | 95,303 |
| Earnings (loss) per share: | | | | |
|     Basic ......................................... | 0.18 | 0.17 | (0.41) | 0.18 |
|     Diluted ....................................... | 0.18 | 0.17 | (0.41) | 0.18 |

(1) Net income in 2003 includes recurring charges of $154.3 million related to the Redemption and amounts received related to our litigation settlements with Amgen, Inc. and Bayer. The settlements were both reported as litigation-related special items in our consolidated statements of income. The settlement of our complaint against Amgen, originally filed in 1996, resulted in a one-time payment from Amgen to us and an increase of approximately $0.17 in earnings per diluted share for the third quarter of 2003. Net income in 2003 also reflects our adoption of FIN 46, "Consolidation of Variable Interest Entities," an interpretation of Accounting Research Bulletin No. 51, on July 1, 2003, which resulted in a $47.6 million charge, net of $31.8 million in taxes, (or $0.09 per share) as a cumulative effect of the accounting change in the third quarter of 2003.

(2) Net income (loss) in 2002 reflects litigation-related special charges of $518.0 million in the second quarter for the City of Hope judgment and other litigation-related matters, $12.5 million in the third quarter for accrued interest related to the City of Hope judgment, and $13.4 million in the fourth quarter for accrued interest and costs related to obtaining a surety bond in conjunction with the City of Hope judgment. Net income (loss) in 2002 also includes recurring charges related to the Redemption for the amortization of other intangible assets of $38.9 million in each quarter of 2002. As a result of our adoption of FAS 141 and 142 on January 1, 2002, reported net income increased in each quarter of 2002 by approximately $39.4 million (or $0.08 per share) due to the cessation of goodwill amortization and the amortization of our trained and assembled workforce intangible asset.

## Item 9.    CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

Not applicable.

## Item 9A.   CONTROLS AND PROCEDURES

(a) *Evaluation of Disclosure Controls and Procedures*:   The Company's principal executive and financial officers reviewed and evaluated the Company's disclosure controls and procedures (as defined in Exchange Act Rule 13a-15(e) as of the end of the period covered by this Form 10-K. Based on that evaluation, the Company's principal executive and financial officers concluded that the Company's disclosure controls and procedures are effective in timely providing them with material information relating to the Company, as required to be disclosed in the reports the Company files under the Exchange Act.

(b) *Changes in Internal Controls*:   There were no significant changes in the Company's internal controls or other factors that could significantly affect those controls subsequent to the date of the Company's evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

## PART III

### Item 10.  DIRECTORS AND EXECUTIVE OFFICERS OF THE COMPANY

(a) The sections labeled "Nominees for Directors," "Board Committees and Meetings," "Audit Committee Report," and "Section 16(a) Beneficial Ownership Reporting Compliance" of our Proxy Statement in connection with the 2004 Annual Meeting of Stockholders are incorporated herein by reference.

(b) Information concerning our Executive Officers is set forth in Part I of this Form 10-K.

### Item 11.  EXECUTIVE COMPENSATION

The sections labeled "Compensation of Directors," "Compensation of Executive Officers," "Summary of Compensation," "Summary Compensation Table," "Stock Option Grants and Exercises," "Option Grants in Last Fiscal Year," "Aggregated Option Exercises in Last Fiscal Year and FY-End Option Values," "Change-In-Control Agreements," "Loans and Other Compensation" and "Compensation Committee Interlocks and Insider Participation" of our Proxy Statement in connection with the 2004 Annual Meeting of Stockholders are incorporated herein by reference.

### Item 12.  SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The sections labeled "Relationship With Roche," "Equity Compensation Plans" and "Beneficial Ownership of Principal Stockholders, Directors and Management" of our Proxy Statement in connection with the 2004 Annual Meeting of Stockholders are incorporated herein by reference.

### Item 13.  CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

The sections labeled "Relationship With Roche," "Loans and Other Compensation" and "Certain Relationships and Related Transactions" of our Proxy Statement in connection with the 2004 Annual Meeting of Stockholders is incorporated herein by reference.

### Item 14.  PRINCIPAL ACCOUNTING FEES AND SERVICES

The sub-section labeled "Principal Accounting Fees and Services" of our Proxy Statement in connection with the 2004 Annual Meeting of Stockholders is incorporated herein by reference.

**PART IV**

**Item 15.   EXHIBITS, FINANCIAL STATEMENT SCHEDULES AND REPORTS ON FORM 8-K**

**(a) The following documents are included as part of this Annual Report on Form 10-K.**

**1. Index to Financial Statements**

Report of Ernst & Young LLP, Independent Auditors

Consolidated Statements of Income for the years ended December 31, 2003, 2002 and 2001

Consolidated Statements of Cash Flows for the years ended December 31, 2003, 2002 and 2001

Consolidated Balance Sheets at December 31, 2003 and 2002

Consolidated Statements of Stockholders' Equity for the year ended December 31, 2003, 2002 and 2001

Notes to Consolidated Financial Statements

Quarterly Financial Data (unaudited)

**2. Financial Statement Schedule**

The following schedule is filed as part of this Form 10-K:

Schedule II — Valuation and Qualifying Accounts for the years ended December 31, 2003, 2002 and 2001

All other schedules are omitted as the information required is inapplicable or the information is presented in the consolidated financial statements or the related notes.

**3. Exhibits**

| Exhibit No. | Description |
| --- | --- |
| 3.1 | Amended and Restated Certificate of Incorporation.[1] |
| 3.2 | Certificate of Amendment of Amended and Restated Certificate of Incorporation.[6] |
| 3.3 | Certificate of Amendment of Amended and Restated Certificate of Incorporation.[8] |
| 3.4 | Restated Bylaws.[10] |
| 4.4 | Form of Common Stock Certificate.[2] |
| 10.1 | Form of Affiliation Agreement, dated as of July 22, 1999, between Genentech, Inc. and Roche Holdings, Inc.[2] |
| 10.2 | Amendment No. 1, dated October 22, 1999, to Affiliation Agreement between Genentech, Inc. and Roche Holdings, Inc.[5] |
| 10.3 | Form of Amended and Restated Agreement, restated as of July 1, 1999, between Genentech, Inc. and F. Hoffmann-La Roche Ltd regarding Commercialization of Genentech's Products outside the United States.[2] |
| 10.4 | Form of Tax Sharing Agreement, dated as of July 22, 1999, between Genentech, Inc. and Roche Holdings, Inc.[2] |
| 10.5 | Genentech, Inc. Tax Reduction Investment Plan, as amended and restated as of January 1, 2002.[10] |
| 10.6 | 1990 Stock Option/Stock Incentive Plan, as amended effective October 16, 1996.[4] |
| 10.7 | 1994 Stock Option Plan, as amended effective October 16, 1996.[4] |

| Exhibit No. | Description |
|---|---|
| 10.8 | 1996 Stock Option/Stock Incentive Plan, as amended effective October 16, 1996.[4] |
| 10.9 | 1999 Stock Plan, as amended and restated as of February 13, 2003.[11] |
| 10.10 | 1991 Employee Stock Plan, as amended on April 23, 2003. |
| 10.11 | Long-Term Key Employee Incentive Program, effective as of July 1, 1999.[5] |
| 10.12 | Promissory Note, dated as of December 22, 2000, issued to Genentech, Inc. by Myrtle S. Potter.[7] |
| 10.13 | Change in Control Agreement, dated as of January 20, 2001, between Genentech, Inc. and Myrtle S. Potter.[7] |
| 10.14 | Lease, dated as of October 26, 2001, between Genentech, Inc. and Vacaville Real Estate Trust 2001.[9] |
| 10.15 | Participation Agreement, dated as of October 26, 2001, among Genentech, Inc., Vacaville Real Estate Trust 2001, Wilmington Trust Company, The Chase Manhattan Bank, J.P. Morgan Securities, Inc., BNP Paribas, Credit Suisse First Boston, UBS AG, Stamford Branch, Wachovia Bank and various financial institutions named therein.[9] |
| 10.16 | Amended and Restated Backup Facility Agreement and Amendment to Other Operative Agreements, dated as of November 6, 2003, among DNA Finance Corp, JP Morgan Bank and various financial institutions named therein. |
| 10.17 | Guarantee, dated as of October 26, 2001, between Genentech, Inc., DNA Finance Corp and the investors named therein.[9] |
| 23.1 | Consent of Ernst & Young LLP, Independent Auditors. |
| 24.1 | Power of Attorney. Reference is made to the signature page. |
| 28.1 | Description of the Company's capital stock.[3] |
| 31.1 | Certification of Chief Executive Officer pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Securities Exchange Act of 1934, as amended. |
| 31.2 | Certification of Chief Financial Officer pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Securities Exchange Act of 1934, as amended. |
| 32.1 | Certifications of Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |

---

(1)  Filed as an exhibit to our Current Report on Form 8-K filed with the Commission on July 28, 1999 and incorporated herein by reference.

(2)  Filed as an exhibit to Amendment No. 3 to our Registration Statement (No. 333-80601) on Form S-3 filed with the Commission on July 16, 1999 and incorporated herein by reference.

(3)  Incorporated by reference to the description under the heading "Description of Capital Stock" relating to our Common Stock in the prospectus included in our Amendment No. 2 to the Registration Statement on Form S-3 (No. 333-88651) filed with the Commission on October 20, 1999, and the description under the heading "Description of Capital Stock" relating to the Common Stock in our final prospectus filed with the Commission on October 21, 1999 pursuant to Rule 424(b)(1) under the Securities Act of 1933, as amended, including any amendment or report filed for the purpose of updating that description.

(4)  Filed as an exhibit to our Registration Statement (No. 333-83157) on Form S-8 filed with the Commission on July 19, 1999 and incorporated herein by reference.

(5)  Filed as an exhibit to our Annual Report on Form 10-K for the year ended December 31, 1999 filed with the Commission and incorporated herein by reference.

(6)  Filed as an exhibit to our Annual Report on Form 10-K for the year ended December 31, 2000.

(7)  Filed as an exhibit to our Quarterly Report on Form 10-Q for the quarter ended March 31, 2001 filed with the Commission and incorporated herein by reference. This is an agreement between the Company and an executive officer.

(8)  Filed as an exhibit to our Quarterly Report on Form 10-Q for the quarter ended June 30, 2001 filed with the Commission and incorporated herein by reference.

(9)  Filed as an exhibit to our Annual Report on Form 10-K for the year ended December 31, 2001 filed with the Commission and incorporated herein by reference.

(10) Filed as an exhibit to our Annual Report on Form 10-K for the year ended December 31, 2002 filed with the Commission and incorporated herein by reference.

(11) Filed as an exhibit to our Quarterly Report on Form 10-Q for the quarter ended March 31, 2003 filed with the Commission and incorporated herein by reference.

**(b) Reports on Form 8-K:**

On October 8, 2003, we filed a Report on Form 8-K under Item 5 — Other Events, reporting the issuance of a press release, announcing our earnings for the quarter ended September 30, 2003.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**GENENTECH, INC.**
Registrant

Date: February 27, 2004                By:     _____/s/   JOHN M. WHITING_____

                                                John M. Whiting
                                         *Vice President, Controller, and*
                                            *Chief Accounting Officer*


## POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Louis J. Lavigne, Jr., Executive Vice President and Chief Financial Officer, and John M. Whiting, Vice President, Controller and Chief Accounting Officer, and each of them, his true and lawful attorneys-in-fact and agents, with the full power of substitution and resubstitution, for him and in his name, place and stead, in any and all capacities, to sign any amendments to this report, and to file the same, with exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, granting unto each said attorney-in-fact and agent full power and authority to do and perform each and every act in person, hereby ratifying and confirming all that said attorney-in-fact and agent, or either of them, or their or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated:

| Signature | Title | Date |
|---|---|---|
| **Principal Executive Officer:** | | |
| _____/s/   ARTHUR D. LEVINSON_____<br>Arthur D. Levinson | Chairman, President and<br>Chief Executive Officer | February 27, 2004 |
| **Principal Financial Officer:** | | |
| _____/s/   LOUIS J. LAVIGNE, JR._____<br>Louis J. Lavigne, Jr. | Executive Vice President and<br>Chief Financial Officer | February 27, 2004 |
| **Principal Accounting Officer:** | | |
| _____/s/   JOHN M. WHITING_____<br>John M. Whiting | Vice President, Controller, and<br>Chief Accounting Officer | February 27, 2004 |

| Signature | Title | Date |
|---|---|---|
| **Directors:** | | |
| /s/  HERBERT W. BOYER<br>Herbert W. Boyer | Director | February 27, 2004 |
| /s/  JONATHAN K.C. KNOWLES<br>Jonathan K.C. Knowles | Director | February 27, 2004 |
| /s/  FRANZ B. HUMER<br>Franz B. Humer | Director | February 27, 2004 |
| /s/  MARK RICHMOND<br>Mark Richmond | Director | February 27, 2004 |
| /s/  CHARLES A. SANDERS<br>Charles A. Sanders | Director | February 27, 2004 |

SCHEDULE II

**GENENTECH, INC.**
**VALUATION AND QUALIFYING ACCOUNTS**
Years Ended December 31, 2003, 2002 and 2001
*(in thousands)*

| | Balance at Beginning of Period | Addition Charged to Cost and Expenses | Deductions[1] | Balance at End of Period |
|---|---|---|---|---|
| **Allowance for doubtful accounts and returns:** | | | | |
| Year Ended December 31, 2003: . . . . . . . . . . . . . . . . . . . . . . | $19,998 | $29,393 | $(24,297) | $25,094 |
| Year Ended December 31, 2002: . . . . . . . . . . . . . . . . . . . . . . | $20,509 | $16,563 | $(17,074) | $19,998 |
| Year Ended December 31, 2001: . . . . . . . . . . . . . . . . . . . . . . | $15,477 | $16,287 | $(11,255) | $20,509 |
| **Inventory reserves:** | | | | |
| Year Ended December 31, 2003: . . . . . . . . . . . . . . . . . . . . . . | $20,975 | $16,232 | $(16,524) | $20,683 |
| Year Ended December 31, 2002: . . . . . . . . . . . . . . . . . . . . . . | $25,589 | $18,588 | $(23,202) | $20,975 |
| Year Ended December 31, 2001: . . . . . . . . . . . . . . . . . . . . . . | $11,817 | $16,354 | $ (2,582) | $25,589 |
| **Reserves for nonmarketable debt and equity securities:** | | | | |
| Year Ended December 31, 2003: . . . . . . . . . . . . . . . . . . . . . . | $23,862 | $  — | $ (8,812) | $15,050 |
| Year Ended December 31, 2002: . . . . . . . . . . . . . . . . . . . . . . | $36,137 | $ 1,465 | $(13,740) | $23,862 |
| Year Ended December 31, 2001: . . . . . . . . . . . . . . . . . . . . . . | $32,785 | $ 3,352 | $  — | $36,137 |

(1)   Represents amounts written off or returned against the allowance or reserves, or returned against earnings.

**EXHIBIT 23.1**

## CONSENT OF ERNST & YOUNG LLP, INDEPENDENT AUDITORS

We consent to the incorporation by reference in the Registration Statements pertaining to the 1991 Employee Stock Plan, the 1999 Stock Plan, the 1996 Stock Option/Stock Incentive Plan, the 1994 Stock Option Plan, the 1990 Stock Option/Stock Incentive Plan, and the Genentech, Inc. Tax Reduction Investment Plan, and the Registration Statement (Form S-3 No. 333-37072) related to resales of common shares deliverable upon the exchange of Liquid Yield Option Notes, and in the related Prospectuses, of Genentech, Inc. of our report dated January 13, 2004, except for the second paragraph of the note titled Subsequent Events and the twenty-first paragraph of the note titled Leases, Commitments and Contingencies, as to which the date is February 25, 2004, with respect to the consolidated financial statements of Genentech, Inc. included in the Annual Report (Form 10-K) for the year ended December 31, 2003.

*Ernst + Young LLP*

Palo Alto, California
February 26, 2004

EXHIBIT 31.1

## CERTIFICATIONS

I, Arthur D. Levinson, certify that:

1.   I have reviewed this annual report on Form 10-K of Genentech, Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

c)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 27, 2004                                   By:   /s/   ARTHUR D. LEVINSON
                                                                      Arthur D. Levinson, Ph.D.
                                                                      President and Chief Executive Officer

**EXHIBIT 31.2**

## CERTIFICATIONS

I, Louis J. Lavigne, Jr., certify that:

1.  I have reviewed this quarterly report on Form 10-K of Genentech, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    c)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 27, 2004                    By:  /s/   LOUIS J. LAVIGNE, JR.
                                                Louis J. Lavigne, Jr.
                                                Executive Vice President and
                                                Chief Financial Officer

EXHIBIT 32.1

**CERTIFICATIONS OF
CHIEF EXECUTIVE OFFICER AND CHIEF FINANCIAL OFFICER
PURSUANT TO 18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Arthur D. Levinson, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Annual Report of Genentech, Inc. on Form 10-K for the year ended December 31, 2003 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in such Annual Report of Genentech, Inc. on Form 10-K fairly presents in all material respects the financial condition and results of operations of Genentech, Inc.

|        |                                  |
|--------|----------------------------------|
| By:    | /s/  ARTHUR D. LEVINSON, PH.D.   |
| Name:  | Arthur D. Levinson, Ph.D.        |
| Title: | President and Chief Executive Officer |
| Date:  | February 27, 2004                |

I, Louis J. Lavigne, Jr., certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Annual Report of Genentech, Inc. on Form 10-K for the year ended December 31, 2003 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in such Annual Report of Genentech, Inc. on Form 10-K fairly presents in all material respects the financial condition and results of operations of Genentech, Inc.

|        |                                  |
|--------|----------------------------------|
| By:    | /s/  LOUIS J. LAVIGNE, JR.       |
| Name:  | Louis J. Lavigne, Jr.            |
| Title: | Executive Vice President and Chief Financial Officer |
| Date:  | February 27, 2004                |

*A signed original of this written statement required by Section 906 has been provided to Genentech, Inc. and will be retained by Genentech, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.*

**Genentech**
IN BUSINESS FOR LIFE

One DNA Way
South San Francisco, California
94080-4990
(650) 225-1000

www.gene.com

SKU# 0724-AR-04