# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

) MDL No.1592

IN RE: COLUMBIA UNIVERSITY ) (MLW)

PATENT LITIGATION

------------------------------------

VIDEOTAPED DEPOSITION OF

BRUCE J. DOLNICK

New York, New York

Wednesday, September 29, 2004

Reported by:
Frank J. Bas, RPR
JOB NO. 75309

Dolnick

BY MR. BARSKY:

Q. Dr. Dolnick, I'm going to hand you what has been marked as Exhibit 27 and ask you

10:04:32 to take a moment.

(Deposition Exhibit 27, for identification, article titled Gene Amplification and Drug Resistance in Cultured Murine Cells.)

10:05:47 (Witness reviews document.)

Q. Dr. Dolnick, do you recognize Exhibit 27 as a publication from the Schimke lab in 1978?

MS. NORTON: Take as long as you

10:05:57 need to review it, Dr. Dolnick.

(Witness reviews document.)

BY MR. BARSKY:

Q. I just have a couple of questions about this, Dr. Dolnick. If I can direct your

10:16:19 attention to page 1054.

MS. NORTON: I would just like to note that it didn't look like the witness had finished reviewing the document yet.

Q. By the way, this was a paper that

10:16:45 you read in connection with the work that you

Dolnick

performed for Amgen in this case, correct?

10:22:46

10:22:55

A. No.
Q. Do you recall this work from when you were in the Schimke lab?
A. You mean recall the general body of work?
Q. Yes, the general body of work that you saw reported in this Exhibit 27.
A. I recall most of it, yes.
Q. Okay. Let me hand you what has been

Dolnick

marked as Exhibit 26.

(Deposition Exhibit 26, for identification, article titled Selective Multiplication of Dihydrofolate Reductase Genes in Methotrexate-resistant Variants of Cultured Murine Cells.)

Q. I just have one question about this article.

10:23:22 A. Can I look at it?
Q. I beg your pardon?
A. Can I look at it?
Q. Absolutely.
(Witness reviews document.)

10:24:01 MR. STONE: Counsel, this has been marked as Exhibit 26, is that right?
MR. BARSKY: Yes.
MR. STONE: Thank you.

BY MR. BARSKY:

10:24:15 Q. While you're looking at it, I'll

just state for the record that Exhibit 26 appears to be an article published in the Journal of Biological Chemistry in 1978. It's entitled Selective Multiplication of

10:24:31 Dihydrofolate Reductase Genes in

Methotrexate-resistant Variants of Cultured Murine Cells.

And while you're looking at that,

10:24:44 I'll also note that Exhibit 27, which you previously looked at, entitled Gene Amplification and Drug Resistance in Cultured Murine Cells.

(Witness reviews document.)

10:25:10 BY MR. BARSKY:

Q. If it will assist in your review of the article, Dr. Dolnick, I'm not going to be asking about any of the experimental results in this particular paper, I'm going to have some

10:25:22 general questions about the article, but that's all.

(Witness reviews document.)

BY MR. BARSKY:

Q. Dr. Dolnick, let me direct your

10:29:00 attention in particular to the portion of the discussion section that appears at the bottom of page 1367. It is the last incomplete paragraph on page 1367, that begins with the word "clearly." Do you see that?

10:29:27 A. Yes.

Dolnick

Q. Okay, that's what I'm going to ask you about. Why don't you take a moment to read through the bottom of that page, and then I have

10:29:34 a question for you.

A. (Reading) Okay, I've read that paragraph.

Q. Thank you. Do you see the question that the authors ask in the second sentence of

10:31:01 that paragraph? I'll read it into the record: "Are they chromosomal or extrachromosomal, and do they exist in tandem arrays or at many locations in the genome?" Do you see that?

A. Yes, I see that.

10:31:18 Q. Do you understand the authors to be positing as an open question whether or not the amplified DHFR genes exist on the chromosome or off the chromosome?

A. Yeah, I think this was a reasonable

10:31:32 question in 1978.

Q. Why was it a reasonable question in 1978?

A. It was a relatively new phenomenon.

Q. Would a person of skill in the art,

10:31:49 as you have defined it, in 1980 have understood

Dolnick

that as well?

Q. I beg your pardon?

A. Where?

Q. Well, I believe it begins in that first column on 1368 and continues through --

10:37:47 A. Starting with which paragraph?

Q. Well, it actually starts with the paragraph that you just read, and it continues through the paragraph that begins with the word

10:38:00 "Finally," on 1368.

A. Okay. Can I read that through?

Q. Yes, go ahead. And then the question, so you have it in mind while you're reading it, is just whether or not the authors

10:38:11 are positing different mechanisms, different possible mechanisms for the amplification of the DHFR gene.

(Witness reviews document.)

BY MR. BARSKY:

10:46:30 Q. Are you ready for a couple of general questions about that portion of the article?

A. I suppose so.

Q. The authors of this article from

10:46:38 1978 were proposing that gene amplification, at least with the DHFR gene, might occur as a result of a number of different mechanisms. Correct?

A. That's right.

10:46:49 Q. And a person of skill in the art, as

Dolnick

more likely than the other. Do you have that question in mind?

A. Yes.

11:38:22 Q. Thank you.

(Witness reviews document.)

Q. So Dr. Dolnick, did the authors of Exhibit 26 write anything that would suggest to a person of skill reading this article in 1978 that one of these mechanisms was significantly more likely than any other?

A. I haven't finished reading the discussion section.

Q. Okay.

11:47:54 (Witness reviews document.)

BY MR. BARSKY:

Q. Based on the review that you've made so far, are you able to say whether or not the authors distinguished the likelihood of any one of these amplification mechanisms?

A. Actually, after -- I didn't finish it, but from what I've read so far, it does look like they thought that some mechanisms might be more likely than others.

11:48:12 Q. Which ones do you think that the

Dolnick

authors suggest might be more likely than

11:54:25

Q. Well, when you read the first two sentences of that, let me know and I'll ask you the question.

(Witness reviews document.)

Q. A person of skill in 1980 reading

this portion of Exhibit 26 would have understood the authors to be reporting both stable and unstable amplified DHFR cell lines. Correct?

11:54:40

MS. NORTON: Objection, vague with respect to reporting. And he still hasn't had the chance to read the entire article. If you feel you need to read the whole article to answer the question, take your time.

11:55:09

(Witness reviews document.)

BY MR. BARSKY:

Q. By the way, I agree with what your counsel said. If you feel you need to read the entire article, go ahead.

11:55:31

MR. BARSKY: But I do want to point out, Ms. Norton, that we are going to need Dr. Dolnick for two days.

MS. NORTON: You haven't asked for that. He's scheduled to return. He has a 7 o'clock flight back to Buffalo tonight. I have a flight back to San Diego tomorrow morning.

11:55:41

(Witness reviews document.)

12:01:29

Q. Do you still have the question in

mind, Dr. Dolnick?

A. I haven't finished reading it yet.

Q. I know. But do you have the question in mind?

12:01:34

A. Well, I won't really know until I have finished reading.

Q. I didn't ask the answer. I just --

A. I'm sorry, I didn't understand. Yes, I still have the question in mind.

12:01:41

Q. Thank you.

(Witness reviews document.)

A. So getting back to the question again, can I have it restated just one more time?

12:03:45

Q. Sure. The question I wanted to ask you is with reference to the intriguing question that's referenced towards the end of page 1368, do you see that reference?

A. Yes.

12:03:57

Q. Okay. Would a person of skill at the -- let me withdraw that.

Would a person with skill in the art as of the date of the publication of this article have understood that the authors were

12:04:08

commenting on a fact that there are stably

I may have leafed through it. But I didn't read it.

Q. Okay.

01:48:04 This publication appeared in Cytogenetics and Cell Genetics; is that correct?

A. That's right.

Q. There are two passages I can direct your attention to in an effort to conserve time, if you would like. 01:48:43 The first is on page 149. It's the first complete paragraph on page 149, in the right-hand column. The second is the paragraph on the following page. It's the first complete paragraph that appears in the 01:49:06 right-hand column.

138

Dolnick

(Witness reviews document.)

Q. I'm only going to be asking you about those two passages, so when you're ready 01:50:38 let me know. Okay?

A. Okay.

(Witness reviews document.)

A. Okay.

Q. This paper was published after 01:57:04 the -- Dr. Dolnick, have you now reviewed Exhibit 28?

A. Yes.

Q. And this is your article from 1981?

A. This is Ronald Berenson's article. 01:57:17 I'm a coauthor on this article.

Q. And if you were a coauthor on this

referring to the -- not to the transformation with the linearized plasmid, but they're referring to the transformation of the in vitro
03:14:35 ligated DNA. So if we want to talk about the plasmid, I think we have to find the appropriate paragraphs that specifically refer to that.

Q. Okay, do you want to take a look for that?

03:14:50 A. Sure. So I'm looking for references with regard to stability; is that correct? Is that what you want me to be looking for?

Q. Yes.

(Witness reviews document.)

03:16:46 A. I'm having a difficult time

173

Dolnick

discriminating where the authors make a distinction between the clones that were transfected with the linearized plasmid versus
03:16:55 the plasmid ligated in vitro, in terms of stability of ovalbumin.

Q. Earlier you testified with respect to chromosomal integration being a fair inference from the presence of the TK+ gene in
03:17:15 the high molecular weight DNA. Is that correct?

A. I testified that chromosomal integration of a TK gene -- after transformation with high molecular weight DNA would be expected?

03:17:28 Q. Yes.

A. Yes.

got that impression from. That's all.

A. From reading the paper.

03:30:00 Q. Okay. And if you can't point to it quickly, then don't bother. But take a quick look and see if you can find the passage that reports on that.

(Witness reviews document.)

03:30:49 A. So they're saying three out of the seven clones, if I'm interpreting this correct, contain portions of the ovalbumin gene.

MS. NORTON: Take all the time you need to review the reference.

03:31:18 THE WITNESS: Okay.

(Witness reviews document.)

A. The place we should be looking is on page 245.

Q. Okay.

03:31:44 A. And it states there, in the intact paragraph, it's specifying transformation with the linearized POV12 TK plasmid, and it says that they isolated six transformants. "All six transformants showed a predominant hybridization signal at 12.2 kb, indicating that the entire

03:32:04

12.2 kb of chicken DNA from POV12 - TK was present."

Q. And these are data regarding the chimeric plasmid experiment?

03:32:16 A. That's correct.

Q. And when they say they identified

03:46:06
03:46:19

to just read it and then answer the question?

A. It would probably facilitate it.

Q. A framework?

A. A framework.

Q. Certainly. First I'm going to ask you to point to what data were reported, or what discussion was had in this article that you believe would have changed the way a person of skill in the art viewed the viability of reverse

03:46:29
04:14:15
04:14:39
04:14:52

transcription as an amplification mechanism. Let's start there.

A. Okay.

Q. Thank you.

(Witness reviews document.)

A. Okay.

Q. Have you now read Exhibit 29?

A. I have.

Q. Can you identify this, Dr. Dolnick, as the article by Kaufman and others from 1979 that you testified about earlier in your testimony?

A. Yes. This is the article that I referred to earlier.

Q. Before I ask you some specific questions about this article, I want to go back to one issue that we discussed earlier. As of 19 -- and I want to construct a hypothetical for you, if I could.

it mischaracterizes the claim as a process claim.

A. So you're asking me if it requires some amplification within the chromosome?

Q. Yes.

A. I don't think that is stated anywhere within the claim.

Q. Okay. And so you don't think that it would be a requirement, Claim 19. Is that fair?

A. I think it did happen -- I don't think it would be a requirement based upon what I'm reading here.

MR. BARSKY: Counsel?

271

Dolnick

MS. NORTON: Are you done with that line of questioning, or will you finish in the next few minutes?

MR. BARSKY: No. Should we have our competing statements on the record now? You tell me, and we could let Dr. Dolnick go. You tell me. You have advised me that you're going to terminate the deposition, so if that's what you're going to do, we can -- you can tell your witness to leave, and then we can --

MS. NORTON: Can I ask the court reporter to tell me what the total transcript time is at this point?

THE VIDEOGRAPHER: On the record,

06:48:27 we've been on for seven hours and two minutes.

MS. NORTON: I was right, then. Okay, it's our position that we produced Dr. Dolnick at 9 o'clock this morning, and it is now nearly 7 o'clock p.m., and that you've had seven hours with which to question him, that you spent several hours
06:48:42 of your time asking him basically the same

question over and over about reverse transcription, and that's the way you've made use of your time, and the time is now
06:48:51 over. In the schedule that your client sent around proposing a schedule for the expert depositions, you only asked for one day with Dr. Dolnick, and one day is seven hours.

06:49:02 MR. BARSKY: And we've already met and conferred on the motion we're filing on this. We understand you're terminating the deposition. I'm not going to brief the issue now. You know what my position is
06:49:13 about us not having had a full opportunity to depose Dr. Dolnick. You know we're not done. And so rather than take up anyone's time or transcript pages, we're going to just simply brief the issue in our motion
06:49:28 that will be filed very shortly. And so

you are terminating the deposition, correct?

MS. NORTON: I think that the deposition has gone its natural course, its full seven hours, and I think it's time for

06:49:41

Dr. Dolnick to get to go home.

MR. BARSKY: Okay. Well, there's a difference between thinking it's time and terminating the deposition. If your position is the deposition's terminated, then just say it.

06:49:51

MS. NORTON: Our position is that you've had the full seven hours that you asked for and that you're entitled to with Professor Dolnick.

06:49:59

MR. BARSKY: Well, I think we are adjourned, in that case.

THE VIDEOGRAPHER: This concludes today's deposition of Bruce Dolnick. We're now off the record at 6:48 p.m., 9/29/04.

06:50:10

(Time noted: 6:48 p.m.)