# EXHIBIT B-2

IX.  **ARGUMENT**

A.  **THE COURT BELOW COMMITTED
REVERSIBLE ERROR BY FAILING
TO RECOGNIZE THAT A JUDICIABLE
CONTROVERSY SURVIVED THE FILING
OF A REISSUE APPLICATION AND A
STATEMENT OF NONLIABILITY BY FULLER**

1.  **The Dismissal Of This Action
Was Improper In That It Defeats
The Very Purpose Of The Declaratory
Judgment Act To Afford Relief
Against In Terrorem Tactics And
Flies In The Face Of Altvater v.
Freeman, 319 U.S. 359 (1943)**

The seminal Supreme Court case of <u>Altvater v. Freeman</u>,

319 U.S. 359 (1943}, laid down the guidelines for declaratory

judgment actions in patent cases.

The facts in <u>Altvater</u> were very close to those here

present.   Freeman's original patent had been litigated.   Only

three of the 26 claims of the original patent were held valid.

Freeman had reissued his patent into two reissue patents.

Licensees (petitioners) under the original patent sought relief

from a Circuit Court ruling that when the District Court found no

license agreement and no infringement, all other issues had

become moot.   The petitioners relied on their counterclaim for a

declaratory judgment seeking to invalidate the reissue patents.

In reversing the Circuit Court, Justice Douglas stated:

> We have here not only bill and answer but a
> counterclaim.  Though the decision of non-
> infringement disposes of the bill and answer,
> it does not dispose of the counterclaim which
> raises the question of validity

319 U.S. at 363.

It was to lift the heavy hard of that tribute
from the business that the counterclaim was
filed. ...   It was the function of the
Declaratory Judgment Act to afford relief
against such peril and insecurity.   S. Rep.
No. 1005, 73d Cong. 2d Sess. pp. 2-3

319 U.S. at 365.

This Court has followed Altvater in Shelcore, Inc. v.
Durham Industries, Inc., 745 F.2d 621, 624 (Fed. Cir. 1984),
where the patentee Shelcore sought to remove claim 13 of its
patent by voluntarily dismissing it with prejudice.  In denying
Shelcore's attempt to remove the validity issue of claim 13
because of the alleged infringer's counterclaim for a declaratory
judgment of invalidity, this Court stated:

> By voluntarily dismissing with prejudice
> claim 13 of the '831 utility patent, Shelcore
> removed the issue of infringement of claim
> 13 from the trial court's consideration.[2] But
> Shelcore could not unilaterally remove the
> validity issue because Durham's counterclaim
> put validity of all the claims in issue.[3]

---

[2] See, Stearns v. Bekman Instruments, Inc.,
737 F.2d 1565 at 1557 (Fed.Cir. 1984).

[3] Altvater v. Freeman, 319 U.S. 359, 363, 63
S.Ct. 1115, 1117, 87 L.Ed. 1450, 57 U.S.P.Q.
285, 288 (1943).

Chief Judge Markey, in Arrowhead Industrial Water, Inc.
v. Ecolochem, Inc., 846 F.2d 731, 734-735 (Fed.Cir. 1984),
summarized the background rationale for a declaratory judgment
actions in patent cases:

> This appeal presents a type of sad and
> saddening scenario that led to enactment of

956-35.33
/rz                              - 22 -

the Declaratory Judgment Act (Act), 28 U.S.C.
§2201.  In the patent version of that scen-
ario, a patent owner engages in a *danse
macabre*, brandishing a Damoclean threat with
a sheathed sword. ... Guerrilla-like, the
patent owner attempts extrajudicial patent
enforcement with scare-the-customer-and-run
tactics that infect the competitive environ-
ment of the business community with uncer-
tainty and insecurity. .... Before the Act,
competitors victimized by that tactic were
rendered helpless and immobile so long as the
patent owner refused to grasp the nettle and
sue.  After the Act, those competitors were
no longer restricted to an *in terrorem* choice
between the incurrence of a growing potential
liability for patent infringement and aban-
donment of their enterprises; they could
clear the air by suing for a judgment that
would settle the conflict of interests.

2.   Once A Declaratory Judgment
     Action Has Been Initiated,
     The Action Must Go Forward
     Notwithstanding Voluntary
     Dismissals By The Patentee
     Or Concessions Of Non-Infringement

It is settled both in patent infringement actions,
where the defendant counterclaims for a declaration of invalidi-
ty, and declaratory judgment actions, where the plaintiff seeks
invalidity, that a patentee cannot withdraw the issue of validity
by either a voluntary dismissal or a concession of non-infringe-
ment. *Akzona, Inc. v. E.I. du Pont de Nemours & Co.*, 662 F.Supp.
603, 619 (D.Del. 1987):

In a typical case where the patentee insti-
tutes an action for infringement and the
alleged infringer counterclaims that the
patent is invalid and unenforceable and/or
noninfringed, courts will allow the action to
go forward on the counterclaim even if the
patentee voluntarily dismisses the charge of

infringement or stipulates to noninfringement.  5 D. Chisum, Patents ¶21.02[1][ d) ] [((i) )]-[C]; see Wang, 657 F.2d at 538-39; Dale Electronics, Inc. v. R.C.L. Electronics, Inc., 488 F.2d 382, 390 (1st Cir. 1973); Handry Products Company v. United States Trunk Co., 259 F.2d 69, 74-76 (1st Cir. 1958); see also, Shelcore, Inc v. Durham Industries, Inc., 745 F.2d 621, 624 (Fed. Cir. 1984). Blackman v. Hadron, Inc., 450 F.2d 781, 782-83 (2d Cir. 1971). Additionally, in the related instance where an alleged infringer files a declaratory judgment action and the patentee counterclaims for infringement, this court has held that the patentee could not belatedly withdraw the issue of validity by entering in a "concession of noninfringement". Phillips Petroleum Co. v. Shell Development Co., 6 F.R.D. 406, 407-08 (D. Del. 1947).

Courts generally articulate three bases for going forward on the counterclaim (or complaint) and determining validity. First, the court's jurisdiction is determined as of the complaint's filing. Thus, even if infringement is no longer an issue, a declaratory judgment counterclaim technically remains, so long as the requirements for maintaining such an action are met. See, 5 D. Chisum, ¶21.02[1][B][i][C]. Second, and most important, there is a clear public interest in determining a patent's validity. See, Handry Products, 259 F.2d at 75 (noting Sinclair v. Interchemical Corp., 325 U.S. 327, 330, 65 S.Ct. 1143, 1145, 89 L.Ed. 1644 (1945)). The public has a greater interest in ridding the act of an invalid patent than in a determination that any given product or process is infringing a patent. Declaratory judgment action allow the potential infringer to garner a decision before committing substantial resources to directly infringe the patent. If patentees were permitted to variously threaten legal action and then unilaterally withdraw the issue of infringement in order to defeat the court's jurisdiction, invalid patents would be insulated from judicial scrutiny. Third, products may change and markets may evolve

such that charges of infringement may once
again be leveled in the future, drawing the
parties into yet another confrontation. See,
5 D. Chisum, ¶21.02[1][d][ii][C].

For an excellent discussion of Second Circuit author-
ity, see Judge Sweet's opinion in Airship Industries (UK) v.
Goodyear Tire & Rubber Co., 643 F.Supp. 754, 759, 760 (S.D.N.Y.
1986). Judge Sweet notes that under Second Circuit precedent the
test is whether a declaratory judgment plaintiff has a reasonable
apprehension of possible future litigation. Manifestly, such
reasonable apprehension is clearly present here. In addition,
the subject litigation involves inequitable conduct, which
apparently was not an issue in Airship.

Judge Sweet further noted that he had the discretion to
decline to hear the case where there was earlier pending litiga-
tion on the same issues. Manifestly, that is not the case at bar
since the Patent and Trademark Office can neither deal with the
issue of inequitable conduct nor purge inequitable conduct.

Finally, the language in the letter from Fuller's
counsel which accompanied the Statement of Non-Liability, is
analogous to the affidavit of the patentee Schwartz in C.R. Bard,
Inc. v. Schwartz, 716 F.2d 874, 881-882 (Fed.Cir. 1983), which
this Court found did not relieve a licensee of reasonable appre-
hension of a future infringement suit:

> Appellee argues these factors are negligi-
> ble in light of the affidavit he signed and
> submitted with his motion to dismiss the
> declaratory judgment action. An examination
> of the affidavit shows that its words were

carefully chosen and did not negate the possibility of an infringement action. That affidavit said Schwartz had and has no intention of terminating the license agreement or suing for infringement. Intentions, however, may change over time. Schwartz did not say that he would not terminate the agreement and would not bring an infringement suit. Thus, under the terms of his own affidavit Schwartz was free to terminate the agreement at a time of his choosing and institute an infringement action. At oral argument Appellee's was asked whether he would affirmatively state that he would not bring an infringement suit. He would only say that on the facts presently known to him he would not sue. The facts presently known to appellee and his attorney are not indicated anywhere. Thus, Bard has a reasonable apprehension that Schwartz may bring an infringement action against it. Cf. Wallace & Tiernan, Inc. v. General Electric Co., 291 F.Supp. 217, 160 U.S.P.Q. 653 (S.D.N.Y. 1968). (Although defendant attested he would never sue plaintiff for infringement, actual controversy was found. Plaintiff's business was hurt by conduct and asserted legal claims of defendant, and other parties were unwilling or unable to bring suit.)

Last, we note that the affidavit signed by Schwartz did not foreclose him from instituting an infringement action against Delmed. In such a suit, Bard's attorney stated and appellee did not dispute that Bard would be likely to be held liable for any damages found to be owed by Delmed. In light of the totality of the circumstances, we find Bard has a reasonable apprehension of an infringement suit. Bard's declaratory judgment action was therefore not in defense of the state court action brought but in defense of an actual federal controversy "arising under" the patent law.

Unlike the case at bar, no issue of inequitable conduct was present before the Court in Bard.

956-35.33
/rz

- 26 -

This Court's decision in <u>Grain Processing Corp. v. American-Maize Products Co.</u>, 840 F.2d 902 (Fed.Cir. 1988) referred to by both Fuller's counsel and the District Court in the passage quoted at page 16 of this brief is not to the contrary.

In <u>Grain Processing</u> the patentee abandoned the allegation in its original complaint that the defendant had infringed the method claims in issue. Under the facts of that case this yielded a complete disposition of the process claims, with no remaining reasonable apprehension that infringement could be asserted:

> Here, Maize has no "reasonable apprehension" it will face an infringement suit on the process claims. GPC abandoned its charge that Maize had infringed them prior to trial, and since then has "steadfastly refused to assert infringement" of those claims. <u>There is also nothing in the record to suggest that Maize will be faced with a similar infringement suit in the future.</u> Therefore, no case or controversy surrounds them, and the district court correctly refused to consider a declaratory judgment of invalidity.

<u>Grain Processing</u> at 906. (Emphasis added).

<u>Grain Processing</u> is clearly distinguishable from this case in that Fuller has not fully abandoned any future assertion of infringement. Rather, Fuller's counsel (in his letter to Spectronics' counsel quoted at page 10 of this brief) made it very clear that Fuller was reserving the right to bring suit under the reissue claims. This possibility of future litigation

956-35.33
/rz

- 27 -

on the reissue patent was recognized by patent counsel for
DuPont, potentially one of Spectronics' biggest customers.

Moreover, inequitable conduct before the Patent and
Trademark Office was not an issue in Grain Processing. As will
be seen, infra, the question of inequitable or fraudulent conduct
in prosecution of the original patent will not affect the reissue
patent application in the Patent and Trademark Office. The
District Court is the only forum that can deal with this ques-
tion.

Proctor & Gamble Co. v. Nabisco Brands Inc., 711
F.Supp. 759, 778-779 (D.Del. 1989), analyzes Grain Processing in
precisely the way set forth above:

> In Grain Processing, the Federal Circuit
> affirmed the District Court's refusal to
> adjudicate the validity of claims in the
> patent-in-suit which were no longer being
> asserted as infringed, where there was a
> declaratory judgment counterclaim attacking
> those claims.
>
> *        *        *
>
> P&G's reliance upon the result in the Grain
> Processing case is misplaced because the
> facts in the present case are contrary to
> the three fundamental facts which the Federal
> Circuit found crucial in Grain Processing.
> First, the Federal Circuit concluded that the
> patentee had abandoned the allegation in its
> original complaint that the defendant had
> infringed the method claims in question. In
> the present case, P&G has asserted that it
> would rely only on six claims at trial on the
> issue of infringement . . . Nevertheless, P&G
> has not abandoned its charge of infringement
> against the non-trial claims. For example,
> when P&G amended its Complaint, it did not
> drop the charge of infringement of claim 35

956-35.33                           - 28 -
/rz

even though it did not select to prosecute
infringement on this claim at trial . . .
Although P&G claims that this court recog-
nized in a previous opinion that "P&G has
stipulated that it will rely on the same six
claims in its patent for each of Defendants'
cookies", Proctor & Gamble Co. v. Nabisco
Brands, Inc., 604 F.Supp. 1485, 1492 (D.Del.
1985), unlike the facts in Grain Processing
P&G have not "steadfastly refused to assert
infringement" of the asserted claims which
were not selected as the representative trial
claims.

Moreover, the record is not devoid of any
suggestions that the Defendants will be faced
with a similar infringement suit in the
future. . . . Furthermore, the subject matter
of one of Frito-Lay's motions involves
inequitable conduct before the PTO with
respect to claim 35 which, if proven, would
render the entire '333 Patent unenforceable.
See, J.P. Stevens & Co., 747 F.2d at 1561-62.
P&G can not be permitted to circumvent the
Defendants' charges of inequitable conduct by
"picking and choosing" which claims it will
prosecute and which claims it will not
prosecute as infringing. See, e.g., Shel-
core, Inc. v. Durham Industries, Inc., 745
F.2d 621, 624 (Fed.Cir. 1984) ("By voluntar-
ily dismissing [one of the claims at issue,]
Shelcore [attempted] to remove the validity
issue because Durham's counterclaim [of
declaratory judgment] put all the claims in
issue."); See also, Jervis v. Webb Co., 742
F.2d at 1399-1400 n.8 (Federal Circuit noted
that if the declaratory judgment plaintiff
can satisfy the requirement of "reasonable
apprehension", then it would be appropriate
to adjudicate a declaratory judgment counter-
claim asserting the invalidity of all of the
patentee's claims in response to a complaint
that asserted the infringement of less than
all of the claims).

Because the fundamental facts of the Grain
Processing case cannot be found in the
present case, it can be concluded from the
record that the Defendants have at least a
"reasonable apprehension" that P&G could

956-35.33
/rz                              - 29 -

> bring suit on the non-asserted trial claims
> in the future.  Thus, the Defendants have
> satisfied their evidentiary burden to main-
> tain the declaratory judgment counterclaim.
> (Emphasis added).

Jurisdiction in declaratory judgment actions in patent cases must be determined on the facts existing at the time the Complaint under consideration was filed.  In Arrowhead Industrial Water, Inc. v. Ecolochem, Inc., 846 F.2d 731, 734 fn.2 (Fed. Cir. 1984), Chief Judge Markey stated:

> The presence or absence of jurisdiction must
> be determined on the facts existing at the
> time the complaint under consideration was
> filed.  Jervis B. Webb Co. v. Southern Sys.,
> Inc., 742 F.2d 1388, 1398, 222 U.S.P.Q. 943,
> 949 (Fed. Cir. 1984).

Because Fuller has not completely abandoned any future assertion of infringement, and because jurisdiction of declaratory judgment actions in patent cases must be determined on the facts existing at the time the Complaint was filed, and because of the presence of inequitable conduct in connection with the original claims of the '366 patent, this action should not have been dismissed.  It is respectfully submitted that such dismissal was clearly reversible error.

956-35.33                          - 30 -
/rz

B.    IT WAS REVERSIBLE ERROR FOR THE
DISTRICT COURT TO REFUSE TO DEAL
WITH THE VERY SUBSTANTIAL AND
WELL-DOCUMENTED ALLEGATIONS OF
INEQUITABLE CONDUCT WHICH WERE
PROPERLY BEFORE IT

1.    Only The District Court Can
Resolve Issues Of Inequitable
Conduct, The Patent and Trademark
Office Having Declared It Will
No Longer Consider Or Make Any
Findings On These Issues In
Connection With A Reissue
Patent Application

The reissue of patents is controlled by 35 U.S.C. 251-
252, and by 37 C.F.R. 1.171 through 1.179.   (A472-474)

Reissue proceedings are entirely _ex parte_ and have been
such since May of 1982 when the Patent and Trademark Office
terminated its previous procedure (in effect since February 22,
1977) which had permitted third parties to protest the approval
of reissue applications.    5 L. Horowitz, Intellectual Property
Counseling and Litigation, pp.101-107 (1990).

In late 1988, the Patent and Trademark Office mandated
a new policy, admitting that it was ill-equipped to deal with
inequitable conduct issues.   Henceforth, the Patent and Trademark
Office would no longer investigate and reject either original or
reissue patent applications on the basis of inequitable conduct,
but would leave this issue to the courts which were better
equipped to handle it, and to whom appeals from the Patent and
Trademark Office would lie.   1095 Official Gazette, pp.16-17
(September 8, 1988); 1096 Official Gazette, p.19 (October 17,

956-35.33                         - 31 -
/rz

1988); 1098 Official Gazette, pp.502-503 (December 8, 1988).

(A456-462)

The official policy was stated thusly:

The Office [PTO] is not the best forum in which to determine whether there was an "intent to mislead", such intent is best determined when the trier of facts can observe demeanor of witnesses subjected to cross-examination. The Office is not presently equipped to handle live testimony. Modifying Office procedures to do so would not be an effective utilization of resources. A court, with subpoena power, is presently the best forum to consider duty of disclosure issues under the present evidentiary standard for finding an "intent to mislead". The court proceeding involves two participating adverse parties. This is not the case in the Office, since even "protesting" parties are not permitted to participate under the Rules. Also, it is the courts and not the Office that are in the best position to fashion an equitable remedy to fit the precise facts in those cases where inequitable conduct is established. Furthermore, inequitable conduct is not set by statute as a criteria for patentability but rather is a judicial application of the doctrine of unclean hands which is appropriate to be handled by the courts rather than by an administrative body. Because of the lack of tools in the Office to deal with this issue and because of its sensitive nature and potential impact on a patent, Office determinations generally will not deter subsequent litigation of the same issue in the courts on appeal or in separate litigation. Office determinations significantly add to the expense and time involved in obtaining a patent with little or no benefit to the patent owner or any other parties with an interest.

Accordingly, the Office will no longer investigate and reject original or reissue applications under 37 CFR 1.56 and to the extent 37 CFR 1.56 now requires the Office to do so, it is hereby waived. Likewise the

956-35.33                    - 32 -
/rz

Office will not comment upon duty of dis-
closure issues which are brought to the
attention of the Office in original or
reissue applications except to note in the
application, in appropriate circumstances,
that such issues are no longer considered by
the Office during its examination of patent
applications. Examination of lack of decep-
tive intent in reissue applications will
continue but without any investigation of
inequitable conduct issues. Applicant's
statement of lack of deceptive intent nor-
mally will be accepted as dispositive except
in special circumstances such as admission
or judicial determination of fraud or
inequitable conduct.

1095 O.G. 16-17.

The Board of Patent Appeals and Interferences has held

that it is without authority to deal with the issue of inequi-

table conduct citing the Official Gazette Notices in Flehmig v.

Giesa, 13 U.S.P.Q. 2d 1052, 1053 (Bd.Pat.App.Int. 1989):

ISSUES

The Flehmig brief raises the matter of
whether Giesa has complied with its duty of
disclosure under 37 CFR 1.56. We, however,
are without authority to consider this
matter. See the Commissioner's notice, dated
September 8, 1988, 1095 O.G. 16, as clarified
in his Notice, dated October 17, 1988, 1096
O.G. 19. Accordingly this issue is dis-
missed.

While the regulations, 37 C.F.R. 1.291, provide for

protest by the public (which would include Spectronics) against

pending reissue patent applications, this procedure is exceeding-

ly limited. Again, this limitation was emphasized in the above-

quoted notice from 1095 O.G. 16-17.

956-35.33                    - 33 -
/rz

The Court proceeding involves two participa-
ting adverse parties. This is not the case
in the Office, since even "protesting"
parties are not permitted to participate
under the Rules.

The regulations only permit Spectronics, or any other
protesting party, to file a one-time documentary "protest"
containing a listing of the prior art.    37 C.F.R. 1291(c).
Nothing beyond this is permitted.

Only a determination by the District Court on the issue
of inequitable conduct will, in fact, reach this issue, and it
can be explored only by discovery taken during the course of a
civil action and by live testimony in open court.

The procedure presently in place in the Patent and
Trademark Office, therefore, prohibits any finding of inequitable
conduct. The only forum in which this issue can be raised and
disposed of on its merits is in the District Court.

In this case, the District Court had before it substan-
tial and detailed allegations of inequitable conduct in the
prosecution of the '366 patent. And, it is significant to note
that Fuller offered no meaningful refutation of these charges.
At the time that this action was dismissed, it had already been
decided that trial of this matter would be trifurcated, the
question of inequitable conduct to be determined first.

It was reversible error, therefore, for the District
Court to determine that it did not have a "live" controversy
before it.

956-35.33                    - 34 -
/rz

Finally, it may be, that the District Court was swayed by the misrepresentations of Fuller's counsel as to the procedures currently extant in the Patent and Trademark Office relative to reissue. At the very least, counsel's statements do not accord with the unequivocal notices mandating avoidance of all issues of inequitable conduct, and which severely limit Spectronics' participation in the reissue proceeding.

The following colloquy from the June 7, 1990 hearing is to be noted:

> THE COURT: What does that do . . . I assume your current patent as far as the Patent Office is concerned remains in good stead pending whatever developments here or else-where?
>
> MR. CARLSON: Well, except that we are giving up all the claims in the patent in favor of new claims so we are cancelling those claims and we feel that this entire case because they are going to be cancelled. We are seeking a new set of claims and the beauty of a reissue proceeding is that both parties can participate. All of the issues that are in this litigation can be aired and the Patent Office can examine claims and those claims that are valid and are legitimate based upon the disclosure and the invention.
>
> *     *     *
>
> So to answer your question, we feel that we have taken the entire case now to the Patent and Trademark Office and Spectronics can participate. We have cancelled those claims and we feel that this case is moot. (A254-255)

956-35.33                       - 35 -
/rs

2.    **Inequitable Conduct
Cannot Be Purged By
A Reissue Proceeding**

This Court has squarely held that reissue is not available to obtain new claims and rehabilitate a fraudulently procured patent. Hewlett-Packard Co. v. Bausch & Lomb Inc., 882 F.2d 1556, 1563-1564 fn.7 (Fed. Cir. 1989), cert. den., 110 S.Ct. 1125 (1990):

> It is well settled that, in the reverse case of inequitable conduct during prosecution of the original application, reissue is not available to obtain new claims and thereby rehabilitate the patent. See, e.g., In re Clark, 522 F.2d 623, 627, 187 USPQ 209, 213 (CCPA 1975) (reissue unavailable to rescue patentee who committed inequitable conduct during original prosecution).

In Hoffman-La Roche Inc. v. Lemmon Co., 906 F.2d 684, 688-689 (Fed. Cir. 1990), this court reiterated the rule stated in Hewlett-Packard (at page 10):

> If the District Judge finds that there was inequitable conduct during the original patent prosecution, then this court directs the District Court Judge's attention to footnote 7 in Hewlett-Packard . . .
>
> *      *      *
>
> ". . . Thus, if the District Court finds that there was inequitable conduct in the prosecution of the original patent then the reissue patent is invalid and an appropriate judgment should be entered.

Hence, a reissue patent cannot purge inequitable conduct.

The American Intellectual Property Law Association (AIPLA) has unsuccessfully sought to change this settled law so as to enable inequitable conduct to be purged by reissue and has adopted resolutions favoring post-patent purging. The PTO successfully opposed this change, setting forth its position in the article: *The Patent and Trademark Office View of Inequitable Conduct or Attempted Fraud in the Patent and Trademark Office*, 16 AIPLA Q.J. 88, 94 (1988) by Assistant Commissioner for Patents Tegtmeyer:

### POST-ISSUANCE PURGING
### Resolution 3

Resolved that the AIPLA favors, in principle, amendment of PTO Rule 56(d) by deleting "or in connection with any previous application upon which the application relies."

### Resolution 6

Resolved that the AIPLA favors in principle the concept of post-patent purging if the claims are not changed.

The PTO is opposed to post-issuance purging as proposed in Resolutions 3 and 6. These resolutions would seriously erode the duty of disclosure since any misconduct could be overcome by simply filing a reissue application or in appropriate cases by filing a continuing application claiming priority from an application which is allowed to become a patent. Also the proposed resolutions sanction intentional failure to cite information as well as grossly negligent omissions of information. Under this procedure there would be no incentive to use any care to cite prior art with a marked drop in quality being the result. The image of the PTO and the patent system would suffer in the eyes of the courts and the public. (A466)

Since major issues of inequitable conduct underlie this case, no useful purpose is served by the reissue patent application. At some point in time, the District Court will have to deal with the issue of inequitable conduct. There is a strong possibility, based upon what is presently known regarding prior art and the failure of the patentee to make certain key disclosures, that inequitable conduct will, in fact, be found. The reissue procedure, therefore, will have been a waste of time.

It is to be noted that no reported cases have been found staying or dismissing a pending patent infringement action involving inequitable conduct to await the outcome of a reissue application after the implementation of the policies outlined by the PTO in the Official Gazette notices of late 1988.

Again, the Court below may have been in part persuaded by the misrepresentations of Miller's counsel who inaccurately depicted the procedure on reissue at the hearing of June 7, 1990:

> THE COURT:  Is there any authority for the proposition — let's assume Widger was-- worst case scenario -- alright, they [sic] were just flat out fraud on the Patent Office and your [sic] blameless.  You bought a patent you thought was otherwise legitimate. ~~You bought -- ... ! [illegible]~~ You thought was otherwise legitimate.  Is there any authority for the notion that the sins of the original applicant are to be visited upon, in effect, an innocent purchaser off the patent.

> MR. CARMODY:  I don't know.  I haven't looked at that but . . .

THE COURT:  And if so where would that happen
if it wasn't happen in the Patent Office?

MR. CARLSON:  But what you can do is purge.
We're talking here about an equitable concept
. . . in fact, to answer your question again,
we would be entitled to purge that inequit-
able conduct and we would identify for the
Patent and Trademark Office all the evidence,
all the alleged misstatements and Spectronics
would take part in making arguments with
respect to the significance of any alleged
misstatements.

THE COURT:  Very interesting.

MR. CARLSON:  Now as I said, we would be
filing a Motion to Dismiss or at least to
stay this action in view of that reissue and
as you point out, I think this should be the
prelude . . . (A274-275)

1.      The Patentee's Inequitable Conduct
        Drastically Affects The Public

The District Court's dismissal of this action merely
postponed the day of reckoning for the '366 patent.  The evidence
unmasked by Spectronics clearly points in the direction of
inequitable conduct and fraud.  The District Court should have
recognized its duty to rule upon these issues.

If for no other reason, this case should not have been
dismissed because major rights of the public are implicated.
Thus, a fraudulent patent monopoly has far-reaching social and
economic consequences affecting the public.  Precision Instrument
Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806,
815-816 (1945):

        In the instant case Automotive has sought to
        enforce several patents and related con-
        tracts.  Clearly these are matters concerning

986-35.33                     - 19 -
/rz

far more than the interest of the adverse
parties. The possession and assertion of
patent rights are "issues of great moment to
the public. Hazel-Atlas Glass Co. v. Hart-
ford-Empire Co., 322 U.S. 238, 246, . . . . A
patent by its very nature is affected with a
public interest. As recognized by the
Constitution, it is a special privilege
designed to serve the public purpose of
promoting the "Progress of Science and useful
Arts." At the same time, a patent is an
exception to the general rule against monopo-
lies and to the right to access to a free and
open market. The far-reaching social and
economic consequences of a patent, therefore,
give the public paramount interest in seeing
that patent monopolies spring from back-
grounds free from fraud or other inequitable
conduct and that such monopolies are kept
within their legitimate scope.

The Supreme Court has repeatedly recognized that one

who invalidates an invalid patent performs a useful public

service. Lear Inc. v. Adkins, 395 U.S. 653, 670 (1969):

Surely the equities of the licensor [paten-
tee] do not weigh very heavily when they are
balanced against the important public
interest in permitting full and free competi-
tion in the use of ideas which are in reality
a part of the public domain. Licensees may
often be the only individuals with enough
economic incentive to challenge the patent-
ability of an inventor's discovery. If they
are muzzled, the public may continually be
required to pay tribute to would be monopo-
lists without need or justification.

Nor is this doctrine new. As the Supreme Court stated

almost 100 years ago in Pope Mfg. Co. v. Gormully, 144 U.S. 224,

36 L.Ed. 414, 418 (1892):

It is as important to the public that compe-
tition should not be repressed by worthless
patents, as that the patentee of a really

valuable invention should be protected in his monopoly; . . .

The patent-in-suit involves the detection of leaks of Freons (fluorinated and chlorofluorinated hydrocarbons) to the atmosphere.   It is difficult to conceive of an invention of greater ecological importance than the avoidance of the destruction of the earth's ozone layer.  Only the prompt invalidation of Fuller's fraudulently obtained patent monopoly, would, as Justice Murphy stated in Precision, at 324 U.S. 818, enable "the public [to] escape from being classed among the 'mute and helpless victims of deception and fraud'."

956-35.33
/zz

- 41 -

## X.   CONCLUSION AND STATEMENT OF RELIEF SOUGHT

Appellant respectfully requests that the dismissal of this action be reversed, that this action be reinstated and that it be permitted to proceed to trial on the merits.

Respectfully submitted,

Date:   January 3, 1991

ARTHUR H. SEIDEL
PAUL S. CHIRGOTT
PER-OTTO L. ERICHSEN
Seidel, Gonda, Lavorgna
 & Monaco, P.C.
1800 Two Penn Center Plaza
Philadelphia, PA 19102
Tel. No. (215) 568-8383

Attorney for Appellant
Spectronics Corporation

956-35.33
/rz

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that two (2) copies of the foregoing (corrected) BRIEF OF PLAINTIFF-APPELLANT was served by Federal Express, overnight mail, upon counsel for the Appellee listed below on this 3rd day of January, 1991:

Alan G. Carlson, Esq.
Merchant, Gould, Smith,
   Edell, Welter & Schmidt, P.A.
3100 Norwest Center
90 South Seventh Street
Minneapolis, MN 55402

PER-OTTO L. ERICHSEN

956-35.33
/rz                           - 43 -