# Tab 7 (Part 1)

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BIOGEN, INC., ET AL            )  CA 03-11329
                               )  Boston, MA
v.                             )  June 22, 2004
                               )
COLUMBIA UNIVERSITY, ET AL     )

BEFORE THE HONORABLE MARK L. WOLF
UNITED STATES DISTRICT JUDGE

APPEARANCES:

(As previously noted.)

JUDITH A. TWOMEY, RPR
Official Court Reporter
One Courthouse Way
Courtroom 10~Room 5200
Boston, MA 02210
(617)946-2577

1          THE CLERK:  This is Civil Action Number

2     03-11329, Biogen, Inc, et al versus Columbia University,

3     et al.

4          Court is in session.  You may be seated.

5          THE COURT:  Good morning.  Would counsel please

6     identify themselves for the court and for the record.

7          MR. WARE:  Donald Ware.

8          THE COURT:  Mr. Ware, you've got to stand up.

9          MR. WARE:  Donald Ware on behalf of Biogen and

10    Genzyme.

11         MS. LAPORTE:  Claire Laporte, Foley Hoag LLP,

12    also for Biogen and Genzyme.

13         THE COURT:  We're having trouble.  You have to

14    speak up.  Say that again, please.  Use the microphone.

15         MS. LAPORTE:  Claire Laporte, Foley Hoag LLP,

16    also for Biogen and Genzyme, your Honor.

17         MR. MAFFEI:   Thomas Maffei for Columbia

18    University.

19         MR. GINDLER:   Good morning, your Honor.  David

20    Gindler for Columbia.

21         MR. SHEASBY:  Jason Sheasby for Columbia.

22         THE COURT:  Would you spell that, please.

23         MR. SHEASBY:  S H E A S B Y.

24         THE COURT:  Thank you.

25         MR. ZALESIN:  Good morning, your Honor.  Steven

1    Zalesin for Johnson and Johnson.

2            THE COURT:  You're going to have to spell that

3    too.

4            MR. ZALESIN:  Z A L E S I N.

5            MS. PRUETZ:  Good morning, your Honor, Adrian

6    Pruetz and Robert Stone for Genentech.

7            THE COURT:  Okay.

8            MS. BEN-AMI:  Good morning, your Honor.  Leora

9    Ben-Ami for Wyatt and Genetics Institute.

10            MR. PALS:  Mark Pals of Kirkland and Ellis for

11    Abbott Bioresearch Center.

12            MR. WEINBERG:  Good morning, your Honor.  Arthur

13    Weinberg and Eileen Herlihy for Amgen and Immunex.

14            THE COURT:  Is she hiding behind the podium?

15            MR. WEINBERG:  Right over here.

16            THE COURT:  It's hard enough to keep track of

17    those of you who are visible.

18            MR. BARSKY:  Good morning, your Honor.  Wayne

19    Barsky for Columbia.

20            THE COURT:  Is there anybody else for Columbia?

21            MS. TESSAR:  Amanda Tessar, T E S S A R, for

22    Columbia.

23            MS. KEEFER:  I'm Elizabeth Keefer for Columbia

24    University.

25            THE COURT:  I thought Columbia was a nonprofit

4

1    organization who couldn't afford this litigation.

2              MR. CHENG:  We are.  Good morning, your Honor.

3    Augustine Cheng, C H E N G, for Columbia.

4              MS. HAJBUFIEWICZ:  Alison Hajbufiewicz, also

5    Columbia.

6              THE COURT:  So there should be within the

7    enclosure counsel for all parties in this Multi-District

8    Litigation.

9              Before we focus on the substance, I'd like to

10   confirm or, if necessary, clarify the procedural posture

11   of this.

12             On April 9, I issued an order relating to my

13   possible recusal.  I subsequently had a telephone

14   conference with counsel for the parties, and they

15   responded to that order.

16             As I said in the order that I issued on May 10,

17   it's my understanding that no party believes that my

18   recusal is required under 28 United States Code, section

19   455B.  No party believes my recusal is required under

20   section 455A.  And, in any event, each party has waived

21   any ground for recusal based on the disclosures I made

22   pursuant to section 455A.

23             So, as I stated in my May 10, 2004 order, I am

24   continuing to preside in this case.

25             But did I misunderstand anybody's position?

5

1          Apparently not.

2          Now, this isn't going to affect whether I go

3    ahead, but it will affect my comfort or discomfort level.

4          One of the matters I discussed in that initial

5    order regarding my possible recusal was the involvement

6    of Baxter Health Care Corporation, which was then a party

7    to one of the pending cases, but it's my understanding

8    that Baxter settled with Columbia and that the Baxter

9    case has been dismissed.

10          What I'm wondering, however, though, is whether

11    Baxter is likely to come up again, even if not a party in

12    this litigation, in some way that's now foreseeable?  For

13    example, I know from the submissions that Serono has

14    settled, but Biogen is talking about Serono getting a

15    competitive advantage by virtue of the settlement if

16    there's no preliminary injunction.

17          Does anybody foresee any further or future

18    argument relating to Baxter?

19          MR. WARE:   Your Honor, I was counsel for Baxter

20    and, as I sit here, I don't foresee any such argument.

21          THE COURT:  And there's so many of you, at least

22    to begin with, you're going to have to say your name

23    before you speak.  That was Mr. Ware.

24          Okay.  There were a series of motions for

25    admission pro hac vice here, all in order.  They are

6

1    allowed.

2            There were a number of motions to exceed the 25

3    -- I'm sorry, the 20-page limit and to file replies or

4    sur-replies.  They're also allowed.

5            What I have on my agenda for today are the

6    Biogen and Genzyme motions for a preliminary injunction,

7    Columbia's motion to stay the litigation, Columbia's

8    motion for a protective order limiting disclosure of

9    portions of a pending patent application, a schedule for

10   the case if there's no stay, and certain logistical

11   issues, including the master docket that we're creating,

12   in part, to facilitate electronic filing.

13           Are there any other matters that ought to be on

14   the agenda?

15           Apparently not.

16           When I originally scheduled events for today, I

17   knew I had the motion for preliminary injunction, and I

18   knew I would want to set some kind of schedule.

19           The motion to stay came in after, and it seems

20   to me at the moment that the motion to stay is related

21   possibly to the motion for resolution of the motion for

22   preliminary injunction, and I'd probably want to discuss

23   them, hear your argument in tandem before I decide either

24   of them.  And I have, with considerable assistance from

25   my law clerk, Mr. Goldberger, tried to get quite deeply

7

1    into everything you filed, and I have some thoughts that

2    are definitely tentative but are also, in some respects,

3    different than the positions that anybody is proposing on

4    all of this.  And, as is my practice in other matters,

5    what I would like to do is tell you what my present state

6    of mind is, what my tentative thoughts are, what my --

7    some of my major questions are, and then we can go to the

8    argument, but you will be able to address my present

9    state of mind and, if it's confused or worse, you can

10   straighten me out.

11          But in preparing, there were also some questions

12   that emerged that I think I would like to discuss with

13   you as a threshold matter.

14          Biogen, Genzyme, and Columbia entered into the

15   stand-still agreement that permitted the very helpful

16   briefing to be done that leads up to today.  But, as I

17   looked at that, a couple of questions came to mind.  And

18   by raising this first one, I don't want to promote any

19   undo anxiety because, even if I have this authority, I

20   wouldn't exercise it if I thought it was not fair in view

21   of the reasonable expectations of the parties.

22          But, normally, when a judge conducts a hearing

23   on a motion for a preliminary injunction, he has the

24   discretion to merge the -- some or all of the trial on

25   the merits with the hearing on the motion for a

1    preliminary injunction.  And I don't know whether -- and

2    I'm going to tell you where this is going, because it's

3    going to be a recurring theme.  I don't know whether I

4    should regard myself as having that authority that's

5    provided by Federal Rule of Civil Procedure 65A2.

6         As I have got into this and tried to think about

7    what a fair and efficient way for the whole

8    Multi-District Litigation to progress would be, I've come

9    to wonder whether the issue of nonstatutory double

10   patenting or double patenting or obviousness -- you're

11   all patent lawyers, I'm not -- but, as I understand it,

12   there are certain statutes like section 1001 and section

13   1003, and then there's this judicially crafted doctrine

14   that's called double patenting or obviousness double

15   patenting that I thought was succinctly and helpfully

16   discussed in the Geneva Pharmaceuticals case, 349 F 3rd

17   1373, particularly at 1378 and in note 1.  Because -- and

18   you'll hear me continually come back to this -- I wonder

19   whether that issue can be carved out properly for quite

20   quick preparation for a summary judgment hearing in which

21   I would conduct a Markman hearing and, if there wasn't

22   summary judgment, you know, a reasonable time thereafter,

23   but as promptly as possible, a trial.  Because, as I

24   understand it, reading the footnote in Geneva, basically,

25   to do that type of analysis, I'm comparing claims in an

9

1     earlier patent to claims in a later patent.  I'm not
2     inquiring into motivation, and I'm not inquiring into
3     objective criteria, like what happened in the
4     marketplace.  And I already have Professor Lodish's
5     affidavit from Biogen and Genzyme which, I think, puts
6     Columbia on notice of what the double patenting claims
7     are in pretty high degree of detail.  And if something
8     similar were provided by Columbia, and then with some
9     expert discovery, I wonder what more would be needed for
10    me to construe the relevant claims, decide if the matter
11    is amenable to summary judgment and, if not, try the
12    case.
13          And you don't have to answer that now, although
14    by the time I get through these lengthy notes -- well,
15    maybe you should give me an immediate -- just a reaction.
16    Nobody is stuck with this answer if on reflection you can
17    think of something you should have said.
18          MR. WARE:   Donald Ware for Biogen and Genzyme.
19          Of course, I think we would wish to be able to
20    confer with other counsel involved, but my immediate
21    reaction is that I think a procedure along those lines
22    could be followed here.  We've thought from the
23    beginning, to be very candid, that these issues would be
24    decided on summary judgment.  We don't think it's very
25    likely that they really are factual disputes.  After we

1    filed our preliminary injunction motion and put together

2    Doctor Lodish's affidavit and laid out the argument and,

3    in light of the Geneva Pharmaceuticals case which, as

4    your Honor points out, removes the whole issue of what

5    they call secondary considerations, market objective

6    criteria, that sort of thing, we even asked ourselves if

7    maybe we should just be moving for a summary judgment and

8    get on with it.

9         THE COURT:  And I would have said, gee, it's too

10    early.  But your motion for a preliminary injunction was

11    even better because you've caused me to think I thought

12    of it myself.  Go ahead.

13         MR. WARE:  So, really, the principal -- and

14    when I think about discovery for the double patenting

15    issues, of course, if we had simply filed that as a

16    motion for summary judgment, I suppose Columbia would

17    have presented some affidavit or whatever in response and

18    tried to create some factual disputes.  And so one of the

19    reasons that you like to go ahead and take inventor

20    depositions is, hopefully, to sort of remove those and

21    confirm that those aren't issues.  And then, of course,

22    there could be a little bit of expert discovery.  So

23    those are possibilities.  Although, even having said

24    that, I think it's entirely plausible that the entire

25    issue could be a summary judgment issue.  In any case, I

11

```
 1    think in the end, they really are questions of law.
 2            The other thing that the court said that I think
 3    is of interest, potentially, if we didn't think that this
 4    could be put into a summary judgment posture, would be
 5    expediting a trial on the merits on the double patenting
 6    issues.  We could have the stand-still agreement continue
 7    in place up to that point.  It presumably wouldn't be
 8    that far off.  Maybe with some limited discovery, we
 9    actually could try it on the merits.
10            And so without, as you said, absolutely
11    committing ourselves, my initial reaction is that I think
12    it would be doable, and it would be a creative approach
13    to what's a very, very important case that will have
14    important implications both for Columbia and for the
15    entire biotechnology industry.  And I think everybody's
16    interests would be served, honestly, by finding a way to
17    get to a resolution promptly.
18            THE COURT:  And what's Columbia's reaction?
19            MR. GINDLER:   Good morning, your Honor.  David
20    Gindler.
21            I see a number of problems.  I'll put them into
22    two categories.  The first is judicial economy and our
23    time, everyone's time.  No matter what happens in this
24    courtroom on double patenting, we're going to have
25    reissue and reexamination proceedings.  And no matter
```

12

1     what happens in this courtroom, those proceedings will

2     continue.  This court could invalidate every single claim

3     of the '275 patent on double patenting grounds or any

4     other grounds, and the reissue and the reexamination will

5     continue on any new or amended claims that are submitted.

6          THE COURT:  And, actually, a couple of things.

7     When we get into this -- and I'm starting with this, and

8     when I finished my notes about 25 minutes ago, I kind of

9     ended with it on the schedule -- but one of the things

10    that came into focus for me is that even with Mr.

11    Goldberger's invaluable assistance, I don't feel I

12    understand enough about the implications of reissuance

13    and reexamination here at ten in the morning.  I may

14    think I do in a couple of hours.  So that's well worth

15    talking about.  And I'm going to explain all this to you

16    eventually, but I'm not inclined to stay this case, for a

17    variety of reasons, but one of them is I think that, you

18    know, some resolution at this level would be practically

19    very valuable.  I think -- well, I wonder -- whatever I

20    think is very tentative, but I think it appears that the

21    simplest, maybe strongest argument that Biogen and

22    Genzyme have is that this is invalid for double

23    patenting.

24          The prosecution laches would require more

25    discovery.  It might be less likely to be amenable to

1      summary judgment because there has to be an explanation,

2      because we have to decide what's reasonable.  You know,

3      presumably, Mr. White can explain why he's been working

4      on this for 24 years, and Columbia will explain to me why

5      Mr. White is still doing this, although he fouled up so

6      terribly and drafted these narrow claims that didn't

7      cover everything he should have covered in the first 24

8      years he worked on this.  But that may not be amenable to

9      summary judgment.

10          If I were to declare this invalid for double

11     patenting -- and so far I don't think I have anything

12     from Columbia on the merits of the double patenting --

13     you know, that might inform what the Patent and Trademark

14     Office is doing.  You can take it up on appeal.  You can

15     see where you stand.

16          If you win, if Columbia wins on double

17     patenting, and you think you've got a pretty good chance

18     of winning on prosecution laches, except maybe, as I read

19     it, I think, from Amgen, there's no serious question

20     about infringement.  You're going to win on infringement,

21     I think.  And, you know, we've got this -- we'll get to

22     it -- you know, these sort of conundrums created by the

23     two Cordis cases and the Gen-Probe case.  But none of

24     this is supposed to be a game, you know, where people

25     have to take risks.  You should get an answer.

14

1          So, you know, maybe the reissuance and

2     reexamination will go ahead, and maybe in the course of

3     today you'll explain it to me, but -- in a way that

4     alters my inclinations.  But regardless -- you want to

5     defeat the preliminary injunction.  And maybe I ought to

6     go through the whole thing.  But on my present sense, the

7     only injunction I would issue is the limited one that

8     neither of you want with regard to the '636 and the

9     possibly emerging '159, if I have the numbers right.  But

10    that can change.  That's definitely an open question.

11         But if I don't give them the injunction, then I

12    assume they're not going to pay the royalty because they

13    don't want to end up in the Gen-Probe situation.

14         And then I really think a speedy resolution is

15    particularly important.  If I do grant the injunction, I

16    wouldn't be amazed if you came back to me and said, you

17    know, let's not stay this, let's go ahead.  Because in

18    some respects those cases educate somebody like me to

19    understand that, you know, the injunction kind of affects

20    the risks and bargaining power of the parties.

21         But what else about this proposal of carving

22    this double patenting out?

23         MR. GINDLER:   I think the centerpiece of the

24    proposal that the plaintiffs have presented is that it

25    would be good to carve it out because there will be an

15

```
 1     early resolution and, if it gets resolved, we're done.
 2     And that would be attractive if it were correct, and the
 3     problem is that it's not correct.
 4          So, if this court were to go forward, carve out
 5     double patenting, hold an early summary judgment hearing,
 6     invalidate our patent, every single claim, what's going
 7     to happen?  Well, the most likely scenario is as follows,
 8     and this is something the plaintiffs agreed with.  Our
 9     patent will come out of the Patent Office, come out of
10     reexamination and reissue with certain claims intact that
11     are new or amended, and we'll be back, and we'll do the
12     same thing all over again.
13          THE COURT:  You might be back.  You might have a
14     new license agreement.  And I'll get to this when we get
15     to the stay, but they say I'm going to have to interpret
16     these claims anyway to decide whether to give them
17     attorneys' fees or to interpret the reissued claims.
18     But, okay, I guess I get the sense of it.
19          Is there more?
20          MR. GINDLER:   I feel pretty comfortable in
21     saying that if our patent emerges from the Patent Office
22     -- and, remember, 64 percent of patents which go into
23     reexamination or reissue come out with new and amended
24     claims -- I feel pretty confident in saying the same
25     talented lawyers seated to my right are going to be back
```

16

```
 1    here shooting bows and arrows at that patent.  There's a
 2    hundred percent chance of that, because they don't want
 3    to pay royalties anymore.  That's the gist of their
 4    position.  So the question is, should we do it once or
 5    should we do it twice?  I think we should do it once.
 6    And that's why there's a large body of case law that
 7    suggests at the absence of prejudice or in the absence of
 8    a tactical attempt by the patent holder to delay
 9    proceedings, a court should stay this.
10         THE COURT:  I think you've only cited me one
11    case where somebody seeking declaratory judgment who
12    hasn't himself sought the reexamination got a stay.
13         MR. GINDLER:   There are a lot of cases where
14    the procedural posture of the case is a declaratory
15    judgment.  We cited just one.  There are more cases in
16    this body of law than it would make sense to give to the
17    court.  And the plaintiffs have cited some cases.  We
18    have cited some cases.  And we cite the cases that we
19    like best.  But I think it will be fair to say the
20    following.  The general rule is federal court should
21    stay, but it shouldn't if there will be prejudice or if
22    it was a tactical attempt by the patent order to shut
23    things down.  And that happens.
24         THE COURT:  We're going to get to that.
25         MR. GINDLER:   Maybe I'm getting ahead of
```

1    myself.

2         THE COURT:  Because this patent prosecution had

3    been going on for 24 years.  I'll give you more details,

4    because this is at least confirming my sense that all of

5    these things are related.  That's why I made somebody

6    from every party sit inside the rail.

7         MR. GINDLER:   They are related.  One final

8    point in this sort of preliminary time.  Just remember,

9    we didn't want to go back to the Patent Office.  We

10   didn't start this process.  Somebody else did.  We were

11   content to litigate, leave our patent right here.  But

12   somebody over in the Patent Office said, take back their

13   patent, and that started the entire process.  Once that

14   happened, the entire procedural landscape changed.  It

15   was not our doing.  It was someone else's doing.  We

16   didn't do that.  So the question is, well, now what?  Do

17   we do it once, do we do it twice?  I think once is

18   better.  I'll discuss that in more detail within the

19   arguments.

20        THE COURT:  Do you want to extend the

21   stand-still agreement until the Patent Office ends, then

22   we'll do it once?

23        MR. GINDLER:   Absolutely.

24        THE COURT:  You mean so you won't terminate

25   their licenses pending the end of the Patent Office

18

1    reexamination and reissuance?

2           MR. GINDLER:   Let me be very clear.   The

3    stand-still was we won't bring suit for infringement and

4    we won't seek to preliminary enjoin Biogen or Genzyme

5    during the interim period.   And if the court were to rule

6    in their favor when it comes up for hearing, the court

7    can put their license back in place.   It's terminated

8    now, but the court could enter a order nun pro tunc to

9    put it back in place.   We will continue that in place.

10   We offered that.

11          We'll offer something more, actually.   We have a

12   pending application in the Patent Office, the '159

13   application.   If that issues as a patent, we won't sue

14   them on that patent, and we won't seek a preliminary

15   injunction on that patent.   And I'll extend that exact

16   same offer, exact same representation, to every plaintiff

17   in this courtroom.

18          THE COURT:   Just let me see if I understand it.

19   They wouldn't be paying you royalties during that period

20   of the stand-still?

21          MR. GINDLER:   It would be nice if they did, but

22   I think they're not going to.

23          THE COURT:   So if they don't pay you royalties

24   and you win, then you have all the remedies that would be

25   available under the patent law as if they had been

19

1       terminated by now?

2             MR. GINDLER:   But only at the end of the day,

3       that's right.  In other words, if the case is stayed, I

4       don't want to use the stay to try and get some tactical

5       advantage over any of the plaintiffs.  I don't want to

6       say, I'll sue you in some other forum on the '275 patent

7       or, if the '159 application issues as a patent, I'm going

8       to sue you someplace else, because that wouldn't be fair.

9       I'm going to keep things in abeyance, hold things,

10      maintain the status quo.  Let's see what happens in the

11      Patent Office.  The proceedings there are supposed to be

12      expedited if there's a stay of litigation.  Let's get

13      that done with.  Let's see what claims come out, what

14      claims don't come out.  If the whole patent is wiped out

15      in the Patent Office, we won't be back.  That happens in

16      at least ten percent of the cases.  If the claims change,

17      we'll know what the landscape looks like.  We can have a

18      more focused, intelligent proceeding.  But, in the

19      interim, nothing bad should happen to anybody, and we're

20      prepared to do nothing, and we'll just wait.

21            THE COURT:   I think the plaintiffs are concerned

22      about the uncertainty in that period, but maybe I

23      misunderstand.

24            Mr. Ware, is this something you knew that was an

25      option?

1           MR. WARE:   No, your Honor, and let me explain

2    why.  Let me explain why everyone's interests are really

3    better served, I would say, by moving expeditiously to

4    resolve the double patenting issue.  And I believe we can

5    move expeditiously, in fact, to resolve the prosecution

6    laches issue as well.

7           Mr. Gindler has pointed out that claims often

8    come out of reexamination intact or amended or what have

9    you, but the reason for that is because it's an ex parte

10    process in which Columbia with the resources of its

11    counsel is pressing all of these claims.

12           THE COURT:  I apologize for cutting you off.  I

13    know some of that.  My question was a little more

14    focused.  I asked you whether you had known about this

15    offer before.

16           MR. WARE:   Yes.

17           THE COURT:  The answer to that is yes or no.  If

18    the answer -- well, is the answer to that yes or no?

19           MR. WARE:   Yes.

20           THE COURT:  You did know.  Okay.  And it's not,

21    for reasons you'll explain to me at some point, that's

22    not attractive?

23           MR. WARE:   Yes.  You want me to defer?

24           THE COURT:  You can wait because I think it

25    merges into the stay.

1           MR. WARE:  Yes.

2           THE COURT:  Maybe I ought to go back, because I

3    may never get back to it.  I mean, do I have the -- under

4    your present stand-still agreement, you're basically

5    agreed to stand-still until I decide.  I don't think it

6    addresses what happens once I decide, whether there's any

7    stand-still in the Court of Appeals, Federal Circuit, or

8    whether you have to go seek relief, does it?

9           MR. WARE:  The existing stand-still?

10          THE COURT:  Right.

11          MR. WARE:  The existing stand-still, I think,

12   and I looked over it this morning, I think it essentially

13   runs up to the time of the preliminary injunction

14   hearing.  It was to get us up to this hearing.

15          THE COURT:  I think it runs up to the decision.

16          MR. WARE:  On the preliminary injunction.

17          THE COURT:  Right.  By me.

18          MR. WARE:  Yes, but not to trial on the merits.

19          THE COURT:  But what about to -- and it doesn't

20   mention what happens if I decide the motion for

21   preliminary injunction and then there's an appeal to the

22   Federal Circuit, does it?

23          MR. WARE:  Correct, it does not.

24          THE COURT:  Do I have the authority that usually

25   exists under Rule 65A2 to combine the trial with the

1    merits on the hearing on the motion for a preliminary

2    injunction?

3          MR. WARE:   Yes, I believe you do.  And what I

4    wish to add, in light of Mr. Gindler's comments, was I

5    think that one of the problems with the Patent Office

6    reviewing these claims again in an ex parte proceeding is

7    that as the examiners themselves pointed out during the

8    earlier prosecution, the issue of double patenting is

9    very much of a legal issue.  It was something that they

10   found to be unclear to them.  It's an issue that the

11   Federal Circuit has addressed on a number of cases

12   recently.  But it's an issue that's best decided by this

13   court.  And I think that the difference is that in the

14   ordinary case, while claims come out of reexamination

15   intact most of the time because it's an ex parte

16   proceeding, if the patent examiners of the Patent Office

17   had guidance from a Federal District Court, it would be a

18   very different story.  And so what they would really be

19   left with would be the new claims that they want to add

20   or they want to begin prosecution on some new broader

21   claims.  And those claims, I think, are not going to be

22   obtained in any case because they're genus claims.

23   They're trying to get genus claims over a species, and

24   the double patenting law is clear that you can't do it.

25   So Mr. Gindler's suggestion that all that the court does

23

1      will be for naught, I think, is mistaken.

2              THE COURT:  We'll get to that.  Let me ask Mr.

3      Gindler, under the stand-still agreement, do I have the

4      power that ordinarily exists under Rule 65A2 to merge the

5      trial on at least one issue with the hearing on the

6      motion for preliminary injunction?

7              MR. GINDLER:   I'm confident that you do.

8              THE COURT:  Would it be unfair for me to do

9      that, given the way the stand-still agreement, you know,

10     was sort of developed quickly?

11             MR. GINDLER:   Well, I think it would be -- if

12     what you're asking is would it be unfair to implement the

13     proposal that I've made, which is just to hold everything

14     in abeyance, I think that would be fine.  If the question

15     is should we basically have an expedited proceeding where

16     we carve out double patenting and just do that on some

17     sort of expedited track, I think there are some

18     significant problems.  I've outlined some of them in my

19     previous remarks.  I'll talk about that a bit more --

20             THE COURT:  At the appropriate time.

21             MR. GINDLER:   Yes.

22             THE COURT:  Okay.  So it's fair if I come out

23     your way.

24             MR. GINDLER:   Absolutely, your Honor.

25             THE COURT:  And I'll put Mr. Ware down for the

1    same, his way.

2         And, Mr. Gindler, what's your understanding of

3    when the stand-still expires?  Is it when I decide or

4    when, if there's an appeal, the Federal Circuit decides?

5         MR. GINDLER:   I believe the parties' agreement

6    is that it lasts until when you decide.

7         THE COURT:  That's consistent with my reading of

8    what was there, unless you reach some further agreement.

9         And then, in response to my order, as I read

10   your submissions that were made on June 16 for Columbia

11   and 17 for Biogen and Genzyme, you each agree that I have

12   the authority to enter a more limited injunction than the

13   one that's requested if there's a proper basis, that is,

14   enjoin the termination of the license agreement for the

15   '636 and the '159.  But you both think that that's not

16   what I should do.  But what I'd like to confirm now is

17   what I read, that I have the power to do that if there's

18   a proper evidentiary basis, right?

19        MR. WARE:   Yes, your Honor.

20        MR. GINDLER:   Yes, your Honor.

21        THE COURT:  All right.  Then when we get to the

22   motion for a preliminary injunction, there's an issue of

23   what the questions are before there's an issue of the

24   standard, and I wonder if anybody thinks there's any

25   material difference between the law concerning a

25

1    preliminary injunction in the First Circuit and the law

2    in the Federal Circuit.  In the Texas Instruments case,

3    the Federal Circuit says that, you know, a preliminary

4    injunction standard is essentially a procedural issue, so

5    you can use the iteration of the law in the circuit in

6    which the District Judge is sitting.  Generally, it's the

7    same as the Federal Circuit, but Mikohn, M I K O H N,

8    Federal Circuit, says it does have some precedence that

9    reflects consideration to specific patent cases.

10            But does anybody -- well, I can tell you what I

11   think the basic law in the First Circuit is.  It would be

12   helpful for me to know whether somebody thinks somehow

13   this is not right.  I summarized in it the Cablevision

14   case, 38 F Supp 2nd 46 at 53, in 1999, for the First

15   Circuit.  I said:  The standard for obtaining a

16   preliminary injunction is familiar.  I cited cases.  The

17   burden of proof is on the plaintiff.  The court is

18   required to weigh four factors.  The first is whether the

19   plaintiff has shown a likelihood of success on the

20   merits.  The second is whether the plaintiff has

21   established an imminent threat of irreparable harm in the

22   absence of a preliminary injunction.  The court is also

23   required to balance the hardship to the plaintiff if no

24   injunction is issued against the hardship to the

25   defendant if the requested injunction is ordered.  In

1    addition, the court must consider the effect of the

2    proposed injunction on the public interest.  The Court of

3    Appeals for the First Circuit has said on a number of

4    occasions the likelihood of success on the merits is of

5    primary importance.  It is the sine qua non for obtaining

6    the preliminary injunction.  If a great showing of likely

7    success on the merits is made by a plaintiff, a reduced

8    showing of irreparable harm may be appropriate.  In

9    addition, a preliminary injunction is an equitable

10   remedy.  It does not issue automatically, even if the

11   foregoing criteria indicate that an injunction is

12   warranted.  Thus, a court may properly consider any

13   inequitable conduct by the plaintiff.  The court may also

14   consider any adverse impact on the public interest which

15   a bond cannot compensate and withhold relief for this

16   reason alone.

17        Although nobody in the courtroom except my clerk

18   and I seem to have focused on this, Federal Rule of Civil

19   Procedure 65C requires a prevailing plaintiff to post a

20   bond to pay for costs and damages that may be suffered by

21   defendants if defendants later prevail on the merits of

22   the case.

23        Does somebody think that the Federal Circuit

24   wouldn't feel comfortable with that standard for deciding

25   the motion for a preliminary injunction?  There's one

27

 1    refinement I'll add in a minute.

 2              MR. WARE:   We've looked at it, and we didn't

 3    find that there was any material difference.

 4              MR. GINDLER:   We didn't see any difference, and

 5    the factors you've recited reflect our understanding of

 6    what the appropriate standard is to be applied.

 7              THE COURT:   And then this nuance, I think, has

 8    some pertinence to this case in its present posture.  As

 9    I understand it, in both the First Circuit and the

10    Federal Circuit, a greater showing of likelihood of

11    success on the merits diminishes the degree of

12    irreparable harm that the plaintiff has to show, but the

13    plaintiff does have to show some irreparable harm.  There

14    are First Circuit cases like Ross Simons, 217 F 3rd 8 at

15    13, that say that; EEOC versus Astra USA, 94 F 3rd 738 at

16    743 to 44; and then, again, the Mikohn case, 165 F 3rd at

17    895.

18              There's something of a sliding scale of

19    irreparable harm and likelihood of success on the merits,

20    but there has to be some irreparable harm demonstrated.

21              Do the parties agree with that?

22              MR. WARE:   Yes, your Honor.

23              MR. GINDLER:   I think that's correct, your

24    Honor.

25              THE COURT:   And nobody has proposed any

1    testimony.  I take it nobody thinks I have to hear any

2    witnesses if I'm going to decide the motion for a

3    preliminary injunction now or based -- well, nobody has

4    asked to present any witnesses, right?

5              MR. WARE:  We have not.  We submitted an

6    affidavit and, of course, it wasn't contested, so we

7    didn't see any need for witnesses, live witnesses.

8              MR. GINDLER:   We have no witnesses here.

9              THE COURT:  Well, why don't I take a little

10   while and tell you what my tentative views are, and then

11   I'll be, as you'll find me trying to be continuously, as

12   transparent as possible so we can talk about what's on my

13   mind.

14             It seems to me, based on what's been presented,

15   that the plaintiffs are likely to prevail on their claim

16   that the '275 patent is not valid.  I understand the

17   patent is presumed to be valid and must be proven invalid

18   by clear and convincing evidence.

19             One argument Biogen and Genzyme have is that

20   there is this obvious type double patenting that violates

21   the judicially developed doctrine discussed in Geneva

22   Pharmaceuticals.  If the harm that that doctrine

23   addresses appears would exist here, Columbia would get 17

24   more years, I think until 2019, if the '275 patent is

25   valid.

1          Biogen and Genzyme submitted the Lodish

2     declaration which, viewed in isolation, at least -- and I

3     don't have anything that challenges it -- seems to make a

4     powerful case for double patenting to the extent I

5     understand it at the moment.

6          As I said, Columbia has not offered evidence to

7     refute this, and I don't know if it's even offered

8     argument to refute it.

9          With regard to prosecution laches, the other

10    ground on which Biogen and Genzyme rely, Symbol

11    Technologies and then In Re Bogese tell me that that's a

12    viable doctrine.  As I understand it, I have to consider

13    if the long delay in getting the patent, which I think

14    was about 20 years, is unexplained and unreasonable.

15         I don't think I have any explanation from Mr.

16    White, the attorney who prosecuted the patent.  I guess

17    it took 22 years for the '275 patent to issue.  Biogen

18    and Genzyme, I gather or would infer, the public thought

19    that the Columbia patent had expired.  They made their

20    last payment.  And a couple of days later, they get a

21    letter that says, oh, we just got another one.

22         So maybe this all requires some -- you know, if

23    that were the end of the inquiry, it appears that Biogen

24    and Genzyme on the present record are likely to prevail

25    in proving that the '275 patent is invalid.  But it

1       doesn't seem to be the end of the inquiry because I have

2       to consider the implications of Cordis I, Cordis II, and

3       Gen-Probe.

4               As I read it, Cordis I seems to hold that a

5       licensee cannot refuse to pay royalties or escrow

6       royalties in litigating the validity of a patent.

7               I'm interested in hearing from all of you on

8       these cases, particularly.  I'm interested in hearing

9       from you on everything, but you all recognize that these

10      cases are particularly important.

11              My present reading of Cordis I is not that it

12      simply involved the failure of proof regarding likelihood

13      of success on the merits.  I think the Federal Circuit

14      actually found that the evidence was sufficient to prove

15      the patent was invalid for purposes of going forward.

16      The evidence was insufficient to prove that it should be

17      found invalid at its inception.  You're going to have to

18      explain to me how that distinction comes up, but that's

19      the way I read it.  So it did seem to be saying rather

20      broadly that the licensee cannot refuse to pay royalties

21      or escrow royalties and litigate the validity of the

22      patent.  And there seemed to be fairness concerns to me

23      that run through the three decisions.  But this case is

24      not factually identical to any of them.

25              Basically, as I said, the theory of Cordis I

1    seems to me to be that it's not fair to let a licensee

2    litigate without risk and cap damages at the licensed

3    rate.  In other words, if you want to challenge the

4    validity, you're going to run the risk that if you lose

5    and you haven't been paying license fees, you're going to

6    deal with Columbia's effort to get more than the license

7    fees to the extent the law permits it.

8          Gen-Probe seems to say that if a licensee pays

9    the royalties during the pendency of litigation, there's

10    not a sufficient actual controversy to merit relief under

11    the Declaratory Judgment Act, rather, the court lacks

12    subject matter jurisdiction.

13          The Federal Circuit said in Gen-Probe:  The

14    licensee must "stop paying royalties before bringing suit

15    to challenge the validity or scope of the licensed

16    patent."

17          But the Federal Circuit said that it was relying

18    in part on undesirable results of allowing litigation

19    while Gen-Probe paid the patent.  But in Gen-Probe, the

20    license was granted after a dispute arose.  In essence,

21    the parties had settled the dispute by entering into a

22    license agreement, and then Gen-Probe, I guess, decided

23    that it learned something else and wanted to challenge

24    the validity of the patent.

25          Here, the license was entered into for a bundle

1    of Columbia patents that didn't include the '275 at the

2    time the license was entered into.  So, while Gen-Probe,

3    the recent case, seems to state a broad proposition, the

4    equities are arguably different in this case.

5         And in Gen-Probe, the Federal Circuit did not,

6    as far as I could see, address or say whether it was

7    overruling Cordis II because, in Cordis II, it says on

8    page 861, the plaintiff continued to pay royalties on the

9    tine leads and refused to pay royalties on the fin leads

10   that it said were not covered by the patent at issue.

11        And the Federal Circuit said that case was

12   unusual because neither the validity of the patent or the

13   validity of the license were at issue.  And I know the

14   validity of the license is at issue here.  So, on a

15   literal level, this could be distinguished.  But it

16   seemed to me that, essentially, the Federal Circuit was

17   allowing Cordis to litigate what in the antitrust context

18   is called a tying arrangement.  Where the defendant is

19   attempting to compel the plaintiff to pay royalties, it

20   might not be -- that the defendant might not be entitled

21   to for one product, fin leads, in order to maintain the

22   license to the products covered by the defendant's

23   patent.

24        And in my perception, and this is why this idea

25   of the more limited possible preliminary injunction

33

1   emerged, arguably, this case is analogous.  Arguably,

2   Columbia is trying to require that Biogen and Genzyme pay

3   royalties regarding products relating to the '275 patent

4   to maintain its right of license, at least on the present

5   terms, to the '636 patent, which I know is not now being

6   used, and the '159, if it emerges as a patent.

7           And I get the sense that that '159 may be very

8   important to Biogen.  You have to tell me whether that's

9   right and whether it's in the record.  I get the sense

10  that the '159 is aimed at, you know, right at what Biogen

11  does to produce Avonex.  And I have to decide this case

12  based on what's in the record.  I don't know if this is

13  what's in the record in this case, and I don't even know

14  if it's true anymore.  But when I had the Biogen versus

15  Berlex case several years ago, I think Avonex was like

16  Biogen's only product, or it was a huge part of its

17  revenues.  So if you destroyed their ability to sell

18  Avonex, you put them out of business at that time.  I

19  don't know if that's still true.  In fact, maybe I

20  misremember.  Maybe it was never true.

21          So, in one sense -- and this is something I've

22  been struggling with -- I perceive that there's an

23  imminent threat -- well, this is true -- I mean, there's

24  an imminent threat that Columbia will terminate the

25  license in the absence of a preliminary injunction.  The

34

1    letters have been sent.  You know, if I were to deny the

2    preliminary injunction, the stand-still ends.  The

3    licenses, including for the '636 and any rights that

4    emerge from the '159 application, are gone.

5         So, in that sense, there's a kind of concrete

6    harm.  You've lost a right.  But -- well, and, arguably,

7    it's irreparable harm.  Biogen and Genzyme are not using

8    the '636.  But maybe it would in the future, although I

9    don't have any evidence to suggest it intends to -- that

10   anybody is planning to.  But if the licenses are lost and

11   the '159 is issued, Biogen and Genzyme may not be able to

12   license them again, and that could impact their

13   businesses.

14        But there is -- there are a line of cases that

15   the threat -- that say the threat of harm must be more

16   than conjecture or unsubstantiated fears in the future.

17   Charles Bank Equity Fund, 2004 Westlaw 1205717, decided

18   on June 2 of this year, is a recent iteration of this by

19   the First Circuit.

20        So I wonder if the '636 is not being used, the

21   '159 might not even become a patent, is losing the

22   license to those sufficient to constitute irreparable

23   harm?

24        But if it is, the loss of the bundled rights to

25   the '636 and possibly the '159 are a minimal form of

35

1    irreparable harm.  Maybe it's sufficient to justify a
2    preliminary injunction, given the strong showing on the
3    present record of likelihood of success on the merits,
4    even if there wouldn't be in a case with a record that's
5    more competitive on what the ultimate outcome on validity
6    appears to be.  I don't know.
7            And then I'm wondering whether in view of Cordis
8    I and II and Gen-Probe, both a permissible and equitable
9    resolution on the motion for a preliminary injunction, if
10   I decide it now and don't merge it with a trial on the
11   merits of something, might be to permit Columbia to
12   terminate the license with regard to the '275, so then
13   Biogen and Genzyme are at risk there the way Cordis I
14   seems to say it should be, but not permit Columbia to
15   terminate the license with regard to the '636 or '159 if
16   it becomes a patent.
17           As I said, that would put Biogen and Genzyme in
18   a position that the plaintiff was in Cordis I.  It's not
19   litigating risk free.  But as in Cordis II, it doesn't
20   permit Columbia to use the leverage or the threat of the
21   possible '159, which I think it claims that Biogen and
22   Columbia -- and Genzyme should not even now know about
23   to, plaintiffs would say, extort payments to the '275
24   patent that is on the present record likely to be held
25   invalid and/or unenforceable.

1          It also seems to me that, theoretically, Biogen

2    and Genzyme could also establish a form of irreparable

3    harm by proving for present purposes that if their

4    licenses are terminated, they would lose market share.

5    In Cordis II, 835 F 2nd at 864, the Federal Circuit said

6    that loss of market share can be irreparable harm.  But I

7    don't think Biogen and Genzyme have offered any evidence

8    on this.  There's a paragraph in one of their briefs that

9    addresses the issue, but I don't think I have it in any

10   affidavits.

11         If there was a demonstrated substantial risk

12   that Biogen and/or Genzyme would lose customers if the

13   licenses were terminated, I think a preliminary

14   injunction would serve the public interest, which was a

15   consideration.

16         Somebody is going to have to explain to me

17   Genzyme's products and tell me whether the record shows

18   there's competition for them.  But, as I understand it,

19   Avonex is a multiple sclerosis drug.  So if doctors

20   stopped prescribing Avonex because it was uncertain

21   whether a patient who started on it would be able to

22   continue to use it because maybe they'd infringe and

23   they're going to get enjoined, this could be harmful to

24   human health and, therefore, adverse to the public

25   interest.

1           I don't now view the threat of counterclaims for

2      infringement of the '275 as a form of irreparable harm.

3      I think there would be an adequate remedy of law.  If

4      Columbia came in for a preliminary injunction and all I

5      had is what I have now, there would be an invalidity

6      defense, and I don't think -- I think there's an adequate

7      remedy of law.

8           And then, as I said, neither party has addressed

9      the amount of the bond that should be required if a

10     preliminary injunction is granted.  And that's a

11     requirement under Rule 65C.  If I were to grant the

12     injunction, I would have to order a bond, and the bond

13     would likely, in my quick thinking, have to be an amount

14     or should be an amount that's greater than the royalty

15     rate.  I mean, it wouldn't be less.  And then there are

16     costs.  I'm not sure if costs include attorneys' fees.  I

17     didn't refresh myself on that.  But Columbia would argue,

18     I think, that they're going to be entitled to more than

19     the royalty rate.  And I don't know whether that bond

20     requirement is material to anybody's position.  But it

21     really needs to be focused on.  It might conceivably make

22     a difference in the positions.

23          If I issued a preliminary injunction that only

24     directed that the license continue for the '636 and the

25     '159 if it emerges as a patent, then the bond would be in

38

1    a smaller amount, because there are no royalties going to

2    Columbia now, as I understand it, on the '636.  It's not

3    being used.

4         We're going to get into it, but in one way or

5    another, I'm not at the moment inclined to grant a stay.

6    I know I have the authority to do it.  But that Ethicon

7    case, 849 F 2nd at 1428, talks about the different

8    approaches taken by the PTO in courts and how, therefore,

9    they could each correctly reach different results from

10   the same evidence.  There's a possibility that I'll hear,

11   you know, hear different evidence than the PTO would

12   hear.  I think a judicial -- I think I can consider some

13   issues that the PTO can't.  But judicial proceedings are

14   far more adversarial.  The adversary process frequently

15   make things look different than an ex parte proceeding

16   does.  And I know that there are limited rights that

17   Biogen and Genzyme might have if they filed their own

18   protests, but I don't think they're the functional

19   equivalent of what you get in court.

20        And, as I said, and perhaps there are other

21   cases that would educate me, but I thought that Implant

22   Innovations case was the only case that was cited where a

23   stay was granted against a party moving for a declaratory

24   judgment which did not itself request the reexamination.

25        There are some things in this case that favor

1    legitimately granting the stay.  Those cases are at an

2    early stage.  Reexamination, I accept, would be less

3    expensive than litigation.  Maybe the decision by the PTO

4    would simplify some issues or change the issue.  But at

5    the moment it seems to me that these factors are

6    outweighed by countervailing considerations, including

7    the fact that, as I understand it, the reexamination was

8    not fully open to the public or truly adversarial.  MPEP,

9    section 2200, is captioned Ex parte Reexamination of

10   Patents.  I think the parties in this case would have no

11   right to be heard unless they filed their own request for

12   reexamination, which would generate more delay.

13        I actually have doubts as to whether the Patent

14   and Trademark Office can address the prosecution laches

15   argument as it's presented here.  In In Re Bogese, 303 F

16   3rd 1362, the Federal Circuit did hold that the PTO may

17   refuse to grant a patent because of prosecution laches.

18   However, it also reaffirmed a 1975 decision of the Patent

19   and Trademark Office Board of Appeals, an ex parte caller

20   that required the PTO to give an applicant notice before

21   it could properly order forfeiture of patent rights.

22   Thus, although the PTO could put Columbia on notice that

23   further dilatory prosecution during the reissue might

24   result in forfeiture, if Columbia ignored the warning and

25   refused to reissue the patent, at least as I at the

40

1    moment understand it, I doubt that the PTO could properly

2    revoke the '275 patent based on dilatory practices if

3    there are any that have already occurred.

4            As I understand it, the PTO cannot compel

5    testimony from Mr. White or other witnesses on that.  The

6    information I've been given says that the average

7    reexamination takes 21 months.  And I do know that a stay

8    -- if I granted a stay, the Patent and Trademark Office

9    would give priority.  But I don't think the record tells

10   me even what the average is when there's also a

11   reissuance linked to the reexamination.  It seems to me

12   that the case may proceed faster if I focus on the double

13   patenting issue.  And it seems to me that the plaintiffs

14   -- this is tentative -- will be harmed in meaningful ways

15   if this action is stayed.

16           The reexamination and reissue may moot some

17   issues in the case, but I don't see it resolving the

18   parties' disputes.  While any stay is in effect, the drug

19   company's potential damages will mount with uncertainty

20   over whether they owe Columbia royalties on its products.

21   It may create difficulty in pricing those products.  It

22   may cause the delay of introduction of new products or

23   needlessly invest money in efforts to design around the

24   invalid patent.

25           And a stay would have the effect if not purpose

41

```
 1        of causing a delay in the case, which involves in part

 2        the assertion of the '275 as unenforceable because of the

 3        delays.  And now after 24 years -- now, 24 years after

 4        the filing of the original application, John White, the

 5        attorney who is still representing Columbia -- I think he

 6        has for the past 24 years, if I understand it right -- is

 7        telling the Patent and Trademark Office that the patent

 8        should be reissued because the earlier claims he filed

 9        were not broad enough.

10             If the '275 is invalidly written as written, it

11        seems to me that the broader claims may be invalid too,

12        although I'd have to hear more about this.  But I'm not

13        sure I understand the genus of the species.  It's far

14        from my high school biology.  But I'm educable.  But if

15        you're talking about that you're trying to go from a

16        specific like CHOs to even broader mammalians, I was

17        engaged by that, but maybe that's not a good analogy,

18        because maybe everybody knew you could do things with

19        Chinese hamster ovaries, and nobody imagined you could do

20        it with mammals generally.  I don't know.

21             But, in any event, I think the Founding Fathers

22        thought that, if you got a patent, it was going to go for

23        17 years, not 24 or 31 or whatever it is.  And Columbia

24        has been very alert.  I guess they filed one of those

25        applications a day before new law from the Uruguay round
```

42

1    came into effect, which, you know, would have said 20

2    years is the maximum, 20 years from the first

3    application.

4         That in the absence of prosecution laches may be

5    all permissible.  This is probably one of the last

6    patents to get grandfathered in that way.  But when I

7    look at the stay, it's sort of an equitable thing.  This

8    has just been going on a long time.

9         So I'm inclined to deny a stay, either -- carve

10    out -- I'm thinking about it -- "inclined" may be too

11    strong -- but I've been seriously thinking about denying

12    the stay, carving out that double patenting issue.  I

13    could postpone -- you know, I could merge the trial on

14    the merits with the hearing on the double patenting.

15         The one thing I'm inclined to permit go on

16    simultaneously -- some of the parties say there's some

17    witnesses who are getting well up in years, and maybe

18    their depositions ought to be taken and maybe Mr. White's

19    deposition on prosecution laches.

20         But, basically, on the double patenting, sort of

21    -- I mean, this is what I do -- this is merging into some

22    of your disputes on the schedule.  Then I'm going to

23    stop.  But I'm inclined to do what you call staging the

24    case.  I would say phases.  Carve out the double

25    patenting issue.

43

```
 1          It's my usual but not unalterable practice to do
 2     a Markman hearing in connection with a motion for summary
 3     judgment.  And, in fact, when Judge Young said the
 4     practice of this capital C Court is not to do that, he
 5     was talking about himself.  He wasn't talking about the
 6     District Court for the District of Massachusetts.
 7          And, in fact, Mr. Goldberger while he was in his
 8     summer employment happened to watch that hearing.  Ten
 9     minutes after he did the Markman hearing, he took a
10     break, and Judge Young did the summary judgment.
11          You think I'm trying to go fast.
12          A couple of weeks ago, I did a Markman hearing
13     that wasn't in the context of summary judgment.  In fact,
14     it involved Serono, and the parties agreed that I should
15     do it.  So I went along.  I found it very difficult.  It
16     was just too abstract for me to really -- didn't feel as
17     comfortable as I would have if I was doing it on summary
18     judgment.  And the law is that any claim interpretation,
19     as I understand it, can change, if my understanding
20     changes in the course of the case.  So I think the more
21     information I have, the better chance -- I won't even say
22     more likely, but the better chance I have to get it
23     right.  And I'll listen to anything and be open minded,
24     but my informed intuition is that I'll be better in this
25     case if I do the claim construction in the context of
```

44

1    summary judgment.

2         If Biogen and Genzyme, you know, win on that,

3    maybe everything else is moot.  You can go quickly to the

4    Federal Circuit.  It will inform the PTO.  It will take

5    care of the case.  If they lose on that, either at

6    summary judgment or at a trial.  Because what I would do

7    -- I mean, I think, you know, it makes sense.  You know,

8    Columbia says, tell us what the double patenting

9    contentions are.  I think that they've done that to a

10   pretty specific degree in that Lodish declaration.  But

11   if you need more, figure out what more.  The Federal and

12   Local Rules for automatic discovery will apply here.  So

13   I would anticipate that the plaintiffs would have to turn

14   over in automatic discovery, you know, this is the

15   information we're relying on for these contentions, and

16   here's Doctor Lodish.

17        And then I'd give a reasonable period of time

18   for Columbia to come back and do the same thing.  If you

19   have an expert, you know, here's our expert, here's our

20   expert report, under Rule 26F or whatever it is.  But,

21   basically, you have Federal Rule of Civil Procedure 26A1

22   and Local Rule 26.2A that require certain automatic

23   disclosures.

24        If I understand it right, there might only be

25   one expert witness on each side.  Double patenting, turn

45

1     over the contentions, the documents, take two

2     depositions, file your motions for summary judgment.  If

3     they're filed in September and October, give me a couple

4     of weeks to try to catch up to you, we could have a

5     hearing on a motion for summary judgment.  And if it

6     can't be properly resolved on summary judgment, maybe a

7     couple of weeks later we could have a trial on that

8     issue, be finished by Christmas here on that issue, if

9     that's a reasonable schedule.

10            You know, this seems to be the contention, and

11     there seems to be some advantages to that.  One, if

12     Biogen and Genzyme on behalf of everybody take their best

13     shot and fail, maybe you renegotiate something.  That

14     kind of approach may eliminate discovery issues relating

15     to trade secrets or competitors.  I need to hear more

16     about this.  Columbia doesn't think it's important, but

17     it engaged my interest.  And if the '275 is valid and

18     enforceable, as I said at the outset, I don't think

19     Biogen and Genzyme contend they wouldn't be infringing

20     it.  I thought that was only Amgen that seemed to have a

21     serious non-infringement contention.  And I don't think

22     there would be duplicative discovery on that approach

23     because the fact witnesses, except for those who are

24     perhaps older and Mr. White, wouldn't be deposed in this

25     first stage.

46

```
 1              I don't know whether the deposition and

 2       discovery materials from the other cases would be

 3       relevant.

 4              Anyway, we've now gone an hour and-a-half, and

 5       you haven't had an opportunity to make any arguments, but

 6       you now have a moving target.  I think, unless you want

 7       to ask me a question, what I'll do is take a break for

 8       the stenographer for ten or 15 minutes.  Think about this

 9       and whether this tentative thinking, which is a position

10       that's different than what anybody advocated or has some

11       questions that nobody else raised, you know, affects what

12       your positions are.  And, indeed, if you want some time

13       to talk about all this, I'll give it to you, because I

14       like to do something that's fair, that's legally sound,

15       but gets this to some reasonably prompt resolution on

16       some of the issues, if that can be fairly and feasibly

17       done.

18              It may make sense to articulate this.  My

19       general sense of this case is it not only involves a lot

20       of money, plainly a lot of lawyers, you know, but you're

21       talking about drugs that potentially are very important

22       to human health, and I know that NIH says, in effect,

23       that Columbia has to license (sic) on reasonable grounds,

24       and you can tell me more about that.  Maybe that will

25       diminish my concerns.  But it just seems to me that what
```

1     happens in the Patent and Trademark Office is not likely

2     to resolve this.  I'm going to have to deal with it

3     sooner or later.  And, you know, judges are busy, and

4     sometimes it's nice to have a good reason if not an

5     excuse to put something off for a couple of years.  But

6     it just wouldn't be -- that's not the way I do things (A)

7     and (B), given the nature of the products, it's just not

8     in the public interest.

9             You know, if I'm persuaded that staying the case

10    is in the public interest, of course, I'll do it.  But

11    now you know everything I know.

12            So why don't we take a break until about 11:15.

13    Why don't you spend -- two teams, you know, huddle for

14    about ten minutes.  But talk to each other for a couple

15    of minutes too and see whether there's anything in here

16    that you agree might cut through some or all of this or,

17    you know, you think is worth talking about rather than

18    going right into the argument.  And I've got all of today

19    put aside for this.  We'll spend as much of today as

20    necessary on it.  Okay?

21            Anything before we break?

22            Court is in recess.

23            (Short break.)

24            THE CLERK:  Court is back in session.  You may

25    be seated.

48

1          THE COURT:  As you requested, we had about what

2     turned into a 40-minute break so you could think about

3     all this, confer, make calls.

4          Has there been any evolution to the thinking of

5     the parties as to how we ought to proceed?

6          MR. WARE:   Your Honor, Don Ware for Biogen and

7     Genzyme.  We certainly have now had an opportunity to

8     speak with our clients, and my initial reaction to the

9     court's suggestion of consolidating the preliminary

10    injunction with a hearing on the merits is confirmed,

11    that we think that that would be a very sensible way to

12    proceed.

13         As we've, I think, all noted, it's very much in

14    everybody's interest for a variety of reasons to get to

15    these issues and to resolve them as soon as we can.

16         That being the case, if we were to go that

17    route, it would be my understanding that we would not be

18    pressing the preliminary injunction argument at this

19    time, but that the stand-still arrangement that is

20    currently in place would continue.  The only possible

21    clarification of that would be I'm not sure whether Mr.

22    Gindler's earlier offer to include the '159 application

23    should it issue as a patent during that time frame would

24    be encompassed.  Perhaps we can clarify that.  But we

25    think that with this kind of time frame that we could

1    continue to live with the stand-still.  And although I'm

2    certainly happy and quite prepared to address the court's

3    comments on the various factors entering into preliminary

4    injunction, it would seem to me to be unnecessary to do

5    so if that is the course that we follow.

6            THE COURT:  Let me try to clarify.  I was

7    talking about doing this in phases and focusing on the

8    double patenting, but not the prosecution laches in the

9    first phase.  Is that what you're referring to also?

10            MR. WARE:   I did understand that, your Honor.

11    As to that, one thought, though, that I would like to

12    offer is that there is not very much discovery that we

13    would take with regard to prosecution laches.  There's

14    particularly the deposition of John White.  And I would

15    hope that in the time that we would be permitted to

16    proceed with that discovery, so as to be sure it isn't

17    lost.

18            THE COURT:  And I had referred to that.

19            MR. WARE:   That's what I thought.

20            THE COURT:  I don't know how old Mr. White is or

21    what his --

22            MR. WARE:   Classmate of Mr. Maffei.

23            MR. MAFFEI:   Good high school, your Honor.

24            THE COURT:  I've got another basis for recusal.

25    Mr. Maffei is a graduate of Boston Latin School, and I'm

1    one of three honorary graduates of Boston Latin School.

2    The first one was John F. Kennedy.  The third one was

3    Bill Cosby.  We had a distinguished Boston Latin School

4    alumnus two weeks ago sitting at the table Mr. (Sic) is,

5    but those are not the ties that bind for these things.

6        But the idea is you would take Mr. White's

7    deposition on your proposal and -- but we wouldn't be

8    having summary judgment -- or we might or might not be

9    having summary judgment on prosecution laches.

10       MR. WARE:   I think we could revisit that, but I

11   think that in terms of the discovery that we would need

12   just to get under our belt for prosecution laches would

13   be the deposition of John White, and there would probably

14   be a deposition of Columbia or a 30(b)(6) deposition, but

15   very little.  And it's very unlikely that there will be

16   factual disputes.  The record is what it is.  The patent

17   prosecution record is what it is.  And, of course, Mr.

18   White will offer his explanation for the delays, and I'm

19   not sure that there will be further factual disputes

20   about that.  He'll say what he says, and the court

21   ultimately will have to decide whether that's an adequate

22   excuse, I guess.

23       THE COURT:   And what's -- just so I understand

24   it, that means that if you lost on summary judgment or

25   trial, the licensing agreements would be deemed

51

1    terminated, I think, with regard to Biogen in April and

2    Genzyme in May, or maybe I've got them reversed.

3          MR. WARE:   They are one month apart, that's

4    right.  I think at that point we would perhaps, if that

5    eventuality occurred, I think we'd take up with the court

6    whether that might be continued through the Court of

7    Appeals proceeding.

8          THE COURT:  That might have to be litigated,

9    whether there's a stay, but --

10          MR. WARE:   I don't see any need to take that up

11    now.

12          (Short pause.)

13          THE COURT:  One of the issues about how much

14    time -- one of the reasons I was inclined to not put

15    prosecution laches in a first stage is that you might

16    want expert opinion on the reasonableness of the delays.

17    That could stretch things out.  There's a Reiffen, R E I

18    F F E N, versus Microsoft case that relates to that, as

19    you know.

20          What's Columbia's reaction to this approach?

21          MR. GINDLER:   Well, we're jumping ahead a

22    little bit to the assumption we're going to have a

23    schedule, but, okay, let's go there.  I think it would be

24    not a good thing to include prosecution laches if there

25    is going to be a first phase for a number --

52

1          THE COURT:  Let me ask you -- don't go there

2     yet.

3          MR. GINDLER:   Okay.

4          THE COURT:  In other words, what about this idea

5     -- and we have to talk about how much time we're talking

6     about -- but what about this idea, you know, of a first

7     phase that includes at least and maybe only double

8     patenting that I've assumed in some number of months, not

9     years, you all could properly prepare for summary

10     judgment with the trial not long after if it's not

11     amenable to summary judgment, and the stand-still would

12     continue in that period.  As I understand it then, if

13     Columbia were to win -- well, if Columbia were to win on

14     double patenting and I still hadn't decided prosecution

15     laches, the stand-still would not necessarily -- I mean,

16     I think you'd have to revisit the stand-still.  If you

17     wanted to renew the motion for preliminary injunction,

18     saying they don't have a reasonable likelihood of

19     prevailing on prosecution laches, the analysis might be

20     different than it is with the double patenting.  And I'm

21     just thinking off the top of my head.

22          MR. GINDLER:   There are a lot of reasons why I

23     think it would not make sense to do this in stages or to

24     not stay the case.  But I do want to be responsive to

25     your Honor's question.  And if the court were inclined to

53

```
1     give us some sort of staging, with the first stage

2     limited to some discrete issue or issues, I think it

3     would make sense to limit it only to double patenting,

4     and there are a number of reasons for that.

5          THE COURT:  Why don't you tell me those reasons.

6          MR. GINDLER:   Prosecution laches, there's a

7     bunch of law on the subject, and a lot of the law on the

8     subject has a requirement that the plaintiff show

9     prejudice.  In other words, it's a personal defense.  So

10    it's not just showing there was unreasonable delay that

11    can't be explained, but each plaintiff must show how they

12    were prejudiced.  They were relying upon invention being

13    in the public domain.  They didn't know it was out there.

14    And all the plaintiffs have alleged prejudice in their

15    complaints because they think it's a requirement.  So

16    that means the discovery would be a lot more than just a

17    deposition of John White and maybe the other attorneys

18    who were involved in prosecuting the patent.

19         THE COURT:  Let me ask you this question.  I

20    thought that Judge Walker's decision in that Reiffen case

21    was helpful.

22         MR. GINDLER:   Does not require prejudice.

23         THE COURT:  That was my memory.  But he did

24    survey how the different courts had different

25    requirements.  Okay.  That's confirming my memory.
```

54

1    Actually, it might be another reason to carve out the

2    prosecution laches.  The Federal Circuit, every time I

3    get a big patent case, I'm reminded, decides a lot of

4    cases.  Sometimes things that are unclear in June are

5    decided in September, and I don't know what's in the

6    pipeline.  But there seems to be a lot of litigation on

7    this subject.

8              MR. GINDLER:   There has been more recently, and

9    I think before Rifin, I think the majority view would

10   have been that you have to show prejudice.  And so Judge

11   Walker thought not, but I think he acknowledges the large

12   body of law that would suggest otherwise.  So that would

13   mean that we'd want to have discovery on all of the

14   prejudice that each one of the plaintiffs would want to

15   show.  And that really changes the landscape of the case.

16             I have one other thought on the issue, which is

17   that if we're going to have a schedule which carves out

18   some issue, it should be done in a way that's fair.  So

19   if you give them most of their claims, we don't have any

20   of our claims, that doesn't seem fair.

21             THE COURT:  What do you mean, your claims?

22             MR. GINDLER:   Here's what I mean.  If the case

23   were simply to go forward without any staging, we would

24   likely be filing infringement counterclaims.  They would

25   have their validity defenses.  Okay.  Well, if we do

55

```
 1      staging, what the plaintiffs would like is to have, in

 2      their perfect world, all of their (sic) defenses and none

 3      of our counterclaims.  That's their perfect world because

 4      there's no risk for them.

 5              THE COURT:  How would your counterclaims -- what

 6      issues would the counterclaims add?  And let me just tell

 7      you what my thinking is, because there's a good chance

 8      that it's me and not you who's missing something here.

 9      But with regard to Biogen and Genzyme as opposed to

10      Amgen --

11              MR. GINDLER:  Mm hmm.

12              THE COURT:  -- I operate on the assumption that

13      if the '275 is valid, they infringe it.  So let's say

14      just hypothetically in November on summary judgment or in

15      a trial -- and I just pick that -- you all are going to

16      have to educate me on what's kind of the minimum

17      reasonable time, but reasonable has to be part of it.

18      You know, let's say in November, hypothetically, you win,

19      either on summary judgment or at trial or a jury decides

20      that there's not double patenting.  At that point, I

21      think -- you know, there has to be some refinements to

22      the stand-still agreement, because I'm not suggesting

23      that I think you ought to be stuck with this if you don't

24      want to be indefinitely.  You know, at that point, either

25      the agreements would be terminated or you would renew
```

56

1    your motion for summary judgment based on prosecution

2    laches, and maybe the record should be as it is today.  I

3    don't quite know how that would work.  But what's the

4    problem?

5            MR. GINDLER:   So here's a concern.  I raise one

6    issue about having a level playing field.  Our

7    infringement counterclaims, the first step in any

8    infringement analysis is the first step in any invalidity

9    analysis.  It's claim construction, okay?  Why should we

10    have a Markman hearing twice, and that's what's going to

11    happen.

12            THE COURT:  Why would we have it twice?

13            MR. GINDLER:   Because I think it's virtually

14    certain that every plaintiff that is in this room will

15    defend on the grounds they don't infringe.

16            THE COURT:  I know, but if I've -- I mean, in

17    terms of the Markman part of the hearing --

18            MR. GINDLER:   Yes.

19            THE COURT:  -- and this is why we have

20    Multi-District Litigation -- I mean, I could let

21    everybody be heard, not just Biogen and Genzyme, but

22    everybody be heard on the claims.

23            MR. GINDLER:   Yes.

24            THE COURT:  Because I want the best information

25    possible.  And then I'll construe those claims to the

1   best of my ability at that time, and that will be the

2   claim construction for all purposes in the case, unless

3   I'm later convinced I made a mistake.  But I'll try to do

4   it carefully the first time if it's in a concrete

5   context.  And then it was my thought that it was really

6   only Amgen where there would be any contested issues on

7   infringement if you have a valid '275 patent.

8           MR. GINDLER:   I think if you were to poll all

9   the plaintiffs in this courtroom and ask them if they

10  concede infringement, I feel pretty comfortable in

11  saying, no one is going to concede infringement.  They

12  will fight us to the nail on infringement.

13          Let me go back to the point about the Markman

14  hearing.

15          THE COURT:  And what kinds of issues or defenses

16  would they have on infringement?

17          MR. GINDLER:   I have no idea, because I think

18  they infringe, but, you know what, there's a lot of money

19  at stake, and I'm just going make a bold prediction that

20  they're all going to say, we have not infringement

21  attached to this.  I'm happy to have them say it right

22  now, but it's just my bold prediction.

23          THE COURT:  And what generically is a

24  non-infringement?  I mean, it's a fact specific defense.

25          MR. GINDLER:   It will be fact specific.

58

1   They'll say, we don't practice this element of this

2   claim.

3          THE COURT:  But I'll have already construed the

4   claim.  I won't be doing claim construction twice.

5          MR. GINDLER:   But will you have, though?

6   That's my other point, which is that Markman will now

7   take place with their views on what are the double

8   patenting issues, what are the key terms to construe for

9   double patenting purposes?  Well, what are the key terms

10  to construe for infringement?  They are not necessarily

11  -- in fact, I think they are not coextensive.  So your

12  Honor is likely to have a second Markman hearing on that.

13  And your Honor might have a third Markman hearing.  Why?

14  Because they have other invalidity defenses.  They have

15  101, 102, 103, all of the usual things you see, and those

16  might raise additional questions about what terms to

17  construe.

18         You made a very good point before we broke,

19  which is that you like to have some context when you do a

20  Markman hearing.  What's this all about?  Well, you won't

21  have that context.  You'll have one context, the context

22  of double patenting, but not infringement, not

23  obviousness, not 101, nothing else.

24         THE COURT:  I also like things to be in sort of

25  manageable bite size pieces.  But it is hard to pick it

1    up and put it down.  Let me go right to it, because I

2    could ask them the infringement questions, but I'm

3    sitting here.  I have, I think, nothing in the record

4    where Columbia for the purposes of the motion for

5    preliminary injunction essentially defends the validity

6    of the patent.  I don't have an expert affidavit

7    challenging Doctor Lodish.  I don't have anything that

8    explains, you know, why it took so long for the '275 to

9    be prosecuted and mature.

10         Do you expect -- do you have an expert?  Do you

11    have an explanation?  They're two separate questions.

12         MR. GINDLER:   Oh, of course we do, your Honor.

13    In fact, we thought very hard about whether or not to

14    meet the challenge, and we thought we did not have to

15    under Cordis I, and I'm happy to talk about that issue

16    now or later.  I'm also happy to talk about why some of

17    the reasons we think the '275 patent is different, a

18    different invention than the earlier patents.  But we

19    didn't address that issue because Cordis I says it's not

20    relevant.  In fact, it explicitly says it's not relevant.

21    And so why should I have a big fight --

22         THE COURT:  It's not relevant --

23         MR. GINDLER:   It's not relevant to the question

24    of success on the merits of the issue presented in the

25    motion, which is do I -- does Columbia have or not have

60

1    the right to terminate?  That's the question.  Not

2    whether are they going to invalidate my patent?

3            THE COURT:  Actually, that's what you haven't

4    persuaded me is the ultimate question.  I may not have

5    made that sufficiently clear because --

6            MR. GINDLER:   I think you made that clear.

7            THE COURT:  That's what I'm having trouble --

8            MR. GINDLER:   I thought you did make that

9    clear, and I'd like to address that issue.

10           THE COURT:  Okay.

11           MR. GINDLER:   So let me start with our

12   agreement, okay, because the question about whether we do

13   or do not have a right to terminate, the starting point

14   should be the license agreement.  Now let's go from

15   there.  So our license agreement defines license products

16   in a specific way.

17           THE COURT:  Hold on just a second.

18           (Short pause.)

19           MR. GINDLER:   Believe the definition of license

20   products is in section 1D little i.

21           THE COURT:  Okay.

22           MR. GINDLER:   And "license products" means

23   products, excluding EBO (sic), the manufacture, use, or

24   sale of which is covered by a claim of licensed patent

25   rights which have neither expired nor been held invalid

61

1    by a court of competent jurisdiction from which no appeal

2    has or may be taken, nor have been held invalid by a

3    court of competent jurisdiction.

4         Have any of the claims of our patent been held

5    invalid?  No.  What happens if they don't pay?  Section

6    5B says we can terminate:  Licensee shall be in material

7    breach of this agreement if it fails to make all reports

8    or pay all fees and royalties when due.

9         Under the express terms of this agreement, they

10   are in breach.  They don't claim that the products aren't

11   covered.  And my patent, Columbia's patent, has not been

12   held invalid.

13        So, looking at the contract on its face within

14   the contract law principles, they're in breach.  So why

15   shouldn't Columbia have the right to terminate?  Well,

16   Cordis I addressed --

17        THE COURT:  Part of the -- one of the questions,

18   if you ask me a question, why shouldn't you have, because

19   in the Lear case, didn't the Supreme Court say, you know,

20   state contract principles don't govern when you're in

21   this patent area, and then you have to figure out how the

22   patent laws come into play.

23        MR. GINDLER:  That's what Lear says, and Cordis

24   is very instructive on that point, because that was the

25   exact argument that was made.  They said, look, under

62

1     Lear, we don't have to pay while challenging the patent,

2     and Cordis I said, that's right, you don't, but there are

3     still contractual consequences, and you don't get

4     protection from that.  You don't have to pay, but you can

5     still be terminated.  That was one of the two reasons

6     that the court found there was not likelihood of success

7     on the merits.

8          The second reason was that the court said this

9     question about invalidity is not relevant.  The other

10    side submitted a declaration which on its face showed the

11    patent was invalid.  And the court said -- and this

12    discussion is at the very end of the opinion -- the court

13    said, not relevant.

14         THE COURT:  Actually, I don't think it said

15    that.  I thought it said, sufficient to show it was

16    invalid, but not sufficient to show that it was invalid

17    in its inception.  Let me get it while you get it.

18         MR. GINDLER:  Well, the court said --

19         THE COURT:  Let me get it.

20         (Short pause.)

21         THE COURT:  You got eight helpers.  I'm just

22    sitting here going through my files.

23         MR. GINDLER:   I keep a copy of Cordis near and

24    dear to me.

25         THE COURT:  What page?

1          MR. GINDLER:   I'm looking at the last page.

2          THE COURT:  What's the page number?

3          MR. GINDLER:   996 and 997, at least on my copy.

4     So it would be the bottom of 996.

5          THE COURT:  They print it differently, but

6     you're talking about head notes 6 and 7 probably.

7          MR. GINDLER:   The paragraph that begins:

8     Finally, the District Court erred  --

9          THE COURT:  Exactly.

10          MR. GINDLER:   -- in evaluating the likelihood

11     of success factor.  And if you go on, it says:  The

12     District Court's error occurred in using evidence of

13     patent invalidity to establish the movement's likelihood

14     of success on the claim that the license is void at its

15     inception.

16          THE COURT:  What does the next sentence say?

17          MR. GINDLER:   The affidavit by an employee of

18     Medtronics (sic) setting forth facts arguably sufficient

19     to prove the patents are invalid under the provisions of

20     35 USC 102A.  And it goes on to say it's not sufficient,

21     but it explains where why.  It says:  Patents are issued

22     by the government after examination by the Patent Office

23     and are presumed valid once issued.

24          THE COURT:  What this is saying, though, is that

25     the affidavit was sufficient on count 1 and not on the

1    second count.

2              MR. GINDLER:   I think what it's saying is that

3    it's not relevant.  In other words, I think the court is

4    not saying --

5              THE COURT:  That's not what it says.  It says:

6    The District Court's error occurred in using evidence of

7    patent invalidity to establish the movement's likelihood

8    of success on the claim that the license was "voided at

9    its inception," count 2.

10             MR. GINDLER:   Exactly.

11             THE COURT:  The affidavit by an employee of

12   Medtronic's competitor setting forth facts is arguably

13   sufficient to prove that the patents in suit are invalid

14   under the provisions of 35 US Code, sections 102A and B.

15   However, this affidavit alone is insufficient to support

16   the movement's likelihood of success on the second count

17   of the complaint, that is, the license agreement as void

18   at its inception.  Patents are issued by the government

19   after examination and evaluation of the patent

20   application by the United States Patent and Trademark

21   Office and are presumed valid once issued.

22             And then it says:  Absent fraud or misconduct,

23   the patentee should not be held responsible for the

24   issuance of an invalid patent.

25             But the affidavit was sufficient for some

1      purpose.  It was relevant to what's apparently count 1.

2      It was relevant to count 2, but it wasn't sufficient.  It

3      may have been evidence, but it wasn't enough evidence to

4      establish the proposition in question.

5              MR. GINDLER:   But I think what this is saying

6      is that this affidavit, while it might be sufficient on

7      counts 1, in other words, it's sufficient to show the

8      patents are invalid, it's not sufficient to eliminate the

9      royalty obligation.  That's our issue.  It's not relevant

10     to the question of whether the license agreement is void

11     in its inception.  It's totally relevant to the validity

12     of the patent.  But it's not relevant to the second

13     question.  In that case, they had a stronger argument.

14     They said:  Your patent is void at its inception.  Here,

15     it's just breach.  So, I have a license agreement.

16     Columbia has a license agreement.  It says:  You pay

17     royalties until the patent is found to be invalid by a

18     court of competent jurisdiction.  And this court says:

19     And if you come up with evidence that the patent is

20     invalid, that does not terminate your royalty obligation.

21     You still have to pay.

22             THE COURT:   Now let me, you know, ask a question

23     of sort of practicalities.  Let's say I decide to merge

24     the double patenting -- the trial of the double patenting

25     issue with the hearing on the motion for a preliminary

1     injunction on that question alone.  And, you know, this

2     goes back to my very first point, you know, that

3     stand-still agreement was, you know, it was a clear

4     understanding that, you know, emerged from a conversation

5     when I think you were maybe on the telephone.  But this

6     particular question wasn't raised.  I don't want to do

7     anything that would be unfair to anybody.  But let's just

8     say we didn't have the prosecution laches.  The only

9     issue was double patenting.  If sometime this fall the

10    double patenting issue were true and you won, Columbia

11    would be just as well off as if I denied the preliminary

12    injunction today, wouldn't it, because the -- in both

13    instances, the licensing agreement would be deemed

14    terminated with regard to Biogen in April, Genzyme in

15    May.  Is that right so far?

16          MR. GINDLER:   Yes, but there are a number of

17    assumptions built into it, which is, what does it mean

18    that we win?  So, for example, they could make a motion

19    for summary judgment, and that could be just questions of

20    fact.

21          THE COURT:  And then we'll have a trial.

22          MR. GINDLER:   And then we'll have a trial at

23    some point.  So your question -- your point is that

24    whether we win on the merits.

25          THE COURT:  No, if the only witnesses are like

1    your two experts -- because I read -- you know, Friday, I

2    didn't know what double patenting was.  Friday, I'm

3    trying an armored bank robbery.  And, Thursday, I won't

4    know what double patenting is because I'm sentencing

5    somebody on a RICO murder case.  But since Friday, you

6    know, I've tried to learn about double patenting.  So I

7    read Geneva Pharmaceuticals, and I look at footnote 1,

8    and it says motivation is not involved.  You don't look

9    to objective criteria like the marketplace.  And I'm

10   thinking, you know, there can't be very many witnesses on

11   this.  I mean, what I really have in mind is, you know,

12   if we have an argument on summary judgment November 10,

13   and I study up -- I usually do the Markman rulings

14   orally, and maybe I decide the matter orally.  Maybe, you

15   know, you make it clear to me, there's just a material --

16   here's my claim construction and, in the context of that

17   construction, there's a genuine dispute as to some fact

18   that's material.  But as far as I still know, the only

19   witnesses are your expert and their expert.  So, you

20   know, why couldn't we have a trial just two or three

21   weeks later, and why would the trial take more than -- I

22   don't know how long it would take.

23            MR. GINDLER:   It's hard to say how that would

24   happen.  It could be short.  That's entirely possible.  I

25   think there are a lot of reasons that we shouldn't do

68

1        that, which I'm happy to address.

2              THE COURT:  But is there a reason we couldn't do

3        that?

4              MR. GINDLER:  No, I'm available.

5              THE COURT:  Well --

6              MR. GINDLER:  Except that we would just be

7        doing a lot more.  In other words, if we win on double

8        patenting, either because we win on summary judgment or

9        we win at trial, then to me it's the worst of all

10       possible worlds.

11             THE COURT:  But I make judgments at this point,

12       and all I have is Professor or Doctor Lodish's affidavit

13       that, standing alone, you know, sounds pretty good.

14             MR. GINDLER:  Your Honor, that declaration and

15       the presentation they made addressed three of 20 claims

16       of the patent.  They didn't take a swipe at 17 claims,

17       and they didn't identify whether those are the claims

18       that they infringe or not.  So I understand, you just had

19       one side.  I've tried to explain a bit about why we

20       didn't address the merits.  I think Cordis I doesn't take

21       you there for two reasons.  The first is discussion that

22       the evidence of invalidity is not to be used on the

23       question of whether the license agreement was void at its

24       inception, i.e., did they have a royalty obligation, and

25       Cordis decided the second issue, which is that when they

69

1    don't pay in reliance upon Lear, can the licensor

2    terminate?  And the answer was yes.

3         THE COURT:  What are the implications of Cordis

4    II for this case?

5         MR. GINDLER:   I think Cordis II is much

6    different.  I actually made a little list of all of the

7    things I thought were different about Cordis II.  So

8    Cordis II, as your Honor pointed out, had product A and

9    product B.  You had tine leads and fine leads.  I'm sure

10   I'm saying that wrong.  And they paid on tine leads and

11   didn't pay on fine leads, okay?  That's because Cordis

12   was using the patent to make tine leads and was paying on

13   it, because they were using the patent, and they were

14   also selling tine leads.  Call it product A and product

15   B.

16        THE COURT:  Well, I call them fin.

17        MR. GINDLER:   Tined and fined.

18        THE COURT:  Tined and fined.

19        MR. GINDLER:   I don't have a pacemaker so I'm

20   not really up on this.

21        THE COURT:  Hold on a second.

22        (Short pause.)

23        THE COURT:  Tined, t-i-n-e-d.

24        MR. GINDLER:   Tined and finned.

25        THE COURT:  Finned, f-i-n-n-e-d.

1          MR. GINDLER:    They are paying on tined and not

2     paying on finned.  So they were using the patent,

3     concededly, to make tined, and they were also selling and

4     making finned.  So what's the distinction there?  Cordis

5     was actually paying royalties for a patent it was using,

6     and they're saying, we're paying royalties for a patent

7     that we're in fact using, and we have a dispute about

8     whether fin leads are covered.  Don't take away our

9     license when we are making and selling a product in

10    reliance on the patent, and we're paying on it.  Is that

11    happening here?  No.  They're paying us on nothing.  So

12    even on the '636 patent, they aren't using it and making

13    products and selling it to somebody else.  There's no

14    disruption of their business.  It's totally different.

15          The second thing about Cordis, Cordis said,

16    look, I have a problem because if we get terminated, you

17    could sue our customers for infringement, and that would

18    be terrible.  Is that going to happen here?  No, because

19    they have no customers on the '636 patent.  They don't

20    sell or make anything in reliance upon it.

21          THE COURT:  But you say they have customers on

22    the '275.

23          MR. GINDLER:    And they're not paying us.

24    They're not paying us for making and using.

25          Now, Medtronics argued in response to Cordis,

71

1      that Cordis I stands for the proposition, "that a

2      licensee cannot avoid the natural consequences of a

3      decision to stop paying royalties."  The Federal Circuit

4      didn't disagree.  It simply said, "in this action, there

5      has been no decision by Cordis to stop paying royalties."

6      And, in fact, in our case, there has been a decision by

7      Biogen and Genzyme and everyone else in this room to not

8      pay royalties to Columbia.

9              THE COURT:  Because the Federal Circuit in

10     Cordis didn't have Gen-Probe.  They'd pay you royalties

11     if it wasn't going to end the litigation, end their

12     opportunity to litigate the issue they want to litigate,

13     in this case, the validity of the '275, in Cordis II, the

14     scope of the patent at issue.

15             MR. GINDLER:  Well, you should know that with,

16     I think, maybe one exception, no one has been paying us

17     royalties on the '275, whether before or after Gen-Probe.

18     That seemed to make no difference to anybody.  So

19     Gen-Probe didn't change anyone's calculus about what to

20     do.  They just decided not to pay royalties, period.

21             THE COURT:  It affects my calculus.  If I didn't

22     have the two Cordis cases and Gen-Probe, I'd say, well,

23     just pay it in.  But I'm educated to understand --

24             MR. GINDLER:  Right.  They're not paying.  They

25     made that decision long before Gen-Probe.  They decided

72

1   not to pay.  And they're not paying.  The real

2   distinction between Cordis II and Cordis I is that Cordis

3   II found there would be irreparable harm.  They had facts

4   to show irreparable harm.  They gave facts about showing

5   possible loss of market share, as your Honor pointed out

6   before the break.  And, here, there's been no such

7   evidence presented at all.

8         So Cordis II said Cordis I is different because

9   that case involves a decision to stop paying royalties

10  full stop.  Our case is different.  They are paying

11  royalties.  They're using a patent.  They're paying

12  royalties.  They don't want to have the use of the patent

13  and the payment of royalties to be disrupted.  Cordis I,

14  that wasn't happening.  And that was the key distinction

15  on the merits and, combined with irreparable harm, the

16  court said, this is a different set of circumstances.

17  Our case is Cordis I.  Our case is exactly in the same

18  scenario, someone decides to stop paying royalties.  They

19  said, I don't have to under Lear.  And under Gen-Probe,

20  they can't, if they want to be in this court.

21        So what happens?  Do we lose our right to

22  terminate?  No.  Cordis I says we can.

23        THE COURT:  But as a practical matter, if the

24  '275 is the only patent, you could terminate.  I mean, I

25  wonder if there would even be any dispute.  You could

1     terminate.  You could sue them for infringement.  And

2     they would have an invalidity defense.  Or they can have

3     their declaratory judgment for invalidity.

4            Let's talk about -- can we talk about the '159.

5            MR. GINDLER:    Absolutely.

6            THE COURT:  Are you sure?  We're in open court.

7            MR. GINDLER:    A little bit.

8            THE COURT:  What's that?

9            MR. GINDLER:    A little bit.

10           THE COURT:  You're going to talk about it a

11    little bit.  No, but this is, as I say, this is not

12    intended to be a game.  If this was only about the '275,

13    they wouldn't pay, you would terminate, we would litigate

14    validity and prosecution laches.  But I want to

15    understand this '159 because, if they're terminated, then

16    they don't have any right to the '159 if it becomes a

17    patent, right?

18           MR. GINDLER:    That's correct.

19           THE COURT:  And is the '159 basically aimed at

20    Biogen's product or process?

21           MR. GINDLER:    It is not aimed at their product

22    or process, but it would probably cover their product and

23    process and probably everybody else in this room.

24           THE COURT:  All right.  So if it's issued,

25    either they would have to -- they would be infringing the

74

1    patent?

2            MR. GINDLER:    That would be my view.

3            THE COURT:  Right.

4            MR. GINDLER:    I'm sure they would have

5    different views, but that would be my view.  So what this

6    means is that licensees have to make a decision.  They

7    have a package of rights they licensed.  They have a

8    right to a --

9            THE COURT:  They have a patent of rights that

10   they knew existed that they licensed.  But with the '159,

11   you say that except for -- is it Immunex? -- you know,

12   they're not even supposed to know what it is.  How can

13   they make an informed decision whether to license it or

14   not?

15           MR. GINDLER:    That's the position that

16   everybody is in.  It's very common for parties to enter

17   into license agreements which cover all divisionals on

18   down the line.  That's standard language on a license

19   agreement.  Some license agreements are negotiated to

20   give people a right to see those, and some don't.

21           THE COURT:  I'm sorry, some give them a right to

22   see them, some don't.

23           MR. GINDLER:    That's correct.

24           THE COURT:  So Immunex had a right to see it?

25           MR. GINDLER:    No, no one had a right to see it.

1    If we want to, we can show it to them if they ask.  But,

2    on the other hand, do they have a right to see it?  The

3    agreement does not contain that right.  Many license

4    agreements the parties negotiate would contain that, but

5    no one in this room has such an agreement.  If they

6    wanted that right, they could have negotiated for it, but

7    they didn't have it.  Our license agreement is a standard

8    form, but many parties negotiated for different things.

9    Genentech negotiated very early on for a really low

10    royalty rate, and they got one.  Everybody else also has

11    a really low royalty rate, not quite as low as

12    Genentech's, but lower.  So there are benefits to

13    everybody to this agreement.  They didn't put it in the

14    agreement, either because they didn't ask for it or

15    because we said no, but it's not in there.

16          The parties should be willing to live by the

17    bargain that they made in this document.  And so it

18    doesn't give them the right to see it, and it also says

19    --

20          THE COURT:  Why don't they have a right to see

21    it?  You wrote Mr. White:  Disclose the existence of the

22    '159 application to Immunex in May 2000, and stated that

23    copies of the pending claims which we had sent to you on

24    May 6, 2002 are not being treated as confidential with

25    respect to licensees such as Immunex.

1          MR. GINDLER:  Yes, Immunex asked for a copy of

2     the then current claims, and we said, okay.  They didn't

3     have a right to it, but they asked.  They didn't say, we

4     have a contractual right to this.  They said, we'd like

5     to see it.  Can we have it?  And Mr. White said, sure,

6     you can have the copy of the then pending claims.  They

7     didn't have a right to it.  No one else has a right to

8     it.  They can ask.  We can say yes.  We can say no.  And

9     there are reasons that we might say yes and reasons that

10    we might say no.  We might say yes because it might

11    encourage them to keep their license in place, keep

12    paying fees.  We might say no.  But it's just the

13    parties' agreement.  The parties made these agreements,

14    and they should live by it.  Our agreement says, you pay

15    royalties until the patent -- unless and until the patent

16    is held invalid by a court of competent jurisdiction.

17         THE COURT:  What would happen if I ordered that

18    you -- you know, that I denied the preliminary injunction

19    with regard to the '275 but not the '636 or the potential

20    '159?

21         MR. GINDLER:  They would keep the license to

22    the'636 and the '159.  If the '159 became a patent, they

23    would be licensed and obligated to pay us royalties.

24         THE COURT:  And is that a problem for Columbia?

25         MR. GINDLER:  Well, it doesn't honor the

1    license agreement.  But is it a problem?  Well, if they

2    were to pay us on the patent if the '159 issues, that

3    would be great.  I have this really bad feeling that they

4    don't plan to do that, that when the '159 issues, if it

5    issues, they're going to challenge that patent too.  So

6    I'm not feeling so good that we're going to get money

7    from them at the end of the day, but  --

8         THE COURT:  When do you expect a decision from

9    the Patent Office on the '159?

10        MR. GINDLER:  Oh, I can never predict how

11   quickly they're going to act.

12        THE COURT:  Well, have you made all the --

13        MR. GINDLER:  I think it's fair to say the

14   following, that we're pretty much toward the end of the

15   process.

16        THE COURT:  Is it affected by the reexamination

17   and reissuance regarding the '275?

18        MR. GINDLER:  Nothing we've been told by the

19   Patent Office says that.  It wouldn't surprise me if it

20   were, because there must be overlapping issues, but I

21   just don't know if they're going to look at them together

22   or not.

23        THE COURT:  And if I ordered that you couldn't

24   terminate them with regard to the '636 and '159, should I

25   order that they pay something and, if I ordered that they

1    pay something, would that destroy subject matter

2    jurisdiction because they're not paying in connection

3    with -- they're not licensing the '275; is there a real

4    case in controversy?

5           MR. GINDLER:   I don't think so because the

6    reason that they're here is not because of the '636 or

7    the '159.  They're here because they really don't like

8    that '275 patent.

9           THE COURT:  So you think there would be a real

10   case of controversy?

11          MR. GINDLER:   Well, there is a case of

12   controversy about the '275.

13          THE COURT:  So, if I entered that more limited

14   injunction because I thought, given the two Cordis cases

15   and Gen-Probe, it's legally permissible, and that's the

16   equitable way to strike the balance, you would not argue

17   that that destroyed subject matter jurisdiction?

18          MR. GINDLER:   That's correct.  If you ordered

19   them -- if you enjoined us from terminating on '636 and

20   '159, as long as they complied with their contractual

21   obligations as to '636 and '159, I don't think there

22   would be any destruction of subject matter jurisdiction

23   here on the '275 issues.

24          THE COURT:  And when you say pay for it, that's

25   $30,000 a year, which is applied against royalties.

79

1    There are no royalties, so they'd basically be paying

2    $30,000 a year?

3          MR. GINDLER:    It's that and, of course, if '159

4    issues, then that raises the question of royalties, which

5    they would have to pay if the '159 covers their products.

6          THE COURT:    Because -- maybe you want to address

7    this directly.    You know, I read Cordis II, as I told

8    you, as a kind of discussion of something analogous to a

9    time arrangement.

10          MR. GINDLER:    Mm hmm.

11          THE COURT:    And while that may have involved one

12    patent, this seemed to me analogous.    It's more than one

13    patent, but they have to pay on the '275 that they seem

14    to ardently believe is not valid in order to maintain the

15    potential for this, you know, to have access to this '159

16    that is at least likely to be very important to Biogen's

17    business, and they can't even know what's going on with

18    the '159.    You know, they're sort of betting the farm

19    blindly, so it puts a lot of pressure on them, they would

20    say.    And that's the reason I would enter the more

21    limited injunction, because giving up their right to that

22    '159, particularly not -- you know, not being in a

23    position to make an informed decision, because they don't

24    know many things about the prosecution.    Do you want to

25    address that kind of thinking as this is analogous to

1      Cordis II in that way?

2            MR. GINDLER:    Sure.    Let me raise two points.

3      I think that there's really no pressure on them as to the

4      '159, because we know exactly what's going to happen if

5      the '159 issues.    They're going to challenge the

6      validity, which they can only do if they don't pay

7      royalties.    If they think the '275 patent is invalid on

8      prosecution laches grounds, do you have any doubt they'll

9      be here challenging the validity of the '159 on

10     prosecution laches grounds?    Well, of course, they are.

11     And they can't do that while paying.    So that decision

12     has been made.

13           THE COURT:    Well, I don't know about that.    I

14     mean, in this case, they thought they made all of their

15     payments, and they didn't know about the '275 until a

16     couple of days after they sent you a check and said,

17     here's the last check.    But, presumably, they read the

18     '275 patent, and Biogen and Genzyme in consultation with

19     their lawyers made a decision.    They said, you know, it's

20     in our business interest to stop paying.    We think we can

21     invalidate this patent.    But because they haven't seen a

22     '159 patent and they can't read the full prosecution

23     history, they can't make a comparable judgment.    I mean,

24     if they -- I'm sorry, I don't mean to be talking about

25     things that may not be in the record here.    But when I

81

1     did the Biogen case a couple of years ago, Avonex was

2     generating close to a billion dollars a year.  It was

3     either their only product or, by far, their dominant

4     product.  They'd really be betting the whole business

5     here, buying the pig in the poke, because you really

6     think you're going to come out of this with a valid '159

7     patent.  Maybe they'll agree and say, wow, they figured

8     out a way to do it.

9          MR. GINDLER:   You know, I think I can address

10    that issue right now and that concern, and I can make a

11    representation on behalf of Columbia University because I

12    thankfully have the general counsel from the University

13    seated right behind me.

14         THE COURT:  Who's that?

15         MS. KEEFER:  I am, your Honor.

16         THE COURT:  Say your name for the record.

17         MS. KEEFER:  Elizabeth Keefer.

18         THE COURT:  Go ahead.

19         MR. GINDLER:   We will never in this case

20    against Biogen or Genzyme or any other plaintiff ever

21    seek a preliminary injunction to stop them from making

22    and using and selling their products, either on the '275

23    patent or, if it issues, on the '159.  We will never seek

24    a preliminary injunction.  Columbia is not going to stop

25    before a final judgment in any case any of these

82

```
1       companies from delivering pharmaceuticals that they make

2       in discovery.  That is a risk none of them face.  We

3       won't do it.

4               THE COURT:  Well, they face the risk still,

5       though, that they'll get to the end of the litigation,

6       your '159, as it emerges, you know, will be valid, and

7       then they're out of business unless they get a license.

8               MR. GINDLER:   And then they face, as simply

9       every other party has faced, the patent infringement

10      suit.  And think about what our interests are.  We only

11      benefit from royalties.  Columbia doesn't benefit from

12      enjoining them.  We don't make and sell anything.  We're

13      a university.  So think about what our interests are.

14      Our interests are not in putting Biogen out of business

15      and to stop the delivery of Avonex to people who need it.

16      What would happen to our mission --

17              THE COURT:  They're telling me then Serono would

18      have a monopoly, raise the price, you'll get more

19      royalties.

20              MR. GINDLER:   That would be great headlines for

21      Columbia University.  Columbia enjoins sale of Avonex.  I

22      really just don't see that in the cards.  And to be real

23      clear, we're never going to try and do that at any time

24      before there's a final judgment in the case.

25              THE COURT:  When there is a final judgment, you
```

83

1     can do it.

2          MR. GINDLER:   We can.  Will we?  It's really

3     not in our interest.  But that means we've won, and the

4     playing field is much different.

5          THE COURT:   Whatever decisions I make today, I

6     have to make based on what I've been presented, and I

7     don't have a shred of evidence that suggests that you're

8     going to win on double patenting, because all I have is

9     Doctor Lodish's -- I mean, you have the presumption, and

10    they have to offer clear and convincing evidence.  But,

11    you know, you made a tactical decision, and this is

12    plainly -- not plainly -- you know, you can see, I think,

13    you know, this is what's engaging.  Eventually, I have to

14    turn to Mr. Ware, and my attitude sort of is, you know,

15    take your best shot.  It looks to me like double

16    patenting, you know, is your cleanest shot.  And the

17    prosecution laches may be good too.  But this is one

18    clean shot.  They think it's a no brainer.  They win.

19    And I think, you know, rather than trying to predict on

20    the present record, you've got an expert or will have

21    one.  They've got an expert.  I haven't done any claim

22    construction yet.  I didn't appreciate that Doctor Lodish

23    only talked about some of the claims, and you're talking

24    about 17 more.  You say there are 17 more independent

25    claims?

84

1          MR. GINDLER:   No, there are not more

2     independent claims, but they just chose three.

3          THE COURT:  How many independent claims are at

4     issue?

5          MR. GINDLER:   At issue in our case?  Well, we

6     haven't asserted any infringement claims against them

7     yet, so I don't know the answer to that.

8          THE COURT:  You say they addressed three.   If

9     they proved that there's double patenting with regard to

10    those three, does it knock you out on the other 17 too?

11         MR. GINDLER:   I don't think so.  I don't think

12    it does, no.

13         THE COURT:  You may have claim 1 left, I'm told,

14    unlinked.

15         MR. GINDLER:   Claim 1 is a good claim.

16         THE COURT:  It's got to be the most basic claim,

17    right?

18         MR. GINDLER:   Right.  But keep in mind that

19    double patenting is claim by claim, so they still have to

20    do one claim versus one other claim.  It's a very sort of

21    arcane process.  It's not claim 5 versus claims 1, 2, 3,

22    4, 5 off of the patent.  It's claim 5 versus --

23         THE COURT:  For me, it's not a question of keep

24    in mind.  You've got to teach me this.

25         MR. GINDLER:   Your Honor, could I address one

85

1     other issue, which is about --

2          THE COURT:  Absolutely.

3          MR. GINDLER:  Should we even just do it in this

4     staged way?  What I heard your Honor say before the break

5     was you had concerns about whether the Patent Office

6     would provide complete or effective relief and that it

7     made more sense to try and resolve issues here in real

8     court as opposed to in the Patent Office.  And that

9     assumes that we have two competing proceedings doing the

10    same thing, one which is better than the other.  And I

11    think that's wrong.  And I want to tell you why I think

12    that's wrong.  That's how the plaintiffs want to portray

13    it, but I think it's wrong.  The Patent Office is going

14    to reexamine and, we hope, reissue the patent.  What

15    unusually happens in that process is that a new patent

16    comes out.  The old patent disappears, a new patent comes

17    out.  That's what happens three-fourths of the time.  And

18    even the plaintiffs say in their papers, that's what's

19    probably going the happen, it's going to come out, and

20    there will be new and different claims.

21         THE COURT:  Let me ask you a question.  If there

22    are new and different claims, are you going to sue

23    Columbia (sic) for infringement that it took place before

24    the reissue?

25         MR. GINDLER:  Can't do that under the rules.

86

1       There are two rules --

2                    THE COURT:  No.  Let me ask you this.  I mean --

3       let me ask you the question again and, if I asked it

4       imprecisely -- if there's a new -- I mean, maybe I'm

5       wrong.  I'm not a patent lawyer.  I do organized crime

6       cases.  But I understand or misunderstand that if the

7       reissue generates a new claim, something that Biogen,

8       Genzyme, and people ordinarily skilled in the art didn't

9       have notice of, you can't sue on that.

10                   MR. GINDLER:  I cannot sue them for

11      infringement that happened before the claim issued,

12      that's absolutely correct.

13                   THE COURT:  Based on a new claim that emerged in

14      the reissue.

15                   MR. GINDLER:  That's correct.

16                   THE COURT:  But the reissue will not necessarily

17      involve what you would characterize as all new claims,

18      will it?

19                   MR. GINDLER:  That's correct.  So --

20                   THE COURT:  So if there's a claim in the reissue

21      that you say is substantially identical to something in

22      the '275 as it exists now, I think it's your position

23      that you would have the right to sue based on that claim

24      for infringement before the reissue, right?

25                   MR. GINDLER:  Yes, but --

87

```
 1          THE COURT:  Let me just give you the last part
 2     of my question.  Then I'd have to go back and -- listen,
 3     listen, listen.  I'm going to give you a chance to talk
 4     to him.  Then I would still have to go back and construe
 5     the claim in the present '275 to decide whether it's
 6     essentially the same as the claim in the reissue, right?
 7          MR. GINDLER:  That's correct, if there was a
 8     dispute on the question, because we might not disagree
 9     about whether or not there is a change, and my guess is,
10     from looking at the claims that have been presented to
11     the Patent Office, I think it's clear which ones are real
12     significant meaningful changes and which might not be,
13     but only if the parties disagree.
14          THE COURT:  But then I'd still have -- I mean,
15     even if you agreed that it wasn't the change, I'd still
16     have to do -- I'd still have to litigate the issue of
17     infringement.  I wouldn't have been saying anything by
18     waiting for the Patent Office to do its work.
19          MR. GINDLER:  Sure, you will.  And here's why.
20     If we do it now, the odds are, the statistics, the odds
21     are we're doing it twice, absolutely, positively, because
22     there will be amended or new claims that come out.
23          THE COURT:  We're not -- no, I don't think so.
24     We may be having two proceedings, but I wouldn't be
25     construing the identical claim twice.  In fact, it would
```

88

```
 1    either be law of the case if the case is still going,
 2    although I can always change my mind on claim
 3    construction, or if the case were over, with regard to
 4    those claims, there would be issue preclusion, assuming,
 5    you know, the appeals were exhausted.
 6              MR. GINDLER:  My point, though, is this.  Two
 7    things can happen.  If we get new claims, we'll be back,
 8    and there will be another case involving the new and
 9    improved '275 patent, and some of the claims that you
10    construed or maybe all the claims that you construed
11    could be held invalid, and so there will have been no
12    reason for you to have spent a second construing claims
13    which the Patent Office said, I'm sorry, you don't get
14    those, but these amended claims or these new claims you
15    do get.  And that really is the --
16              THE COURT:  And the reissuance, you -- some
17    fellow who used to work for Johnson and Johnson law firm
18    filed a request for the reexamination, right?
19              MR. GINDLER:  Yes.
20              THE COURT:  And then about last week you made a
21    request for a reissuance, right?
22              MR. GINDLER:  That's correct.
23              THE COURT:  And in that request for a
24    reissuance, you identified preliminarily some of the
25    claims you would like reissued, right?
```

89

```
 1          MR. GINDLER:    That's correct.

 2          THE COURT:   Have you completely and finally

 3     identified all of the claims that you want reissued?

 4          MR. GINDLER:    Well, the answer is yes, based

 5     upon the state of proceedings.  What happens next is

 6     patent prosecution.  The Patent Office will then write

 7     back and say, claims allowed or not allowed.  And if not

 8     allowed, here's why.  And then we have a chance to meet

 9     that office action by possibly changing the language of

10     the claims or any new claims.

11          THE COURT:   So how long is this process of

12     reissuance and reexamination going to take?

13          MR. GINDLER:    It will probably take between one

14     and two years.  I think that's a fair assessment.  I'm

15     not sure people disagree very much about that, but that's

16     just how long it's going to take the Patent Office to do

17     it.  The Patent Office will expedite.  It's part of the

18     rules.  The Patent Office will speed things up if we have

19     stayed litigation, because they know there's a lot of

20     people in the green room waiting to see what's going to

21     happen.  But why should we have a case for construing

22     claims that might be wiped out by the Patent Office or we

23     may get new claims or the claims may be amended and

24     narrowed.  We don't know what we're fighting about.  And

25     that's the difference.  The Patent Office is a
```

1    fundamentally different forum.  What they're doing is

2    reconsidering the '275 patent all over again.  They're

3    saying, let's start from scratch.  Do you get any of

4    these claims?  Do you get some of them, but only

5    modified?  Or can you get new claims which better

6    describe the subject matter of the invention?  That's why

7    the Patent Office is different.  We can have a hearing

8    here on summary judgment.  The plaintiffs can win and

9    validate all the claims.  But why?  Because which claims

10   will emerge?  Which claims will be narrowed?  Which

11   claims will be added?  It is a tremendous waist of

12   resources, both of the parties and of the court to do

13   that.  We didn't bring this on, you're right.  Something

14   called Public Patent Foundation brought this on.  It was

15   a surprise to us.  But they did it.  And now the question

16   is what's the most efficient thing to do?

17        THE COURT:  Well, they did part of it.  They

18   asked for the reexamination.  They didn't ask for the

19   reissuance.

20        MR. GINDLER:   That's correct.  But it's very

21   common to ask for reissue, and that's why there's a

22   procedure to merge the two proceedings when someone asks

23   for a reexamination.  But it both happened together on

24   the same track by the same examiner so nothing gets

25   slowed down.  That's what we want to happen.  We want

91

1    this done quickly in the Patent Office too.  We want to

2    know what rights we do and do not have.  But we don't

3    know the answer to that question right now, and that's

4    fundamentally why this case can't go for.  This case is a

5    fight about the '275 patent.  How can you fight about

6    that patent if we don't know what it claims?

7            THE COURT:  We know what it claims.

8            MR. GINDLER:   We know what it claims today  --

9            THE COURT:  It might change.

10           MR. GINDLER:   -- but we don't know what's going

11    to happen, and that's the fundamental issue.

12           THE COURT:  Isn't it time to know what the --

13    isn't it time to know what they patents -- the first

14    application was filed in 1980, right?

15           MR. GINDLER:   That's correct.

16           THE COURT:  And if we had the current law, the

17    longest any of these patents could have run would be

18    2000.

19           MR. GINDLER:   Also correct.

20           THE COURT:  So now --

21           MR. GINDLER:   And the Patent Office --

22           THE COURT:  I mean, you're grandfathered in by

23    one day.  You know, we have an expression in public

24    policy by Congress and the President that, you know, you

25    get 20 years to do this, and anything more than that is

1    abusive.  And they tell me -- you know, you're standing

2    here and predicting one to two years, but you're not

3    prosecuting this in the Patent Office.  That's Mr. White.

4         MR. GINDLER:   That's correct.

5         THE COURT:  And Mr. White is in there and, in

6    effect, confessing error.  He's saying, I've been

7    prosecuting this for 24 years and here it is, June 2004.

8    I realize I didn't claim enough.  I mean, if he did such

9    a lousy job, why didn't Columbia fire him and get

10   somebody who can articulate the claims as they should

11   have been articulated 24 years ago?

12        MR. GINDLER:   I don't think he did a lousy job.

13   When a patent is issued, it's not uncommon for the patent

14   court, look at the patent and say, I wish I had done a

15   better job in that claim.  And people often leave it

16   alone, and they leave it alone because if you go back to

17   the Patent Office and you seek reissue, it's a whole new

18   ball game.  You put the entire patent at risk.  Well,

19   since that's already happened, since reexamination was

20   filed, it makes sense for us to go back and try and

21   figure out what the proper scope of the claims is.

22        THE COURT:  I want to hear Biogen and Genzyme's

23   response, but I have to decide this based on the record.

24   You know, with what's in the record, you're making a

25   great argument, but, you know, I'm looking at this, and

93

 1    I've got one affidavit that -- from the guy who says he

 2    wrote the textbook, and he says, these are the same

 3    things.  And I have no explanation in the record for why,

 4    you know, it's taken 24 years to get to this point.  You

 5    know, if it's improper, what's it called, a submarine

 6    patent?  You just sort of take your time to do this.  You

 7    wait for the industry to develop, surface, and then sort

 8    of, got you.

 9            MR. GINDLER:   Your Honor  --

10            THE COURT:  The present record, it has a feel of

11    that, and that may not be fair.  So what I'm aiming at is

12    trying to find some way to as fairly and efficiently as

13    possible test that, at least on the double patent.

14            MR. GINDLER:   As I mentioned to your Honor, we

15    didn't submit evidence in opposition because we thought

16    it was irrelevant under Cordis I.  And I understand your

17    Honor may have a different view of the case.  That's how

18    we read it, and I think it's right.  A second reason is

19    we thought they weren't even close to showing irreparable

20    harm, not even warm on that subject.  So I have a big

21    fight about one issue.  I don't think they have a prayer

22    on irreparable harm.  So I'd like your Honor to please

23    keep an open mind that there is another side to this

24    story.  There is the story about how the patent was

25    prosecuted.  There is the story about why this patent

94

1    claims different inventions than claimed in the previous

2    patent.

3            THE COURT:  Well, that's --

4            MR. GINDLER:   But you're right, our story has

5    not been told, and we're hoping you will keep an open

6    mind to that question.

7            THE COURT:  I don't have any trouble keeping an

8    open mind with regard to the merits of the case, but if I

9    have to decide the motion for a preliminary injunction, I

10   have to decide it on the present record.

11           MR. GINDLER:   On the motion to stay, we have

12   tried to address both the plaintiffs' concerns and your

13   concerns, concerns about the public interest, concerns

14   about harm.  I think we've come a long way in this area

15   in doing that.  We've come a long way by saying no one in

16   this courtroom -- no one on this side of the courtroom

17   need worry about getting sued for infringement during the

18   period of  --

19           THE COURT:  Did you tell them that before about

20   a half hour ago?

21           MR. GINDLER:   I told --

22           THE COURT:  Time out.  There's part of your

23   submissions I didn't read, the part about the settlement

24   discussions.  So if I just asked you a question that

25   invites you to tell me that, don't tell me.

95

```
1              MR. GINDLER:   But the actual  --

2              THE COURT:  I mean the settlement discussions in

3         terms of working out some lack of -- something that would

4         moot the stay issue.

5              MR. GINDLER:   This is the first time I've told

6         the entire courtroom that we will never seek a

7         preliminary injunction ever in this case, either on the

8         '275 or the '159, and we did that to (sic) your Honor's

9         concerns about fairness, about the public interest, about

10        prejudice.  We want to basically have a position where

11        our patent is back in the Patent Office.  Our application

12        for reissue doesn't matter.  We'd be doing the exact same

13        thing if it was just reexamination, because the same

14        thing happens in reexamination.  You amend the claims.

15        You submit new claims trying to overcome the double

16        patent challenge.  The reissue application is a way of

17        trying to have more flexibility in what we can do if

18        there are errors in the patent.  But it makes no

19        difference in the analysis.  The arguments are exactly

20        the same if it's just reexamination.  The same thing

21        happens, claims of change, new claims, amended claims.

22        So why should we be fighting about a patent we don't know

23        what it's ultimately going to say?  The Patent Office

24        might take the entire thing away from us.  In which case,

25        everyone is done, and it didn't cost these people much of
```

96

1    anything else.  Or the Patent Office will change the

2    claims, maybe all of the claims.

3            THE COURT:  I understand the argument.  Why

4    don't I give Mr. Ware a chance to respond before we go to

5    lunch in about 20 minutes or something.

6            MR. GINDLER:    Thank you, your Honor.

7            MR. WARE:    Let me first say just a couple of

8    comments about the reissue, and then I'll turn back to

9    the preliminary injunction, if that's all right your

10   Honor.

11           There's a reason that Columbia hasn't fired Mr.

12   White, and that's because he's quite masterful in the

13   Patent Office, and he's quite masterful at stringing

14   prosecution along for many, many years, as we all know.

15           As far as the claims that are in the '275 now,

16   while Columbia tells us today that anything could happen

17   and the Patent Office can amend them, they've actually

18   taken a position on that through the reissue.  And what

19   they've really done in the reissue is -- and, indeed, as

20   they told this court earlier, they're quite prepared to

21   defend the existing claims of the '275 patent as they

22   are, and they will fight any changes in those claims

23   other than a couple of minor changes that they suggested,

24   plus wanting to add a whole new set of claims so that

25   they can reach mammalian cells now for the next 17 years.

1    Just in case somebody gets the idea of changing their

2    manufacturing process away from CHO cells, now they want

3    to cover every other kind of mammalian cells.  But the

4    likelihood is that Mr. White will succeed, as he has

5    succeeded over and over again, and we will be litigating

6    these same claims.

7         Mr. Gindler pointed out  --

8         THE COURT:  Why would we be litigating the same?

9    I thought you meant he was going to succeed in dragging

10   it out.

11        MR. WARE:  Yes, what I'm saying is as far as

12   the claims of the '275 patent, as they exist and as we

13   have challenged them, they very likely will come out in

14   that same form, and we'll be challenging them three or

15   four years from now instead of right now.  That's our

16   only point.  And we'd like to get on with it.

17        THE COURT:  What's the harm to you if you wait

18   four years?

19        MR. WARE:  The harm is -- it falls into several

20   categories.  First, of course, there is the '636 and the

21   '159 application.  I think your Honor has spoken of that

22   sufficiently.

23        One of the reasons why we seek the preliminary

24   injunction as to the '275 as well is that, of course, to

25   begin with, as Mr. Gindler acknowledged, in the license

98

 1    agreement, it provides that if that patent is not valid,

 2    we don't have any obligation to pay royalties  --

 3            THE COURT:  That's actually --

 4            MR. WARE:    -- shouldn't be termination.

 5            THE COURT:  He usefully pointed out to me

 6    precisely what it says.  It says, if it's held invalid.

 7            MR. WARE:    That is correct.

 8            THE COURT:  Hold on just a minute.

 9            (Short pause.)

10            THE COURT:  It does say it has to have been held

11    invalid to relieve you of your obligation to pay, and it

12    hasn't been held invalid.

13            MR. WARE:    And this is not a hearing on the

14    merits, this is a hearing on a preliminary injunction,

15    and our point is very simply that were it possible to

16    come in immediately after receiving a 30-day notice of

17    termination and say, we'd like a trial on the merits

18    tomorrow on that, we believe we would prevail.  We

19    believe we have shown you that we would prevail.  And, in

20    that case, we would not -- it would be found that we did

21    not owe any royalties, and there would be no right to

22    terminate.  So that's what interlocutory relief does.  It

23    takes us ahead to the point in time when the court can

24    actually reach the merits and says, let's preserve the

25    status quo up to that point, because let's protect a

99

1    party from the prejudice.

2              THE COURT:  How does that square with Cordis I,

3    though?

4              MR. WARE:   Cordis I was decided at a time when

5    the law was very different.  And one of the principal

6    bases for Cordis I is the following statement.  If the

7    plaintiffs wish to continue to invoke the protections of

8    their licensing agreements, they should be required to

9    continue paying their royalties to the defendant.  Well,

10   we all know now, you can't do that.  We don't have that

11   option.  And so we suggest that the equities are simply

12   different.  The Cordis I case is a case decided

13   considering the four factors for a preliminary injunction

14   on the equities, and they said, well, this isn't such

15   harm, because they could just pay the royalties and later

16   get them back.  Well, we can't do that.  So that

17   situation no longer obtains.

18             I think the other thing that's important to keep

19   in mind is that Cordis I --

20             THE COURT:  Actually, what page were you just

21   reading from?

22             MR. WARE:   This was  --

23             THE COURT:  Where you say you have the option to

24   keep paying.

25             MR. WARE:   On Westlaw, it's page 4 here, but

1      it's about a page before -- the last paragraph that the

2      court was looking at earlier, it's about a page before

3      that, and it's a quotation from the Warner Jenkinson

4      case.  It's in the discussion of Lear, so it's a sort of

5      long quotation that begins:  We believe that.

6            THE COURT:  I have it, okay.  You're basically

7      saying you would do that now but for Gen-Probe.

8            MR. WARE:   Well, we can't do that.  We don't

9      have the option.  So it changes the equities at this

10     point.  That case was decided under different law in

11     1985.

12            In 1987, also, the Federal Circuit made clear

13     that Cordis I was not the last word on this subject.  And

14     virtually every argument that Columbia has made here

15     today was made by Medtronic in the Cordis II case, and I

16     thought it was interesting that Mr. Gindler quoted this

17     language where Medtronics said:  "A licensee cannot avoid

18     the natural consequences of a decision to stop paying

19     royalties."

20            THE COURT:  Where is that?

21            MR. WARE:   This is in Cordis II.  And I don't

22     know why I have all these Westlaw pages here but, anyway,

23     it's about the fourth paragraph or so from the end of the

24     decision.  I guess it's 864 in the F 2nd.

25            THE COURT:  Hold on a second.