# Tab 7 (Part 2)

1           MR. WARE:    Yes.

2           (Short pause.)

3           THE COURT:    What is it?  What language do you

4     want to point me to?

5           MR. WARE:    This was the argument that Medtronic

6     made that "A licensee cannot avoid the natural

7     consequences of a decision to stop paying royalties.  And

8     so the point being there was a license agreement.  It

9     licensed, for sake of simplicity, one patent -- maybe

10    there was another patent -- but there was one patent in

11    question, and that patent was licensed.  They stopped

12    paying royalties on -- I'm sorry, they didn't stop.  They

13    never started paying royalties on a particular product,

14    so Medtronic could as a matter of contract interpretation

15    and contract law say this was a breach of the agreement.

16    Our agreement gives us the right to terminate for breach.

17    You breached it.  It's a material breach.  So the

18    argument, the same argument that Columbia makes today,

19    was being made that there could not be an injunction

20    against terminating the license because they had breached

21    the license by not paying.  And what the court said is

22    they said this argument was "totally unwarranted."

23    That's at the bottom of that paragraph.  And what they

24    say is Cordis has never paid royalties to Medtronic on

25    its fin lead and, if its interpretation of the license

1    agreement is correct, Cordis never will pay royalties to

2    Medtronic on the fin leads.

3           In our case, if our view is correct that the

4    '275 patent is invalid, we would not under this agreement

5    be required to pay royalties.

6           Now, what we have done simply is ask the court

7    as a matter of its equitable discretion, since it's not

8    possible to determine the validity of the patent within

9    the 30-day period of a termination notice, to simply

10   preserve the status quo so that can be determined so that

11   we will not be prejudiced.

12          One of the concerns that we have and one of the

13   reasons that we sought the stand-still order before is

14   that I think we can anticipate from Columbia's arguments

15   that if the court does not enjoin termination with

16   respect to the '275 and we go forward and we ultimately

17   win and we prove that the '275 is invalid, we will hear

18   this same argument being presented that, nevertheless,

19   they were entitled to terminate our license agreement

20   and, consequently, the court can no longer -- cannot

21   enter a nunc pro tunc order.

22          THE COURT:  Why can't I?  I thought that was the

23   effect of the stand-still.  If you win on --

24          MR. WARE:  Oh, as long as we have the

25   stand-still.  I just meant if the stand-still ended and

1    the court denied the preliminary injunction with respect

2    to the '275, the argument would be made that we were

3    required to pay royalties, and the court can't reinstate

4    the contract.

5           THE COURT:  Right.  But that's the risk you

6    take.  I mean, see, it seemed to me that the animating

7    principle of Cordis I is that somebody in your client's

8    position cannot have risk free litigation, although,

9    there, they thought you just had to pay while the case

10    was going on.  Now, I think, after Gen-Probe, you're

11    dilemma is either you pay and you can't attack the '275,

12    even though I think the equities are different here

13    because the '275 didn't exist when you entered into the

14    licensing agreement, in contrast to the situation in

15    Gen-Probe, or you don't pay and you run the risk that if

16    you lose the case, you'll be ordered to pay more than the

17    amount of royalties under the agreement.  I think it

18    would be probably hard for them, based on what I know

19    now, and it could change, to prove willfulness, but there

20    may be some measure of damages that's more than the

21    license rate.  But that's the risk you take.  You think

22    you're going to prove it invalid, right?

23           MR. WARE:  Yes, that was Cordis I.  Cordis I --

24    you might read Cordis I that way.  As we've said, I think

25    it's under different facts and circumstances, different

1     law, actually, because of Gen-Probe.  But Cordis II,

2     let's remember what actually happened in Cordis II.  They

3     did not pay royalties on the finned leads.  The court

4     enjoined termination of the license in its entirety.

5     And, so, therefore, had they ultimately lost their claim

6     on the merits that they didn't have to pay on fin leads,

7     they would not have had their license terminated.  They

8     would pay the contract rate if it was owed.  They

9     wouldn't be facing an infringement suit.

10          THE COURT:  Does this make any difference, they

11     say in Cordis II, on the facts of this -- they say:  The

12     facts of this case are outside the parameters of the

13     normal license agreement controversy in that neither the

14     validity of a patent or the validity of a license

15     agreement is at issue.

16          Here, the validity of the patent is at issue.

17     Does that distinguish this case from Cordis II in any way

18     that ought to make a difference?

19          MR. WARE:  Not that ought to make a difference.

20     It's simply a different kind of dispute that arose as to

21     whether royalties were due.  In that case, the issue

22     wasn't the validity of the patent, it was the scope of

23     the patent, but it was still a dispute over whether

24     royalties were due, and Cordis didn't pay, and the court,

25     nevertheless, enjoined termination, which meant that

1    Cordis would not face an infringement suit, would not

2    face any claim for additional damages over and above the

3    contract rate.  So it cannot be that Cordis I established

4    a principle of law that you must not bear any risk if you

5    want to litigate over a patent in a license agreement.

6    And, so, quite the contrary in Cordis II.  And it seems

7    to us that in any preliminary injunction that is granted

8    that there is always the possibility, of course, that the

9    moving party will not ultimately succeed on the merits.

10   And so, in one sense, a court anytime it grants a

11   preliminary injunction, is giving some relief that maybe

12   ultimately is improper, unfair, whatever.

13        THE COURT:  Which is why what the bond

14   requirement that nobody addressed, despite all the

15   lawyers in the room, is intended to get at.  We'll have

16   to talk about that.

17        MR. WARE:  And we thought about that.  And I'll

18   say something about that, because then I do want to come

19   back.

20        THE COURT:  Come back, because we'll get to it

21   eventually.

22        MR. WARE:  Okay.  So, in any case, it seems to

23   us that anytime that a court grants a preliminary

24   injunction, it is making an equitable determination as to

25   whether someone should bear certain risks during the

1    litigation.

2          THE COURT:  What's the question -- I often tell

3    my law clerks the essence of good lawyering is defining

4    the questions, and then the answers follow.  This really,

5    I think, exemplifies it.

6          You say -- when we're talking about reasonable

7    likelihood of success on the merits, I think you say it's

8    reasonable likelihood of success on the merits of whether

9    the '275 is valid and enforceable.

10          MR. WARE:  Yes.

11          THE COURT:  Mr. Gindler says, no, it's

12    reasonable likelihood of success on the merits of our

13    ability, our right to terminate.  So I think you're

14    disagreeing on the question.  If I decided what was the

15    right question, the answer may not be easy, but it's

16    easier.  So why is his question the wrong question?

17          MR. WARE:   Actually, two reasons.  One is that

18    the validity question, even by the contract itself, that

19    is the question of the merits, whether or not we have an

20    obligation.  Now, you can say -- he can say, well --

21          THE COURT:  Let me stop you right there.  I

22    think you do have an obligation under the language of the

23    contract, because the patent has not yet been held

24    invalid.  Basically, the contract tells you who bears,

25    you know, what you'd have to do during the pendency of

1     litigation concerning validity.

2          MR. WARE:   But, of course, the ultimate

3     question is -- under that license agreement, the ultimate

4     question is is it valid or not?  And so what a

5     preliminary injunction does is it simply represents an

6     exercise of the court's equitable discretion where there

7     has been an extremely powerful showing of likelihood of

8     success on the merits to say, that would be an unfair

9     result if merely -- because we all know it's impossible

10    in the 30-day cure period to have a court actually

11    finally establish that the patent is invalid -- that

12    where we think there is a high likelihood that that would

13    happen, that the equitable thing to do would be to stay

14    or enjoin the termination as, indeed, the court did in

15    Cordis II.

16          I would make a second point because this

17    contract, of course, refers to validity, a holding of

18    validity.  We have also asserted unenforceability, and I

19    think that one could look at unenforceability differently

20    and say, there's nothing in the contract that forces you

21    to pay up to a finding of unenforceability.  If it's

22    unenforceable, it's just plain unenforceable.  And so if

23    there's an ultimate finding of unenforceability, our

24    position would be, even under this contract, you can't

25    read this contract as saying that you can force somebody

108

```
 1          to pay, terminate a license agreement for failing to pay,

 2          when the contract as a matter of Federal Patent Law has

 3          found it to be enforceable.  That's a slightly different

 4          twist on it.

 5                THE COURT:  And just to make sure I understand

 6          it, double patenting would render the patent invalid.

 7          Prosecution laches would render it unenforceable.

 8                MR. WARE:   That is correct, right.  So I don't

 9          think we could stand here and make this argument if we

10          had not made a very strong showing on the merits.  But

11          where we have and where we have our license agreement in

12          which the parties contemplated that for an invalid patent

13          you would not be paying royalties, it seems unfair to

14          allow their license to be terminated with the potential

15          for irreparable injury coming out of that, because we

16          don't know  --

17                THE COURT:  What's the irreparable -- if I grant

18          a limited injunction that gives you continued rights to

19          the '636 and the '159, if it becomes a patent, what's the

20          irreparable harm to you if you've lost your license for

21          the '275?

22                MR. WARE:  A couple of different categories.

23          One, the court mentioned earlier that the mere threat of

24          litigation of an infringement case should not be regarded

25          as irreparable injury.  Well, it was in Cordis II.  And
```

1    it's not just a threat of --

2         THE COURT:  I think it was in -- where do you

3    find that?  Let's look.

4         MR. WARE:    Towards the end of Cordis II.  I

5    know it's also in the District Court, but I guess it

6    would be page 864 in the "furthermore" paragraph.

7         THE COURT:  What's that?  Right.  No, this is

8    what I was talking about.  They said that there was a

9    finding of a loss in market share caused by an injunction

10   that resulted in irreparable harm.  And then they said:

11   The trial court did not make legal error or abuse its

12   discretion in concluding that termination of the license

13   agreement would cause loss of market share and possible

14   further litigation against Cordis and its customers for

15   patent infringement, thereby irreparably injuring Cordis.

16        Let me focus on that.  I guess it has two parts.

17   And maybe I need to read -- reread the District Court

18   decision.  But I was accepting that loss of market share

19   could be irreparable harm.  But I don't think I have any

20   evidence of that in the record here, do I?

21        MR. WARE:    I think that the problem is that, of

22   course, because we're at this early stage and nothing has

23   actually happened yet, it becomes very difficult to prove

24   or to imagine how would you prove or how would you

25   measure that because how do we -- how can we establish

1    what our competitors -- we know there are competitors --

2    for example, in the beta interferon market, I mean, we

3    know there's Berlex, and we know there's Serono, which

4    has just settled with Columbia.  So if we are unlicensed

5    in that marketplace, and they're either licensed or, in

6    the case of Berlex don't, practice the patent because, as

7    the court may remember, they manufacture prokaryotic

8    cells, which are not claimed by Columbia, in that

9    environment, one can easily predict, I suggest, that

10   there will be, particularly in this very -- in this area

11   of public health where the importance of maintaining

12   patience on a particular regimen is very important, that

13   one can predict that competitors will suggest that Biogen

14   may not long-term be able to stay in this market.  But I

15   can't.  There's no way I can think to actually prove

16   that.

17            THE COURT:  Well, you could have had an

18   affidavit from somebody who says, you know, this is how

19   doctors behave, and they're not going to start somebody

20   on Avonex if they think they're going to have to switch

21   them to another product in a year.  But I don't have

22   that.

23            MR. WARE:   No, I understand, and I think

24   there's -- I think that one can also predict that this is

25   an area where patients are anxious, and to suddenly hear

1    that Biogen is unlicensed under a Columbia patent can

2    cause concerns.  I recognize there isn't an affidavit,

3    but I think --

4         THE COURT:  In this sense, you know, I'm holding

5    you at the moment in the same standing as Mr. Gindler.

6    Mr. Gindler says, you know, I'm going to bring in an

7    expert who says this isn't double patenting, and Mr.

8    Jones (sic) is going to explain why this has taken 24

9    years.  It's very reasonable.  You know, but I can't give

10   any weight to that because I have to decide, if I decide,

11   based on what's right in front of me.  But why -- and I'm

12   looking at this sentence -- and when I can go to lunch,

13   I'll look at the District Court decision in Cordis II --

14   but the trial court says:  Possible further litigation

15   against Cordis and its customers for patent infringement,

16   thereby irreparably injuring the  --

17        (Short pause.)

18        THE COURT:  Why is, the idea of irreparable harm

19   is, essentially, there's no adequate remedy of law.  And,

20   you know, you're here.  I'll try to give you an adequate

21   remedy.  And, first, they say they're not going to sue

22   you and try to enjoin you, you now know that.  You didn't

23   know it an hour ago.  And even if they did, on the

24   present record, you've got a strong invalidity defense.

25   Where's the irreparable harm?

1          MR. WARE:   I think what he said was that if

2    there was a stay pending reexamination and reissue, they

3    wouldn't sue us.

4          THE COURT:  No, actually, I don't think it was

5    qualified.

6          MR. WARE:   On the preliminary --

7          MR. GINDLER:   Not qualified.

8          THE COURT:  Unqualified?

9          MR. GINDLER:   We will never ever seek a

10   preliminary injunction against any plaintiff in this room

11   at any time before the final judgment on the '275 or the

12   '159.  It's not in the cards.  And the possibility for a

13   preliminary injunction was the irreparable harm that Mr.

14   Ware first identified for you, and now that's gone.

15         MR. WARE:   That's what I understood also as to

16   preliminary injunction.

17         THE COURT:  But it's not linked to a stay,

18   right, Mr. Gindler?  Even if I deny the stay and don't do

19   this in stages or phases, you're not going to be moving

20   for a preliminary injunction that would restrain the sale

21   of products during the pendency of the case?

22         MR. GINDLER:   Correct.  Representation that's

23   unqualified and irrevocable.

24         MR. WARE:   Very nice, but what I understand,

25   vis a vis a preliminary injunction, that doesn't mean

113

```
1    that there isn't harm from a lawsuit brought against us
2    for infringement.  And if we have a license that
3    continues with respect to the '275 while we have a chance
4    to litigate the validity of the patent, then we will not
5    have a lawsuit brought against us during that period of
6    time.  If a lawsuit -- because if the license is
7    terminated and a lawsuit is brought against us for
8    infringement of the '275, we will bear an extraordinary
9    additional cost and burden of having to litigate an
10   infringement suit, which we will not bear if we have a
11   license.  That money --
12            THE COURT:  It's a cost.
13            MR. WARE:  It's a cost.  It cannot be
14   recovered.  It is money that our clients could be
15   spending on research and development and new products.
16            THE COURT:  Actually, let me see.  If you
17   prevail on the counterclaim, you have to bear all your
18   own costs?
19            MR. WARE:  Yes.
20            THE COURT:  If you prove any validity, do you
21   have to bear all your own costs?
22            MR. WARE:  If we establish -- if the court
23   rules that the patent is invalid --
24            THE COURT:  Hold on a second.
25            (Short pause.)
```

114

1          THE COURT:  Mr. Goldberger wants to know what

2     about section 285?

3          MR. WARE:   185, exceptional case.  And,

4     certainly, you can assert that -- we can assert that, but

5     the circumstances in which a defendant --

6          THE COURT:  You've got an exceptional case.

7     You've got Doctor Lodish who wrote the textbook, and

8     they've got nobody.

9          MR. WARE:   Well, if Mr. Gindler wants to assure

10    me that our legal fees will be compensated for an

11    infringement case --

12         THE COURT:  I mean, this is the usual rule.  If

13    that could be irreparable harm, there would be

14    irreparable harm in every case.  The American rule is

15    except if there's a statutory exception, you don't get

16    your attorneys' fees.  It costs you money, even if you

17    were right.

18         MR. WARE:   But that's the difference.  My point

19    is simply that's the difference between being able to

20    litigate validity while we have a license and being

21    forced to litigate it without a license.  And so that is

22    an unrecoverable cost, in all likelihood, and that --

23    unrecoverable costs are irreparable injury.

24         Again, ultimately, in Cordis II, what the court

25    did was they simply enjoined termination of the license

1    agreement.  And that's, I think, true to the concept of a

2    license agreement.  It's taking -- rather than splitting

3    it up, rather than kind of rewriting it, it's taking the

4    termination clause, and it's saying, in order to really

5    terminate and to have had a basis to terminate, you

6    should only be invoking that right under the contract

7    where you really legitimately have a valid patent on

8    which they're not paying damages.  And a court of equity

9    can decide to preserve that license agreement during the

10    limited period it takes to litigate that on the merits

11    rather than letting you terminate the license.

12           So we think the Federal Circuit in Cordis II

13    endorsed that approach, and we think that the contrary

14    approach that was suggested in Cordis I was largely

15    predicated upon the fact that the licensee could avoid

16    that kind of irreparable injury to itself simply by

17    paying the royalties, which is no longer available.

18           So that's essentially the argument, although I'd

19    like, because I know we're going to break for lunch, and

20    I'd simply like to suggest again that if we can move

21    forward with the kind of schedule that the court

22    indicated earlier, I think we can put these issues aside.

23    And I'm happy to answer more questions about --

24           THE COURT:  A couple of things, because we will

25    stop in about five minutes.  One, is there anything you

1    want to say about this stay?

2         MR. WARE:    Well, as far as the stay goes, I

3    know that there are other counsel here from all the other

4    parties who were prepared to speak on that and, I think,

5    would like to have the opportunity to do that.

6         THE COURT:    Maybe, if necessary, after lunch,

7    but I'm still not inclined to stay this, no matter what I

8    decide on the preliminary injunction.

9         MR. WARE:    Then I think the best thing I can do

10   is say nothing.

11        THE COURT:    I'll let everybody be heard on the

12   stay later, if necessary.    But -- or appropriate.    But,

13   second, when you say proceed on the basis I was talking

14   about earlier, I was talking about double patenting, not

15   prosecution laches.    But I, frankly, haven't thought

16   through what happens if you win on double patenting.

17   Then do I have another hearing on a preliminary

18   injunction with regard to prosecution laches?

19        MR. WARE:    Well, I think what section 265C says

20   is that, essentially, we would have consolidated the

21   hearing on a preliminary injunction with the merits.    And

22   so if we have only tried a portion of the merits and if

23   there were any issue about the fairness of continuing the

24   stand-still or whatever at that point, for example, if we

25   had lost on double patenting, then it would seem to me

1    that we would seek at that time to argue further on the

2    preliminary injunction.

3         THE COURT:  That's my general sense, that if you

4    won on the double patenting issue, I would be issuing a

5    permanent injunction, and it would be consistent with the

6    licensing agreement.  If you lost on double patenting,

7    there wouldn't have been full discovery with regard to

8    prosecution laches, and then we would have a regular

9    preliminary injunction hearing.  You know, the

10   stand-still would continue for some limited period of

11   time so Columbia doesn't get prejudiced by having been

12   into this, you know, agreed to it, for some limited

13   period of some for some further briefing on the

14   prosecution laches in the context of the preliminary

15   injunction analysis.

16        So it's now almost 1:20.  We're going to break

17   until 2:30.  But you don't get a full hour for lunch

18   because what I want counsel to do is spend some of this

19   time talking about whether either by agreement -- may not

20   be possible -- but you may want to, because, I mean, as

21   you think about it, or, you know, if as I -- if my

22   tentative views become this afternoon my decision, which

23   I might give you the conclusion of and then write

24   something up, but you'd have to get going on the

25   schedule, you know, what would be the schedule for doing

1    double patenting?  You know, what is sort of the minimum

2    reasonable time?  It's the summer.  You know, what do you

3    want?  I mean, maybe I'd permit the termination of the

4    '275 but not the '636 and the potential '159, and I'd say

5    I'm merging or maybe -- however it's phrased, whatever

6    reason, you know, I'm thinking, is Doctor Lodish -- you

7    know, have you identified your double patenting claims

8    completely?  If not, how much more time do you want?  Do

9    you want to go ahead based on Doctor Lodish's affidavit,

10   or do you want to supplement it with something further

11   that he would do, maybe not under the same time pressure?

12   Is there any other witness other than Doctor Lodish from

13   Biogen and Genzyme's perspective.  And then, you know,

14   what's the minimum reasonable time for Columbia to

15   respond and to provide, you know, an expert and an expert

16   report?  Are there -- you would know this.  I didn't get

17   the impression under that Geneva Pharmaceuticals that

18   there would be documents that would be discoverable but,

19   if somebody has a different view, that would have to come

20   into focus.  Is there any other discovery other than this

21   sort of expert discovery?  But, basically, once the

22   issues were identified, the expert reports were

23   exchanged, I'd give you a reasonable period of time to

24   depose the experts, to say prepare cross motions for

25   summary judgment if you thought there was a proper basis,

1    or I probably would see you, actually, and say, you know,

2    is there a material disputed fact here?  Should we

3    leap-frog over summary judgment and start talking about

4    trial?  And you would probably say, you know, we've got a

5    good motion for summary judgment.  And then, you know,

6    what's the schedule for briefing the motion for summary

7    judgment?  And then you'd have to give me a couple of

8    weeks to get ready for the hearing.  And then if I denied

9    it, you know, a couple of weeks after that, I hope we

10   would have a trial.

11        So if you had about 15 minutes or so to talk

12   about that, do you think you could come up with a

13   schedule?  I'm figuring you'd get like an hour to eat.

14        MR. WARE:  We'll try.  We may end up

15   suggesting, particularly if it were possible to work this

16   through with Columbia's counsel, it may be easier if we

17   had until tomorrow, for example.

18        THE COURT:  Here's the problem.  As a practical

19   matter, here's the problem.  Today is the last day I have

20   in the near future to deal with this.  I have some major

21   matters -- a major matter to deal with tomorrow and

22   Thursday.  Friday is my last day here.  I have a judicial

23   meeting.  I'm going on vacation.  I may write something

24   that memorializes the decision while I'm on vacation.

25   But, I mean, if you would reach something in general

120

1    principle -- it's not that you couldn't mail it in to

2    finalize the schedule -- but I want to know if we're

3    talking about a couple of months or if somebody thinks

4    we're talking about -- if I understand double patenting,

5    I don't know why we can't have a motion for summary

6    judgment and maybe the trial this year.  That's my point.

7        MR. WARE:  We think so too, and we'll work on

8    that over lunch.

9        THE COURT:  Well, come back at 2:30.  We'll see

10   where we are.  And after lunch, if there's somebody else

11   who wants to be heard on the stay and I think it's useful

12   or, even if it's not, since you've come a long way, I'll

13   let you be heard.  This issue will influence the

14   schedule.  And then we still have the issue of what the

15   Patent Office passed out on the '159.

16       MR. WARE:  May I just ask for the benefit of

17   counsel who did travel a long way, there was an earlier

18   order to the effect that counsel should plan to be here

19   tomorrow as well, do you think that's not likely  --

20       THE COURT:  I guess I would say the following.

21   I hope not.  I'm prepared to stay as long as necessary

22   tonight to get you all going.  I think that should be

23   feasible.  Okay?

24       MR. WARE:  Thank you.

25       THE COURT:  Say your name for the record.

1          MR. WEINBERG:  Arthur Weinberg for Amgen.  Very

2     heartened by your inclination on the stay motion, but I'm

3     a little bit uncomfortable sitting on the sidelines for

4     the double patent, since I think all of us plaintiffs

5     have raised that issue, and it's very important to all of

6     us.

7          THE COURT:  You all should talk.  I don't want

8     to -- that's a very important point.  If that's an issue

9     that's common to all the cases, that's why we have a

10    Multi-District Litigation.  You know, I think I would,

11    you know, let you all participate in that, and then

12    you're stuck with my decision or the jury's decision.

13    It's not my intention to do it four different times.

14          All right.  So you all talk over lunch.

15          Come back -- you have to eat, I suppose.  Come

16    back at 2:45.  Try to hammer out a schedule you all can

17    live with.  Unless I change my mind, that's where this is

18    going, one way or another.

19          Court is in recess.

20          (Luncheon recess.)

21

22

23

24

25

```
 1                    AFTERNOON SESSION

 2              THE CLERK:  Court is back in session.  You may

 3      be seated.

 4              THE COURT:  Good afternoon.

 5              MR. GINDLER:   Good afternoon.

 6              THE COURT:  Did you make progress on a possible

 7      schedule?

 8              MR. WARE:   We did, your Honor.  The parties

 9      have met and, believe it or not, we more or less are in

10      agreement --

11              THE COURT:  Take that microphone, please, and

12      speak into it.

13              MR. WARE:   Start all over.  This is Don Ware

14      again on behalf of Biogen and Genzyme.  We did meet with

15      opposing counsel, and we certainly, I think, agreed on

16      the outlines of a schedule.  There may be a few wrinkles

17      in it.  We weren't quite sure what to do about a trial

18      date in the event a trial were necessary.  But I think in

19      terms of period for discovery, for expert reports, for

20      briefing and, indeed, for a hearing date, if November 10,

21      as the court had perhaps just arbitrarily suggested, but

22      November 10 was the date we worked back from and, if that

23      date were available for a hearing, I think we have a

24      schedule in mind that would allow us to get to that date

25      for a hearing.
```

1          THE COURT:  November 10 looks okay.  November 12

2     is the day after Veterans Day, but we can work back from

3     November 10.

4          So what are the dates?

5          MR. WARE:  I think I'll defer to my colleague,

6     Claire Laporte, if I may.

7          THE COURT:  Okay.

8          MS. LAPORTE:  Yes, your Honor, the dates that we

9     came up with -- and, again, we haven't had a chance to

10    fully work these through with Columbia -- but at least I

11    think that plaintiffs would suggest that -- I'll start

12    with certain dates -- that document production of certain

13    limited types of documents occur in approximately a week.

14         THE COURT:  By whom?

15         MS. LAPORTE:  By Columbia, since we believe that

16    there are essentially a very limited set of documents

17    that we're looking for at this point, and I can get into

18    that in a moment.

19         In terms of the dates --

20         THE COURT:  So in a week, say, basically, by

21    July 1, roughly?

22         MS. LAPORTE:  Yes.  The other thing I should add

23    is that we actually believe that most of the document

24    production that we would want has been produced in a

25    previous case in which Columbia was seeking to enforce

124

1    the earlier three Axel patents.  And so it's already been

2    produced.  It's been numbered.  It's been privilege

3    reviewed.  And, in fact, counsel for Serono represented

4    the defendant in that action, and so we were thinking

5    that if we could get the consents from Columbia, we might

6    simply be able to just pull that production over  --

7         THE COURT:  Are these dates that you've

8    discussed with Columbia?

9         MS. LAPORTE:  Well, yes.

10         THE COURT:  Tell me what they are.

11         MS. LAPORTE:  The dates are to serve contention

12    discovery, July 2.  To respond and to provide claim

13    charts for claim construction, July 23.  August 5 for

14    initial expert reports.

15         THE COURT:  Actually, maybe I'm getting very

16    tired.  Are these things the plaintiff is going to do?

17         MS. LAPORTE:  These are things that both sides

18    would do.

19         THE COURT:  Simultaneously?

20         MS. LAPORTE:  I'm sorry?

21         THE COURT:  Simultaneously?

22         MS. LAPORTE:  Yes, simultaneously.

23         THE COURT:  Go ahead.

24         MS. LAPORTE:  That responsive expert reports

25    would be due August 20.

125

```
1          THE COURT:  Wait a minute.  When are the expert

2    reports due, August 5?

3          MS. LAPORTE:  Yes.  Well, initial expert reports

4    would be due August 5, and then each side would respond

5    to the other's report, and then a responsive report due

6    August 20.

7          THE COURT:  Yes, then?

8          MS. LAPORTE:  Then the next date would be to

9    move for summary judgment on September 24, with

10   opposition briefs due on October 8.

11         THE COURT:  Right.

12         MS. LAPORTE:  And reply briefs due on October

13   20.  And we were aware -- we were working back from the

14   November 10 date that the court had suggested earlier

15   but, also, had flexibility to try to provide a tutorial

16   to the court either right before that or at some other

17   time that the court might find convenient.

18         THE COURT:  Yeah, we built in a tutorial

19   probably once your summary judgment briefing was filed,

20   and that may push things back a little beyond the 10th

21   by, I mean, like a week or something to build in time for

22   the tutorial.

23         MR. GINDLER:  There are a couple of parts of

24   this that we might want to modify a bit.  One is how the

25   contentions work, because we need something to respond
```

126

1    to.  In other words, we're okay if they want to serve

2    their contentions of invalidity, and they want us to

3    serve our responses as to why they're wrong.  That's

4    fine.  But I think it should just be a mandatory

5    disclosure.  They disclose their invalidity position on

6    double patenting, and we respond to it, since it's their

7    burden of proof.

8            THE COURT:  That sounds sensible.  It's what I

9    had in mind, although you all are patent lawyers.  Why

10   wouldn't that make sense?

11           MS. LAPORTE:  Well, your Honor, I think that our

12   thought was that we would actually build it in by having

13   besides served things like contention interrogatories  --

14           THE COURT:  What is a contention interrogatory?

15           MS. LAPORTE:  Well, for example, please tell us

16   the reason why claim X of the '275 patent is not invalid

17   in view of claim Y of the '017.  So what that does is

18   that pretty clearly sets forth the contention that we're

19   starting out with, which is that it is invalid.

20           THE COURT:  That's what you're proposing to file

21   on July 2, correct?

22           MS. LAPORTE:  Yes, your Honor.

23           THE COURT:  But you wouldn't get an answer on

24   July 2.

25           MS. LAPORTE:  Right, we would be expecting to

1    get an answer on July 23.

2              MR. GINDLER:   But that doesn't really help us.

3    In other words, I need to be responding to something.   In

4    other words, what's their contention and what's the basis

5    for it?  Because I need to tell them why they're wrong.

6    So they'll tell me the claim 5 of the '275 patent is

7    invalid in light of claim X of the '216 patent, and here

8    is the reason we say that it is.  And we then respond by

9    saying, it's not invalid in light of claim so and so of

10   the '216 patent, and here is the reason for our position.

11   Each side should be disclosing fully their positions as

12   if they were serving interrogatories.  I don't want to be

13   saying, well, claim 5 is not invalid in light of claim X

14   of the '017 patent, and they're saying, that's not our

15   contention.

16             MS. LAPORTE:   Your Honor, we have already

17   provided fairly extensive disclosure of our contentions

18   with the Lodish declaration and, as I was proposing, we

19   would try to focus the inquiry somewhat by having actual

20   contention interrogatories that would provide some sort

21   of preliminary identification of the particular claims we

22   would be asking Columbia to respond to.

23             MR. GINDLER:   They're the plaintiff.  They have

24   the burden of proof.

25             THE COURT:  Okay.  Let's say I'm persuaded.  How

1     would we proceed?  You just have to tinker with the

2     schedule.

3            MR. GINDLER:   Give us a date by which they'll

4     disclose  --

5            THE COURT:  I'm asking them what date.

6            MR. GINDLER:   Why don't they disclose on July 2

7     and we'll respond on July 23.

8            MS. LAPORTE:  Your Honor, July 2 is so close, I

9     don't think that all the plaintiffs can at that point

10     coordinate their contentions by that time, so I think we

11     would need to push those dates a little bit.

12            THE COURT:  That's okay.  If I really could

13     trust -- I don't mean to insult anybody -- if I could

14     trust you all when out of my sight, I'd give you until

15     tomorrow, but I can't put this down.  But we'll take care

16     of this before you leave.  We're going to come back to

17     it.  Because my present intention -- and this is all

18     fluid -- but my present intention is whether I enjoin

19     everything, whether I enjoin termination of the '636 and

20     '159, or I enjoin nothing, my present intention is to

21     take up double patenting first and, in this same period

22     allow, if you identify it for me by name, the sort of --

23     the people who might be vulnerable to not being --

24     foreseeably vulnerable not being around a year from now.

25     And I'm going to permit Mr. Jones' (sic) deposition be

1     taken by both sides.

2          MS. LAPORTE:  Mr. White?

3          THE COURT:  Mr. White, excuse me.  I've been

4     here since six this morning.  You're finally getting to

5     me.  Mr. White's deposition.  So it's there we quickly go

6     into a preliminary injunction hearing after a summary

7     judgment on prosecution laches after summary judgment or

8     trial.  Here's what Mr. White had to say.  One

9     deposition.

10          All right.  Let's come back to some of these

11     issues.

12          The plaintiffs in the other cases want to

13     participate in this process?

14          COUNSEL:  Yes, your Honor.

15          THE COURT:  Just identify yourself and your

16     client for the record, please.

17          MR. PALS:  Your Honor, maybe I should go first.

18     This is Mark Pals.  We represent Abbott Bioresearch

19     Center, which is in the same case as Biogen and Genzyme,

20     and we'd want to participate.

21          THE COURT:  Okay.  So you're in the District of

22     Massachusetts in that case before me.  You can

23     participate clearly at summary judgment and at trial.

24          Okay, who wants to go next?

25          MS. BEN-AMI:  Yes, your Honor, it's Leora

1    Ben-Ami, and I represent Wyatt and Genetics Institute,

2    and we also have a case before you.  Our case was filed

3    in Boston.  So we would like to be part of it.

4            THE COURT:  So you'll be part of summary

5    judgment and trial.

6            MS. BEN-AMI:  Yes.

7            THE COURT:  Who else?

8            MS. PRUETZ:  Good afternoon, your Honor.  Adrian

9    Pruetz for Genentech.  Our case is in the Northern

10   District of California, but we would like to participate

11   in the summary judgment and the trial.

12           THE COURT:  Summary judgment and trial.

13           MR. MAFFEI:   And the trial in this court if

14   there is one.

15           THE COURT:  I haven't had a Multi-District

16   Litigation for about 15 years, so I may have reacted a

17   little too quickly this morning.  I have authority, as I

18   understand it and refreshed myself over lunch, to decide

19   summary judgment in all of these cases.

20           In an exceptional case -- but I don't know if

21   it's me or the panel that decides what's an exceptional

22   case -- I can try a case.  So you're all in for summary

23   judgment, at least.  And, you know, if you want to be

24   here for trial, we'll just have to look at how to do it,

25   because I do think it would serve the purposes of the

1    Multi-District Litigation to have as many of you if not

2    all of you here for trial.  But that's just something to

3    think about.

4          MS. PRUETZ:  We agree with that, your Honor, and

5    we'd like to be part of the expedited proceeding that the

6    court has suggested.

7          THE COURT:  I'm not trying to talk you out of it

8    at all.  I'm trying to talk you into it.  But it will

9    help me in my conversations with Judge Goldberger.  Why

10   do you want to be here all the way through trial and the

11   expedited proceeding?

12         MS. PRUETZ:  Well, I think the first thing is

13   that it's an expedited proceeding, and we'd like to --

14   we, of course, make the assumption that summary judgment

15   will conclude this matter, and we very much want to

16   participate in that.  But throughout these proceedings,

17   the parties -- the plaintiffs have endeavored to

18   cooperate with each other.  The briefs that have been

19   presented to the court have in large part been joint

20   submissions.  And I think we have cooperated well.  We

21   can cooperate to streamline this entire proceeding for

22   all of our clients.

23         THE COURT:  And is certainty important to your

24   client?

25         MS. PRUETZ:  Certainty is extremely important to

1   Genentech.  We have more products implicated in this case

2   than any other party.  The discussion that took place

3   concerning the stay about how uncertainty wouldn't affect

4   product development decisions, I mean, that's really not

5   true.  Uncertainty is the major problem and products

6   coming down the pike.  Do you change manufacturing

7   processes?  Do you add costs to consumers to deal with

8   the issues?  So we really want to -- if we can do all

9   this before the end of the year, we would be delighted.

10         THE COURT:  Because that argument engaged me.  I

11  know your first choice is that you win, but I think the

12  second choice is you know where you stand, and then you

13  deal with it as a business matter, I would think.

14         MS. PRUETZ:  I think that's right, your Honor.

15  One thing that hasn't come out, and I know that a lot of

16  this is not in the record yet, but I think that the

17  parties -- Mr. Gindler has sort of thrown around some

18  terms about changing manufacturing processes and all of

19  that.  When you're dealing with products like these, it's

20  more than just was tweaking an assembly line.  You may

21  have to go through clinical trials again.  There are a

22  lot of issues involved when you're dealing with drug

23  products and biotechnology products.  So we just think

24  the expedition of this is very important.

25         THE COURT:  I got on this path because,

1      basically, the plaintiffs were taking the position that,

2      you know, they had a good clean shot on double patenting.

3      At least when I read that footnote in Geneva

4      Pharmaceuticals I thought, it's clean.  We'll see how

5      good it is.

6            MR. WEINBERG:  Your Honor, Arthur Weinberg for

7      plaintiffs Amgen and Immunex, and we would like to

8      participate both in the summary judgment and in the

9      trial.

10            THE COURT:  Okay.

11            MR. ZALESIN:  Your Honor, Steve Zalesin for

12      Johnson and Johnson.  We certainly would like to

13      participate in the summary judgment proceeding.  I think

14      it's likely that we'll have an interest in participating

15      in the trial as well, if there is one, but I'd like to

16      talk with my client a little bit further before we commit

17      to a position on that.

18            THE COURT:  How long is that going to take?

19            MR. ZALESIN:  A day or two.

20            THE COURT:  All right.  I want you to let me

21      know noon on Friday whether you want to participate in

22      the trial, because I think if you want to participate

23      through trial, we all need to look at how I get

24      jurisdiction over you and whether I need to go back to

25      the Multi-District Litigation panel or maybe if you all

134

```
 1    agree that at least you should be here, you know, through
 2    trial of this first -- we've got to figure out what we're
 3    doing.
 4            MR. ZALESIN:  I agree, your Honor.  Our case
 5    comes out of the Southern District of New York.  I'm not
 6    sure if both parties agree.  I'm sure that's going to
 7    make the process easier, and I'm sure we can get you an
 8    answer by noon on Friday.
 9            THE COURT:  First time in two years I was right
10    on the rare occasions when we disagree.
11            Let me go back a little bit to the preliminary
12    injunction.  I've got a question for Mr. Ware.  Cordis I,
13    I looked at the District Court decision, 1986 Westlaw
14    15722, as well as the Federal Circuit decision in Cordis
15    II.
16            I think, Mr. Ware, you characterized the
17    injunction as an injunction against termination of a
18    license agreement generally, but what it actually says in
19    the order portion of the District Court decision, and
20    it's reiterated on page 864 of the Federal Circuit
21    decision:  It is ordered that the defendant is
22    preliminarily enjoined from terminating its license
23    agreement with plaintiff for the manufacture, sale, and
24    use of tine leads pending the outcome of this litigation.
25    And that suggests to me that there at least could have
```

135

1    been a termination of the agreement with regard to the

2    fin leads, which would have exposed Cordis to the risk of

3    paying some sort of statutory damages if it lost its

4    argument with regard to scope.  And if that's true, it

5    would make Cordis II analogous to what I've been thinking

6    about, that you would be exposed to the risk of statutory

7    -- some form of statutory damages if you lose on the

8    '275, but you would still have a license for the '636 and

9    the '159 if it becomes a patent.

10           I wonder if you read Cordis II differently.

11           MR. WARE:  I'm looking at that language now,

12    and your Honor may be correct.  I will say we attempted

13    in the last week to see whether we could actually get the

14    original papers and, of course, this is in 1985 or '86 or

15    whatever, and we didn't succeed, so I cannot say with

16    certainty what the text of the order was.  I think we

17    would submit, even if that were the case, that the court,

18    nevertheless, under the circumstances of our case, does

19    have the equitable power to go further than that.  But in

20    terms of what actually happened in Cordis II, it's a

21    little bit hard to say.

22           THE COURT:  All right.  Now, what about this

23    bond issue?  I don't know if you've had time to think

24    about it.  But if I were to grant you the broad

25    preliminary injunction that you're looking for and say

1   they can't terminate the '275, what kind of bond should

2   you be required to post?  Because it says in Rule 65C:

3   No preliminary injunction shall issue except upon the

4   giving of security by the applicant in such sum as the

5   court deems proper for the payment of such costs and

6   damages as may be incurred or suffered by any party who

7   is found to have been wrongfully enjoined.

8           MR. WARE:   And the court is certainly correct

9   that the provision does so provide.  Columbia, of course,

10  didn't ask for one, and our position would be on the face

11  -- on the record before the court, that there would be no

12  basis or that if -- if the court were going this route as

13  opposed to the expedited trial, we were going this route

14  and the court were granting an injunction  --

15          THE COURT:  Or doing both.  In other words, my

16  present intention is to do an expedited trial, whether I

17  issue a complete injunction, a narrow injunction, or no

18  injunction.

19          MR. WARE:   I think the court pointed out

20  earlier, of course, it depends a little bit on the scope

21  of the injunction.

22          THE COURT:  That's why I said if I grant you an

23  injunction against termination of the '275, what do you

24  say the bond should be?

25          MR. WARE:   And we would still say that the bond

137

1     should be in a nominal amount, and here's why.  First,

2     not only did Columbia not ask for a bond, but Columbia

3     did not make any showing in its papers of any harm to

4     Columbia other than an abstract proposition that this

5     could be harmful to educational institutions or whatever,

6     but there was no showing of harm.

7         THE COURT:  I don't know the amount, but they're

8     losing, at a minimum, the royalties you would pay if the

9     '275 is valid.

10        MR. WARE:  Well, no, because, first of all, if

11    the result of the injunction -- if there is no

12    injunction, Biogen is not currently and Genzyme are not

13    currently paying anything, so the injunction is not

14    changing that status quo in terms of payments.

15        Now, they might say, well, okay, but if we -- if

16    we ultimately succeed --

17        THE COURT:  Let me stop on that.

18        MR. WARE:  Okay.

19        THE COURT:  So you're saying I would have found

20    that you're reasonably likely to succeed, that there's

21    some sufficient degree of irreparable harm, and you're

22    saying, well, we're not paying anything anyway because

23    we're only using the '275, and it's likely to be held

24    invalid, so a nominal bond is appropriate.

25        MR. WARE:  Yes.  And just to play that out a

1    little bit further.  It's not as if an injunction was

2    cutting off any current revenue to Columbia, so that's

3    point 1.  Now, point 2, if ultimately the patents were

4    found invalid, then Columbia would have a claim under the

5    contract.  That is to say, if the contract is still in

6    place, Columbia would have a claim under the contract.

7    And so the only argument that they could make that

8    somehow there was some incremental loss to them would be

9    to establish that somehow they would have had a right --

10    they would in fact have obtained an amount greater than

11    what is in the contract, and they certainly have offered

12    no basis for the court to make such a finding, and we

13    think such a finding -- well, certainly, this record does

14    not support that.  And, so, under those circumstances, it

15    would be, in our view, speculative to say that the entry

16    of the injunction forcing Columbia to stick with the

17    license would be -- would give rise to anything other

18    than a nominal bond.

19            Now, if they came in and they said, well, but we

20    don't think Biogen or Genzyme will be able to pay because

21    of a financial issue -- sometimes you can have that

22    situation with a bond -- and somebody would say, our

23    contract remedy doesn't help us because we can't predict

24    that they'll be in a position to pay -- but that hasn't

25    been suggested at all, and there wouldn't be any basis

1    for it.

2              So, in those circumstances, since Columbia would

3    still be able to recover its contract amount, we don't

4    think that there's a basis for the court to enter a bond

5    that would cover some incremental amount.  So, therefore,

6    on the basis of this record, we think a nominal bond

7    would be the only appropriate amount.

8              THE COURT:  And what should the bond be if the

9    '275 is terminated?

10             MR. WARE:  Well, if the '275 is terminated so

11   that the only effect of the injunction is to -- is to

12   retain the license in force with respect to the '636

13   patent, which is not currently being practiced, and the

14   '159 application, which has not issued, it would, in our

15   view, be highly speculative for Columbia to suggest that

16   the issuance of that injunction has caused them or will

17   cause them any actual monetary harm.

18             THE COURT:  Are Biogen and Genzyme both paying

19   $30,000 a year that's credited towards royalties?

20             MR. WARE:   Yes, but they are continuing to pay

21   that.

22             THE COURT:  Oh, they are?

23             MR. WARE:   Yes.

24             THE COURT:  So you would continue to pay that so

25   you don't have to pay it as a bond?

1          MR. WARE:   Yes.  As we have, by the way, your

2     Honor.  We paid it in 2004 well into this case, and the

3     payments were accepted by Columbia.

4          THE COURT:  And what would Columbia say the bond

5     should be if I enjoined the termination of the '275?

6          MR. GINDLER:   Well, that's a good question.  I

7     was just thinking about that.

8          THE COURT:   Thank you.

9          MR. GINDLER:   I think the harm that we would

10    suffer, I believe, is the difference between the contract

11    rate and what a jury or a trier of fact might find as the

12    infringement rate.  Because, right now, all the

13    plaintiffs have really cheap licenses.  They're very,

14    very cheap.  Rates were set a long time ago.  And I think

15    there's a decent chance, maybe a good chance, in an

16    infringement claim, the actual reasonable royalty rate

17    could be much higher.

18          THE COURT:  And, in fact -- I don't know, if I

19    had started with you in the back room -- maybe I should

20    have started this out here this way -- I thought that's

21    what this case is about.  In other words, think about

22    what I've heard today so that you can either confirm or

23    disabuse me of these notions, but you've said you

24    certainly don't intend to seek to enjoin them in the

25    short run, you know, to seek a preliminary injunction.

1    And even at the end of the case, we're not interested in

2    taking Avonex off the market.  Our interest is in seeing

3    it sold.  So you want -- Columbia wants more money,

4    right?

5           MR. GINDLER:    That would be correct.

6           THE COURT:  That's what the case is about from

7    Columbia's --

8           MR. GINDLER:    That's correct.

9           THE COURT:  -- perspective.  I mean, you want

10   money.  And the risk to the plaintiffs, because Cordis I

11   makes me think they shouldn't have no risk in attacking

12   the validity of the '275, the risk to the plaintiffs is

13   that if they lose, they're not going to just pay the

14   contract rate.  The contract's terminated for these two

15   as of May and April.  And then they're going to have to

16   pay at some statutory rate.  What can the statutory rate

17   be?

18          MR. GINDLER:    Well, the rate is not so much

19   statutory as it is what experts say would be a reasonable

20   royalty.

21          THE COURT:  I mean, they get statutory damages.

22          MR. GINDLER:    That's correct.  And that's a

23   different number than the license rate because, in that

24   analysis, you assume the patents are valid and infringed.

25   Whereas, in a licensed negotiation, people can say, well,

142

1    I'm not sure your patent is valid, but I'll pay you X

2    percent.  So, just as a rule of thumb, I think your

3    Honor's suggestion of the amount of royalties that would

4    be owed is a good number, because if right now they paid

5    a one percent royalty, an expert might say a two percent

6    is a better royalty.  So I think that's probably a good

7    rule of thumb.

8            THE COURT:  Twice as much?

9            MR. GINDLER:   Twice as much, one percent to two

10    percent.

11            THE COURT:  Is it a matter of public record or

12    some kind of trade secret as to what each of these drug

13    companies pays Columbia every year?

14            MR. GINDLER:   I think it's not a matter of

15    public record, but I think we could probably be persuaded

16    to disclose what those amounts are.  All of the

17    agreements are pretty much the same on the royalty rates,

18    with one exception, and that's Johnson and Johnson, which

19    has a somewhat different agreement.  And pretty much

20    everybody pays one percent.  There are some variation.

21    Genentech pays less.

22            THE COURT:  One percent comes out to be a high

23    number for some of these.  Well, I work for the

24    government, so anything is a high number for me.  But is

25    it known, for example, approximately how much Biogen pays

1    Columbia?  I'm trying to figure out what's at stake in

2    this case.  Maybe you don't want to say it in open court.

3            MR. GINDLER:   One can look at product sales and

4    multiply one percent times those product sales and have

5    an idea of what it is.

6            THE COURT:  So what's about one percent of

7    Biogen's annual sales?

8            MR. GINDLER:   I'm not sure what it is today for

9    products like Avonex.  The historical payments probably

10   are lower than it will be right now.  I'm not privy to

11   projections what they'll sell this year or next year.

12           THE COURT:  For example, what were they last

13   year when they were paying?

14           MR. GINDLER:   I don't know right now, but I can

15   find out in about two minutes.  I do have their 10K here.

16           THE COURT:  Maybe Mr. Ware is.

17           MR. GINDLER:   Yes.  But that's a number that we

18   can easily get in next five or ten minutes.

19           THE COURT:  Mr. Ware, do you know?

20           MR. WARE:   I don't know the precise number so

21   I'm reluctant, but I think your Honor makes the point.

22   Of course, the order of magnitude we're talking about

23   with many of these products are, you know, maybe a

24   billion dollars.

25           THE COURT:  I don't ask this rhetorically.

144

1     What's one percent of a billion dollars?

2            MR. WARE:   Ten million.

3            THE COURT:   Ten million.   Starts to add up.

4            MR. GINDLER:    One percent here, one percent

5     there.

6            THE COURT:   In total from everybody, Columbia

7     thinks that if it wins, it means a hundred million

8     dollars a year.   I got that impression from the papers.

9            MR. GINDLER:    I think that's a fair statement.

10            THE COURT:   And we're talking about 17 years or

11     something.

12            MR. GINDLER:    Right.   There is a fair amount of

13     variation about which company picks up what percentage of

14     that pie.

15            THE COURT:   I'm just trying to -- so that's what

16     makes it either hard to settle or at least worth having

17     all these lawyers, because you're talking about a hundred

18     million dollars a year.

19            MR. WARE:   It's real money and, if one were

20     going that direction in terms of a bond, it might be

21     quite prohibitive in terms of that sort of approach to

22     it.   Now, we certainly wouldn't agree with Mr. Gindler's

23     analysis about the necessary likelihood that a litigated

24     royalty rate would be different.   There's a whole

25     complicated set of facts there that has to do with an NIH

145

1    termination letter that puts constraints on what Columbia

2    could charge.  There's a Doctrine of Law --

3    THE COURT:  The NIH agreement requires that they

4    make it available to you at reasonable rates?

5    MR. WARE:  Yes.

6    THE COURT:  And what was reasonable -- when did

7    you enter your license agreement?

8    MR. WARE:  Biogen in '93.  But the value of

9    this invention was known in 1993.

10    THE COURT:  I mean, you go back and forth.  I

11    can't decide it, but it's possible that what was

12    reasonable in '93 is less than is reasonable now.

13    MR. GINDLER:  We set the rates a long time ago.

14    MR. WARE:  Well, there's an issue because of

15    the fact that there are all these agreements out there.

16    There's also a doctrine in patent law, patent damages,

17    called Established Royalty.  And so if you have enough

18    license agreements out there, courts will hold that that

19    is an established royalty, and so you don't on individual

20    cases expect to have different rates.  This is

21    particularly true, I think, in a situation where, again,

22    the NIH had some involvement.  So I'm not sure that the

23    NIH would regard it as reasonable to charge some of the

24    licensees multiples of what other licensees are being

25    charged.  So that would be a debate that we would have.

146

1    And all I mean to suggest now --

2          THE COURT:  Well, but it could be that -- you

3    know, you're concerned about Serono.  They may have said

4    it, so they're thinking, gee, you know, we've got a 50

5    percent chance of losing and, if we lose, we're going to

6    have to pay two percent, so we'll pay one percent and

7    just wipe out the uncertainty.  I think that's what Mr.

8    Gindler is planting in my mind.  If you have a negotiated

9    rate, it's to avoid the risk of litigation.  It's kind of

10   a settlement sum.

11         MR. WARE:   I think that our point with respect

12   to the bond would simply be that to pick a number that

13   was other than the rate that multiple parties have in

14   their contracts would be picking a number out of a hat.

15   Columbia has given the court no guidance other than Mr.

16   Gindler's suggestion today that it ought to be doubled,

17   but without any evidence to support that.  And so it

18   seems to us that if Columbia wanted to make that

19   argument, they could have made a presentation to the

20   court with respect to the amount of a bond and provided

21   some support for that.  And there isn't any in this

22   record.

23         THE COURT:  And what should the bond be from

24   Columbia's perspective if I only entered the limited

25   injunction with regard to the '636 and '159?

1          MR. GINDLER:   That's a much harder question

2    because they don't use the '636 patent, and the '159 is

3    right now sitting in a Patent Office somewhere, and we

4    don't know if it will issue or not.  I think the damage

5    there would only be if they start using the '636, if they

6    start using the '159 if it's issued.

7          THE COURT:  And, actually, my quick thought on

8    that was I would require they pay some nominal bond and

9    then, if they started using the '636 or the '159 was

10    issued and this case was not resolved, Columbia could

11    come back to me and say, this bond is no longer

12    sufficient.  There's been a material change in

13    circumstances.

14          MR. GINDLER:  I think that's fair.

15          THE COURT:  All right.  Do the other parties

16    want to be heard on the stay?

17          MS. PRUETZ:  Adrian Pruetz for Genentech.  I was

18    prepared to address the stay, but if the court is

19    inclined to deny it, I don't need to go into my argument.

20          THE COURT:  All right.  Is there anything I

21    didn't mention in my soliloquy that you'd like me to

22    particularly have in mind?

23          MS. PRUETZ:  No, I think the court really stole

24    my thunder on this one and covered everything I was going

25    to say in my argument.

148

```
 1            THE COURT:  Okay.  When we finish, I can take up
 2     to a dozen of you back in the -- maybe a few more -- back
 3     in the jury room, maybe after a break.  I think we can
 4     hammer out a schedule, you know, within the principles
 5     we've been discussing, and I think that is likely to be
 6     more effective than trying to do it in open court.
 7            So I think that leaves for argument the
 8     emergency motion to seal and restrict access to
 9     confidential information.  And on this one, my thoughts
10     are not as advanced, even tentatively, as they were on
11     the preliminary injunction and the stay.
12            I can say two things.  One, we've shifted away,
13     I think, from Rule 26.  But in certain circumstances, I
14     think I do have some inherent authority.  It's not clear
15     to me because this has been moving very fast whether in
16     view of the present state of the record Columbia contends
17     that there has been some attorney misconduct, and you
18     should clarify that.  If there hasn't been any attorney
19     misconduct -- indeed, maybe even if there has -- I'm
20     interested in hearing about whether the information at
21     issue is really a trade secret or otherwise confidential,
22     although not quite a trade secret, because some of it, at
23     least, was given to Immunex.  And just so you don't think
24     there's nothing for the approximately 40 lawyers to think
25     about, I think there's a First Amendment dimension to
```

1      this.  If they lawfully got some information, why

2      shouldn't they be allowed to talk about it, or if they

3      didn't unlawfully get some information.

4            And with regard, you know, to the remedy of, you

5      know, restricting the information to outside counsel, I

6      don't know if the horse is out of the barn, although I

7      guess it sells in the grand jury context.  That wasn't

8      the end of the inquiry.  So those are my questions.

9            MR. GINDLER:  Let me try to address them this

10     way.  Let me start with confidentiality.  This isn't a

11     privilege in the sense that it's an attorney/client

12     privilege.  This is simply a statutory prohibition.

13     Pending patent applications developed before a certain

14     time frame are confidential from the public, period.

15     There are a number of exceptions set forth, and no one

16     claims that the '159 application history falls into any

17     of those exceptions.  That's the playing field.  No one

18     disputes that.  No one tries to argue  --

19            THE COURT:  Why don't you speak into that

20     microphone.

21            MR. GINDLER:  I'll try and speak up, maybe.  No

22     one tries to argue otherwise.  Okay.  Now, what's

23     happened?  How did they get the file history?  Well, we

24     know little more than we knew before, but we don't know

25     everything.  They got it from what we know in two ways.

1    Immunex asked for and got some claims from us, a set of

2    claims at a given time, not the whole file history, just

3    then currently pending claims.  Others went to the Patent

4    Office.

5         Now, here's what we know based upon what people

6    have filed.  Foley Hoag in October of 2002 requested the

7    file histories of the original three earlier patents and

8    of the '275 patent.  And what they got back included the

9    entire '159 application 2, although they say they didn't

10   ask for it.

11        THE COURT:  It all came on a CD Rom or

12   something?

13        MR. GINDLER:  I think that came later.  But it

14   all came.  They've had it, and they've kept it.  They

15   didn't tell the Patent Office, whoops, I shouldn't have

16   this.  They tell us, did you authorize the release of

17   this?  They just kept it.

18        THE COURT:  Well, did they reference it in the

19   complaint last year?

20        MR. GINDLER:  There were references to claim

21   language but, remember, we had already disclosed claim

22   language to Immunex.  And so it wouldn't have surprised

23   us if Immunex passed it around to other licensees.  We

24   had no idea that in fact people had the entire copies of

25   the file history.

1          A second thing happened which is that they say

2     that in November of 2002, Biogen's in-house counsel

3     received the '159 history, and they say, maybe directly

4     from the PTO.  They don't say yes.  They don't say no.

5          Now, there's one other sort of troubling thing

6     that happened right around November of 2002, which is

7     that a gentleman named Mr. Linton went to the Patent

8     Office, and he filed a form to get a copy of the '159

9     application, and he falsely stated in that application

10    that the application had been abandoned and, therefore, I

11    get the '159 file history because it's abandoned.

12          THE COURT:  Who is Mr. Linton?

13          MR. GINDLER:   I don't know who Mr. Linton is,

14    but he filed that document, and it seems that right about

15    that same time, November of '02, Biogen has a copy of it.

16    I have no reason to believe one way or the other, other

17    than just the timing, whether or not Mr. Linton was

18    acting on behalf of Biogen or anybody else.  Don't know.

19    I can just tell you, both happened at the same time.

20          So then a third thing happened, okay.  In May of

21    this year, Foley Hoag ordered a certified copy of the

22    '159 application as filed.  Now, that's permissible,

23    because the application as filed is actually part of the

24    '275 patent history.  So that was a proper request.

25          THE COURT:  They were both filed on the same day

1     in 1994?

2              MR. GINDLER:   I'm sorry?

3              THE COURT:  Were they both filed on the same day

4     in 1994 and the '159 is referenced in the '275?

5              MR. GINDLER:   I believe that's correct.   I

6     don't have the dates clearly in mind, but my point,

7     though, is that the '159 application was -- it had to be

8     put into the '275 file.  So it's public, the application

9     itself.  So the request made in May of 2004 was proper.

10    What they got back was a CD Rom with the whole file

11    history current as of that date.

12             THE COURT:  So it's the application and all the

13    prosecution history?

14             MR. GINDLER:   Everything.  What I don't

15    understand is why Foley Hoag asked for it again, asked

16    for the application on May 4, because they already had

17    it.  They got it in October of 2002.  Unless they were

18    hoping that the Patent Office would make a mistake again.

19             THE COURT:  When did you learn -- when did you

20    first learn that the Patent Office made a mistake?

21             MR. GINDLER:   We first learned -- I don't know

22    that exact date.  I know when I first learned about it,

23    which is from my client, but I was told that they heard

24    about this person named Mr. Linton going to the Patent

25    Office, getting a copy of it improperly, and Columbia's

1    prosecuting counsel talked to Patent Office and said,

2    hey, this file is still confidential, would you please

3    keep it that way.  And I'm told the Patent Office said,

4    whoops, our mistake, shouldn't have gone out.  Won't

5    happen again.

6         They have not been very good about the "won't

7    happen again" part of it, because they seem to have a

8    problem with keeping the documents confidential, which

9    are confidential.  They're confidential statutorily.

10        I am concerned, I don't fully understand why

11   Foley asked for the application again on May 4 if they

12   already had it, but I just don't know.

13        So the main arguments which are being made as to

14   why it is that they can keep all this is they argue

15   things like waiver and that the public has an interest,

16   and this is all resolved by the statute.  The statute

17   sets forth the exceptions.  There is no general concept

18   of waiving.  There's no case which says that in this

19   context.  There's no case that says the confidentiality

20   of section 122 can be waived forever.  There is

21   exceptions.  You either follow them, or you don't follow

22   them.

23        THE COURT:  Well, I'll have to focus on it, but

24   the statute says that the Patent and Trademark Office has

25   to keep this information confidential, doesn't it?

154

1            MR. GINDLER:    That's correct.

2            THE COURT:  It doesn't say that Columbia has to.

3            MR. GINDLER:    That's correct.

4            THE COURT:  So if -- I mean, if Columbia

5    published all of this in the New York Times and then you

6    came in and ordered me, you know, asked me to order the

7    -- not to let inside counsel read it --

8            MR. GINDLER:    That would be a bad day for me in

9    court.

10           THE COURT:  But that -- I mean, obviously,

11   that's an exaggerated example, but it's not -- I think

12   you're right, it should be analyzed in terms of waiver,

13   but that's why I put it in terms of whether Columbia

14   treats this information -- and you should describe for me

15   with a little more precision what this information is --

16   as a trade secret or, if it doesn't quite rise to a trade

17   secret status, as confidential information deserving a

18   protection.  Because, you know, if you told Immunex and

19   when you told Immunex you said, you know, we're giving

20   this stuff to our licensees, you know, I wonder whether

21   that's more like publishing it in the New York Times.

22   You've given it to the, you know, the heart of the

23   information to the relevant universe.

24           On the other hand, if it's distinguishable, it's

25   not like publishing it in the New York Times, and you do

1    show me that you've done things to maintain the

2    confidentiality of something particular that you're

3    concerned about, maybe -- well, then I might be more

4    inclined to do something.

5            MR. GINDLER:   This is not a case, though, of

6    everybody having the same thing.  And that's an important

7    distinction.  So we're not claiming that we have to have

8    attorneys' eyes only or sealing of anything which we gave

9    to Immunex, because we gave it to them.  And if they gave

10   it to somebody else, that was our decision to give it to

11   them and we, in effect, chose not to keep that

12   confidential.

13           THE COURT:   So that's the claims as of when,

14   2002?

15           MR. GINDLER:   It's what we gave to Immunex,

16   which I think happened in May of 2002.  I don't have a

17   copy of exactly what we gave to them, but we've never

18   asserted that that's improper.  Okay?  What is improper

19   and what causes us concern is everything else the Patent

20   Office improperly released.  And there was no contention

21   that the other parts of the file history, other amended

22   claims, other argument, other things that Columbia did,

23   should have gotten out.  If the Patent Office followed

24   proper procedure, it would not be in the hands of anyone

25   else.  But now it's in the hands of quite a few people,

1      and now it's in the court file.

2            You asked the question of is it a trade secret?

3      And I think the answer is not exactly in the way that we

4      would think about trade secrets under the Uniform Trade

5      Secret Act, because patent applications and trade secrets

6      can sometimes overlap and sometimes not.  And so I think

7      it's clearer to talk about this in terms of

8      confidentiality, protected by law, and established by

9      law.  But I think knowledge of trade secret is not

10      exactly correct.  One could use that term.

11            THE COURT:  I said trade secret or, if it

12      doesn't quite rise to that level, something confidential.

13            MR. GINDLER:   So I think that's a fairer way of

14      describing it, it's just confidential.  I think part of

15      the reason it's fairer is because you can waive in almost

16      a subject matter sort of way trade secret protection,

17      just as you can waive lots of protections.  But this is

18      entirely established by statute, with exceptors

19      established by statute as to who gets to see it and who

20      doesn't.

21            THE COURT:  I know, but I don't think you're

22      contending there's a private right of action under the

23      statute.

24            MR. GINDLER:   And we have not attempted to

25      bring such a claim.  We're not bringing any causes of

1    action on that.  We don't know all the facts right now.

2    All that we're saying is people have documents that,

3    whether they were acting with a bad intent or not, they

4    shouldn't have.  It causes us concern that they got the

5    documents and didn't do anything about it, because they

6    know they shouldn't have them.  The '159 hasn't issued.

7    No exception applies.  All of the lawyers who got them

8    knew they shouldn't have them.

9         THE COURT:  Now, we're in Massachusetts, and I'm

10   not -- I haven't thought about whether Massachusetts law

11   should apply to this -- but in 1995 I wrote a decision in

12   a non-jury trial, Picker International Corporation versus

13   Imaging Equipment Services, and I talked about trade

14   secret law, and then I said:  While this matter may not

15   constitute a trade secret, it may be entitled to

16   protection as confidential business information "Against

17   one who improperly procures such information, the law

18   puts its imprimatur on fair dealing, good faith, and

19   fundamental honesty.  Courts condemn conduct which fails

20   to reflect the (sic) accepted moral values by penalizing

21   such conduct wherever it occurs."  And I think I was

22   quoting USM Corporation, 379 Mass at 97.

23        Is that about the right standard to be applying

24   here?

25        MR. GINDLER:   I think it's about the right

158

1    standard, but instead of saying improperly procured, it's

2    probably improperly keep, because I don't know whether

3    they did anything that was improper.  I don't know

4    whether one of the licensees sent Mr. Linton down to the

5    Patent Office.  And the requests that we have seen that

6    they've submitted showing what they gave the Patent

7    Office and what they got back, the requests were proper.

8            THE COURT:  And this isn't a rhetorical

9    question.  Somebody gave it to Mr. Linton, and then who

10   was it who went to the Patent Office and said, don't do

11   that again?

12           MR. GINDLER:   John White or someone from John's

13   firm.

14           THE COURT:  And do I have that in the record in

15   front of me, that somebody from Mr. White's firm went and

16   said that?

17           MR. GINDLER:   I believe that is in our

18   supplemental filings.

19           THE COURT:  And what do you think is the legal

20   theory and authority for my taking action in these

21   circumstances?

22           MR. GINDLER:   I think just what we said in our

23   supplemental brief.  I think the court has an inherent

24   power to protect the integrity of the proceedings, the

25   integrity of laws to protect confidential information.

1   And so here it is.  It's out of the Patent Office.  It

2   shouldn't be out of the Patent Office.  It shouldn't be

3   in the hands of the licensees.  It shouldn't be in the

4   court.  And we're asking for a lot less than what we

5   might ask for.  So, for example, it's okay for right now

6   for outside counsel to keep it.  They shouldn't have it,

7   but I understand that there may be arguments as to why

8   they should be able to keep it for the time being,

9   because we haven't established that there was wrongdoing

10  by them or by anybody acting on their behalf.  We haven't

11  made that allegation.  But I don't think their client

12  should have it because their clients are the licensees.

13  And it shouldn't be in the public file.

14          THE COURT:  Well, those are two separate

15  questions.

16          MR. GINDLER:   Yes.

17          THE COURT:  In my mind.  I sent you the Biogen

18  versus Berlex confidentiality agreement we haven't talked

19  about.  I haven't looked at it recently.  But my memory

20  is that there were designated people of the clients who,

21  in addition to outside counsel, could have access to

22  trade secrets.

23          MR. GINDLER:  Mm hmm.

24          THE COURT:  Generally speaking, I wonder how

25  lawyers, you know, can prepare and present cases if they

1   can't discuss things with their clients who are the ones

2   who, presumably, have the most technical expertise.  So I

3   have that concern.

4           MR. GINDLER:   But this case isn't about the

5   '159 application.  This case is about the '275 patent.

6   And so --

7           THE COURT:  Well, the '159 is part of the

8   history -- okay, but they have the application, the '159

9   application.

10          MR. GINDLER:   It seems they do now.  But if

11  they were going to get it, if it was discoverable, it's

12  rediscoverable, if at all, through the discovery process,

13  and then the court would establish whatever ground rules

14  applied under a protective order.

15          THE COURT:  I thought you said that the '159

16  application was in the file with the '275.

17          MR. GINDLER:   Just the application.

18          THE COURT:  Right.

19          MR. GINDLER:   Not the file history.  Just the

20  first application.

21          THE COURT:  No, I understand.  So you want me to

22  issue an order that, one, limits what the Patent and

23  Trademark Office improperly released to outside counsel

24  and order that that information not be put in the public

25  record?

1          MR. GINDLER:    That's correct, your Honor.

2          THE COURT:   And the second part of that

3     implicates -- in the First Circuit, we have Anderson

4     versus Cryovac that says discovery materials can be

5     subject to a protective order, although these aren't

6     discovery materials.  But we also have the New England

7     Rare Coins decision, which is a 1987 appeal on a decision

8     of mine.  When a court relies on a piece of information

9     in making a decision, there's a strong presumption that

10    that will be in the public record, particularly when

11    government conduct is at issue.  Here, the Patent and

12    Trademark Office's conduct is at issue.  Now, I haven't

13    relied on anything yet, I don't think, although I've been

14    making reference to the '159 application.  Maybe at least

15    implicitly, something is associated with it.

16         MR. GINDLER:   It's a little more difficult

17    question because this is not something that comes up in

18    the case law.  It doesn't quite fit into any one box.

19    What we're really asking for is to have this done, I

20    think, at least now on an interim basis, because events

21    in the case may overtake it.  So, for example --

22         THE COURT:   Let me ask you this, and then I'll

23    ask all the other counsel.  Is the '159 prosecution

24    history relevant to the double patenting.

25         MR. GINDLER:   We would say it's not.  I'm

1    confident the plaintiffs will say that it is.  That's

2    going to be what happens a lot in this case.  I'm sure

3    they will ask for it in discovery.  They have asked for

4    it in discovery.  If your Honor decides it gets produced,

5    it will get produced under some form of confidential

6    order.

7           THE COURT:  I think I understand why the '159

8    would be relevant to prosecution laches.  I think I don't

9    see at the moment why it would be relevant to

10   nonstatutory double patenting.

11          MR. GINDLER:   I don't see how it is.

12          THE COURT:  But if it's not, maybe I would issue

13   an order that would apply in the coming double patenting

14   phase of the case and then come back to it afterwards.

15          MR. GINDLER:   That's essentially what I have in

16   mind because if the document becomes discoverable and

17   it's produced pursuant to a protective order, then a

18   protective order should apply, and that will govern going

19   forward.  That may or may not have an attorneys' eyes

20   only level of confidentiality.  Hasn't been worked out.

21   But it will one day if the case proceeds.

22          THE COURT:  Well, let me see what the drug

23   companies have to say on this.

24          MR. WARE:   Your Honor, I think that Amgen's

25   counsel, Ms. Herlihy, was going to address this.

1          THE COURT:  Say your name for the record,

2     please.

3          MS. HERLIHY:  Eileen Herlihy on behalf of Amgen

4     and Immunex.  Your Honor, as far as Amgen and Immunex is

5     concerned, we believe that the file history is not

6     confidential and, in any event, even if it were, it has

7     been waived.  Any confidentiality has been waived by

8     Columbia's actions.

9          Your Honor, Mr. Gindler has made some statements

10    that as a matter of statutory law this file history is

11    definitely confidential, but what Mr. Gindler has not

12    referred to is 37 CFR, section 1.14H2.  And under that

13    section, the Patent Office under special circumstances if

14    special circumstances exist which warrant petitioner

15    being granted access to all or part of the application

16    can give out the application.  And, in fact, I believe in

17    Columbia's briefs that they have made some comment to the

18    effect that they aren't aware that the Patent Office has

19    done any such thing, but they don't say anything about

20    whether they have investigated that, your Honor.

21         But --

22         THE COURT:  Is there any evidence that the

23    Patent Office has made such an exception?

24         MS. HERLIHY:  Well, the Patent Office has given

25    it out, your Honor.  The Patent Office, perhaps, wasn't

1    mistaken.  Perhaps they were giving it out pursuant to

2    this provision.  We really don't know.  But we do know

3    that the Patent Office has given out the '159 file

4    history not only to Biogen, but also to Amgen and

5    Immunex.

6         Your Honor, aside from that, we do believe that

7    there can be waiver.  Columbia certainly waived any

8    confidentiality with respect to the '159 claims when it

9    wrote the famous, now perhaps famous White letters that

10   are attached to our opposition.

11        In a letter of May 6, 2002, John White sent the

12   claims to Immunex.  And in a letter of May 15, John White

13   announced that the pending claims are not being treated

14   as confidential with respect to the licensees, such as

15   Immunex.

16        Your Honor, thereafter -- that relates now to

17   the claims.  So we know now that the '159 application is

18   not confidential, because it was referred to in the '275

19   prosecution history.  The '159 claims are not

20   confidential, at least according to Columbia, with

21   respect to the licensees.  The PTO distributed the '159

22   file history at least to Amgen and Biogen, and we don't

23   know who else.  And then Columbia --

24        THE COURT:  Well, did you make a request for an

25   exception under 37 CFR, section 1.14H2?

1          MS. HERLIHY:  Your Honor, as far as I know,

2     Amgen obtained the file history through a service, and I

3     believe that some of the other plaintiffs also obtained

4     it through a service.  So, to be honest, I don't know

5     what papers were filed with the PTO.

6          THE COURT:  Well, at least one of your agents

7     should know.  You know, was it a mistake, or was somebody

8     arguing that an exception should be made?

9          MS. HERLIHY:  Your Honor, we don't know what was

10    argued, but we do know that repeatedly -- and Twomey

11    (sic) has admitted this as well -- repeatedly, the PTO

12    has given it out, and the question is, was it a mistake

13    or not?  It's our position that it could very well not

14    have been a mistake but, even if it were, it doesn't

15    matter.  I believe it is true, as your Honor suggested,

16    that if Columbia published this in the New York Times,

17    there would be no question that the parties could look at

18    it.  As Mr. Gindler said, it would be a very sad day in

19    court for him.  I believe it should still be a sad day in

20    court for him, because the parties, as long ago as almost

21    a year ago, have referred to more than the claims.

22    They've referred to the claiming strategy in their

23    complaints.  So they have filed inequitable conduct

24    claims that are based on the claim strategy based on

25    having the '159 file history, your Honor.

1          THE COURT:  Well, is the file history -- I'll

2     ask you the same question.  Is the file history relevant

3     to the double patenting issue?

4          MS. HERLIHY:  Yes, your Honor, we believe it is

5     relevant to claims construction and, also, Columbia has

6     taken the position that with respect to the reissue

7     proceedings that all of the plaintiffs will be able to

8     participate and monitor this.

9          And, your Honor, Mr. Gindler this morning -- and

10    I want to make sure I have this correctly -- told your

11    Honor that there must be overlapping issues between the

12    reexam and the reissue, on the one hand, and the '159.

13    And so, in any event, if Columbia is serious that all of

14    the plaintiffs should have some opportunity to be able to

15    monitor the reissue, then all of the plaintiffs should

16    have access to the '159 file history.

17         Your Honor, Columbia, when the parties -- and,

18    first, it was Biogen that raised inequitable conduct

19    complaints based upon Columbia's actions during the

20    prosecution of the '159 file history -- did not complain,

21    Amgen also, in both the first and second amended

22    complaint, as early as September of 2003, described acts

23    with particularity from the file history, Columbia did

24    not complain.  They did not say, you should not have the

25    file history, it should be sealed.

1        Your Honor, given Columbia's actions and their

2    lack of objections in the past, their current position

3    is, we would suggest, similar to the famous scene in Casa

4    Blanca when Captain Renault shuts down Rick's Cafe and

5    said, I'm shocked, shocked to learn that there's gambling

6    going on.  They knew that the parties had the '159 file

7    history.

8        Your Honor, we believe that, in any event, the

9    in-house counsel should have access to this, for the

10   reasons that you have been raising.  The in-house counsel

11   are part of the trial teams.  They're going to have to

12   work with the outside counsel.  They are going to have to

13   see the '159 file history.  It's relevant to claims

14   construction.

15        THE COURT:  Are you agreeable to limiting the

16   circulation to in-house counsel?

17        MS. HERLIHY:  And outside counsel?

18        THE COURT:  Yes.

19        MS. HERLIHY:  Yes, your Honor.

20        THE COURT:  Okay.

21        MR. GINDLER:  If can answer one question -- I

22   didn't mean to interrupt.

23        THE COURT:  I'll give you a chance to respond.

24        Go ahead.

25        MS. HERLIHY:  Your Honor, I'm getting close to

1    the end.  We do believe that it would be unfair to

2    restrict it.

3          THE COURT:  Have you already given it to inside

4    counsel for your clients?

5          MS. HERLIHY:  Well, your Honor, they had it from

6    the PTO, so they have already seen it.

7          THE COURT:  Because that's -- I mean, I can look

8    at the analysis in Sells, which I've read on other

9    occasions.  But if they've already seen it, the efficacy

10    of taking it away from them is less.  And it also gets

11    more -- I don't issue orders that I don't intend to

12    enforce, and, you know, if inside counsel have for a

13    year, perhaps, had this information, and then they say,

14    we're going to give it back, and then somehow they act on

15    it or discuss it with their attorneys, you know, have

16    they violated my order, or are they just acting from

17    memory or knowledge generated at a time when they weren't

18    prohibited from having the information?  It's a concern.

19          Okay.  Thank you.

20          Do you want to respond briefly?

21          MR. GINDLER:  Yes, just briefly.

22          We actually asked the question of the Patent

23    Office.  Is this application still confidential?  Did you

24    make an exception we didn't know about?  And they sent us

25    an e-mail back that said, no, still confidential.  It's

169

1    attached to our papers.  So we wondered the same thing,

2    because it kept leaving the Patent Office when it

3    shouldn't.

4         It shouldn't be the case that the court doesn't

5    issue an order because somebody got something improperly

6    and just had it for a while, because that means if you

7    get something improper, then you should get to keep it.

8         THE COURT:  Well, that has a certain appeal but,

9    you know, in Shakespeare, Henry IV is talking -- they're

10   anticipating the attack from Prince Harry, and some of

11   them are scared, and they say, oh, he can summon demons

12   from the deep, and the response is, so can any man, but

13   will they come?

14         (Laughter.)

15         THE COURT:  I'm sorry, I don't like to tell

16   jokes, because everybody thinks they have to laugh.  But

17   I can issue any order.  It's not just giving the document

18   back, but forget about it, because it's not just the

19   document you're concerned about or documents, it's the

20   information.  But I can't effectively order them to

21   forget about it and, if I can't -- you know, if I'm

22   thinking about the various things that, you know, go into

23   exercising some inherent authority, the potential

24   efficacy of the order influences me.

25         MR. GINDLER:   I understand, but I don't think

170

1      we're asking for an order that prevents them from using

2      their memories.  They had it.  They had it for a period

3      of time.  But their memories will fade.  And the

4      documents have a lot of complexity to them.  Claim

5      language is very, very complicated.

6          THE COURT:  The claim language, at least as of

7      two years ago, you gave out.  So in this area of trade

8      secrets -- and I think it relates to confidential

9      information -- what -- you know, what have you done to

10     maintain the confidentiality?  And if Mr. White says, we

11     don't treat the claims as confidential in 2002, what

12     makes them confidential in 2004?

13         MR. GINDLER:  Because the law says they're

14     confidential.  The law says that the plaintiffs can't go

15     and get it.

16         THE COURT:  How come Columbia keeps employing

17     Mr. White?  He keeps fouling up.

18         MR. GINDLER:  Mr. White didn't foul up.  The

19     Patent Office fouled up.

20         THE COURT:  No, now I'm just focusing on the

21     claims, not the file history.  He said, you can have

22     these claims in 2002.  You know, if it's not treated as

23     the Crown Jewels in 2002, why are they so important in

24     2004?

25         MR. GINDLER:  I'm sure he did so, with

1    Columbia's consent at the time.  I wasn't part of those

2    negotiations, although I can imagine why they asked,

3    which was Immunex might be wondering, should we keep

4    paying license fees?  Do we care about this?  I wasn't

5    there and so I'm not saying that's what happened.

6         THE COURT:  I know, you're not the witness, and

7    he's going to be a witness, Mr. White.  You're the

8    lawyer.  But the point is, you know, if you want to have

9    a real siren song, the words and the music have to go

10   together.  And if this is information that hasn't been

11   treated by Columbia historically as confidential, I mean,

12   I wonder what the harm is.

13        MR. GINDLER:  But I think it has.  People have

14   recited an occasion on which we gave claims at one time

15   to a licensee.  That's what's been recited.  It's not

16   that we're simply handing this out to everybody on the

17   street.  We don't know how they got it.  I don't know how

18   all the plaintiffs got it.  I just know what's written in

19   Biogen's papers, and I know that it was released

20   improperly by the Patent Office.  I know that they

21   shouldn't have it.  And so now what do we do?  We learned

22   about it much later.  Do we leave it as it is, or do we

23   try and repair the status quo?  And I think we try and

24   repair the status quo.  We take the documents away from

25   the clients.  Their outside counsel can still have them

1    on an interim basis.  If the '159 becomes relevant to

2    other parts of the case, they'll be produced.

3        THE COURT:  Ms. Herlihy says, you know, with

4    regard to the stay, you argue -- and I haven't decided

5    any of this yet.  It's part of the reason I wanted to

6    hear all of it, because it's somewhat seamless -- that I

7    should stay the case, and they can participate in the

8    Patent Office proceedings and monitor them.  Well, how

9    can they participate if they don't know what's going on?

10   How can they monitor them if they can't read the

11   prosecution history?

12       MR. GINDLER:   I think what people are saying is

13   they can participate in the reissue and then the

14   reexamination.  The '159 is sort of on its own track.

15   I'm just guessing that the examiners responsible for the

16   two are going to talk to each other, but I'm just

17   guessing there.  But in terms of monitoring, that file is

18   open to the public.  Reissue and reexamination

19   proceedings are totally public.  And so anyone can find

20   out what's going on there.

21       THE COURT:  Well, the '159 application is in the

22   '275 file, but the file history of the '159 is not?

23       MR. GINDLER:  That's correct, just the

24   application as originally filed.  That's it.  So that's

25   proper for them to have.  It's also proper for them to

1    have what John White gave out.  Everything else is not

2    proper.  It left the Patent Office and went into their

3    hands.  I don't know how it happened, but it did, and no

4    one has cited an exception that would apply to the rules.

5    And we asked the Patent Office, did we miss something?

6    Did you make an exception?  They said, no, still

7    confidential.  Maybe they'll get it right next time.

8             THE COURT:  Do the plaintiffs object, at a

9    minimum, to my ordering that at least pending the outcome

10   of the double patenting issue that the documents and

11   information not be disseminated beyond outside --

12   in-house counsel?

13            MS. HERLIHY:  In-house counsel and outside

14   counsel?

15            THE COURT:  Yes, outside counsel and in-house

16   counsel can have it, but  --

17            MS. HERLIHY:  Yes, your Honor, that's fine.

18            THE COURT:  That's okay?

19            MS. HERLIHY:  Yes.

20            THE COURT:  Well, why don't you assume -- don't

21   assume.  I'm ordering that.  For now, just so I can think

22   about this more, there should be no distribution beyond

23   outside counsel and inside counsel for the drug company

24   plaintiffs and, by the close of business Thursday, you

25   should just each send a letter with the names of the

174

1      people who are authorized for each law firm and client to

2      have access and stating they've been advised of that

3      order.  Okay?

4              MS. HERLIHY:  Yes.  Your Honor, we'd like to

5      point out one more thing with respect to the e-mails.

6      The only thing that we've been given as far as support

7      for this proposition that the PTO has admitted they made

8      a mistake are some e-mails that are attached to the

9      declaration of David Gindler, and the e-mails do not,

10     it's important to say, point out that mistakes have been

11     made.

12             THE COURT:  What tab?

13             MS. HERLIHY:  I believe it is exhibit K.

14             Your Honor, there are two e-mails, and one of

15     them contains some information.  The one that was sent to

16     the PTO contains some information that appears to be

17     false on its face.  It's stating that -- it's stating to

18     the PTO from Columbia's attorneys that the prosecution

19     file contents remain confidential and not accessible by

20     the public as of the date of this electronic mail.  It's

21     asking for confirmation that that's still the case, it

22     appears.  And I would say that whoever wrote this perhaps

23     didn't know that someone at the PTO had been giving it

24     out on multiple occasions, as the documentation will

25     show.

1          The response is just that it indicates that this

2     application hasn't been published and is still considered

3     confidential.

4          So I would say that, at best, these documents

5     are showing that some people at the PTO gave it out, and

6     one person when asked and told that it had been published

7     said, well, it hasn't been published.  It's still

8     considered confidential.  It's a little bit ambiguous,

9     and Columbia did say in their briefs that they were not

10    aware of an exception, not that there wasn't one.

11         THE COURT:  Well, in effect, Mr. Gindler said

12    the same thing.  Okay.

13         MR. GINDLER:  Will the documents that are in

14    the court file remain sealed?

15         THE COURT:  Yes.

16         MR. GINDLER:  Thank you, your Honor.

17         THE COURT:  And so far I haven't relied on them

18    to make any decisions.

19         (Short pause.)

20         THE COURT:  Mr. Goldberger would like to know

21    whether an exception would be published in the Official

22    Gazette if it had been requested or granted?

23         Well, there you go.

24         MR. GINDLER:  My colleague Mr. Sheasby, who

25    knows these things, told me it should be, but sometimes

1    it's not.

2         THE COURT:  Well, some of this is reinforcing my

3    sense that I shouldn't stay this until -- but having said

4    that, having said that, there's also confidential

5    information that sometimes gets out of court.  I don't

6    mean to disparage people who are doing difficult jobs

7    probably with limited resources.  And all this

8    technology, you can put everything on a CD Rom, sometimes

9    might mean you hand out the CD and you haven't eye-balled

10   it and seen you should have taken one file out of the box

11   the way we used to do before we had everything

12   electrically.

13        I'm going to issue later today or tomorrow a

14   very short order memorializing the order I just entered

15   orally regarding what should be done with this

16   information pending a further order, and I may explain to

17   you in more detail than I have the energy to do now what

18   I think the First Amendment issue is that's embedded in

19   here that nobody has addressed.

20        But what I'd like to do now -- it's a little

21   after 4:15 -- is give you until 4:30.  I think, Mr.

22   Gindler, explain to Ms. Laporte what you would like in

23   terms of being put on notice of the contentions, what

24   kind of time to respond.  That much seems to me to be in

25   the interest of justice.  And Biogen and Genzyme, I

1    think, are pretty far along in their ability to do that.

2         You've devised a schedule that will keep you all

3    busy throughout the summer.  That's okay with me.  But if

4    you build in -- if you want to build in a week or two to

5    get some vacation, that's okay with me too.  And in the

6    joint statement, it was suggested that we -- that I see

7    you sort of regularly, every other month, because

8    something will come up.  And when we go back and we

9    develop a schedule, I want to pick sometime in August for

10   you to come back and say where are we.  If there are

11   issues that have emerged, you'll tee them up.  And I'll

12   want that probably in about mid-August, you know, around

13   or about August 15.

14        So talk about that.  Look at your schedules.  I

15   don't know that I need all 40 of you.  It's up to you, of

16   course.  But I'll see you in about 15 minutes.

17        And I'm going to take the motion for preliminary

18   injunction under advisement and the motion for stay as

19   well.  But it is my intention to carve out this double

20   patenting issue to go first, no matter what I do on the

21   other matters.

22        And, as I said, you should talk about, you know,

23   who are these, hopefully, just several people whose

24   testimony you want to capture and how much time for Mr.

25   White, what kind of documents in connection with Mr.

178

1     White.  That can be sort of satellite stuff that you're

2     just kind of depositing, in case things start going fast

3     after the summary judgment or trial.  Okay?

4            See you in about 15 minutes.

5            (Short break.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

179

```
 1                        LOBBY

 2            THE COURT:  Here's where we are so far as a

 3    result of the discussions in the lobby.

 4            As I understand it, on July 23, the plaintiffs

 5    are going to file contention interrogatories.

 6            MR. GINDLER:  Yeah, their positions are

 7    important to the contentions.

 8            THE COURT:  Okay.  They're going to file

 9    invalidity contentions July 23.

10            On August 6, Columbia is going to do the same.

11            On August 27, both parties -- all parties are

12    going to file their initial expert reports.

13            On September 17, they're going to file

14    responsive expert reports.

15            On October 8, they're going to file their

16    motions for summary judgment.

17            October 22, they're going to file their

18    oppositions.

19            On November 1, they're going to file any

20    replies.

21            I am planning to hold a hearing on November 22

22    and 23 on the motions for summary judgment.

23            We haven't discussed it, but to hold the place,

24    would this be a jury trial?  It would be, wouldn't it?

25            MR. GINDLER:  I think so.
```

1          THE COURT:  Start the jury trial, for present

2     planning purposes, December 13.

3          I anticipated that there would be expert

4     depositions between September 17 and October 8.  Did the

5     parties anticipate that or not?  Did you build in a time?

6          MR. BARSKY:  We should set a deadline for that.

7     October 1, two weeks.

8          THE COURT:  Let's say October 1.

9          Now, with regard to prosecution laches, the

10    stand-still agreement, I believe the parties have agreed,

11    but we'll see where we are, will remain in effect.  What

12    that means is that if at the end of summary judgment or

13    trial it is determined that the '275 patent is valid, the

14    plaintiffs can revive, reactivate their motion for a

15    preliminary injunction based on prosecution laches, and

16    the stand-still will remain in effect until I decide that

17    motion.  It will be my goal to decide it as soon as -- to

18    have the hearing as soon as reasonably possible,

19    recognizing the time of year and the fact that everybody

20    will need to get refocused.  But that motion for

21    preliminary injunction on prosecution laches will be

22    decided on the record as it exists today, June 22, 2004.

23          So there won't be any more affidavits, for

24    example, from Mr. White, nor will there be any deposition

25    of Mr. White.

1        The issue that I didn't think existed but was

2    brought to my attention right before we went on the

3    record is the issue of whether any other discovery is

4    necessary on the double patenting issue.

5        (Short pause.)

6        THE COURT:  And, now, since Judge Goldberger

7    handed me a note, I can say that my understanding is that

8    if the '017 or '665 is a result of a restriction

9    requirement, under the statute, it can't be used against

10   the '275 for double patenting.  That's 35 USC, section

11   121.  But if the restriction -- but if there is a

12   restriction requirement, it should be in the file.  So

13   what would Mr. White, for example, know that isn't

14   written down?

15       MR. GINDLER:  There's no position on our part

16   that the '665 or the '017 patents are prior art against

17   the '275.  In other words, we're not taking that

18   position.

19       MR. WARE:   Okay, that helps.

20       MR. GINDLER:  The double patent.

21       THE COURT:  For the purpose of the double

22   patenting, right, Mr. Gindler?

23       MR. GINDLER:  Yes, correct, absolutely.

24       THE COURT:  And does that eliminate the need for

25   the inventors, Axel, Silverstein, and Wigler, Doctor

1    Chasen, and Mr. White on double patenting?

2         MR. WARE:   I think, certainly, we would still

3    want to take the inventors' deposition, depositions.

4    Certainly -- of course, they're the authors of the prior

5    art, to begin with, but they have in the course of their

6    work made statements that may be contradictory of

7    positions that Columbia wants to take with regard to

8    double patenting.  So they would be quite knowledgeable

9    witnesses.

10        THE COURT:  Well, I thought double patenting --

11   I'm reading footnote 1 from Geneva Pharmaceuticals:

12   Nonstatutory double patenting compares claims in an

13   earlier patent to claims in later patents -- in a later

14   patent or application.

15        So you're comparing claims.  Because the

16   question is not, I think, what was intended.  The

17   question is how would something be understood by a person

18   ordinarily skilled in the art.

19        It says:  Nonstatutory double patenting does not

20   require any inquiry into motive.

21        So what the inventors intended, I thought,

22   reading this, is irrelevant.

23        And then it says:  Third, nonstatutory double

24   patenting does not require an inquiry into objective

25   criteria, like what happened in the marketplace.  People

1    go, wow, and switch to this product.  I thought that was

2    an objective criteria.

3          So the reason I was attracted to the

4    nonstatutory double patenting is that I thought it was

5    pretty much done on a paper record as perhaps supported

6    by experts who would tell me, you know, what these things

7    communicated to a person ordinarily skilled in the art,

8    but not what did the inventors intend.

9          MR. BARSKY:  Wayne Barsky, Columbia.  It's

10   always the case, not only in double patenting but in any

11   claim construction that what inventors intend is

12   irrelevant because the claim serves as notice to the

13   world, and so all that matters is what the proper

14   construction of that claim is based upon the language of

15   the claim, the prosecution history, and the

16   specification, and how that would be viewed by a person

17   of ordinary skill in the art.

18         So there's no question that in every patent

19   lawsuit, certainly for infringement, inventors'

20   depositions are usually sought, and interesting things

21   always arise.  But one of the things that the Federal

22   Circuit has made clear, it doesn't come in and can't

23   affect the court's interpretation of claims.  It's what

24   inventor thought his or her claim meant or what the

25   inventor intended his or her claim to mean.

184

1          THE COURT:  And I wrote about that some in

2     Biogen.  I think this whole process ought to be used by

3     judges, among others, to discipline people to clearly

4     express their intentions.  I don't know what the status

5     of the doctrine of equivalents is these days.  I think if

6     you want something covered, go tell the Patent Office.

7     Don't get something that you didn't tell -- don't get

8     something narrower and come tell me they're equivalent.

9          I don't know if I ought to finally decide this

10    today.  I suppose at the moment I'm not authorizing any

11    further discovery, unless there's something more you'd

12    like to tell me as to why you need these people.

13         MS. PRUETZ:  Frankly, I don't disagree with

14    anything that's been said, but I think that in this case,

15    particularly, where we're dealing with a lot of semantics

16    and claims where they go from mammalian cells to CHO

17    cells, which are mammalian cells, and all these different

18    constructs in terms, I think it would be helpful to hear

19    what the inventors have to say about what their

20    understandings are, not so much what their intentions

21    are.

22         THE COURT:  But I can't take that into account

23    in claim construction.  That's extrinsic evidence, isn't

24    it?

25         MR. GINDLER:  Yes.

1          MS. PRUETZ:  Well, it might prevent Columbia

2     from taking positions that are really untenable based on

3     what their own inventors might say.  I think it's kind of

4     an insurance policy it doesn't happen on claim

5     construction.

6          THE COURT:  Well, you're going to get these --

7     look, that would be very risky business for Columbia,

8     because if the drug companies don't win on double

9     patenting, then we're going to have prosecution laches.

10    Then you can take the inventors.  And if they come in and

11    say things that are contrary to -- well, you're going to

12    have all kinds of problems of like -- I don't know

13    exactly what the problems are.

14          I mean, I'll say the following.  If you can --

15    at the moment, I don't see the need for the depositions,

16    but we have to build in another date, and I'm going to

17    order that contentions are going to be exchanged by

18    August 6.  I'm going to order that you give me a status

19    report with any outstanding issue by August 11.  And if

20    somebody thinks that additional very focused discovery is

21    necessary and appropriate, you're going to have to

22    discuss it like any motion.  But we'll have to figure out

23    what the schedule for this is, but I propose to see you

24    on August 16, say, at two o'clock, just to see where we

25    are and whether some things emerge.

1        MR. BARSKY:  Your Honor, just a point of

2   clarification.  The only discovery the court is

3   authorizing right now are the depositions of the

4   individuals who have been identified as being senior in

5   age and --

6        THE COURT:  I haven't even got to that yet.  I

7   haven't got to that yet.  Right now, just for double

8   patenting, it's the experts.  And I guess I'll say the

9   following.  You have to order the transcript.  You're

10  going to do that anyway, but you have to order this one.

11  If by, say, July 10 the plaintiffs can identify some --

12  is this a realistic deadline, or do you need to wait to

13  get the responses?  You know, some really good reason to

14  get some narrowly focused additional depositions.  You

15  have to confer -- make them a little later -- we'll make

16  it the 17th, because I want you to take the 4th of July

17  off.  You have to confer.  You can file a motion by the

18  17th.  Give me a response by the 31st.  When I see you on

19  the 16th, I can decide whether you can have another

20  deposition, you know, but it's got to be very focused,

21  because my present conception is, and the reason I was

22  drawn to this reading this footnote is that there may be

23  a clean way for the plaintiffs, who say they're going to

24  win on double patenting, to get that decision promptly.

25  And you can, as I said, the first choice of plaintiffs is

1    you win and, if you lose, we'll figure out how to deal

2    with it, but I know the uncertainty creates a lot of

3    problems.  So I'm trying to find a way to cut through

4    that.

5         MR. WARE:  Your Honor, could we revisit the

6    issue of document production for just a moment?  I'm not

7    sure where there's been left.  But I can give an example

8    of something.

9         THE COURT:  My question is going to be, if this

10   has to be viewed from the perspective of a person -- is

11   this right? -- it's got to be viewed from the person

12   ordinarily skilled in the art, and then the question is

13   is something in the '275 substantially identical or

14   conversely materially different than something in the

15   earlier patents?  Wouldn't you do that based -- wouldn't

16   a person ordinarily skilled in the art only have access

17   to the intrinsic evidence, the patents, and the file

18   history, you called it -- I call it prosecution history

19   -- and not anything else that you will be now seeking in

20   discovery?  That's my question.

21        MR. WARE:  Well, one other thing that can, I

22   think, always be relevant in discovery is contrary

23   statements that have been made by Columbia.  So just to

24   give the court one example, the touchy subject of the

25   '159 file history, that's a file history that in the

1    prosecution there have been issues raised by the Patent

2    Office about double patenting, and Columbia through John

3    White has responded to those and made certain assertions

4    about the meanings of, I presume, meanings of claims in

5    prior patents, and it would seem to me that it would be

6    unfair for Columbia to be taking contrary positions in

7    this court to positions that it is currently taking in

8    Patent Office on talking about those same prior

9    referenced patents.  So that would be an example of --

10           THE COURT:  Let me ask you this.  Does Columbia

11   anticipate showing its expert the file history of the

12   '159?

13           MR. GINDLER:  We do not.

14           THE COURT:  I thought you might say that.

15           MS. BEN-AMI:  Leora Ben-Ami for Wyatt.  This

16   would be what in the '159 in the later prosecution what

17   was said about the earlier patents and the earlier

18   applications, those which are now prior art.  So if

19   Columbia in the '159 application prosecution is saying,

20   in their earlier applications, this meant this and that

21   meant that, those would be admissions.

22           THE COURT:  And why wouldn't you know that from

23   the file histories of the patents other than the '159?

24           MS. BEN-AMI:  Because these would be later

25   admissions of that earlier work, and so we would need the

189

1    continuations and all the materials going in the '159 to

2    be able to see that.  I'm not arguing about depositions

3    right now, I'm just saying paper.

4         MR. GINDLER:  I don't think any of it is

5    relevant.  I think just the intrinsic evidence is

6    relevant.  It doesn't matter what somebody says about the

7    intrinsic evidence.  What matters is what is the

8    intrinsic evidence.

9         MR. BARSKY:  It may go, your Honor, to -- what

10   Ms. Ben-Ami was referring to -- may well go to an issue

11   of enforceability of the '159, if it ever matures and

12   issues as a patent.  It may go to whether or not --

13        THE COURT:  You're going to want to retire

14   before you come back in front of me with some

15   representation to the Patent and Trademark Office around

16   now that's inconsistent with the position that is being

17   taken in this case.

18        MR. BARSKY:  Right.  I don't disagree, your

19   Honor, and I'm saying that if representations were made

20   to the Patent Office about the meaning of earlier claims,

21   such as in the '275, then that goes to the

22   enforceability, potentially, of the '159, if it ever

23   issues, but it wouldn't -- I mean, for purposes of Geneva

24   and the very rigorous process of a double patenting

25   analysis, which is a determination of whether or not on a

190

 1    claim comparison by claim basis there is identity between

 2    the two claims, it's not relevant.  I realize it's

 3    obviously an issue -- it would be an issue of interest.

 4    And I understand exactly why the plaintiffs would want

 5    that information.

 6            MR. PALS:  Mark Pals for Abbott.  The file

 7    wrappers application or the family of the patents that at

 8    issue are dead bang relevant to the claim construction as

 9    an issue.  There's no question.  The cases are clear on

10    that.

11            MS. LAPORTE:  The Federal Circuit has recently

12    issued a ruling exactly about this.

13            THE COURT:  You're going to have to (A) confer

14    and (B) if you can't resolve this in some narrow focused

15    way, file something on the schedule I just described.

16    You know, you're talking about cases that I haven't had a

17    chance to read.  But if the plaintiff drug companies are

18    going to be seeking some additional discovery, you want

19    to tailor it, your request, as narrowly as you can

20    because, if this is a discretionary area, I'm not likely

21    to have the time or inclination, particularly the

22    inclination, I'll have to the time, to take a Solomonic

23    approach.  And what I'm likely to do is to look at the

24    two competing proposals if I have genuine discretion and

25    say, which of these two is more reasonable, sort of like

1    baseball arbitration.  You want to come in and you want

2    to be the most reasonable.  And if you persuade me that

3    what I thought coming in here was right, none of this is

4    relevant because, if the '159 wouldn't be available -- if

5    the file history or the '159 would not be available to a

6    person ordinarily skilled in the art in trying to figure

7    out what he or she can do and cannot do, then I'd, not

8    knowing much about patent law, say, why should you have

9    discovery?  But if there's an answer to that in the

10    Federal Circuit cases, I'll be educated.  And then you'd

11    identify with precision just what you want, and you try

12    to make it as unburdensome as possible, because you said

13    maybe you just want the documents to show your experts,

14    you don't want depositions or something.  Because if it's

15    going to add a long time to the schedule, it's not what

16    any of you want.

17        MS. PRUETZ:  Adrien Pruetz for Genentech.  Just

18    one small point.  One thing we haven't talked about is

19    the fact that the exercise the court is going to go

20    through in claim construction is an interpreted one where

21    there's going to be some reliance on experts because of

22    the subject matter at issue, the technology.

23        THE COURT:  I don't think that's necessarily

24    true at all.  I've never -- I wouldn't have any -- you'd

25    have to persuade me to listen to an expert if I wasn't

192

1    doing double patenting, I think.  My understanding is

2    that I'm supposed to -- when I do claim construction,

3    it's supposed to be the rare case that I rely on

4    extrinsic evidence.  And I had none.  I've interpreted

5    these patents.  I mean, you say I know something about

6    the technology.  We didn't build in the tutorial.  We

7    have to do that.  No, but I've interpreted some of these

8    patents, haven't I?

9         MS. PRUETZ:  Yes.

10         THE COURT:  And I didn't have any -- there was

11    no extrinsic evidence.  I can say it can be done.  I did

12    it.

13         MS. PRUETZ:  It was just on the issue really of

14    credibility that what could happen, and I don't know if

15    it will happen, is the parties are going to have experts.

16    There could be some disagreement on what terms mean.  And

17    while the court could resolve those itself without any

18    kind of additional assistance, one of the things that

19    the '159 application or some of the other documents and

20    witnesses were talking about for assistance is just

21    providing a credibility check.

22         MS. PRUETZ:  We should probably brief this.  It

23    might be easier at this hour of the day.

24         THE COURT:  It's not a question of the hour of

25    the day, but that's part of it.  I mean, you should go

193

1    back -- in Biogen versus Berlex, 113 F Supp 2nd 77, I

2    discussed what I understood in 2000 to be the applicable

3    standards.  And my memory is that at that time the state

4    of the law was it was supposed to be the rare case, you

5    know, when you would resort to an expert to do claim

6    interpretation.  I thought the experts here came into

7    play after I interpret the claim, and they are going to

8    opine on whether they're the same or not.

9            MS. PRUETZ:  That's right.

10            THE COURT:  So, you know, you talked about a

11    tutorial.  What happened in Biogen versus Berlex is they

12    actually gave me two tutorials because my law clerks

13    changed, but they did it twice.  You'll have to confer on

14    the tutorial, so you try to agree on as much as you can.

15    But Bill Lee at Hale and Dorr when they did it the second

16    time came in with a cartoon, you know, a little film.

17    And then Mr. Clary from Cravath, who didn't have that

18    much advance notice of the film, pointed out, you know,

19    what wasn't agreed.  But Biogen has already -- Biogen has

20    already paid for this once, you know.  And, you know, it

21    got me to the point where I could decide what I decided.

22    So -- and I don't throw anything away.  I still have my

23    notebook.  I probably still have the film somewhere.

24    That's why we have to move out of my chambers.

25            MR. PRUETZ:  Perhaps the rest of us need the

1    tape.

2            THE COURT:  But Biogen has already paid for it

3    once.  First, they did it with power point, and I had a

4    book, and so I had each slide and I could write on it.

5    And then they had something that was animated the second

6    time.  But it exists, and it's the same technology,

7    right?  I mean, it's the same process.

8            All right, we need to build in a date for the

9    tutorial, which should be after November 1, right?  But

10   not too far after it.  How about the 5th.  Is that okay?

11           MS. BEN-AMI:  On your calendar, I just wanted to

12   remind your Honor that I am at trial during the time

13   period --

14           THE COURT:  But you've got to do the following.

15   You've, first of all, got to get somebody else with you.

16   I hope some of those 40 people were with you.

17           MS. BEN-AMI:  I have one.

18           THE COURT:  Get two more.  And that's one.  And

19   you all think you're going to win on summary judgment.

20           MS. BEN-AMI:  I agree with that.

21           THE COURT:  We'll cross that bridge when we come

22   to it.

23           MR. GINDLER:  There's one other date I think we

24   should set now, which is a last day by which pleadings

25   should be amended, because we have counterclaims that we

1    would like to assert, both breach of contract, which will

2    live no matter what, and infringement, but won't be done

3    now, but I think we should at least --

4              THE COURT:  Why?

5              MR. GINDLER:  Because I think that it's only

6    fair to just close the pleadings and to put our claims on

7    the table, and the infringement claims could be

8    terminated if we lose on double patenting.  The breach of

9    contract claims will not, though, because those simply

10   applied during the period before anyone sued.  And so

11   those will be royalty claims.

12             We're not proposing to do anything with the

13   claims.  We just think they should be on the table.

14             THE COURT:  You have so much to do.  Why do

15   that?  I don't know.  What do you think?  Maybe I'm

16   missing something.

17             MR. WARE:  Your Honor, at least in the case of

18   Biogen and Genzyme, there is a stand-still agreement that

19   infringement claims won't be asserted.  So it's obviously

20   not germane to our case.  I don't really see why it's

21   necessary.

22             With respect to contract counterclaims, I think

23   we would want the opportunity to oppose the time to add

24   such claims into the case at this point, which come a

25   year after we sought an declaration of -- that no

196

1    royalties were owed.  So we would certainly at least want

2    the opportunity to oppose adding such claims into the

3    case at this point.  But I don't see why it's necessary.

4            THE COURT:  You'd claim they're futile or

5    something?

6            MR. WARE:   No, I'd claim there are no admitted

7    counterclaims.  We specifically asserted that we did not

8    owe royalties.

9            MR. GINDLER:  We tried to keep activity down to

10    a low buzz before we got before a single court.  It took

11    us a long time to get here.  We started this process in

12    October of last year, with opposition by every plaintiff,

13    and we finally got to one court.  That's good.  So we

14    want to be as in a position so that if, for example, the

15    court were to rule against us on double patenting, okay,

16    that takes a lot out of the case.  What's left?  Well, we

17    should know what's left.  And so  --

18            THE COURT:  Frankly, if I rule against you or

19    the jury finds against you on double patenting, I hope

20    you're all going to sit down in a businesslike way and

21    see if you can work it out.  That's the purpose of all of

22    this.

23            MR. GINDLER:  But I do think it makes sense to

24    just put those on the pleadings.

25            THE COURT:  Why not put them on the pleadings in

1    the beginning of January?

2             MR. GINDLER:  We could do it then.

3             THE COURT:  I'm trying to get you off for the

4    4th of July.

5             MR. GINDLER:  You succeeded.

6             THE COURT:  Did Mr. Barsky show your wife the

7    transcript?  Some other judge will probably foul it up.

8             MR. BARSKY:  I'd point out that there are some

9    counterclaims, contract counterclaims in the consolidated

10   cases already.  For example, the case I'm counsel on,

11   Amgen.  There are those counterclaims already.

12            THE COURT:  I'm really just trying to get this

13   focused.  And maybe I've miscalculated.  But I just think

14   this is -- you know, the validity of this patent is very

15   important to all of you, and Mr. Goldberger was telling

16   me Malcolm Baldridge, Secretary of Commerce, has

17   subsequently said, you know, he could manage adversity,

18   he couldn't manage uncertainty.  And your clients can

19   manage adversity, but this is really important, I think,

20   and these products are very important.  They're not

21   widgets.  They're very important to human health.

22            MR. GINDLER:  If you prefer to have the date in

23   January, it's okay with us.

24            THE COURT:  Yeah.  Just try to keep our eye on

25   this ball and, you know, they think they've got a great

1    double patenting case, and all I've seen is their side of

2    the story so, at the moment, it looks good.  Let's see.

3    And if not, you know, I'll look at what's in the record

4    on prosecution laches.  But, you know, if the case

5    doesn't get resolved as a result of the double patenting

6    issue getting done, then you should know that I don't

7    take any vacation from July to July, but I do take off

8    July, and that's why the Biogen decision with Berlex was

9    August 15, because I wrote it on vacation.  But I don't

10   want to do that anymore.  Last summer, I did the death

11   penalty.  All my big decisions are in August or

12   September, including one that was 661 pages long.  But I

13   don't want to do that anymore.  So don't plan your

14   vacations for next August.  Get used to enjoying the 4th

15   of July.  All right?  Because if this doesn't take care

16   of it, you know, we'll probably be here next year and the

17   year after and the year after that even.

18          There's another issue that has to be addressed.

19   In that July filing that the plaintiffs, I think, were

20   going to make possibly on discovery, you should also

21   address what needs to be done to get the cases that were

22   initiated to other jurisdictions to Massachusetts for the

23   purpose of trial on the double patenting issue, if trial

24   is necessary.  And it may be, if it's complicated under

25   the MDL rules, because the general rules say except in

1    special circumstances, there are remands for trials, it

2    may be that you just, you know, we make some agreement

3    that, you know, the other parties are in privity with the

4    Massachusetts parties, and their lawyers can participate

5    in the case, and then you'll be bound by the decision,

6    even though we didn't literally try your case.  Just if

7    you have to be inventive, be inventive, because this does

8    make sense, apparently.  The plaintiffs are agreed to it,

9    and Columbia wanted it all in one place.  So you'll get

10   one answer.  Who knows what it will be.  Because if this

11   isn't amenable to summary judgment, all of us will do

12   everything we possibly can to make this as clear as

13   possible to a jury but, at that point, you'll be rolling

14   the dice.  At every point, you're rolling the dice.

15   Don't half the decisions by District Judges get reversed

16   in the Federal Circuit?  And I've already been -- well,

17   actually, I wasn't completely affirmed.  Statistically,

18   I'll get reversed the next time.  I mean, I say that.  I

19   haven't discerned that there's anything I could do to

20   encourage a prompt settlement.  It seems to me there's

21   too much money involved, and the positions seem to be

22   disparate.  But if anybody at any point in this case, if

23   you all start talking settlement and think seeing me

24   might help you, just let me know.  I would much prefer --

25   I would happily spend time with you on that if there was,

200

1    you know, any hope that it might resolve everything.

2    Because I really, I think, you know, $2 billion over 17

3    years or something to a college, that's very important.

4    I can see that.  And biotech companies that are reliant

5    on these products are the people who need the products

6    support to them too.  So if anybody thinks he or she has

7    glimpsed some way that this can be resolved by agreement,

8    I'd love to try to facilitate that or give you a chance

9    to go to somebody to facilitate it.  Okay?

10          Anything else?

11          All right.  Mr. O'Leary will let you out.  I'll

12    have to -- I'll issue a decision on the motion for

13    preliminary injunction and the stay.  But whatever it is

14    -- and on the -- with regard to the documents, that will

15    probably stay where it is for now.  But maybe not.  But

16    whatever the outcome of the preliminary injunction, we'll

17    go ahead on this schedule.

18          Thank you.

19          ALL COUNSEL:  Thank you, your Honor.

20

21

22

23

24

25

201

CERTIFICATE


        I, JUDITH A. TWOMEY, RPR, Official Court

Reporter for the United States District Court, District

of Massachusetts, do hereby certify that the foregoing

transcript, pages 1 through 200 inclusive, was taken by

me stenographically and thereafter by me reduced to

transcription and is a true record of the proceedings in

the above-entitled matter to the best of my ability.


                        JUDITH A. TWOMEY, RPR
                        Official Court Reporter