# Exhibit A

(Part 2 of 2)

was known to those of skill in the art prior to February 25, 1980 to be a glycoprotein. In addition, as discussed *supra*, ¶ 41(d), during prosecution of the '275 patent in response to a double-patenting rejection based on claim 73 of the '216 patent, Columbia distinguished rejected claims 128-131 from claim 73 of the '216 patent on the basis that claims 128-131 specified a species not recited in claim 73 of the '216 patent. *See* '275 patent prosecution history, 7/31/00 Amendment at 5. The species recited in claims 128 and 131 included a construct "for expression in Chinese Hamster Ovary cells," while claim 126 generically recited a construct "for expression in eucaryotic cells" and claim 127 recited a construct "for expression in mammalian cells." Claim 131 issued as claim 20 of the '275 patent, reciting a "DNA construct for expression in Chinese Hamster ovary (CHO) cells." The Goodgal Cotransformation Work included the transformation of CHO cells using purified DNA containing the ouabain resistance and *pro+* genes, and the expression of those genes in the transformed CHO cell. For at least the reasons above, the undisclosed information regarding the Goodgal Cotransformation Work was material to the examination and/or patentability of claims in the '275 patent.

43.     The Lewis & Srinivasan Letter, Presentation and Reference, which disclosed, *inter alia*, the use of an amplifiable mutant *dhfr* gene encoding a dihydrofolate reductase resistant to the drug methotrexate in transforming CHO cells, as well as transformed CHO cells expressing that gene, were also material to the examination and/or patentability of the prior issued Axel patents and the '275 patent for at least the following reasons:

a.     The Lewis & Srinivasan Letter, Presentation and Reference were material to the examination and/or patentability of claims in the '216 patent. For example, claims 54-73 of the '216 patent each incorporate a limitation requiring transforming a eucaryotic cell with "a molecule which is formed by linking one of said foreign DNA I molecules to a DNA II molecule

corresponding to an amplifiable gene for a dominant selectable phenotype not expressed by said eucaryotic cell." As another example, claims 18, 46, and 69 specify that the DNA II is a gene associated with drug resistance, and claims 19, 47, and 70 further specify that said DNA II is a "gene coding for a mutant dihydrofolate reductase which renders cells resistant to methotrexate." The Lewis & Srinivasan Letter, Presentation and Reference reported the use of an amplifiable mutant *dhfr* gene encoding a dihydrofolate reductase resistant to the drug methotrexate which rendered transformed CHO cells resistant to methotrexate. For at least the reasons above, Axel et al.'s undisclosed information regarding the Lewis & Srinivasan Letter, Presentation and Reference was material to the examination and/or patentability of claims in the '216 patent.

        b.     The Lewis & Srinivasan Letter, Presentation and Reference were also material to the examination and/or patentability of claims in the '665 patent. For example, claim 10 of the '665 patent recites that the DNA II "comprises a gene associated with drug resistance," while claim 11 of the '665 patent further recites that DNA II "is the gene coding for a mutant dihydrofolate reductase which renders cells resistant to methotrexate." The undisclosed Lewis & Srinivasan Letter, Presentation and Reference involved the use of an amplifiable mutant *dhfr* gene encoding a dihydrofolate reductase resistant to the drug methotrexate for use in transforming CHO cells. In addition, as discussed, *supra*, ¶ 41(b), during prosecution of the '665 patent, in response to an August 12, 1985 Rejection of claims 153-155 based on Willecke *et al.* 1976 in view of Nunberg *et al.*, Columbia responded by distinguishing Willecke *et al.* 1976 and Nunberg *et al.* because "Nunberg *et al.* does not teach or suggest transforming eucaryotic cells with a DNA molecule" and "Willecke *et al.* do not teach or suggest the use of a DNA II which encodes an amplifiable gene for a dominant selectable phenotype as a means of identifying eucaryotic cells which have been amplified to contain multiple copies of a foreign DNA I." '665

patent prosecution history, 2/11/86 Amendment at 4-5. Columbia could not have distinguished the undisclosed Lewis & Srinivasan Letter, Presentation and Reference on the basis used to distinguish Willecke *et al.* 1976 and Nunberg *et al.* because the Lewis & Srinivasan Letter, Presentation and Reference disclosed transforming CHO cells with an amplifiable mutant *dhfr* gene encoding resistance to the drug methotrexate and using the dominant selectable phenotype encoded by the gene to identify transformed CHO cells. For at least the reasons above, Axel *et al.*'s undisclosed information regarding the Lewis & Srinivasan Letter, Presentation and Reference was material to the examination and/or patentability of claims in the '665 patent.

       c.     The Lewis & Srinivasan Letter, Presentation and Reference were also material to the examination and/or patentability of claims in the '017 patent. For example, each of issued claims 1-5 of the '017 patent incorporates the limitations "[a] transformed Chinese Hamster Ovary cell which comprises amplified foreign DNA I . . . and amplified DNA II encoding a dominant selectable phenotype not expressed by the transformed cell prior to transformation." For at least the reasons above, Axel *et al.*'s undisclosed information regarding the Lewis & Srinivasan Letter, Presentation and Reference was material to the examination and/or patentability of claims in the '017 patent.

       d.     The Lewis & Srinivasan Letter, Presentation and Reference were also material to the examination and/or patentability of claims in the '275 patent. For example, as discussed in ¶ 41(d), each of the claims of the '275 patent incorporate the limitations "transformed Chinese Hamster Ovary" cell (issued claims 1-19) or "[a] DNA construct for expression in Chinese Hamster Ovary (CHO) cells" (issued claim 20). As further discussed, *supra*, during prosecution of the '275 patent in response to a double-patenting rejection, Columbia distinguished rejected claims 128-131 which were directed to claims reciting a

- 23 -

construct for use in CHO cells on the basis that the claims specified a species not recited in claim 73 of the '216 patent, directed generically to a mammalian cell. '275 patent prosecution history, 7/30/00 Amendment at 5. The species recited in claims 128 and 131 include a construct "for expression in Chinese Hamster Ovary cells," while claim 126 generically recited a construct "for expression in eucaryotic cells" and claim 127 recited a construct "for expression in mammalian cells." Claim 131 issued as claim 20 of the '275 patent, reciting a "DNA construct for expression in Chinese Hamster Ovary (CHO) cells." The Lewis & Srinivasan Letter, Presentation and Reference involved the transformation of CHO cells with DNA containing an amplifiable mutant *dhfr* gene, and expression of that gene in transformed cells. For at least the reasons above, Axel *et al.*'s undisclosed information regarding the Lewis & Srinivasan Letter, Presentation and Reference was material to the examination and/or patentability of claims in the '275 patent.

44.      Despite Axel *et al.*'s knowledge, *inter alia*, of the Goodgal CHO Transformation and Cotransformation Work and the Lewis & Srinivasan Letter, Presentation and Reference, during prosecution of the prior issued Axel patents and the '275 patent, Columbia never disclosed this information to the PTO. The only primary scientific references submitted to the PTO were submitted by Columbia as part of a May 1, 1981 Communication in response to an examiner's phone request for copies of references, including references co-authored by the named inventors. No other primary references or work by others were disclosed by Columbia during prosecution of the '216 patent or the '665 patent. Instead, in a second Communication submitted November 11, 1981, Columbia cited four articles published after February 25, 1980 as demonstrating the "pioneering nature and widespread utility of Applicants' invention," leaving the impression they knew of no other pertinent work.

45.    Despite knowledge by at least Axel *et al.* of other material references including, *inter alia*, Willecke *et al.* 1976, Columbia also failed to cite this reference to the examiner. In a 1979 publication, Axel *et al.* and their co-authors cited the Willecke *et al.* 1976 reference for the proposition that "[i]n this respect, biochemical transformants obtained after DNA-mediated gene transfer resemble transformants obtained after chromosome-mediated transfer." *See* Wigler *et al.*, "DNA-mediated transfer of the adenine phosphoribosyltransferase locus into mammalian cells," 76(3) Proc. Nat'l. Acad. Sci. 1373, 1376 (1979). Nonetheless, Axel *et al.* failed to disclose Willecke *et al.* 1976 to the PTO during prosecution of the '216 patent.

46.    If Willecke *et al.* 1976 had been disclosed to the examiner of the '216 patent it would have been at least as material to the examination and patentability of claims in the '216 patent as it was to the examination of the '665 patent. The '665 and '017 patent examiners' citation of Willecke *et al.* 1976 in combination with Nunberg *et al.* led to Columbia's cancellation of claims which included the steps of transforming a eucaryotic cell "with a molecule formed by linking a foreign DNA I molecule" to "a DNA II molecule corresponding to an amplifiable gene for a dominant selectable phenotype" and "culturing [transformed] eucaryotic cells under suitable conditions in the presence of successively elevated concentrations of an agent permitting survival or identification of eucaryotic cells which have acquired multiple copies of the amplifiable gene . . . ." '665 patent prosecution, July 11, 1986 Amendment (canceling rejected claims including claims 153-155); '017 patent prosecution (abandoning the '273 application containing claims 126-128 and filing a preliminary amendment in the '089 application). Because claims 54-73 of the '216 patent recite the same or substantially identical limitations, Willecke *et al.* 1976 combined with Nunberg *et al.* would have been at least as

- 25 -

material to the examination and patentability of claims in the '216 patent as it was to the examination of the '665 and '017 patents.

### (ii)    Columbia failed to disclose publications co-authored by named-inventors

47.    Columbia further failed to disclose to the examiners of the prior issued Axel patents and the '275 patent later publications co-authored by Axel.  The publications included Roberts & Axel, "Gene Amplification and Gene Correction in Somatic Cells," Cell 29:109-119 (1982) (hereinafter "Axel 1982") and follow-up studies reported in Roberts, Buck & Axel, Cell 33:53-63 (1983) (hereinafter "Axel 1983").  These publications described cell transformation using a promoterless *tk* gene as the selectable marker.  Axel 1982 showed that the promoterless *tk* gene was an amplifiable gene, while Axel 1983 described the results of studies on the structure of amplified units of DNA following transformation and amplification of the promoterless *tk* gene.  This information would have been material to the examination and/or patentability of the claims of the prior issued Axel patents and the '275 patent for reasons discussed below.

48.    During prosecution of the '665 patent, in an August 12, 1985 Office Action, the examiner rejected claim 153.  In asserting that the claim was unpatentable over Willecke *et al.* 1976 in view of Nunberg *et al.*, the examiner noted that Willecke *et al.* 1976 "teach the cotransfer of two linked genes into cultured mouse cells using one gene coding for a selectable trait and producing proteins from each gene."  One of the genes cotransferred by Willecke *et al.* as reported in Willecke *et al.* 1976 was the *tk* gene.  The examiner cited Nunberg *et al.* as showing "increased synthesis of reductase and the gene copy number in cultured mouse cells . . ."

49.    As discussed above in ¶ 41(b), Columbia's February 11, 1986 Response to the rejection based on Willecke *et al.* 1976 and Nunberg *et al.* attempted to distinguish claims

- 26 -

prosecuted during the '665 patent prosecution on the basis that "Willecke *et al.* do not teach or suggest the use of a DNA II which encodes an amplifiable gene for a dominant selectable phenotype as a means of identifying eucaryotic cells which have been amplified to contain multiple copies of a foreign DNA I." This distinction was misleading in view of Axel's own work. Disclosure of Axel 1982 and 1983 would have alerted the examiner that Axel had demonstrated that the *tk* gene was a selectable, inherently amplifiable, marker. Axel's 1982 and 1983 publications were therefore material to the patentability of the claims rejected by the '665 patent examiner, and the claims in the '216 patent which could also have been rejected based on Willecke *et al.* 1976, as discussed above in ¶ 41(b).

50.    Columbia continued to fail to disclose the amplifiability of the *tk* gene used by Willecke *et al.* 1976 during the prosecution of the '275 patent. During prosecution of the '275 patent, Columbia filed new claim 141 in its June 14, 2001 amendment. As originally filed, claim 141 was substantially similar to the claims rejected on August 12, 1985 in the '665 prosecution as obvious in view of Willecke *et al.* 1976. The Axel 1982 and 1983 publications were also at least as material to the examination and patentability of claim 141 which issued as claim 2 in the '275 patent as they were to the patentability of claims 153-155 in the '665 prosecution.

### (iii)    Columbia also failed to disclose co-owned U.S. Patent No. 5,149,636, and its prosecution history

51.    During the prosecution of the Axel patents, Columbia also filed a separate U.S. patent application, U.S. Ser. No. 358,206 (the '636 patent application), on March 15, 1982. Columbia named Richard Axel and another Columbia employee, James M. Roberts, as inventors on the '636 patent application, which was entitled, "Method for Introducing Cloned, Amplifiable Genes into Eucaryotic Cells and for Producing Proteinaceous Products." After filing several continuation applications, the '636 patent application eventually led to the issuance of U.S.

- 27 -

Patent No. 5,149,636 ("the '636 patent") on September 22, 1992. The same law firm prosecuted both the applications giving rise to the '636 patent and the Axel patents. In addition, both patents name Richard Axel as a co-inventor.

52.    During prosecution of the '636 patent, Columbia pursued claims similar to those pursued and issued in the '216 and '275 patents, and the examiner rejected claims as anticipated or obvious based on the '216 patent. Despite these similarities, Columbia failed to disclose the '636 patent or its prosecution to the examiners of the '216, '665, '017 or '275 patents. On April 15, 1983, the examiner of the '636 patent rejected all the claims as anticipated by, or obvious in view of Axel *et al.*, WO81/02426, the published foreign PCT application corresponding to the '216 patent, and further advised Columbia "to provide a clear line of demarcation between the claims of the subject invention and their other copending applications."

53.    In an August 15, 1983 response, Columbia acknowledged "the Examiner's admonition," and affirmatively asserted it was maintaining a demarcation between the claims in the '636 patent application and the Axel *et al.* line of applications. The examiner disagreed, maintaining the rejection. In addition, upon learning of the issuance of the '216 patent, in a June 3, 1986 Office Action, another '636 patent examiner rejected transformed cell claims as anticipated by the '216 patent, and concluded that the '216 patent "claim[s] the same invention and use[s] the same genes as in the instant application." The examiner maintained the rejection in a March 24, 1988 Office Action.

54.    The '636 examiner's conclusion that the '216 patent and the '636 patent claim the same invention illustrates the substantial similarity of the '216 patent claims to the rejected claims. Since the claims in the '216 patent are substantially similar to claims Columbia pursued

and obtained during the '275 patent prosecution, the '636 patent prosecution was material to the examination and/or patentability of the Axel patents.

> **(iv)    During the prosecution of the '275 patent and its patent family, Columbia made additional misrepresentations and misleading omissions that were material to the patentability of the '275 patent, including misrepresenting the scope of the '216 patent**

55.    On November 5, 1981, in response to a prior art rejection of the claims in the application which matured into the '216 patent, Columbia submitted declarations in an effort to distinguish Mantei *et al.* (1979) "Rabbit β-globin mRNA production in mouse L cells transformed with cloned rabbit β-globin chromosomal DNA," Nature 281:40-46, from the claims. Columbia argued that the claims were patentably distinct from the transformation with linked DNA disclosed by Mantei *et al.* Almost 19 years later, through the same counsel who distinguished Mantei *et al.*, on July 31, 2000 (just as the '216 patent was about to expire), Columbia knowingly and with an intent to deceive contradicted its earlier statement to the PTO during its effort to secure the '275 patent. In responding to an Office Action rejection, Columbia distinguished the '216 patent claims on the basis that they covered transformation with both linked and unlinked DNA. These contradictory statements were material.

56.    In addition, Columbia made false and misleading statements in its June 14, 2001 and January 30, 2002 remarks in order to distinguish the newly filed claims of the '275 patent application from the claims of the '216 patent. First, Columbia stated that "none of the claims of the '216 [patent] make obvious a recitation of 'linked'" DNA (DNA I and DNA II) in the '275 patent claims. In fact, claim 54 of the '216 patent recites transforming a eucaryotic cell with a DNA "formed by linking one of said foreign DNA I molecules to a DNA II molecule."

57.    Second, Columbia told the PTO on June 14, 2001 and again on January 30, 2002 that "none of the claims of the '216 make obvious a recitation that both DNA I and DNA II are

- 29 -

amplified." However, claim 54 of the '216 patent also recites transforming a cell with DNA I

linked to a "DNA II corresponding to an amplifiable gene," and further provides "culturing the

transformed eucaryotic cells in the presence of successively elevated concentrations of an agent

permitting survival or identification of eucaryotic cells which have acquired multiple copies of

said amplifiable gene."

58.     Because DNA I and DNA II are linked, this process would be expected to

produce transformed cells in which DNA I was also amplified. Indeed, Columbia had earlier

told Congress-but not the examiner-that amplification of both DNA I and II was the result of this

process. Columbia's misrepresentations, made to secure allowance of the '275 patent, were

material to the examination and patentability of the '275 patent.

> **(v)     Columbia failed to disclose statements made to Congress that**
> **contradicted or rebutted positions taken during prosecution of**
> **the '275 patent**

59.     Columbia further failed to disclose statements made to Congress regarding the

breadth of the '216 patent, which contradicted the misrepresentations made during the '275

patent prosecution.

60.     In its efforts to convince Congress that the '216 patent was a pioneering, broad

patent meriting a legislative extension, Columbia made statements regarding the breadth and

coverage of the '216 patent that contradicted misrepresentations that Columbia later made during

prosecution of the '275 patent.

61.     For example, in describing "Columbia University's Cotransformation Patent,"

Columbia told Congress that the '216 patent covered both "unlinked" transformation and

"linked" transformation where a selectable marker (DNA II) and the gene encoding the protein

of interest (DNA I) are "joined together in a single DNA construct prior to their introduction into

the cell." Columbia failed to disclose its statement to Congress to the PTO when it later

- 30 -

distinguished the claims of the '275 patent from the claims of the '216 patent by stating just the opposite: "none of the claims of the '216 [patent] make obvious a recitation of 'linked'" DNA.

62.    Columbia also told Congress that the process of the '216 patent could be used "to introduce an amplifiable marker gene" into a cell, "whose numbers can be increased after the initial selection event in response to increasing the concentration of the toxic selective agent. In this way, the number of copies of both the selectable marker and the linked gene of interest are amplified." Again, Columbia contradicted these statements in representations it later made to the PTO. In fact, Columbia stated that "none of the claims of the '216 [patent] make obvious a recitation that both DNA I and DNA II are amplified."

63.    Columbia owed a duty to the PTO to disclose its prior statements made to Congress that tended to refute or were inconsistent with positions it was taking during prosecution of the '275 patent. Nonetheless, Columbia failed to tell the PTO about its earlier attempts to obtain a legislative patent term extension of the '216 patent and the representations it had made to Congress regarding the scope of the '216 patent. This information would have been material to the examination and/or patentability of the '275 patent.

**(vi)    Columbia misled the '275 patent examiner into withdrawing double-patenting rejections based on the '017 patent**

64.    Another example of Columbia's misrepresentations and misleading statements to the PTO began with the PTO examiner's February 3, 1998 rejection of all pending claims in the application leading to the '275 patent, and his identifying as the basis for the rejection "double patenting" with reference to the transformed Chinese Hamster Ovary ("CHO") cell claims of the '017 patent.

65.    On July 24, 1998, Columbia responded to this rejection by canceling the only transformed cell claim and by conceding the merits of the PTO examiner's double-patenting

rejection for this claim in its response. Columbia also argued that the remaining claims were now distinct from the transformed cells claimed in the '017 patent.

66.    On September 14, 1998, the PTO examiner accepted this argument, but rejected the remaining proposed claims on other grounds, and Columbia proceeded with the prosecution.

67.    On January 31, 2000, after a new PTO examiner was assigned to the prosecution, and again on October 24, 2000, the pending proposed claims-which did not include claims to transformed CHO cells-were rejected, and one identified basis for rejection was again "double-patenting," this time with reference to the claims of the '216 patent.

68.    On June 14, 2001, Columbia responded to these rejections, in part by adding new claims like the previously-rejected and then-canceled transformed cell claim. The claims were added by the same prosecuting counsel who had responded to the February 3, 1998 rejection by a different examiner. But in adding these new claims counsel failed to call to the new PTO examiner's attention the rejection of February 3, 1998 and the earlier response of July 24, 1998.

69.    Instead, Columbia limited its prospective arguments that the new claims were free from a double-patenting rejection to distinctions between the new claims and the '216 patent claims. Even though some of the new claims related to transformed CHO cells, Columbia failed to raise the previous examiner's rejections of transformed cell claims in view of the '017 patent. Columbia's statements and omissions were material and misleading, because, among other things, they suggested that the '216 patent was the only basis for a double-patenting rejection and ignored the prior double-patenting rejection based on the '017 patent. In fact, the examiner was misled, as he relied only on the '216 patent as a basis for a double-patenting rejection. As a result of Columbia's manipulation of the process, and its non-disclosures and misleading statements, Columbia obtained the '275 patent.

- 32 -

**(vii)  During prosecution of the '275 patent, Columbia further misled
the examiners to avoid double-patenting rejections based on the
'017 patent**

70.     To avoid double-patenting rejections based on the '017 patent, Columbia further

misled the examiners of the '275 patent regarding the related application, U.S. Application Ser.

No. 08/477,159 ("the '159 application") which it still has pending in the PTO. The '159

application was filed and prosecuted by the same attorney and law firm that filed the '275 patent,

and claims priority to the same application first filed in February 1980.

71.     On April 29, 1997, the examiner of the '159 application rejected claim 135, for

obviousness-type double-patenting in view of claims in the '017 patent. Claim 135 was drawn to

a method of producing a proteinaceous material by culturing CHO cells. Columbia failed to

overcome the '159 examiner's double-patenting rejection of claim 135 and canceled the claim on

August 24, 1998.

72.     When Columbia cancelled claim 135 in the '159 application, the examiner of the

'275 application, was maintaining double-patenting rejections of the then-pending claims in view

of the '017 patent. Nearly three years after canceling claim 135 in the '159 application, when the

examiner of the '275 patent had changed from the one who had rejected claim 135 in the '159

application, Columbia added a corresponding claim in the '275 patent prosecution. Specifically,

on June 14, 2001, when Columbia's other PTO maneuvers had misled the '275 patent examiner

into withdrawing rejections based on the '017 patent, Columbia added to the '275 patent

prosecution a claim substantially similar to the claim cancelled in the '159 application because of

the '017 double-patenting rejection.

73.     This added claim issued as claim 14 in the '275 patent. By the time Columbia

added claim 14, a different examiner was examining the '275 patent application, and the new

examiner was relying only on the '216 patent as the basis for double-patenting rejections. By

canceling claim 135 in the '159 application and waiting three years to file claim 14 in the '275 patent, Columbia manipulated the patent process and misled the examiners of the '275 patent to avoid a double-patenting rejection of claim 14 based on the '017 patent, as it had received in the parallel '159 prosecution.

74.     In addition, Columbia did not bring the existence of the '159 application to the '275 examiner's attention until May 6, 2002-almost seven years after the two applications had been filed. Even then, Columbia failed to specifically point out the '159 examiner's rejection of claim 135, substantially similar to claim 14, as obvious in view of the claims of the '017 patent. The rejection of claim 135 during the prosecution of the '159 application was material to the examination and patentability of the '275 patent.

**F.      Columbia's Allegations that the Prior Issued Axel Patents and the '275 Patent Cover Activities of Plaintiffs**

75.     By letters of January 26, 2001, December 5, 2001, December 28, 2001 and June 14, 2002, and November 12, 2002, and November 26, 2002, and its pleadings in related litigation, Columbia has demonstrated its intention to enforce the '275 patent against the activities of Amgen and its affiliates, including Plaintiffs. It has:

(a)      made demand upon Amgen and Immunex, under the License Agreement, for the payment of royalties for sales occurring after August 16, 2000, and before the issuance of the '275 patent, based on the expired prior issued Axel patents;

(b)      asserted to Amgen and Immunex, in this regard, *inter alia*, that Columbia had pending patent applications after August 16, 2000, as a result of which Columbia demanded that Amgen pay royalties on sales after August 16, 2000;

(c)      asserted further that Amgen was breaching the License Agreement through non-payment of royalties;

(d)      specified the '275 patent, once issued on September 24, 2002, as being part of the

Licensed Patent Rights under the License Agreement;

(e)    provided further "notification" to Immunex, regarding the '275 patent, including a copy of a reported District Court decision regarding enforcement of the first '216 patent, with the comment that in certain instances "Columbia will reluctantly be forced to consider alternative approaches";

(f)    filed counterclaims against Amgen and Immunex, alleging that their activities are covered by one or more claims of the '275 patent;

(g)    purported to terminate the license agreement between Columbia and Amgen, thus purporting to terminate Plaintiffs' rights as affiliates of Amgen;

(h)    refused to extend the Covenant to cover Plaintiffs, despite knowledge that Plaintiffs participate in the activities that Columbia claims are covered by one or more claims of the '275 patent.

## FIRST CLAIM FOR RELIEF

### Declaratory Judgment that the '275 Patent Is Invalid By Reason of Double Patenting and Statutory Grounds
### (28 U.S.C. § 2201)

76.    Plaintiffs repeat, incorporate and reallege the allegations contained in paragraphs 1-75, inclusive, as if fully set forth herein.

77.    An actual controversy has arisen and now exists between Plaintiffs, on the one hand, and Columbia, on the other hand, concerning whether, as Columbia contends, Plaintiffs' activities infringe the '275 patent.

78.    Plaintiffs are informed, and believe, and on such information and belief allege, that Columbia contends that the '275 patent is valid, enforceable and infringed.  Plaintiffs contend that the '275 patent is invalid for double-patenting and for failing to satisfy one or more of the conditions of patentability set forth in 35 U.S.C. §§ 101, 102, 103 and 112.

- 35 -

79.    Plaintiffs desire a judicial determination and declaration that each of the '275 patent claims is essentially identical to or an obvious variation of the claims of the '216, '665 and/or '017 patents, and therefore the '275 patent is invalid for double-patenting.

80.    Plaintiffs desire a judicial determination and declaration that the '275 patent is invalid for failing to satisfy one or more of the statutory conditions of patentability set forth in 35 U.S.C. §§ 101, 102, 103 and 112.

81.    Plaintiffs, therefore, respectfully seek judgment as hereinafter set forth.

## SECOND CLAIM FOR RELIEF

### Declaratory Judgment that the '275 Patent Is Unenforceable By Reason of Inequitable Conduct (28 U.S.C. § 2201)

82.    Plaintiffs repeat, incorporate and reallege the allegations contained in paragraphs 1-81, inclusive, as if fully set forth herein.

83.    The '275 patent is unenforceable as to Plaintiffs by reason of the inequitable conduct of Columbia in the prosecution and enforcement of the '275 patent.

84.    In its dealings with the PTO, Columbia had a duty of candor, good faith, and honesty in seeking the '275 patent and the prior issued Axel patents. Columbia breached this duty, with the requisite intent to deceive, in at least the following eight ways: (1) failing to disclose the Lewis & Srinivasan Letter, Presentation and Reference, the Goodgal CHO Transformation and Cotransformation Work during the prosecution of the Axel patents, or to disclose Willecke *et al.* 1976 during prosecution of the '216 patent; (2) signing and submitting declarations by Richard Axel, Michael H. Wigler, and Saul J. Silverstein which stated "we do not know and do not believe that this invention was ever known or used in the United States before our invention thereof" despite knowledge by one or more of Richard Axel, Michael H.

- 36 -

Wigler and Saul J. Silverstein of the Lewis & Srinivasan Letter, Presentation and Reference, and/or the Goodgal CHO Transformation and Cotransformation Work; (3) misrepresenting the scope of the '216 patent and misleading the patent examiner; (4) failing to disclose statements made to Congress that contradicted or rebutted positions taken during prosecution of the '275 patent; (5) misleading the '275 patent examiner into withdrawing double-patenting rejections based on the '017 patent; (6) further misled the examiners of the '275 patent and related '159 application to avoid double-patenting rejections based on the '017 patent; (7) failing to disclose material information or publications co-authored by named-inventors; and (8) failing to disclose the related, co-owned '636 patent, its prosecution history, and the PTO's rejection of substantially similar claims.

85.    All of Columbia's omissions, misrepresentations, misleading statements and manipulations were material to the examination and patentability of the '275 patent and were made with intent to deceive, as inferred from the circumstances set forth above and on information and belief.  Columbia thereby committed inequitable conduct during prosecution of the '275 patent, rendering the '275 patent unenforceable.

86.    Plaintiffs seek a judicial determination and declaration that the '275 patent is unenforceable because of inequitable conduct.

87.    This is an exceptional case, and Plaintiffs seek an award of attorneys' fees pursuant to 35 U.S.C. § 285.

88.    Plaintiffs, therefore, respectfully seek judgment as hereinafter set forth.

## THIRD CLAIM FOR RELIEF

### Declaratory Judgment that the '275 Patent Is Unenforceable By Reason of Prosecution Laches
### (28 U.S.C. § 2201)

89.    Plaintiffs repeat, incorporate and reallege the allegations contained in paragraphs 1-88, inclusive, as if fully set forth herein.

90.    Columbia engaged in unreasonable and unexplained delay in prosecution leading to the '275 patent.  Columbia took 22 years from filing of the priority documents to obtain the '275 patent.  Columbia consciously delayed the prosecution of the '275 patent to obtain a patent with another 17-year term.

91.    During the period of this delay the industry developed and matured in reliance on the fact that any additional patents arising under the common parent application would have been diligently prosecuted and, if directed to the same subject matter that had already been terminally disclaimed, would also be terminally disclaimed.  As a result, enforcement of the '275 patent would be harmful and prejudicial to the public, including Plaintiffs.

92.    Therefore, Plaintiffs seek a judicial determination and declaration that the '275 patent is unenforceable as a result of prosecution laches.

93.    Plaintiffs, therefore, respectfully seek judgment as hereinafter set forth.

## FOURTH CLAIM FOR RELIEF

### Declaratory Judgment that the '275 Patent Is Unenforceable By Reason of Patent Misuse
### (28 U.S.C. § 2201)

94.    Plaintiffs repeat, incorporate and reallege the allegations contained in paragraphs 1-93, inclusive, as if fully set forth herein.

95.    The '275 patent is additionally unenforceable because Columbia sought unlawfully to extend its patent monopoly by claiming royalties not only for the period of the patent, but also for the period from August 16, 2000 through September 24, 2002, after the '216, '665, and '017 patents had expired and before the '275 patent issued.

96.    Plaintiffs seek a judicial determination and declaration that the '275 patent is unenforceable as a result of patent misuse.

97.    Plaintiffs, therefore, respectfully seek judgment as hereinafter set forth.

### FIFTH CLAIM FOR RELIEF

**Declaratory Judgment of Non-Infringement of the '275 Patent
(28 U.S.C. § 2201)**

98.    Plaintiffs repeat, incorporate and reallege the allegations contained in paragraphs 1-97, inclusive, as if fully set forth herein.

99.    Plaintiffs seek a judicial determination and declaration that they do not manufacture, use or sell any products covered by a valid and enforceable claim of the '275 patent or otherwise infringe that patent.

100.    Plaintiffs, therefore, respectfully seek judgment as hereinafter set forth.

### SIXTH CLAIM FOR RELIEF

**Declaratory Judgment that Columbia Has Engaged in Repressive Practices
(28 U.S.C. § 2201)**

101.    Plaintiffs repeat, incorporate and reallege the allegations contained in paragraphs 1-100, inclusive, as if fully set forth herein.

102.    Columbia's contractual obligation to refrain from repressive practices, in derogation of Plaintiffs' rights under the License Agreement, was a condition to the right of Columbia to own and enforce the '275 patent.

103.    By Columbia's acts and omissions as alleged above, Columbia engaged in repressive practices, thus failing to fulfill this obligation.

104.    An actual controversy has arisen and now exists between Plaintiffs, on the one hand, and Columbia, on the other hand, concerning whether Columbia has engaged in repressive practices such as to bar it from enforcing the '275 patent and/or from terminating the License Agreement with Amgen.

105.    Plaintiffs therefore desire a judicial determination and declaration of the parties' respective rights and duties with respect to Columbia's obligation to refrain from repressive practices, including a declaration that, apart from the requirements of the federal patent laws, Columbia engaged in repressive practices, within the meaning of the License Agreement, as a result of which Columbia may not enforce the '275 patent and may not terminate the License Agreement with Amgen.

106.    Plaintiffs, therefore, respectfully seek judgment as hereinafter set forth.

## SEVENTH CLAIM FOR RELIEF

### Exceptional Case
### (35 U.S.C. § 285)

107.    Plaintiffs repeat, incorporate and reallege the allegations contained in paragraphs 1-106, inclusive, as if fully set forth herein.

108.    This is an exceptional case, and Plaintiffs seek an award of attorneys' fees pursuant to 35 U.S.C. § 285.

WHEREFORE, Plaintiffs pray for judgment against Columbia as follows:

    a.    For a declaration that the '275 patent is invalid and unenforceable;

    b.    For a declaration that Plaintiffs do not infringe the '275 patent;

c.    For injunctive relief to prohibit Columbia from efforts to enforce against Plaintiffs the '275 patent and/or from terminating the License Agreement;

d.    For attorneys' fees and costs of suit; and

e.    For such other, further and additional relief as the Court may deem just and proper.

Dated:  December 15, 2004.                Respectfully submitted,

Eileen M. Herlihy (BBO #231410)
Palmer & Dodge LLP
111 Huntington Avenue at Prudential Center
Boston, MA  02199-7613
Telephone:  (617) 239-0100
Facsimile:  (617) 227-4400

Kirke M. Hasson (CA #61446)
Pillsbury Winthrop LLP
50 Fremont Street
San Francisco, CA  94105-2228
Telephone:  (415) 983-1000
Facsimile:  (415) 983-1200

Arthur Wineburg (DC #163220)
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, NW
Washington, DC  20036-1564
Telephone:  (202) 887-4009
Facsimile:  (202) 887-4288

Vicki G. Norton (CA #175067)
Wilson Sonsini Goodrich & Rosati
3611 Valley Centre Drive, Suite 525
San Diego, CA  92130
Telephone:  (858) 350-2300
Facsimile:  (858) 350-2399

- 41 -